# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

**David E. Patton**
*Executive Director and*
*Attorney-in-Chief*

**Deirdre D. von Dornum**
*Attorney-in-Charge*

March 22, 2021

**By ECF and E-Mail**
The Honorable Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

### Re: United States v. Brendan Hunt, 21-CR-0086-PKC

Your Honor:

We write to renew our bail application on behalf of our client, Brendan Hunt.[1] Mr. Hunt has been in custody at the MDC Brooklyn for over two months based on the government's claim that he was both a danger to the community and a risk of flight. Having now reviewed the discovery, we do not believe the evidence supports this claim. The Bail Reform Act cannot countenance Mr. Hunt's continued pretrial detention. He is neither a danger to the community nor risk of flight and 18 U.S.C. § 3142(a)(1) requires his release on a recognizance bond. At a minimum, he should be released under the least restrictive of those conditions set forth in § 3142(a)(2).

The government's claim of dangerousness at the initial bond hearing was based exclusively upon the four social media posts described in the Criminal Complaint. Law enforcement has now obtained, subpoenaed, and forensically studied everything owned and written by Brendan Hunt, including his text messages, emails, phone records, personal computers, cell phone, social media accounts, personal papers, and his financial, employment, travel and commerce records. They interviewed family, friends, and acquaintances. Despite the breadth of their investigation, they have found no additional evidence of criminal activity or dangerousness.

It is now clear that Mr. Hunt is only being held in custody because of four random social media posts. It is natural to ask what drove these absurd and offensive posts, but the evidence does not support a finding that it was actual dangerousness. Mr. Hunt engaged in no actual planning,

---

[1] Pretrial Services has been requested to update the January 19, 2021, PTS Report from the day of Mr. Hunt's arrest.

criminal or violent associations, weapons possession, or weapons seeking that would be consistent with a plan or belief that he could actually effectuate a "firing squad" or "public execution" of Members of Congress and replace them with "actual patriots." Seen in context, the posts are more consistent with intoxication than insurrection.

The strength or weakness of the government's case is a factor under the Bail Reform Act, of course, and this factor also favors release. Although the government naturally treats Mr. Hunt's conviction as a forgone conclusion, the evidence is demonstrably weak. Mr. Hunt's brief and careless social media posts do not rise to the level of seriousness, specificity, or immediacy required for a violation of 18 U.S.C. § 115(a)(1)(B). He did not send these posts to any Member of Congress or have any expectation that they would see them. At trial, we will have a strong defense that Mr. Hunt is not guilty and that his statements are covered by the First Amendment's broad protections for offensive, caustic, and even violent political speech. Mr. Hunt has every incentive to comply with his bail conditions in order to make that case at trial.

On the question of risk of flight, every factor the Court must consider weighs in favor of release. Mr. Hunt has no criminal record; he has lifelong community ties to New York and no ties elsewhere; he has a long record of employment; and even if convicted, he faces a low sentencing guideline range. *See* 18 U.S.C. § 3142(g); USSG § 2A6.1.

We have conferred with the government regarding this motion and will not oppose their request to respond in writing. We are available to argue this motion on any other date convenient to Court and counsel. We do not demand, but would prefer, that any bond hearing be held in-person given the technological issues at our last remote conference. We leave the balancing of the CARES Act factors to the Court's discretion, but this case seems to favor a finding of compelling circumstances justifying in-person proceedings. Mr. Hunt also consents to appearing in person.

### There is substantial precedent for releasing a defendant accused of making online threats.

Mr. Hunt's release is presumed under the Bail Reform Act. The government conceded this at the January 19, 2021, bail hearing. *See* Exhibit A (Bond Hearing Transcript) at 9:7-11. Yet it inconsistently bases its justification for detention on the nature of the offense charged. Congress has already decided that the offense itself does not raise a statutory presumption of dangerousness or risk of flight. *See* 18 U.S.C. § 3142(e)(3). More evidence of dangerousness or risk of flight is required to justify detention. One would have thought there was something more in the evidence against Mr. Hunt justifying the government's request for detention. But we are not seeing that.

For comparison's sake, online threat charges in this district and others have not categorically barred release of defendants, and in many of these cases the government consented to release. We list here just a few such cases of pretrial release, involving direct and personal threats far more serious than Mr. Hunt's social media posts:

- *United States v. Segui*, No. 19-cr-188-KAM (E.D.N.Y. Apr. 11, 2019) ECF No. 10, 34 (defendant accused of emailing a violent threat to individuals and admitting to planning a trip and the purchase of a weapon; released over government objection on $50,000 bond co-signed by one suretor);

- *United States v. Celli*, No. 19-cr-00127 (E.D.N.Y. Mar. 29, 2019) ECF No. 29 (defendant accused of threatening three federal judges by email; released over government objection on $150,000 bond signed by two sureties);

- *United States v. Brogan*, No. 19-cr-00207-NGG (E.D.N.Y. Dec. 12, 2018) ECF 3 (defendant accused of calling a U.S. Senator and leaving a voicemail threatening to murder them; released with government consent on $50,000 personal recognizance bond);

- *United States v. Turner*, No. 09-cr-00650-DEW-JMA (E.D.N.Y. Sept. 23, 2009) ECF Nos. 4, 27-28 (defendant "shock jock" accused of threatening to murder three federal judges by posting their photos and addresses on his blog and encouraging his followers to kill them; released on bond, details unavailable);

- *United States v. Waterman,* No. 20-mj-11861 (S.D.N.Y. Nov. 6, 2020) ECF No. 6 (defendant accused of making at least 16 threats to kill civilians and politicians on social media over the course of three months; released with government consent on $100,000 bond co-signed by one suretor with standard conditions and no internet restrictions);

- *United States v. Lippa*, No. 20-cr-06052 (W.D.N.Y. Feb. 19, 2020) ECF No. 2 (defendant accused of calling Members of Congress and leaving voicemails threatening to murder them, including "Hey, Schumer, you and Nancy Pelosi are two fucking biggest scumbags who ever lived. And let me tell you something, somebody wants to assassinate you. I'm going to be the driver"; released with government consent on personal recognizance bond);

- *United States v. Carlineo*, No. 19-cr-6140 (W.D.N.Y. May 3, 2019) ECF No. 9 (defendant accused of calling office of U.S. Congresswoman and threatening to murder her; released over government objection on personal recognizance bond);

- *United States v. Humphries*, No. 12-cr-347-RWS (S.D.N.Y. June 13, 2012) ECF No. 33 (defendant accused of emailing graphic threats to injure and kill a woman and cyberstalking; released on $50,000 bond co-signed by two suretors);

- *United States v. Stoll*, No. 21-mj-00030 (D. Ohio Jan. 15, 2021) ECF No. 5 (defendant suspected of participating in Capitol riot accused of posting video online threatening to murder individual; released on personal recognizance bond);

- *United States v. Cain*, No. 16-cr-00103-JAW (D. Me. Feb. 17, 2016) ECF Nos. 28-29 (defendant accused of stalking and transmitting threats granted pretrial release despite allegations that he "engaged in a campaign of harassment" that included threats to kill his ex-wife and rape her daughter; released on $25K unsecured bond);

- *United States v. Kless*, No. 19-cr-60109 (S.D. Fla. Apr. 19, 2019) ECF No. 3 (defendant charged with leaving threatening voicemails for Members of Congress released on $25,000 bond co-signed by one suretor); and
- *United States v. Lloyd*, No. 17-cr-00720 (C.D. Cal. Nov. 15, 2017) ECF. No. 9 (defendant charged with threatening Congresswoman Maxine Waters; released over government objection on $20,000 bond signed by two suretors)

And these are just so-called 'threat' cases. We need not list here the many examples of people charged with offenses that involve actual violence or possession of a weapon who have been released on bail.

Because detaining Mr. Hunt is inconsistent with the Bail Reform Act, we seek his release on a personal recognizance bond pursuant to § 3142(a)(1), subject to the standard conditions of release. We would consent, as the least restrictive condition pursuant § 3142(a)(2), to a special condition that the U.S. Pretrial Services Office monitor his activity on the internet.

**The charges against Mr. Hunt are based on pure speech.**

On January 19, 2021, Mr. Hunt was arrested and charged in a complaint with violating 18 U.S.C. § 115(a)(1)(B), which identified four statements on different social media platforms over the course of about a month:

1. A December 6, 2020 response to a post by @DonaldTrump on Facebook:

    Trump, we want actual revenge on democrats. Meaning, we want you to hold a public execution of pelosi aoc schumer etc. And if you dont do it, the citizenry will. We're not voting in another rigged election. Start of the firing squads, mow down these commies, and lets take america back!

2. A December 6, 2020 response to an article posted on Facebook (in response to a Daily News Article about arresting business owners closed down because they would not wear a mask):

    Fuck the lockdown po-lice! Yeah booii run those pigs over! Anyone enforcing this lockdown mask vaccine bullshit deserves nothing less than a bullet in their fucking head! Including cops! If you're going to shoot someone tho, go after a high value target like Pelosi schumer or AOC. They really need to be put down. These commies will see death before they see us surrender! USA!!

4

3.   January 8, 2021 video posted to BitChute entitled "Kill the Senators" stating:

> Hey guys, so we need to go back to the U.S. Capitol when all of the senators and a lot the representatives are back there and this time we have to show up with our guns and we need to slaughter these mother fuckers. What I'm saying is that our government at this point is a handful of traitors, so what you need to do is take up arms, get to DC probably the inauguration so called inauguration of this mother fucking communist Joe Biden. That's probably the best time to do this get your guns show up to DC and literally just spray these mother fuckers that's the only option. They're gonna come after us they're gonna kills us so we have to kill them first. So get your guns show up to DC put some bullets in their fucking heads. If anybody has a gun give me it I will go there myself and shoot them and kill them. We have to take out these senators and replace them with actual patriots. Basically I would trust anybody over them at this point uh this is a ZOG government um, you know, that that's basically all I have to say let's take up arms against them.

4.   A January 12, 2021 response to a post on Parler:

> exactly, enough with the 'trust the plan bullshit. less go, jan 20, bring your guns #millionmitiamarch

The Indictment charges as follows:

> On or about and between December 6, 2020 and January 8, 2021, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant BRENDAN HUNT, also known as "X-Ray Ultra," did knowingly and intentionally threaten to assault and murder a United States official with intent to impede, intimidate and interfere with such official while engaged in the performance of official duties; and with intent to retaliate against such official on account of the performance of official duties, to wit: HUNT threatened to assault and murder Members of the United States Congress. (Title 18, United States Code, Sections 115(a)(l)(B), 115(b)(4).

**Mr. Hunt's detention violates the Bail Reform Act.**

Categorically denying Mr. Hunt's release based on the charged offense is contrary to the Bail Reform Act and the law of this Circuit. Mr. Hunt's release is presumed under § 3142(c)(1)(B). In a non-presumption case, a defendant *must* be released subject *to the least restrictive* condition or combination of conditions that will reasonably assure their appearance when required and the

safety of the community. *See* § 3142(c)(1)(B). A court may only detain a defendant if the government demonstrates that no such condition or combination of conditions exists. § 3142(e).

In deciding whether a defendant should be released, courts consider four factors:  the nature and seriousness of any danger to the community, the defendant's history and characteristics, the nature and circumstances of the offense, and the weight of the evidence. 18 U.S.C. § 3142(g). When applying these factors, courts should "bear in mind that it is only a limited group of offenders who should be denied bail pending trial." *United States v. Madoff*, 586 F. Supp. 2d 240, 247–48 (S.D.N.Y. 2009) (quoting *United States v. Khashoggi*, 717 F.Supp. 1048, 1049 (S.D.N.Y.1989)). This is true even for the most serious and violent offenses. *See id.* at 248 n. 8 (citing statistics that show "more than half of all defendants are released on bail conditions, including 51% for violent offenses").  Applying these factors to this case, Mr. Hunt should be on release status while his case is pending.

**The government cannot show dangerousness by clear and convincing evidence.**

When the government takes the extreme position that a defendant is an actual danger to the community, it must prove danger by clear and convincing evidence. § 3142(f)(2). To meet this high burden, the danger attributed to the defendant must be certain, not just possible. *See United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985) (ruling that a finding of dangerousness "requires that the evidence support such a conclusion with a high degree of certainty"). The only conceivable danger Mr. Hunt could pose to the community is with respect to the words and tone he uses in social media posts, a factor that can be easily neutralized with a bail condition.

At the initial bail hearing, the government sought detention by describing Mr. Hunt's social media posts as an "extremely serious crime" and "chilling." *See* Ex. A at 5:8-9.  But since the Bail Reform Act does not include 18 U.S.C. § 115 as a crime that gives rise to such a presumption, that argument is insufficient as a matter of law to justify his detention.  Its only merit would be if there were further indicia of dangerousness connected to the words that infused them with meaning, like a plan of attack or concrete facts that that infuse the words with meaning (such as, for example, googling "how to train a firing squad").[2]

There is no tangible connection between Mr. Hunt's social media posts and any actual, planned, or prospective violent acts.  No weapons are connected with this charge or this defendant. Law enforcement searches of Mr. Hunt's apartment, social media, email, phone, GPS, commerce, travel, employment, and utility records have not revealed any desire to engage in violent behavior. To the contrary, they reveal that at the time of his arrest Mr. Hunt had a fairly typical life: like most people, he was working remotely and spending more time at home and online because of the pandemic. His online presence suggested an interest in controversial subjects and conspiracy theories. Although Mr. Hunt was prone to making caustic statements online, there is no evidence

---

[2]The government conceded at the January 19 hearing that it had no reason to believe Mr. Hunt was acting in concert with anyone:  "The fact that there's no (indiscernible) that he's  a member of a militia and that he's a lone wolf instead is neither here nor there for the threats."  Ex. A at 9:15-17.

that he has ever personally engaged in violence. The various family members and loved ones who have spoken to the defense and the FBI about Mr. Hunt describe him as someone who sometimes lashes out verbally and self-secludes when he feels judged. The COVID-19 lockdown was not helpful to his frustration level in that regard.

Another point the government made at the January 19, 2021 bail hearing is that dangerousness could be inferred from the fact that "we find ourselves in the day leading up to the inauguration." *Id.* at 5:20–22. That date has obviously passed and it is clear no one engaged in any violence because of or in the spirit of Mr. Hunt's posts. As previously mentioned, it is not even clear who saw the offending posts, which were removed soon after their posting, either by the social media platforms, law enforcement, or Mr. Hunt himself. But the rest of his substantial online content remains, which puts the four charged posts into context. Mr. Hunt made several online postings between December 6, 2020 and January 12, 2021, and anyone viewing his online content would have access to posts and uploads dating back years. There was no indication that he was planning or seriously advocating violence against Members of Congress. The four social media posts are not characteristic of the information and opinions he posted online, suggesting they were off-the-cuff rants, unworthy of the attention being paid to them.

Whatever comes of this trial, Mr. Hunt has received some important feedback about the four social media posts at issue here. They did not help his cause. Even without a conviction, he has already lost a job, two months of his freedom, and his reputation. Free speech did what it is supposed to do: expose Mr. Hunt's crude outbursts to the criticism of his community.

**Mr. Hunt's lack of criminal history and background indicate his release will not present a danger.**

Mr. Hunt's history and characteristics strongly favor release. To start, he has no criminal history. A defendant's lack of criminal history is "strong evidence that [they] would not be dangerous if released pending trial." *See, e.g.*, *United States v. Adams*, 794 F. Supp. 2d 989, 994 (S.D. Iowa 2011); *see also Kouadio v. Decker*, 352 F. Supp. 3d 235, 237 (S.D.N.Y. 2018) (ruling that habeas petitioner posed "little risk of danger to the community, judging from his lack of a prior criminal history"). The one time he was arrested, during an Occupy Wall Street protest, he made all of his court dates and even followed through with civil complaints. He has a demonstrated understanding of and history of compliance with court processes.

Mr. Hunt's community ties are exclusively rooted in New York City. He was born in New York, was educated in New York, worked in New York, paid taxes in New York, has never lived outside of New York. His extended family resides here. The only thing the government can say negatively about his family ties is that some of his family relationships are strained. This was alluded to in the government's detention presentation on January 19, 2021, regarding statements in the confidential Pretrial Report. Now, after having interviewed several of Mr. Hunt's family members, the government knows Mr. Hunt has relatives that support him and do not believe he is

violent. Like many families they have suffered from trauma and conflict in their relationships, but nevertheless remain supportive and loving.

### Mr. Hunt's relatively low sentencing exposure supports release.

The government suggested at the bail hearing that because Mr. Hunt is charged with such a serious crime, he might have a motive to flee. The statute and the guidelines belie this claim. 18 U.S.C. § 115(a)(1)(B) carries no mandatory minimum and a statutory maximum penalty of ten years, less than what we usually see in this Court. Assuming Criminal History Category I, under U.S.S.G. § 2A6.1, the worst case scenario, after conviction, is:

> Base Offense Level ………………………... 12
> 2A6.1(b)(2) (two or more threats)………….. +2
>
> Total Offense Level…………………………..14 (15-21 months)

The best case scenario after conviction includes a 4-point reduction for lack of deliberation under § 2A6.1(b)(6), and a resulting Total Offense Level of 10 (6-12 months).

If convicted, Mr. Hunt would also have a colorable argument for a nonincarceratory sentence under 18 U.S.C. § 3553(a). In addition to the low-guideline recommendation, federal statutes recognize the appropriateness of a probationary sentence for certain first offenders like Mr. Hunt. *See* 28 U.S.C. § 994(j) (directing that alternatives to incarceration are generally appropriate for first offenders not convicted of a violent or otherwise serious offense); 18 U.S.C. § 3561(a) (authorizing sentences of probation unless the defendant was convicted of a Class A or B felony, probation was otherwise precluded, or the defendant is sentenced at the same time to a term of imprisonment).

Keeping Mr. Hunt in custody pending trial could likely result in his service of a sentence that is more than necessary to satisfy the purposes of punishment.

### The weight of the evidence/likelihood of success on the merits supports release.

Mr. Hunt is accused of making brief and offhand social media posts that on their face do not reach the level of seriousness required for a violation of 18 U.S.C. § 115(a)(1)(b). *See United States v. Turner*, 720 F.3d 411, 421 (2d Cir. 2013) ("brief and off the cuff remarks" do not rise to the level of seriousness required for a violation of 18 U.S.C. § 115(a)(1)(b)). Rather than direct these posts to any federal official, Mr. Hunt directed them into cyberspace without any expectation that they would reach a federal official, much less impact their official duties. The government is unlikely to prove his statements are "true threats" unprotected by the First Amendment. *See Virginia v. Black*, 538 U.S. 343, 359–62003).

As a threshold matter, it is unclear whether many of the "threats" Mr. Hunt is charged with even fall within the purview of § 115(a)(1)(B) (requiring that *the defendant* threaten a federal

official).  Apart from one possible line in the January 8, 2021 video ("if anyone has a gun give it to me"), the four social media posts at issue generally refer to acts of violence by others, not Mr. Hunt himself.  If anything, the statements might be characterized as general calls for violence or incitement, which the government acknowledged in the complaint. *See* Complaint ¶ 3 (alleging Mr. Hunt "made a series of posts on various social media websites in which he *threatened, or incited* others, to murder members of Congress") (emphasis added). But § 115(a)(1)(B) does not criminalize incitement; it criminalizes threats. These terms are not used interchangeably under the United States Code; Congress used them to define distinct offenses. *See, e.g.*, 18 U.S.C. § 2383 (inciting rebellion or insurrection).

It is unsurprising that the government has chosen not to charge Mr. Hunt with an incitement crime given the formidable roadblock of *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). In *Brandenburg*, the Supreme Court established "the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 447. And even if it could be said that Mr. Hunt's posts advocate violence, the "[Supreme] Court has made clear . . . mere *advocacy* of the use of force or violence does not remove speech from the protection of the First Amendment." *See N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982) (emphasis in original); *see also Hess v. Indiana*, 414 U.S. 105, 108 (1973) (speech which amounts to "nothing more than advocacy of illegal action at some indefinite future time," cannot be criminalized as unlawful incitement.).[3] The law simply does not allow the government to blur the line between the two for the purpose of securing Mr. Hunt's conviction under a threat statute.  Thus, at trial, we will ask the Court to instruct the jury that inciting language does not constitute a threat for purposes of § 115(a)(1)(B).

At trial, the jury will also have to evaluate Mr. Hunt's vague, short, and sporadic social medial posts under this Circuit's exacting standard for true threats

> when determining whether a statement qualifies as a 'true threat' for First Amendment purposes, a district court must ask whether 'the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution.

---

[3]Incitement would be hard to prove in this case as the social media posts were "not directed to any person or group of persons, it cannot be said that he was advocating, in the normal sense, any action." *Hess*, 414 U.S. at 108-109.  Given the context and more, it is highly unlikely that Hunt himself, much less a heretofore unknown listener, would be objectively *incited* by the words.  In order to convict, a jury must find that there was a reasonable basis upon which to conclude social media posts amounted to inciting language "intended to produce, and likely to produce, imminent disorder[.]" *Id.* at 108–109.

*New York ex rel. Spitzer* v. *Operation Rescue Nat'l*, 273 F.3d 184, 196 (2d Cir. 2001) (quoting *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir. 1976), cert. denied, 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976)).[4]   Certain common threads emerge in analyzing the existence of a true threat:

- the true threat is generally directed toward an identified target and can be distinguished from political hyperbole/in jest;
- the true threat is unambiguous, unconditional and poses an immediate threat upon life or safety of federal official;
- the true threat is specific enough as to place, time or method to take the threat seriously;
- the true threat is made directly to the intended target or to a third party.

*See, e.g.*, *Kelner*, 534 F.2d at 1024–27; *United States v. Cook*, 472 F. Supp. 3d 326, 334–35 (N.D. Miss. 2020). None of Mr. Hunt's social media posts conveyed a direct, unambiguous, or immediate threat. Even his longest statement, a minute and a half long video, contained only a vague and careless call to action that did not rise to the level of a true threat.

 Moreover, Mr. Hunt's posts did not amount to true threats because they were directed to no one in particular. Mr. Hunt had no reasonable expectation that anyone would respond to his posts by engaging in violent acts. Unsurprisingly, no one did. Significantly, Mr. Hunt did nothing to suggest that he intended for his posts to be viewed by Members of Congress. It is unlikely the government will meet their burden to prove these posts were *specifically intended* to impede, interfere with, or retaliate against federal officials. "This is in sharp contrast to a telephone call, letter or e-mail specifically addressed to and directed at another person, and that difference, as will

---

[4] The Modern Federal Jury Instructions-Criminal for 18 U.S.C. § 115(a)(1)(B) define a "true threat" as follows:

> *A threat is a serious statement expressing an intention to inflict bodily injury (or murder or kidnap) at once or in the future, as distinguished from idle or careless talk, exaggeration, or something said in a joking manner. For a statement to be a threat, the statement must have been made under such circumstances that a reasonable person who heard or read the statement would understand it as a serious expression of an intent to inflict bodily injury. In addition, the defendant must have made the statement intending it to be a threat, or with the knowledge that the statement will be viewed as a threat. To determine whether or not the defendant threatened [the official], you should consider the circumstances under which the statement was made, including its context with respect to surrounding conversation, the language the defendant used, and the reaction of those who heard or read the statement.*

be seen, is fundamental to the First Amendment analysis in this case." *United States v. Cassidy*, 814 F. Supp. 2d 574, 578 (D. Md. 2011)

The case most on point here is the foundational true threats case of *Watts v. United States*, 394 U.S. 705, 707–708 (1969). There, the defendant attended a crowded political rally and spoke against the military draft, saying: "If they ever make me carry a rifle, the first man I want to get in my sights is L.B.J." *Id.* at 706. He was convicted of threatening the President, and the Supreme Court reversed. *Id.* This conditional language was deemed "political hyperbole," viewed "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 708.

The trial will also involve unresolved questions about the specific intent required under § 115(a)(1)(B). Recently, in *Elonis v. United States*, 135 S. Ct. 2001 (2015), the Supreme Court held that a similar threat statute, 18 U.S.C. § 875(c), requires a showing that the defendant intended to issue threats or knew that communications would be viewed as threats. While *Elonis* was not decided as a First Amendment case, its focus on the importance of getting the intent requirement right has application to this prosecution.

**Mr. Hunt's statements are likely protected by the First Amendment.**

The constitutional issues are especially sensitive here because of the political nature of the speech being prosecuted. *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (speech at a public place on a matter of public concern is "entitled to 'special protection' under the First Amendment."). It is unpopular, not popular, speech that the First Amendment was meant to protect. Free speech is especially critical around "social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence." *Virginia v. Black,* 538 U.S. 343, 358 (2003) (quoting *Whitney v. California,* 274 U.S. 357, 376 (1927) (Brandeis, J., concurring). Binding precedent ensures that in "public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide 'adequate breathing space' to the freedoms protected by the First Amendment.'" *See Boos v. Barry*, 485 U.S. 312, 322 (1988) (citing *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988). The fundamental importance of the free flow of ideas and opinions on matters of public concern is the core of the First Amendment protections, even where speech includes "vehement caustic and sometimes unpleasantly sharp attacks." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Another instructive case will be *United States v. Bagdasarian,* 652 F.3d 1113 (9th Cir. 2011), in which the defendant, described by the court as "an exceptionally unpleasant fellow," posted on an online message board two weeks before the presidential election: (1) "Re: Obama fk the n*, he will have a 50 cal in the head soon" and (2) "shoot the n*." The evidence on that threat was insufficient to support a conclusion that a reasonable person who read the postings "would have understood either to mean that the defendant threatened to injure or kill the (then) Presidential candidate." 652 F.3d at 1119. The Ninth Circuit found that the first statement conveyed no explicit or implicit threat that the defendant *himself* would kill or injure then Presidential candidate Barack

Obama. *Id.* Nor was the second statement a true threat, but rather an "imperative intended to encourage others to take violent action, if not simply an expression of rage or frustration." *Id.* The late Judge Reinhardt, writing for the majority, reversed the defendant's conviction on the grounds that there was no "true threat." The Presidential threat statute, 18 U.S.C. § 879, like § 115(a)(1)(B) "does not criminalize predictions or exhortations to others to injure or kill." 652 F.3d at 1119.

That Mr. Hunt's posts were remarkably offensive might say more about the medium of social media than it does about his dangerousness under the Bail Reform Act, or even his guilt as charged. The "freedom to speak foolishly and without moderation," includes the right to oppose government officials by advocating for violence against them. *Cohen v. California*, 403 U.S. 15, 26 (1971) (quoting *Baumgartner v. United States*, 322 U.S. 665, 673—674 (1944). Indeed, in *Claiborne Hardware*, the Supreme Court reversed a civil judgment against the NAACP and its field secretary for "emotionally charged rhetoric" in front of crowds of people, including the statement, "if we catch any of you going in any of them racist stores, we're gonna break your damn neck." 458 U.S. at 902, 927–28.

The Supreme Court cases establish perhaps *the* bedrock principle of our nation: that speech is free for the very *purpose* of inviting dispute even where its provocative and inflammatory content causes anger.[5] This is what "sets us apart from totalitarian regimes." *Terminello v. City of Chicago*, 337 U.S. 1 (1949) (reversing conviction for breach of peace by a racist agitator). The facts of *Terminello*, and many cases like it, reflect this value in a country divided by ideology and civil unrest.[6] Time and time again, the Supreme

---

[5]Former American Civil Liberties Union president (1991 to 2008), Nadine Strossen, a professor and First Amendment scholar, has written extensively on the subject of free speech, and her views that it is 'counterspeech' (or shaming) in the marketplace of ideas, not speech repression, that is best calculated to address hate speech. Stossen, Nadine, *Counterspeech in Response to Changing Notions of Free Speech*, 43 Hum. Rts. 18 (2018).

[6]Justice Douglas, writing for the majority in *Terminello*, sets the stage, 337 U.S. at 1:

> Petitioner after jury trial was found guilty of disorderly conduct in violation of a city ordinance of Chicago and fined. The case grew out of an address he delivered in an auditorium in Chicago under the auspices of the Christian Veterans of America. The meeting commanded considerable public attention. The auditorium was filled to capacity with over eight hundred persons present. Others were turned away. Outside of the auditorium a crowd of about one thousand persons gathered to protest against the meeting. A cordon of policemen was assigned to the meeting to maintain order; but they were not able to prevent several disturbances. The crowd outside was angry and turbulent. Petitioner in his speech condemned the conduct of the crowd outside and vigorously, if not viciously, criticized various political and racial groups whose activities he denounced as inimical to the nation's welfare.

Court has doubled down on the disinfecting purpose of free speech, however close to the edge it looms.

> [A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, *Chaplinsky v. New Hampshire, supra*, 315 U.S. at 571-572, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. See Bridges v. California, 314 U.S. 252, 262, [.]; Craig v. Harney, 331 U.S. 367, 373 [.] There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups.

*Terminello*, 337 U.S. at 6.

In the free-for-all that has become social media, these First Amendment principles have never been so important in protecting the rights of those who express dissenting views.

**Conclusion**

For all these reasons we respectfully seek Mr. Hunt's release under either 18 U.S.C. § 3142(a)(1), or, alternatively, the least restrictive conditions under 18 U.S.C. § 3142(a)(2), while he awaits trial.

Respectfully Submitted,

/s/

Leticia M. Olivera
Jan A. Rostal
Attorneys for Brendan Hunt

Enc. (Transcript of Bail Hearing)
cc:      Counsel of Record