

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:DKK/ICR/FJN  *271 Cadman Plaza East*
F. #2021R00059  *Brooklyn, New York 11201*

March 25, 2021

By ECF

Honorable Pamela K. Chen
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    United States v. Brendan Hunt
                Criminal Docket No. 21-086 (PKC)

Dear Judge Chen:

      The government respectfully submits this letter in opposition to the defendant's motion to be released on his own recognizance, see Dkt. No. 22 (the "Motion" or "Mot."). For the reasons set forth below, the defendant, who repeatedly threatened to assault and kill members of the United States Congress and has shown a tendency towards violence and a refusal to comply with authority, should be detained pending trial.

I.     Background

      As detailed in the complaint, in December 2020 and January 2021, the defendant broadcast a series of videotaped and written threats against members of the United States Congress. (See Dkt. No. 1.) These threats included a video titled "Kill Your Senators," subtitled "Slaughter them all," in which the defendant stated that, if provided with a weapon, he would "go there myself and shoot them and kill them" and that he would "take up arms against them." The defendant's threats were motivated by his view that the members of Congress were "traitors" because of their vote to certify the 2020 election results on behalf of a candidate of whom the defendant disapproved. The defendant's terrifying threats came just two days after an actual mob had stormed the United States Capitol, where members of Congress were meeting to certify the results of the 2020 election.

      On January 19, 2021, the defendant was arrested and arraigned on a one-count complaint charging him with threatening to murder members of the United States Congress in violation of 18 U.S.C. § 115. That day, after interviewing the defendant and evaluating the relevant facts, Pretrial Services recommended that the defendant be detained pending trial because no condition or combination of conditions could address the danger he posed to the

community or ensure future court appearances. United States Magistrate Judge Ramon E. Reyes, Jr. ordered that the defendant be detained, explaining:

> In light of the nature and circumstances of the offense charged, which is very serious, the weight of the evidence against Mr. Hunt, which is strong, his history and characteristics, suspicion of mental health issues, family ties that are, according to the Pretrial Services Report, tenuous at best, some history of drug use and the nature and seriousness of the danger to the community, in particular the legislative community and elected officials, and direct calls for others to cause them physical harm, I find that detention is appropriate.

(Motion Ex. A at 10.)

On or about March 1, 2021, after a grand jury returned a one-count indictment charging the defendant with violating 18 U.S.C. § 115(a)(1)(B), the defendant was arraigned before this Court. The Court declined to release the defendant on a personal recognizance bond, explaining:

> I'm not prepared to release Mr. Hunt on a personal recognizance bond and I will say this, to the extent that it's helpful to the defense, you know, the nature of the charges and the allegations which are very detailed and I gather based on physical evidence, namely both (audio drop) and electronic based evidence to me support a finding by clear and convincing evidence that Mr. Hunt presents a danger that cannot be addressed by no bond conditions, no restrictions and it would be difficult for me to conceive of exactly what kind of conditions would assure me that he doesn't present a risk of danger because the obvious default position is to have someone on home confinement with all sorts of restrictions but here Mr. Hunt carried out the activity, according to the complaint that I've read, via computer at least and I don't know if the government will be able to prove more at the end of the day but it is a threats case, these are threats that were made through electronic media, so I'm not sure that there are any conditions short of remand that would at least assure me that he doesn't present a risk of danger, namely either continuing with threats or inciting violence against U.S. officials.
>
> That being said, you can present whatever package you have when you've figured out what Mr. Hunt is prepared to offer or can offer.

(Mar. 1, 2021 Transcript, Exhibit 1 at 9-10.)

2

II.     Legal Standards

    A.     The Bail Reform Act

Under the Bail Reform Act, Title 18, United States Code, Section 3141, et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e) (a judicial officer "shall" order detention if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists the following factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g).

    B.     18 U.S.C. § 115(a)(1)(B)

Prohibiting threats serves "to preserve citizens from fear and from the possibility that the threatened violence will occur." United States v. Turner, 720 F.3d 411, 420 (2d Cir. 2013) (internal quotation marks omitted); accord, e.g., United States v. McCrudden, No. CR-11-061 DRH, 2015 WL 1198544, at *5 (E.D.N.Y. Mar. 16, 2015), aff'd, 655 F. App'x 23 (2d Cir. 2016) ("a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur"). Prohibitions against threats "even where the speaker has no intention of carrying them out—protect [ ] individuals from the fear of violence and 'from the disruption that fear engenders." Turner, 720 F.3d at 420. These prohibitions are "fully consistent with the First Amendment." Id.

The defendant is charged with violating 18 U.S.C. § 115(a)(1)(B) by threatening to assault and murder members of the United States Congress. That statute has both objective and subjective elements: To be convicted, the defendant must have (1) threatened to "assault ... or murder" a member of the United States Congress, and (2) "intend[ed] to impede, intimidate, or interfere with" such an official "while engaged in the performance of official duties" or "to retaliate against such" an official "on account of the performance of official duties." Turner, 720 F.3d at 420.[1]

---

[1] In Elonis v. United States, 135 S. Ct. 2001 (2015), the Supreme Court held that a different statute, 18 U.S.C. § 875(c), which has no explicit intent element, requires a showing that the defendant intended to issue threats or knew that communications would be viewed as threats. (Mot. at 11.) The defendant asserts that this trial "will also involve unresolved questions about the specific intent required under § 115(a)(1)(B)," suggesting that the Elonis subjective-

3

In the Second Circuit, the test for whether conduct constitutes a "threat" is objective: "[W]e ask whether an ordinary, reasonable recipient familiar with the context of the communication would interpret the speech as a threat of injury." New York v. Griepp, No. 18-2454-CV, 2021 WL 900682, at *19 (2d Cir. Mar. 10, 2021) (citing Turner).[2] The relevant context includes other recent violent events referenced by or alluded to in the threat, Griepp, 2021 WL 900682, at *19, "the relationship of one threat to another, repetition, and other statements near or at the time of the threats," as well as "proof of the effect of the alleged threat upon the addressee." McCrudden, 2015 WL 1198544, at *5. "Under the objective test," however, "evidence is only relevant if it is known to the recipient." United States v. Segui, No. 19-CR-188(KAM), 2019 WL 8587291, at *11 (E.D.N.Y. Dec. 2, 2019). Ultimately, the analysis of whether a given statement or action constitutes a threat is a fact-specific inquiry best left to the jury. See, e.g., United States v. Carrier, 672 F.2d 300, 306 (2d Cir. 1982) ("whether words used are a true threat is generally best left to the triers of fact").

The Second Circuit has cautioned against an overly technical analysis of the precise syntax or grammar of a threatening statement. See Turner, 720 F.3d at 425 (criticizing an argument that "relies overmuch on the literal denotation and syntax of [the defendant]" and explaining that threats "need be neither explicit nor conveyed with the grammatical precision of an Oxford don"). Statements may constitute legal threats even where they are "conditional and inexplicit." Id. at 424. Indeed, "rigid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience would render the statute [Section 115] powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat." Id. at 422-23 (quoting United States v. Malik, 16 F.3d 45, 50 (2d Cir. 1994)). A threat may even be "wholly implicit" in some statement or action. Turner, 720 F.3d at 423. "Nor is there any requirement that the statements on their face show that the defendant personally intended to take

---

intent standard may yet be imported into Section 115. That argument has already been raised to, and not adopted by, courts within the Second Circuit and elsewhere. See, e.g., United States v. Segui, No. 19-CR-188(KAM), 2019 WL 8587291, at *12 (E.D.N.Y. Dec. 2, 2019) ("Although § 115(a)(1)(B) has a specific intent requirement, it is different from the mens rea read into § 875(c) by Elonis, and Elonis has not been held to apply to § 115(a)(1)(B)."); United States v. Fitzgerald, No. 5:15-CR-55-01, 2015 WL 9582144, at *3 (D. Vt. Dec. 30, 2015) ("Because of the specificity of § 115(a)(1)(B), there is no need to add implied elements of mental intent to the offense" as in Elonis); accord, e.g., United States v. Wynn, 827 F.3d 778, 785 (8th Cir. 2016) (jury instruction for Section 115 was not erroneous for omitting subjective intent identified by Elonis); United States v. Nicholas, No. 2:19CR00005, 2019 WL 3774622, at *2 (W.D. Va. Aug. 12, 2019) (Elonis does not apply to Section 115).

[2] Because the test is objective, whether a statement constitutes a threat does not depend upon whether the defendant actually intended to carry out the threat. E.g., United States v. Wright-Darrisaw, 617 F. App'x 107, 108 (2d Cir. 2015) ("True threats encompass those statements where the speaker means to communicate a serious expression of [ ] intent to commit an act of unlawful violence' even without the intent to commit the act.").

violent action," so long as the recipient would be "afraid of the threat's execution by the speaker or their co-conspirators." Griepp, 2021 WL 900682, at *19.

The Motion incorrectly suggests that a statement constitutes a "true threat" only where "the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." (Mot. at 9.) That quotation comes from United States v. Kelner, 534 F.2d 1020, 1027 (2d Cir. 1976), but the Second Circuit has made clear that Kelner's definition is not the exclusive definition of "true threat" and that "we have still found threats 'that were both conditional and inexplicit.'" Griepp, 2021 WL 900682, at *19. Moreover, Turner provides numerous examples of cases post-dating Kelner in which the Kelner definition was not employed. Turner, 720 F.3d at 424 ("Suffice it to say that this [Kelner's definition of threat] does not describe our cases, which have affirmed convictions for threats that were both conditional and inexplicit."); accord United States v. Dillard, 795 F.3d 1191, 1200 (10th Cir. 2015) ("In recent cases, however, the Second Circuit has described this language [in Kelner] as 'dicta' and has rejected the argument that all threats must satisfy all of these conditions in order to fall outside of the First Amendment protections.").

III.   **The Defendant Should Be Detained Pending Trial**

As discussed below, each of the factors sets forth in Section 3142 weighs heavily against the defendant's pretrial release. Moreover, the bail package proposed by the defendant—essentially that he live alone and not use a computer—does not come close to addressing the danger he poses to the community or the risk of noncompliance with court-ordered conditions of release.

A.   **The History and Characteristics of the Defendant**

The history and characteristics of the defendant, as discussed in part during the March 24, 2021 status conference, show his danger to the community and his likelihood of noncompliance with conditions of release. Among other things, the defendant's contention that "[t]here is no evidence that he has ever personally engaged in violence" is disproven by the statements of his father during the March 24 conference and by the written record. (Mot. at 6-7.)

First, the defendant's litany of disciplinary infractions during his short detention in the Metropolitan Detention Center ("MDC") is troubling. Most notable, on February 24, 2021, the defendant assaulted his cellmate while that individual was handcuffed.[3] In addition, on

---

[3] Although the defendant has questioned whether this incident occurred, the memoranda attached as Exhibit 2, as well as a video showing the exterior of the defendant's cell, corroborate the incident report. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

5

or about February 1, 2021, the defendant yelled at an MDC employee who had asked if the defendant needed any psychology services; when asked not to direct his frustration at the employee, the defendant stated: "Yes I do because you're a fucking bitch. Get the fuck away from my door." When interviewed about the incident, the defendant stated that the MDC employee had "disrespected my intelligence." And on January 20, 2021, the defendant refused a medical test that was required as part of his routine processing at MDC. The defendant also refused to attend a hearing related to his refusal of the medical test.

Second, the defendant's reliance in the Motion on the support of his family is also misplaced. (See Mot. at 7-8.) During the March 24, 2021 status conference, the defendant's father described the defendant's acts of violence directed at his father and mother. As the defendant's father explained, the defendant's anger and actions during at least one incident was so troubling that the defendant's father called the police to intervene against his son. (See, e.g., Mar. 24, 2021 Transcript, Exhibit 4 at 14-15 ("I was concerned about the anger [the defendant] was expressing. And it wasn't that I was physically afraid of him, it just was a very, very difficult situation. There was physical contact in terms of pushing and shoving, not -- as far as I recall these things, which we're going back years, I didn't see everything, but I understand that he and his mother had pushed each other or one side pushed the other.").) A father does not lightly call the police to protect a mother from her own son.

The information provided by the defendant's father is consistent with other more recent conduct showing that the defendant's tendency towards violent rhetoric and actions has continued.

On December 14, 2020, after the defendant's relative had "unfriended" him on a social media site, the defendant sent the following text message: "You are full of it. I have nothing further to say to you and if you text me again ill stick a knife in your kid." The government has interviewed the relative, who informed the government that he viewed the message as a threat and considered seeking a restraining order against the defendant. Reports of those interviews are attached as Exhibit 5.

In addition, on January 6, 2021, the day of the Capitol riot, the defendant's father sent him a text message stating: "I'm fine with talking as long as we both can maintain civility." In response, the defendant wrote: "Yeah thats what you said last time and then we sat down and talked until you didnt want to deal with my concerns. Then you said 'i should go' and got up to leave which is why i flipped the table. Then you called me violent." In other words, in the context of an argument with his father, the defendant flipped over a table in anger, and his own father described him as violent.

The government has also provided the defense with a record of domestic incidents involving the defendant, which record is attached as Exhibit 6 to this filing. For example, in 2007, the defendant's mother called the police and requested that they remove "my drug addicted son" from her house. In 2008, the defendant's father called the police because, during a verbal

dispute, the defendant threw objects in his room. In 2014, the defendant's father called the police because the defendant had become "enraged when I did not give him $20 he requested."

      B.      <u>The Nature and Circumstances of the Offense and the Weight of the Evidence</u>

The nature and circumstances of the offense are, as Judge Reyes recognized, "very serious." (Mot. Ex. A at 10.) The offense conduct involves a calculated stream of threats directed at elected officials trying to do their jobs after the November 2020 presidential election. Threats to "slaughter" or to execute members of Congress are the core conduct targeted by Section 115.

The defendant dismisses his conduct as the making of "four random social media posts." (Motion at 1.) But the threats were neither isolated nor off-the-cuff. Most notable, in the "Kill Your Senators" threat video, the defendant spoke clearly during the video, and deliberately uploaded it with both a title, "Kill Your Senators," and subtitle, "Slaughter them all," that belie any sort of off-hand effort. The threats identified in the complaint are all consistent with each other and with other disturbing content the defendant posted. For example, on January 9, 2021, the defendant posted a YouTube video in which he stated, in relevant part, "We delegated them [Congress] to govern but they have violated that trust . . . . So start exercising your rights to take down these corrupt politicians...we have the first amendment – that's still around, remember? And we have the 2nd as well. There are really only 100 of these weakling senators. They are mass murdering psychopaths who are intent on our destruction and they form an illegitimate government. Every single one of them just needs to go. Rise up." The defendant's invocation of the Second Amendment to the Constitution is a clear reference to armed violence.

Viewed through the applicable legal framework, set forth above, the evidence of the defendant's guilt is also clear. There is no dispute that the defendant made the threats identified by the government. Nor is there any dispute that the statements would be deeply disturbing to any reasonable recipient of them, particularly in the context of the violent storming of the United States Capitol on January 6, 2021. It is irrelevant whether the threats meet the narrow definition of "threat" set forth by the defense—"the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution" (Mot. at 9.)—because the law recognizes that a wider variety of conduct is truly threatening. <u>See supra</u> Section I.B. Thus the First Amendment is no defense here. The defendant's own words and the context of his statements also demonstrate his intent to impede, impair, and intimidate members of Congress, and to retaliate against those members for their actions associated with the 2020 election.[4]

---

[4] The defense also argues the weight of the evidence should be discounted because he is not charged with "incitement." (Mot. at 9-10.) That may be true, but the extent to which the defendant's statements may have tended to incite others to violence is relevant in considering the nature of the threats themselves and the danger posed by the defendant's release. Indeed, a threat of violence that suggests someone other than the threatener will carry out the violence can still be a "true threat." <u>See</u> <u>Griepp</u>, 2021 WL 900682, at *19 ("Nor is there any requirement that the statements on their face show that the defendant personally intended to take violent action," so

C. The Nature and Seriousness of the Danger

The danger posed by the defendant is clear. Threatening to murder elected officials of the United States government is a frontal attack on both the individual officials and also on the democratic system of government that the public relies on to maintain order. These types of threats are particularly dangerous when made in a charged political environment that has already led to the overrunning of the United States Capitol and the interruption, for the first time in United States history, of the certification of a Presidential election. As this Court recognized, these actions create a danger to the community, and create the risk of the defendant "continuing with threats or inciting violence against U.S. officials." (Mar. 1, 2021 Transcript, Exhibit 1 at 10.)

There is also ample evidence in the record that the defendant himself is an entitled, unstable and angry individual who does not respect authority. The defendant reacts violently to anyone who disagrees with him or tries to place limits on his behavior—be it family members, elected officials, prison guards, or cellmates. Indeed, the defendant's own father was so concerned about his son's anger that he called the police to intervene with his son on at least one occasion.

D. The Proposed Bail Package Is Inadequate

Even if the defendant's danger to the community or likelihood of noncompliance with conditions of release could be mitigated by some conditions of release, the defense has not proposed such conditions. Under the defense proposal, the defendant would be released without mental health evaluation, to live on his own, under the remote supervision of his father. It is notable that the defendant's parents have not offered for him to live with them, so they could actually supervise him. Moreover, whatever limited suasion the defendant's parents may exercise over him was clearly not enough to prevent him from undertaking the charged conduct. Nor was it sufficient to prevent his prior outbursts, including violent outbursts directed at them.

---

long as the recipient would be "afraid of the threat's execution by the speaker or their co-conspirators."). And, to the extent the defendant's statements tended to incite others to violence, that fact further underscores the danger he poses to the community, not his innocence of the charged crimes.

IV.       Conclusion

        For all of the foregoing reasons, the Motion should be denied, and the defendant should be detained pending trial.

        Respectfully submitted,

        MARK J. LESKO
        Acting United States Attorney

By:   /s/ David K. Kessler
      David K. Kessler
      Ian C. Richardson
      Francisco J. Navarro
      Assistant U.S. Attorneys
      (718) 254-7000

cc:    Clerk of the Court (PKC) (by ECF)
       Defense counsel (by ECF)