**Federal Defenders**
OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

April 7, 2021

**By ECF and E-Mail**
The Honorable Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re: *United States v. Brendan Hunt*, 21-cr-0086-PKC

Your Honor:

  We respectfully offer the Defense Motions in Limine in the above-captioned case charging our client with one count under 18 U.S.C. § 115(a)(1)(B), to wit, that he threatened to assault and murder Members of Congress.

  **I.**  **Statement Of Facts.**

  On January 8, 2021, at 10:05 am, an individual called the FBI National Threat Operations Center "to report a video on bitchute.com called "Kill Your Senators" "encouraging people to kill Senators and Congress members" (the "BitChute Video"). 3500-CD-000017. The video was posted that same day by "xrayultra" who the FBI identified as Brendan Hunt. BH-00001996–1997.

  Members of the FBI NTOC Social Media Exploitation Team located the video on Bitchute on January 8, 2021. 3500-CD-000017. It appears that someone at FBI screen recorded the video when it was still up on Bitchute (BH-00001968) but that screen record fails to capture the comments that accompanied the video. The government's disclosures do not reveal who at the FBI recorded the BitChute Video and when. They contain no explanation as to why the comments to the video were not captured. The government's disclosures indicate the video was removed from BitChute soon after it was posted, but provides no indication as to how, when, or why the video was removed.

  The first notification to anyone at the U.S. Capitol was on January 10, 2021, at 6:49 p.m., memorialized in an email FBI Agent Erica Dobin sent to a Capitol Police/FBI Task Force Special Agent Usman Saleem, copying several other individuals (our 3500 material and discovery is largely redacted regarding who was cc'd). Dobin's email stated:

> Hi Saleem . . . I wanted to pass onto you that we have a Guardian on a New York-resident who posted a video online on 1/8/2020 where he stated in sum and substance: "We need to go back to the capital when the Senators and a lot of the representatives are back there. This time we need to show up with our guns. We need to slaughter these motherfuckers. Our government is [full] of traitors. What you need to do it take up arms, get to dc, probably the inauguration [would be]….the best time to do this. Get your guns, show up…. Literally just spray these motherfuckers….That's the only option...We have to kill them first. Get your guns…put some bullets in their fucking heads. If anyone has a gun, give me it. I'll go there myself and shoot them and kill them. We have to take them out and replace them with patriots… this is a ZOG government."
>
> The video was already taken down. We've identified him as BRENDAN HUNT. He doesn't have a violent criminal history or a gun license from our initial checks. I've attached a government photo, but as you can see from the attached video, he looks very different now. We are going to get pings up on his phone and I will keep you updated.

BH-00002439.

On January 10, 2021, at 8:37 p.m., Saleem responded to Dobin's email: "Greatly appreciate it!" BH-00002440. There do not appear to have been any additional communications between Dobin and Saleem. Saleem did not take any further action on the email or forward it to anyone at the USCP. 3500-CD-000015. We have been provided no information about how or whether any of the other recipients whose names were redacted responded to Dobin's January 10, 2021 email.

On January 12, 2021, the FBI obtained a Search Warrant for Facebook and Google subscriber information and content. In the affidavit, Dobin indicated that in the BitChute Video, Mr. Hunt "advocate[s] that he and others," go to the U.S. Capitol to murder "all of the senators and a lot of the representatives" "probably" during the "so-called inauguration of this motherfucking communist Joe Biden." BH-00002000 (Search Warrant to Facebook and Google, dated January 12, 2019). The only portion of the BitChute Video that references Mr. Hunt personally taking action is where he states, "If anybody has a gun give me it I will go there myself and shoot them and kill them." *Id.*

On January 13, 2021, the U.S. Secret Service sent an "informational notice" to USCP Supervising Special Agent George DeSesso noting that Mr. Hunt "had issued a threat to the 2021 Presidential Inauguration." 3500-CD-000001, 3500-CD-0000010. Open source intelligence research conducted by an unnamed agent determined Mr. Hunt's "BitChute Channel contained videos of the subject reporting news and events, with a focus on Donald Trump. No threatening PI-content to report." *Id.* at 11. A review of 12 other social media accounts linked to Mr. Hunt, including his Facebook and YouTube accounts, also yielded determinations of "No PI-related content to report" or "No threatening PI-related content to report." *Id.* The notice was "closed as

2

informational" because of the "general nature of the statement" and the increased security at the Capitol. *Id.* at 10.

On January 19, 2021, Mr. Hunt was arrested and charged with violating 18 U.S.C. § 115(a)(1)(B). His home was searched at the time of his arrest and his devices were seized. The complaint accuses Mr. Hunt of having "threatened, or incited, others to murder members of Congress" and identifies four statements:

- a December 6, 2020 Facebook comment to a post by Donald Trump calling on "Trump" to take "actual revenge on democrats," in the form of public executions, firing squads, and "mow[ing] down these commies";
- a December 6, 2020 Facebook comment generally advocating for "[a]nyone enforcing this lockdown mask vaccine bullshit" to be shot or run over;
- the January 8, 2021 BitChute Video;
- a January 12, 2021 Parler comment generally advocating for people to "bring your guns" to a protest on "jan 20."

Aside from the Facebook comment directed toward Donald Trump (among hundreds of thousands of other comments), none of the aforementioned posts were directed or sent to federal official or any identifiable person.

On March 3, 2021, USCP Threat Assessment Section Special Agent Christopher Desrosiers learned about Mr. Hunt for the first time after being contacted by the NYPD. 3500-CD-000001-2. He contacted Dobin regarding the investigation into Mr. Hunt and learned about the January 10, 2021 communication with Saleem. 3500-CD-000002. He then contacted Saleem who confirmed that he received the email and did not forward it to anyone. *Id.* That same day, Desrosiers made notifications to the offices of Nancy Pelosi, Charles Schumer, and Alexandria Ocasio Cortez.

On March 17, 2021, Desrosiers provided Dobin with a contact at the Senate Sergeant at Arms Office and "recommend[ed] that the [Hunt] case be closed and retained for future reference, based on the 01/19/2021 FBI arrest of Hunt." 3500-CD-000018.

## II.     The Elements of 18 U.S.C. § 115(a)(1)(B).

We begin by reviewing the elements of the crime and the legal framework. The motions *in limine* necessarily depend upon the peculiar legal framework of law in this area.

The elements of an 18 U.S.C. § 115(a)(1)(B) offense are: (1) that the defendant knowingly and intentionally threatened to assault or murder members of Congress; (2) that the victims were federal officials; and (3) that the defendant acted with the specific intent to impede, intimidate, interfere with, or retaliate against the named federal officials. *See, e.g.*, *Sand Modern Federal Jury Instructions* 14.02 Threatening a Federal Official.

3

As to the first element -- the threat element -- of § 115(a)(1)(B), the government must prove that the defendant made a "true threat" unprotected by the First Amendment. "When determining whether a statement qualifies as a threat for First Amendment purposes, a district court *must* ask whether 'the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution[.]'" *New York ex rel. Spitzer v. Operation Rescue Nat'l,* 273 F.3d 184, 196 (2d Cir. 2001) (quoting *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir. 1976) (emphasis added); *New York v. Griepp*, No. 18-2454-CV, 2021 WL 900682, at *19 (2d Cir. Mar. 10, 2021) ("Our inquiry is informed by whether the threat is, on its face and under the circumstances, so 'unequivocal, unconditional, immediate and specific as to the person threatened as to convey a gravity of purpose and imminent prospect of execution.'"). Whether the alleged threats meet both the statutory (based on § 115(a)(1)(B)) and constitutional (based on the First Amendment) requirements is an issue of fact for the jury. *See United States v. Turner*, 720 F.3d 411, 419 (2d Cir. 2013).

As to the third element -- specific intent -- it is our position that § 115(a)(1)(B) requires proof of both subjective and objective intent on the part of the defendant. Indeed, the Grand Jury charged that he "knowingly and intentionally threatened." Indictment, ECF No. 6. This *mens rea*, necessary for separating criminal from non-criminal conduct, is separate from the specific intent requirement of §115, which requires proof of the specific objective to interfere/impede/retaliate. This *mens rea*, necessary for separating criminal from non-criminal conduct, is separate from the specific intent requirement of § 115, which requires proof of the specific objective to interfere/impede/retaliate.

The *Turner* court has stated that § 115(a)(1)(B) "includes both subjective and objective elements," that is an objectively threatening statement and a subjective intent to interfere, impede, intimidate or retaliate against a federal official. *Id.* at 420. The objective test asks "whether an ordinary, reasonable recipient who is familiar with the context of the communication would interpret it as a threat of injury." *Id.*

The *Turner* court did not reach the question of whether the Supreme Court supplemented the objective test for a "true threat" with a subjective test "in *Virginia v. Black*, and now in [*Elonis v. United States*], both of which might be read (albeit in different statutory contexts) to require that the speaker subjectively intend to communicate a threat or intimidate the threat's recipient." *United States v. Wright-Darrisaw*, 617 F. App'x 107, 108, n.2 (2d Cir. 2015); *Nat'l Coal. on Black Civic Participation v. Wohl*, No. 20 CIV. 8668 (VM), 2021 WL 480818, at *9 (S.D.N.Y. Jan. 12, 2021) (emphasis in original).

Even if *Elonis v. United States*, 575 U.S. 723 (2015) (a post-*Turner* 18 U.S.C. § 875(c) case) does not apply to § 115(a)(1)(B), *Virginia v. Black* has been read to require a subjective *mens rea* as a matter of First Amendment law. *United States v. Cassel*, 408 F.3d 622, 631 (9th Cir. 2005) (ruling that the "clear import" of *Black* is that "only *intentional* threats are criminally punishable consistently with the First Amendment."). A provision of the cross-burning statute at

4

issue in *Black* violated the First Amendment because it did "not distinguish between a cross burning done with the *purpose* of creating anger or resentment and a cross burning done with the *purpose* of threatening or intimidating a victim." *Id.* (emphases added). "Intimidation in the constitutionally proscribable sense of the word is a type of true threat," the Court wrote, "where a speaker directs a threat to a person or group of persons *with the intent* of placing the victim in fear of bodily harm or death." *Id.* at 360. With this definition in place, the Court held that Virginia could only ban cross burning *with intent to intimate* in order to comport with the First Amendment. *Id.* at 362.

Thus, "'[t]rue threats' encompass those statements where the speaker *means to communicate* a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." 538 U.S. at 359 (emphasis added); *Cassel*, 408 F.3d at 632 (noting that in *Black* "eight Justices agreed that intent to intimidate is necessary and that the government must prove it in order to secure a conviction"). *Cassel*, 408 F.3d at 631. It is more "likely [after *Black*] that an entirely objective definition [of true threats] is no longer tenable[.]" *Id.* (quoting *United States v. Parr*, 545 F.3d 491, 500 (7th Cir. 2008)).

The Supreme Court did not reach the definition of a "true threat" in *Elonis* after finding that the relevant statute itself, 18 U.S.C. § 875(c), required proof of a subjective intent to threaten. 575 U.S. at 740. The *Elonis* Court emphasized that in § 875(c) "the crucial element separating legal innocence from wrongful conduct is the threatening nature of the communication." *Id.* at 736 (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 73 (1994)). The Court therefore concluded a defendant may not be convicted of violating § 875(c) based "solely on how his [words] would be understood by a reasonable person," because doing so would impermissibly allow "criminal liability" to "turn solely on the results of an act without considering the defendant's mental state." *See id.* at 740. To violate § 875(c), a defendant must transmit "a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat," or, possibly, with reckless disregard for the likelihood that the communication would be perceived as a threat. *Id.*

Like §875(c), §115(a)(1)(B) requires that a threat be communicated, but is silent on the required mental state for the threat. *See Elonis*, 575 U.S. at 736. The wrongdoing in both statutes—the act that separates innocent conduct from criminal—is the threat. The mental state attached to the third element of § 115(a)(1)(B), requiring intent to interfere, impede, intimidate, or retaliate, is insufficient for criminal liability because seeking to influence a federal official is not inherently unlawful. It is the threat to "assault, kidnap, or murder" a federal official the "crucial element" that makes § 115(a)(1)(B) a crime. *See id.* at 737–38. For that reason, after *Elonis*, Mr. Hunt cannot be lawfully convicted of § 115(a)(1)(B) based only upon the objective, reasonable person test. *See id.* The government must also prove his posts were intended to threaten federal officials.

In sum, *Black* and *Elonis* make clear that proof of subjective intent is necessary under both the First Amendment and § 115(a)(1)(B).

5

### III. Motions in Limine

#### a. The Court should Inspect the Grand Jury Minutes To Ensure that the Grand Jury Did not Indict on an Incitement Theory

The government's theory is that Mr. Hunt's statements amounted to a "true threat" because they caused the alleged victims to fear violence from Mr. Hunt or his "co-conspirators." *See* Gov. Opp. to Bond Motion, ECF No. 7. n.4. This view conflates "threat" and "incitement" in a way that suggests that it potentially gave misleading instructions to the Grand Jury, and we ask that the Court inspect the Grand Jury minutes to ensure that the legal instruction on "threat" comports with the Supreme Court's rulings.[1] The particularized finding for *in camera* review of Grand Jury minutes is made here by the fact that the government theory of guilt conflates "incitement" with "threat." Indeed, the Criminal Complaint drafted by the government made that precise mistake—including the term "incitement" where it did not exist in the statute. Complaint, ECF 1 (defendant "made a series of posts on various social media websites in which he threatened, or incited others").

#### b. The Court should preclude the government from arguing that inciting language is the equivalent of a "true threat"

The government's conflation of threats and incitement also creates the danger that the jury will convict Mr. Hunt based on uncharged acts of unlawful incitement. Supreme Court precedent treats incitement and threats as legally distinct concepts. The Oxford Dictionary

---

[1] In *United States v. Kasper*, a district court inspected Grand Jury minutes in a tax case which turned on "one crucial over-arching legal question," resolved by the Supreme Court as to distinguish between reportable income and a nonreportable gift. *United States v. Kasper*, No. 10CR318S, 2011 WL 7098042, at *9 (W.D.N.Y. June 20, 2011), report and recommendation adopted, No. 10-CR-318S, 2012 WL 243609 (W.D.N.Y. Jan. 25, 2012) (citing *United States v. Cerullo*, No. 05cr1190 BEN, 2007 U.S. Dist. LEXIS 58142, at * 1–2 (S.D.Cal. Aug. 8, 2007) (Docket No. 14, Defs.App. A), amended, 2007 U.S. Dist. LEXIS 101282 (S.D.Cal. Sept. 7, 2007). We do not move at this point for the Court to disclose the Grand Jury minutes to the defense, or to dismiss the Indictment based on misleading the Grand Jury. We believe, however, that the "incitement vs. threat" question is of such constitutional and statutory significance that the Court should inspect the minutes to ensure that the government did not give misleading instructions to the Grand Jury in obtaining this Indictment. In *Cerullo*, the court dismissed the Indictment based on on the "prosecutor misleading the Grand Jury three times on the key question of whether the defendant minister's earnings were a gift or income, with the Grand Jury stating that it was confused on this point and the prosecutor did not resolve that confusion. *Cerullo*, 2007 U.S. Dist. LEXIS 58142, at 9.

defines "threat" as a statement of an intention to inflict pain, injury, damage, or other hostile action on someone. There is only one sentence among the four alleged threats identified in the Complaint that would fit this definition. That line, spoken in the first person, is: "If anybody has a gun, give me it, I'll go there myself and shoot them and kill them." The remainder of Mr. Hunt's charged statements merely called on unidentified third persons to commit acts of violence – which falls squarely within the Oxford Dictionary definition of "incitement," which is defined as "the action of provoking unlawful behavior or urging someone to behave unlawfully."[2]

The Supreme Court and Circuit law makes clear that, given the First Amendment implications, the Courts have been careful to interpret threat and incitement statutes distinctly. Thus, purely inciting speech has met with *Brandenburg* analysis. Threatening speech, on the other hand, has required proof that the recipient was "fearful of the execution of the threat *by the speaker* (or the speaker's co-conspirators)" and distinguished threats from statements that merely indicated support for "violent third parties." *See Operation Rescue Nat'l*, 273 F.3d at 196 (emphasis in original). As the Court is aware, the law even goes so far as to say that incitement of violence or crime is not enough to criminalize speech. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002).

*Ashcroft* is a particularly interesting case in this regard. There, certain plaintiffs moved for an injunction against a statute that would criminalize the publication of virtual child pornography. The Court, recognizing all the ways in which virtual or anime child pornography might encourage others to engage in real criminal acts with children. *Ashcroft*, 535 U.S. at 235 (acknowledging that virtual child pornography whets the appetites of pedophiles and encourages them to engage in illegal conduct). The Supreme Court held that this rationale could not sustain the provision in question, as the "mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Id.* The government can suppress speech for advocating the use of force or a violation of law only if "such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 236 (citing *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam). As there was no charge of attempt, incitement, solicitation, or conspiracy in *Ashcroft,* the government show "more than a remote connection between speech that might encourage thoughts or impulses and any resulting child abuse." *Id.*

The detailed analysis of the issue given by Ninth Circuit Judge Reinhardt in *United States v. Bagdasarian*, 652 F.3d 1113, 1123 (9th Cir. 2011) bears a careful reading. The Court will recall that case involved threats against President-to-be Obama by one "Walter Bagdasarian, an

---

[2] We will be asking the Court to give the jury a special interrogatory, so that the Court and any reviewing appellate court will be able to pinpoint the precise language that forms the basis of the conviction, and guard against the possibility that some subset of jurors would find one threatening statement a "true threat," while another subset would find another statement to be a "true threat."

7

especially unpleasant fellow," who posted his threat on a message board. There, the Ninth Circuit found that "incitement to kill or injure a presidential candidate does not qualify as an offense under" a threats statute. As does the Fourth Circuit decision in *United States v. White*, 670 F.3d 498, 513 (4th Cir. 2012), finding that communications that "clearly called for someone to kill" a man did not constitute threats. So, too, as the Sixth Circuit weighed in that "threats and solicitations remain distinct." *United States v. Doggart*, 906 F.3d 506, 511 (6th Cir. 2018)

In those few cases where threat convictions have been upheld for language that instructed others to commit violence, it was only because the court found that those instructed were "subject to the will of the threatening party." *See United States v. Wheeler*, 776 F.3d 736, 744 (10th Cir. 2015); *see also White*, 670 F.3d at 513 ("White's direction to others to kill Warman could have amounted to a threat if White had some control over those other persons or of White's violent commands in the past had predictably been carried out.").

This was the case, for instance, in *United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013), where the Second Circuit upheld a § 115(a)(1)(B) conviction for a statement that, on its face, merely incited others to commit violence. The defendant in that case, Harold Turner, was a prominent conservative public figure who called in frequently to the Sean Hannity show and had his own blog and talk show. In response to a Seventh Circuit decision upholding a ban on guns, Turner wrote on his blog that the three judges who had decided the case "deserve[d] to be killed" and posted specific and detailed instructions on how to find them, posting photos and a map of the courthouse along with the specific room number for each of the judges' chambers. *See id.* at 416. He also referred to the murders of a Seventh Circuit judge's family members four years prior and wrote that "the 7th U.S. Circuit court didn't get the hint after those killings" and that "another lesson is needed." *See id.* In another post, Turner even proposed that his own earlier statements had inspired the murders: "Judge Lefkow made a ruling in court that I opined made her 'worthy of death,'" Turner wrote. "After I said that, someone went out and murdered her husband and mother inside the Judges Chicago house." *See id.*

Turner's exhortations could be charged and proven as threats because Turner explicitly and believably represented himself as having control and suasion over his audience. "While I can't legally undertake killing, I may— just MAY— be able to say enough of the right things, to enough of the right people, to make it happen," he wrote, along with: "[M]y eight years on the radio and on the internet has gotten me in touch with enough of the right people to get it done. I know how to get it done." *See id.* at 417. Anyone reading Turner's posts, moreover, had every reason to believe that Turner in fact had the influence he claimed to have: he was a public figure, with a large following, whose previous exhortations appeared to have been borne out.

Mr. Hunt's statements are starkly different. With the exception of the one sentence spoken in the first person, Mr. Hunt's statements were not directed towards an identifiable audience over which Mr. Hunt, whose videos typically got only a few hundred views, demonstrated any control. *Cf. Turner*, 720 F.3d at 420. Nor were they directed towards any identifiable "co-conspirators." *Cf. Operation Rescue Nat'l*, 273 F.3d at 196. To be sure, Mr.

8

Hunt had no dedicated following and there is no evidence that anyone was likely to engage in violence at his behest. Without any evidence that a single person could have been reasonably expected to follow Mr. Hunt's exhortations, the government should not be permitted to argue that his inciting statements became "true threats" merely because they identified those he opposed politically.

Here the government *has* statutory tools to prosecute incitement crimes. *See* 18 U.S.C. § 2101(a)(1) (incitement of riots); 18 U.S.C. § 2384 (conspiracy to overthrow the government); 18 U.S.C. § 2385 (advocating the overthrow of the government); 18 U.S.C. § 373 (solicitation to commit a crime of violence). Having chosen not to use these tools, the government cannot end run Congress by asking a jury to read "incitement" into the term "threat." Moreover, any attempt to pass off evidence of an uncharged crime as evidence of the charge at hand must be thwarted. "The Government has the discretion to choose which crime to charge a defendant. But when it errs in that choice, there is no leeway the Court can extend it." *United States v. Mbacke*, No. 18-CV-237-SJB, 2018 WL 3545499, at *13 (E.D.N.Y. July 20, 2018) (vacating jury verdict under Rule 33 finding that the government had proved a different crime than the one charged at trial).

Even if the Court were to limit the introduction of "incitement" language under Rule 404(b), and even if a limiting instruction were given to the jury, the danger of introducing this evidence to a jury presents too high a risk that they will confuse the threats inquiry for an incitement one and convict Mr. Hunt under a charge the government has not brought.

### c. The Court should preclude the government from introducing expert testimony on white supremacist beliefs and anti-Semitic propaganda.

The government improperly seeks to usurp the jury's role in determining whether Mr. Hunt's statements amounted to a "true threat" by seeking to offer expert testimony on extremist beliefs and symbols. *See* Expert Disclosure, ECF No. 45. "Expert testimony is admissible under Fed. R. Evid. 702 if it addresses an issue 'beyond the common knowledge of the average layperson.'" *United States v. Hanna*, 293 F.3d 1080, 1086 (9th Cir. 2002) (citing *United States v. Morales*, 108 F.3d 1031, 1039 (9th Cir.1997) (en banc)). The issues the jury will have to decide in this case are whether Mr. Hunt subjectively and objectively communicated a "true threat" to murder members of Congress and whether he had the specific intent to interfere, intimidate, impede, or retaliate against them.

The government has advocated for the use of an objective test that asks whether "an ordinary reasonable person" would interpret the statements as a true threat. *See* ECF No. 31 at 4. "Without additional assistance, the average layperson is qualified to determine what a 'reasonable person' would foresee under the circumstances." *Hanna*, 293 F.3d at 1086 (citing *United States v. Whitfield*, 31 F.3d 747, 749 (8th Cir.1994)); *United States v. Romo*, 413 F.3d 1044, 1050 (9th Cir. 2005) ("No expert testimony was necessary on [whether a statement is a true threat] because the average juror requires no assistance assessing what a reasonable person would foresee.").

9

The proposed expert's testimony would not be probative of any fact in issue. The government does not allege that Mr. Hunt's statements were motivated by bigotry. As they stated in opposition to Mr. Hunt's motion for bond: "The defendant's threats were motivated by his view that the members of Congress were "traitors" because of their vote to certify the 2020 election results on behalf of a candidate of whom the defendant disapproved." *See* ECF No. 31 at 1. Nor does the government claim Mr. Hunt directed his statements to bigoted individuals, and "[t]he true threat test turns on whether a reasonable person would foresee that a statement would be interpreted as a threat '*by those to whom the maker communicates*.'" *U.S.A. v. Defendant(s)*, No. CR 09-01148-MMM, 2013 WL 12219027, at *2 (C.D. Cal. Jan. 14, 2013) (quoting *Hanna*, 293 F.3d at 1086). The government's proffered expert in bigoted beliefs and symbols would therefore have no bearing on the question of whether Mr. Hunt intended to and in fact did communicate a "true threat" for the purpose of obstructing members of Congress. *Id.*

What is clear is that the expert's testimony as to Mr. Hunt's allegedly bigoted beliefs would be exceedingly prejudicial. "The expert's testimony, along with the court's approval of it, would pose a significant danger of misleading the jury to believe that it should judge the words [Mr. Hunt] purportedly uttered from the perspective of a highly trained academic instead of from the perspective of an average, reasonable person." *Id.* at *2. The expert's testimony also creates the grave risk that Mr. Hunt will be convicted because an "expert" has deemed him to be a white supremacist or nazi-sympathizer. Even if that were true (and Mr. Hunt vehemently contests these conclusions), the government has not charged Mr. Hunt with being a member of an extremist group, or of being a white supremacist or nazi.

This expert testimony would also run afoul of Rule 704 of the Fed.R.Evid. ("Opinion on Ultimate Issue") which states:

> In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

The government will surely counter that the witness will not be asked the "ultimate question," or to opine on the defendant's state of mind. This argument fails to recognize how the witness's very status as an expert distorts the fair evaluation of the reasonable person test and invades the jury's province. Expertise, under Rule 702, is admissible precisely *because* it presents *specialized knowledge* which is *not* in the general purview of a reasonable person.

Should the Court permit expert testimony, the defense reserves the right to argue that the government's proffered expert fails to meet the qualification requirements in Rule 702 and to offer evidence to counter this testimony.

10

### d. The Court should preclude the government from introducing irrelevant and prejudicial character evidence under Rule 404(b).

The government's Rule 404(b) notice shows it intends to overcome the weaknesses in its case by relying on high prejudicial and inflammatory evidence of Mr. Hunt's character. *See* ECF No. 44. The three categories of 404(b) evidence they seek to admit are (i) statements related to the 2020 presidential election and U.S. Capitol riot on January 6, 2021, (ii) white supremacist and anti-Semitic propaganda beliefs and symbols, and (iii) evidence of Mr. Hunt's "violent tendencies and incarceration."

"Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Evidence of other acts "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). As this Court has recognized:

> Three requirements must be satisfied in order for evidence of '[c]rimes, wrongs or other acts' to be admitted under Rule 404(b). First, the evidence must be offered for a purpose other than to prove the defendant's bad character or criminal propensity. Second, the evidence must be relevant under Federal Rules of Evidence 401 and 402 and satisfy the balancing test under Federal Rule of Evidence 403 ("Rule 403"). Third, the court must instruct the jury about the limited purpose for which the government's evidence is being admitted if the defendant so requests.

*United States v. Napout*, No. 15-CR-252 (PKC), 2017 WL 4685089, at *6 (E.D.N.Y. Oct. 17, 2017).

The Second Circuit's "inclusionary approach to evaluating Rule 404(b) evidence," *United States v. Edwards,* 342 F.3d 168, 176 (2d Cir. 2003), does not "invite the Government 'to offer, carte blanche, any prior acts of the defendant in the same category of crime'" *United States v. Delva*, No. 12-cr-802 (KBF), 2014 WL 4460360, at *5 (S.D.N.Y. Sept. 10, 2014) (quoting *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009)) (quoting *United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002)).  Furthermore, "the Court has 'broad discretion to balance probative value against possible prejudice' under Rule 403." *United States v. Mundle*, No. 15-CR-315(NSR), 2016 WL 1071035, at *1 (S.D.N.Y. Mar. 17, 2016) (*United States v. Bermudez*, 529 F.3d 158, 161 (2d Cir. 2008)).

### i. *Mr. Hunt's statements relating to the election and riot are not admissible evidence of his state of mind*.

The government intends to introduce evidence of Mr. Hunt's political beliefs and statements as evidence of "his intent in threatening to assault and murder" members of Congress.

11

ECF No. 44, at 1. This includes not just social media posts, but also his private text messages. *Id.* at Attachment A.[3] The materials the government offers as evidence of "intent" reflect Mr. Hunt's fervent support for Donald Trump, opposition to Democrats, belief that the 2020 election was "stolen" from Donald Trump, and other conservative beliefs. *Id.* The probative value of this "intent" evidence rests on the content-driven notion that anyone who expresses political opposition is more likely to want to threaten to murder or assault those they oppose. In a democratic society that values free speech there is no place for equating passionate political opposition with a desire to engage in violence.

To be clear, we will not be disputing the relevance of Mr. Hunt's public statements or political beliefs. We do not oppose admission of Mr. Hunt's public posts on his personal social media pages to the extent they are part of the context that help determine whether his statements can be properly viewed as a threat.

The Court should nevertheless preclude the government from seeking to admit Mr. Hunt's text messages with his father around the time of the election. In the government's own estimation: "Under the objective test," however, "evidence is only relevant if it is known to the recipient." ECF No. 31, at 4 (quoting *United States v. Segui*, No. 19-CR-188(KAM), 2019 WL 8587291, at *11 (E.D.N.Y. Dec. 2, 2019)). The statements in those messages are merely shorter versions of the statements he has made online. Thus, any evidence of his private text messages should be excluded on Rule 403 grounds as irrelevant and needlessly cumulative evidence.

Should the Court permit the introduction of Mr. Hunt's political statements as evidence of his intent or state of mind, the defense reserves the right to offer evidence in response.

### ii. *Evidence of white supremacist and anti-Semitic propaganda, beliefs, and symbols is inadmissible.*

The government seeks to introduce evidence of Mr. Hunt's "knowledge" of white supremacy and anti-Semitic propaganda, beliefs, and symbols. ECF No. 44, at Attachment B. This evidence is a carefully curated selection of materials on Mr. Hunt's laptop and phones, private text messages, social media posts and searches, and browsing history. This government-selected subset of posts has no relevance to a "threat" so plainly motivated by political opposition and not directed toward non-white or Jewish members of Congress. It seems that this evidence would be offered simply to give the expert something to opine on that portrays Mr. Hunt as a bigot.

---

[3] At least one of the statements in Exhibit A is also identified in the complaint. *Cf.* ECF 1 (complaint) to ECF 44, at 2 ("exactly, enough with the 'trust the plan' bullshit. Lets go, jan 20, bring your guns #million militia march). It is unclear whether this means the government no longer intends to argue this statements is one of the four unlawful "threats" allegedly made by Mr. Hunt. The defense requests that the government provide clarification on this.

The probative value of this evidence seems uncomfortably content-driven to explain the motive for a threat that was so plainly politically driven. Whatever probative value it offers is substantially outweighed by the danger of unfair prejudice. The Court should therefore preclude any evidence of Mr. Hunt's supposed racial animus. *See Turner*, No. 09-cr-00650-DEW-JMA (E.D.N.Y.) ECF No. 85 (ordering in a § 115(a)(1)(B) prosecution that "No reference may be made to the Defendant's beliefs on matters of race or ethnicity, or membership in any organization with racist views unless the Defendant opens the door.").

Should the Court permit the introduction of this evidence, the defense will begin preparing evidence to counter the inferences the government will ask the jury to draw. If we must, we will be prepared to present evidence from Mr. Mr. Hunt's laptop and phones, private text messages, social media posts and searches, and browsing history that rebut the inference that he is a bigot and this is why he made the allegedly threatening statements.

### *iii. Evidence of the Defendant's Violent Tendencies and Incarceration.*

The final category of the government's Rule 404(b) notice threatens to introduce evidence of Mr. Hunt's "violent tendencies and incarceration" should he open the door to such issues. As set forth, below, the government's definition of "opening the door" seems to include basic arguments regarding whether the elements of a § 115(a)(1)(B) offense have been proven beyond a reasonable doubt.

We understand the government's point that if we were to argue that Mr. Hunt is a non-violent man, they might be entitled to try to rebut that. ECF No. 44 at 2. The proffered evidence of "violent tendencies" includes Mr. Hunt's text exchanges with his cousin and father, and police reports from 2007 and 2014. None of these have resulted in charges much less convictions, and the inferences to be drawn from them are more nuanced than the government cares to admit. Indeed, they are more reflective of a tendency to use violent words than violent acts.

The proverbial door to this evidence will not be opened should the defense point to the lack of evidence of a plan to engage in violent acts, co-conspirators, access to weapons, attempts to obtain weapons, possession of weapons, and similar factual matters. Where the defendant's intent to communicate a threat is at issue, courts allow evidence of an intent to engage in violent conduct. *See United States v. Bayon*, 838 F. App'x 618 (2d Cir. 2021) (approving district court's decision to permit evidence of defendant's possession of "nineteen books discovered in his apartment on topics such as bomb-making, explosives, and circumventing security alarms" to show intent to intimidate under 18 U.S.C. § 115(a)(1)(B)). If this evidence makes it "more probable" that the defendant intended to make a genuine threat, then the absence of such steps makes it less probable. *Id. See, e.g.*, *United States v. Parr*, 545 F.3d 491, 498 (7th Cir. 2008) ("A person who says he is going to bomb a building is more likely to give the impression he is serious if he actually is serious—if he actually plans to carry out his threat and is able to do so.").

13

Thus, the defense should be permitted to argue Mr. Hunt's lack of intent to engage in violent acts evinces a lack of intent to communicate a "true threat."

>The second part of this category is described by the government:
>
>Should the defendant elicit any testimony (on direct or cross-examination), offer evidence, or argue to the jury that responses by law enforcement, victims, or other individuals were deficient, delayed, or otherwise indicative that the threats were not taken seriously, the government intends to introduce evidence and testimony regarding the effect of the defendant's incarceration on the responses by law enforcement and/or victims.

We do not fully comprehend this, but it seems the government is suggesting we cannot bring out the lack of immediate response by the Capitol police as a fact for the jury to consider in applying the reasonable person test *because our client is incarcerated.* This, on its face, is simply wrong. Our client was identified by the FBI on January 8, 2021; he was not incarcerated until January 19, 2021. Whatever happened up until that point goes directly to the reasonable person/objective test of "true threat" analysis. It cannot possibly be that questioning witnesses about "true threat" factors opens the door to the prejudicial fact that our client is incarcerated.

We are entitled, indeed obligated, to explore these factors and the strength or weakness of the government's case. We are similarly obligated to test the strength of the government's evidence on the specific intent requirement: that the defendant make the threat with intent to interfere, impede, intimidate or retaliate against federal officials. On that element, the Second Circuit applies an objective test: "whether an ordinary, reasonable recipient who is familiar with the context of the communication would interpret it as a threat of injury." *Turner*, at 420. This inquiry is limited to a "reasonable person" test, and while the response of the victim may be relevant, it is not dispositive.

### e. The government's failure to preserve the reactions to the BitChute Video should preclude introduction of the video as a "true threat."

The government claims the BitChute Video is a "true threat" because it "may have tended to incite violence" by any "co-conspirators." *See* Gov. Opp. to Bond Motion, ECF No. 7. n.4. When the government preserved a copy of the BitChute Video it had 425 views, nine "likes" and eight "dislikes." BH-00001968. The copy of the video – the origin of which is unclear – that shows the Bitchute "framing" fails to include the comments to the video, depriving the defense, the Court, and the jury of the opportunity to consider the context of the statements and listener's reactions.

It is certain there were comments, because the government has produced two of Mr. Hunt's responses to those comments in its April 5, 2021, 404(b) notice letter – apparently obtained by subpoena from Bitchute – but without offering any context for what prompted those comments by Mr. Hunt. After the government's first discovery production, the defense

immediately requested the comments to the BitChute Video because they contain the best evidence available to test the government's claim that an ordinary person viewing the video would consider it to communicate "true threat." Defense Request for Discovery dated Feb. 28, 2021, ECF No. 13. The government's failure to preserve the comments to the BitChute Video is inexcusable and prevents the jury from fairly evaluating whether it is a "true threat." The proper sanction is to preclude introduction of the BitChute Video.

"Spoliation is 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 435 (S.D.N.Y. 2010) (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001)). "Non-production and destruction [of evidence] are subject to the same sanctions." *Gill v. Arab Bank*, PLC, 893 F. Supp. 2d 542, 550 (E.D.N.Y. 2012).

"A district court has broad discretion when determining the appropriate sanctions for spoliation." *Taylor v. City of New York*, 293 F.R.D. 601, 614 (S.D.N.Y. 2013). Spoliation of evidence warrants dismissal of the indictment on due process grounds where the "(1) the government destroyed evidence which was potentially useful and had exculpatory value that was apparent before it was destroyed, (2) the government did so in bad faith, and (3) the destroyed evidence was of such nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Soriano*, 401 F. Supp. 3d 396, 400 (E.D.N.Y. 2019). Where spoliation of evidence does not rise to the level of a due process violation, the Court can nevertheless impose sanctions where the following conditions are met:

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind' and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004).

The first prong of the test for spoliation is easily met: the government had a duty to preserve the reactions to the BitChute Video when it preserved a copy of the video for use in Mr. Hunt's investigation and eventual prosecution. "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *United States v. Barnes*, 411 F. App'x 365, 368 (2d Cir. 2011) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)). "Once the duty to preserve evidence attaches, a party must save any evidence that it 'reasonably should know is relevant' to an anticipated action." *Taylor*, 293 F.R.D. at 611 (internal quotation omitted).

Once the government began investigating whether the BitChute Video was a "true threat" they were on notice that the reaction of anyone who saw the video was "highly probative

15

evidence." *See United States v. Malik*, 16 F.3d 45, 50 (2d Cir. 1994) (regarding the "recipients' states of minds and their reactions" as "significant" evidence of a "true threat"); *see also Bagdasarian*, 652 F.3d at 1121 (considering the reactions of "three or four discussion board members" when determining whether a comment on a message board was a "true threat"). They were aware that the comments and reactions to the BitChute Video would also provide essential context to any jury or Court evaluating the existence of a "true threat." *See Griepp*, 2021 WL 900682, at *19 (noting that "context is critical" when determining the existence of a true threat). There is no question the government had the duty to preserve not just the BitChute Video, but any comments, likes, or dislikes made in response.

The second prong is also met: the government's failure to preserve the reactions to the BitChute Video amounted to gross negligence. "In this circuit, a 'culpable state of mind' for purposes of a spoliation inference includes ordinary negligence." *Richard Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284, 290 (S.D.N.Y. 2009). As part of its determination that the BitChute Video contained "true threats," the government surely reviewed the surrounding comments and reactions. There is no question that the government looked at the comments section to determine whether anyone responded to Mr. Hunt's call to action and request for a firearm. Had they found anything resembling such a response, they would have certainly preserved it like they preserved the video itself. That they did not strongly suggests there were none. For that reason, the choice to preserve the BitChute Video without the comments went far beyond ordinary negligence: it was a failure to preserve potentially exculpatory information.

The third prong is met for the reasons set forth above: the evidence the government failed to preserve was not just relevant, but helpful to the defense. To determine the need for a sanction, "[t]he court must make a 'case-by-case assessment' that examines the discarded evidence's 'significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the government's untainted proof.'" *Soriano*, 401 F. Supp. 3d at 400 (quoting *United States v. Grammatikos*, 633 F.2d 1013, 1020 (2d Cir. 1980)). In addition, "[t]he burden placed on the moving party to show that the lost evidence would have been favorable to it ought not be too onerous, lest the spoliator be permitted to profit from its destruction." *Chan v. Triple 8 Palace, Inc.*, No. 03-cv-6048, 2005 WL 1925579, at *7 (S.D.N.Y. Aug. 11, 2005).

The government's failure to preserve any of the comments deprives the defense of a showing that those who viewed the BitChute Video while it was still online did not take it seriously. Without that context, the defense is unable to counter the inference that the government will ask the jury to draw from the testimony of the tipster, for whom 3500 material was provided. That witness claimed that he called the FBI because "someone needed to be the adult in the room," 3500-HW-000003. Yet even that witness has no information about the response to the BitChute Video. It was incumbent upon the government to preserve these responses in the comments. Mr. Hunt's BitChute channel was shut down before his arrest.

The government agent who viewed the video in the first instance, following the tip, surely took note of the responses and would have paid attention to any that indicated that any "followers" or "co-conspirators" were willing to heed the call to take up arms. That these did not

16

exist and that we have reason to believe that other comments suggested Mr. Hunt's words were not taken literally, the comments were potentially exculpatory. *See Soriano*, 401 F. Supp. at 404 (ruling that spoliation of evidence whose "exculpatory nature . . . was readily apparent to the agents" violated due process). The lack of comments leads to the fair inference that of 425 viewers, only one – the tipster – took the threat seriously enough to report it.

The importance of the comments to the question of whether the BitChute Video meets the "objective test" for a "true threat" cannot be understated. Without this evidence, the only reactions to the BitChute Video available to the jury are those of law enforcement and the individual that reported the video. The government's spoliation of evidence that likely contained anywhere from dozens to hundreds of reactions to the video prevents the jury from fairly evaluating whether it was a "true threat." Accordingly, the only appropriate sanction is to preclude the government from introducing the BitChute Video.

### f. The government should provide a basis for the extensive redactions in the 3500 materials and discovery.

We respectfully request that the government justify the heavy redactions in the 3500 material and discovery, as it is impeding our ability to prepare, and much of it appears to be baseless. Rule 16(d)(1) of the Fed.R.Crim.Pro. provide a method by which the government may seek to limit full disclosure:

> (1) *Protective and Modifying Orders*. At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect ex parte. If relief is granted, the court must preserve the entire text of the party's statement under seal.

Similarly, 18 U.S.C. § 3500, does not protect against disclosure of a witness' (or prospective witness') identity. *United States v. Blake*, No. 3:16CR111 (JBA), 2017 WL 3097494, at *2 (D. Conn. July 20, 2017).

We thank the Court for its time and consideration.

> Respectfully submitted,
>
> /s/
> Jan A. Rostal
> Leticia M. Olivera
> Attorneys for Brendan Hunt

cc: Counsel of Record