# Federal Defenders
OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

May 14, 2021

**Via Email and ECF**
The Honorable Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *United States v. Brendan Hunt*, 21-cr-0086-PKC

Your Honor:

We offer this letter brief in support of our motion for a judgment of acquittal under Fed. R. Crim. P. 29(a), which the Court reserved pursuant to Fed. R. Crim. P. 29(b). We also move for a judgment of acquittal under Fed. R. Crim. P. 29(c).

**Standard Under Rule 29**

The standard under Rule 29 is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). If the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (quoting *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002).

We respectfully submit that no rational juror could conclude, beyond a reasonable doubt, that Mr. Hunt's Bitchute video speech (GX 5) was a true threat under the applicable statutory and constitutional law. It is instructive that he was acquitted of three of the four threats charged:

- A December 6, 2020 Facebook post calling for President Trump to "[s]tart up the firing squads and hold a "public execution of Pelosi aoc schumer etc" and "if you don't do it, the citizenry will. . . take america back!" (GX 151F);
- A December 6, 2020 post on Mr. Hunt's Facebook account saying "anyone enforcing this lockdown mask vaccine bullshit deserves nothing less than a bullet in their fucking head. . . go after a high value target like Pelosi schumer or AOC…these commies will see death before they see surrender us! USA!" (GX 151G);
- A January 12, 2021 Parler post responding to a user named Deeds Not Words, who said that "the Republic will not survive lukewarm platitudes and half-hearted action," to

1

which Mr. Hunt replied "let's go, Jan 20, bring your guns # millionmilitiamarch." (GX 151B).

The fourth alleged threat – the January 8, 2021 Bitchute video – used the same sort of figurative revolutionary speech pattern (citizenry, public execution, firing squad, traitors, patriots, slaughter) mixed with profanity:

> Hey guys, so we need to go back to the U.S. Capitol when all of the Senators and a lot of the Representatives are back there and this time we have to show up with our guns and we need to slaughter these motherfuckers.
>
> What I'm saying is that our government at this point is basically a handful of traitors, so what you need to do is take up arms, get to DC probably the inauguration—so called inauguration-- of this uh motherfucking communist Joe Biden. That's probably the best time to do this.
>
> Get your guns show up to DC and literally just spray these motherfuckers. Like, you know, that's the only option. They're gonna come after us. They're gonna kill us. So we have to kill them first. So get your guns. Show up to DC; put some bullets in their fucking heads. If anybody has a gun, give me it, I will go there myself and shoot them and kill them. We have to take out these Senators and then replace them with actual patriots, basically I would trust anybody over them at this point uh this is a ZOG government um, you know, that that's basically all I have to say. Let's, uh, take up arms against them.

GX5.

The key feature that potentially separates the Bitchute statement from the three acquitted statements is the line: "if anybody has a gun give me it, I will go there myself and shoot them and kill them." We submit that, given the entire context, this statement lacks the necessary attributes for a reasonable juror to find beyond a reasonable doubt that this statement constitutes a "true threat." *See New York ex rel. Spitzer v. Operation Rescue Nat'l,* 273 F.3d 184, 196 (2d Cir. 2001) (quoting *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir. 1976) ("When determining whether a statement qualifies as a threat for First Amendment purposes, a district court must ask whether 'the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution[.]'").

The "if anybody has a gun" line in the Bitchute video is analogous to the statement of one Robert Watts, whose conviction for threatening the life of then President Lyndon Johnson by saying (about the Vietnam draft) "if they ever make me carry a rifle the first man I want in my sights is L.B.J." *United States v. Watts,* 89 S. Ct. 1399 (1969). Mr. Watts's conviction was reversed by the Supreme Court, which found that the threat to LBJ was

> a kind of very crude offensive method of stating a political opposition to the President. Taken in context, and regarding the expressly conditional nature of

> the statement and the reaction of the listeners, we do not see how it could be
> interpreted otherwise.

Taken in the light most favorable to the Government, no reasonable juror could find that the evidence at trial proved that the Bitchute speech was a true threat, rather than hyperbole or, at worst, political incitement. However offensive this speech is, the breathing room for public debate on core political issues guaranteed in the First Amendment protects it against prosecution as a "true threat." Accordingly, this Court should enter a judgment of acquittal.

**Special First Amendment Protection Afforded to Core Political Speech and Advocacy of Force or Violence**

The Court instructed the jury as follows:

> the First Amendment protects vehement, scathing, and offensive criticism of public officials, including Members of Congress. The First Amendment therefore protects political exaggeration or expressions of opinion. Further, the First Amendment protects mere advocacy of the use of force or violence.

Tr. 1129.

This instruction follows the balance struck in *Brandenburg v. Ohio,* 395 U.S. 444, (1969), that protects advocacy such as the calls to arms found in many of Mr. Hunt's social media posts. *See id.* at 447 (ruling that the First Amendment protects "advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action"). Those posts clearly fail to satisfy *Brandenburg*'s imminence requirement, as they are not directed to anyone in particular. *See also Hess v. Indiana,* 414 U.S. 105,107 (1973) ("Since the uncontroverted evidence showed that Hess' statement was not directed to any person or group of persons, it cannot be said that he was advocating, in the normal sense, any action."). Courts have repeatedly affirmed *Brandenburg*'s imminence requirement even with respect to speech that advocates violence. *See, e.g. NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ("This Court has made clear that mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment."). In a recent (March 2021) opinion, the Ninth Circuit applied *Brandenburg* to sever portions of the Riot Act, 18 U.S.C. § 2101 and 2102, which outlawed the urging, promoting, organizing and encouraging acts of violence or the assertion of the rightness of or the right to commit any such act. *See, e.g., United States v. Rundo*, 990 F.3d 709, 721 (9th Cir. 2021).

It is not a surprise then that the jury, instructed that "mere advocacy of the use of force or violence" is constitutionally protected, did what it was supposed to do: it found Mr. Hunt not guilty of the three statements that contained mere advocacy. But the jury reached the wrong verdict on the lone arguably "threatening" statement, the Bitchute video. On that statement it was not the "mere advocacy" instruction that should have prevailed, but rather the "true threat" analysis. On that point, the evidence was insufficient.

The pure political content of this case is obvious. Mr. Hunt's Bitchute video arose during the 2020 Election and in the aftermath of the so-called Capital Riots (or Protests, depending on one's political views). A more core political moment or subject matter cannot be imagined. As evidence at trial showed, Mr. Hunt was an educated, intelligent person who became consumed with politics during the lockdown of the COVID-19 pandemic, which happened to coincide with the most fraught election in history.

"[T]he [Supreme] Court has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983). "Although the boundaries of what constitutes speech on matters of public concern are not well defined, [the Supreme] Court has said that speech is of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 443 (2011) (internal citations and quotations omitted). Matters of public concern are "at the heart of the First Amendment's protections," and reflect "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id.* at 451–52.

It is tempting in the face of speech such as Mr. Hunt's to react to the injury it causes "by punishing the speaker," but "as a Nation we have chosen a different course — to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Id.* at 460–61.

These are the words of Chief Justice Roberts in his 2011 majority opinion (only Justice Alito dissented) involving a lawsuit against one Red Phelps, "who founded the Westboro Baptist Church in Topeka, Kansas, in 1955," and whose congregation lived by and advocated the view that "God hates and punishes the United States for its tolerance of homosexuality." *Id.* at 448. Mr. Phelps' church had picketed some 600 military funerals at the time of the Supreme Court case, carrying signs that were largely the same at all three locations. *Id.* They stated, for instance: "God Hates the USA/Thank God for 9/11," "America is Doomed," "Don't Pray for the USA," "Thank God for IEDs," "Thank God for Dead Soldiers," "Pope in Hell," "Priests Rape Boys," "God Hates Fags," "You're Going to Hell," and "God Hates You." *Id.* By 2011, Mr. Phelps' view that homosexuality was an abomination had fallen into serious disfavor, and by that point it was the Red Phelps among us who were seen on the wrong side of history. *Id.* at 460 ("Westboro believes that America is morally flawed; many Americans might feel the same about Westboro."). Which is precisely why his speech was protected by the Supreme Court, which reversed a multimillion dollar award for emotional distress damages for the father of a soldier killed in Iraq who had to endure these offensive placards at his own son's funeral.

Despite the pain inflicted by Phelps and his church's words, the Supreme Court did what it has been doing since the Civil Rights protests of the 60's: it protected free speech *even* when it seemed contrary to our every instinct about civilized discourse in matters of public concern. Indeed, "the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston, Inc*., 515 U.S. 557, 574 (1995).

Applying these guiding principles, we respectfully ask that the Court enter a judgment of acquittal here even though it means tolerating ideas that hurt, offend, and may even tempt others to violence. Our firm belief is that this tolerance is what "makes America great," and that Mr. Hunt and all of society is better served by his learning this lesson through the natural consequences that befall those who carelessly or foolishly challenge the prevailing narrative. Touting oneself as a revolutionary comes with consequences, but unless one's revolutionary rhetoric becomes a "true threat" or likely to produce "imminent lawless action," those words are protected by the First Amendment. *Brandenburg,* 395 U.S. at 447 (1969).

We respectfully submit that it is a mistake of constitutional proportions to apply the self-perpetuating retributive machine that has become our criminal justice system to the newest of social problems: the limits of Internet speech. The facts of this particular case simply do not support it.

**Element One: True Threat**

To prove the crime charged, the Government had to prove a "true threat." We begin with the term "threat" as set forth in 18 U.S.C. § 115(a)(1)(B).

The plain language of § 115(a)(1)(B) provides, in relevant part: "Whoever – <u>threatens</u> to assault, kidnap, or murder, a United States official … shall be punished as provided in subsection (b)." 18 U.SC. § 115(a)(1)(B) (emphasis added). Incitement is proscribed elsewhere, *inter alia,* 18 U.S.C. § 2101 (Riot Act), 18 U.S.C. § 2383 (Rebellion), 18 U.S.C. 2384, 18 U.S.C. § 2384 (Sedition), or 18 U.S.C. § 2385 (Violent Overthrow). Here, the Government opened on a theory of direct threat, and thus took on the burden of proving each of the alleged threats under § 115(a)(1)(B). With its verdict, the jury narrowed that charge down to the one alleged threat in the Bitchute video.

The Court instructed the jury that the test in this Circuit is the "reasonable recipient" test, which requires that "a reasonable recipient familiar with the context" would understand it as a "serious expression of an intent to do harm" to the recipient. *United States v. Turner*, 720 F.3d 411 (2d Cir. 2013). But this case is different from *Turner.*

- Turner posted threats on his website to specific, named judges, and tied those threats to the *actual* murder of a judge, and Turner had taken some credit for inciting that murder by saying that the murdered judge had "made a ruling in court that I opined made her 'worthy of death[,]' [and] [a]fter I said that, someone went out and murdered her husband and mother inside the Judges Chicago house." Turner's statements publicly implied a causal connection between his calls for judges' deaths and *actual* murders, thus making his statements about Judges Easterbrook, Bauer, and Posner, reasonably interpreted by the jury as the serious expression of intent that these judges, too, come to harm. *Id.* at 420.
- The seriousness of Turner's threat was heightened by his posting of the judges' photographs and work addresses, coupled with Turner's admission in an email a few weeks earlier that releasing addresses was an "effective way to cause

5

otherwise immune public servants to seriously rethink how they use [their] power." *Id.* at 422-23.
- Turner's advocacy of violence against Judges Easterbrook, Bauer, and Posner was made imminent by the posting of photographs, work addresses and room numbers for each of the judges, along with a map and photograph of the courthouse. 720 F.3d at 423.

The facts of *Turner* are thus easily distinguishable from Mr. Hunt's case. First, Turner was a well-known radio "shock jock" with an established following that included "violent white supremacist groups such as the Ku Klux Klan and Aryan Nations." *Id.* at 414. Mr. Hunt had no following to speak of, apart from his Kurt Cobain videos on Youtube. No co-conspirators were noticed or proved at Mr. Hunt's trial. There was no evidence that Mr. Hunt knew or had any direct interaction with a single Bitchute user.

His Bitchute channel was not known to the FBI or any other law enforcement agency, and was unknown to every witness who testified. Turner, on the other hand, was widely read and followed by extremist groups, which was relevant to whether Turner intended for his threats to reach—and thus to intimidate—Judges Easterbrook, Bauer, and Posner. *Id.* at 427. In fact, Turner represented himself as having command or control over his large audience of extremists and "emphasized his status in the white supremacist community." *Id.*

Second, and most pointedly, Turner's "threatening speech was targeted against specific individuals or was communicated directly to the subject of the threat." *Turner*, 730 F.3d at 432; quoting *Fogel v. Collins*, 531 F.3d 824 (9th Cir.200). Here, there was no evidence that Mr. Hunt had any knowledge of, much less control, over Bitchute viewers. There was no evidence that any Members of Congress were users of Bitchute or would have had occasion to view the video. Mr. Hunt mentioned no specific target of the threat in the video -- beyond the entirety of Congress. Turner's threat was more of a surgical strike to the heart of three judges and their whereabouts. Hunt's amorphous references to "going back to Washington" (where evidence showed he had never been) for "probably the inauguration," lacked any of specific identifiers of the sort used by Turner, who mapped the course of crime for his followers, even down to the placement of the "anti-truck bomb barriers" in front of the courthouse. *Id.* at 414.

Viewed as a whole, the Bitchute video is, at most, incitement, not a threat. The video itself is exhorting *others* to "take up arms against" the politicians. It is entitled in the imperative grammatical voice: "KILL YOUR SENATORS" and captioned "SLAUGHTER THEM ALL" – not "I WILL KILL SENATORS" or "I WILL SLAUGHTER THEM ALL." This is not a pedantic distinction. It strikes at the crux of a threat: whether the statement warns of violence the speaker has some control over. A speaker who exhorts others may be inciting violence, but he is not threatening it.

In a case involving similar exhortations made directly to a threat recipient, *United States v. Weiss*, 475 F.Supp. 3d 1015 (N.D. Cal 2020), the court dismissed an indictment finding no true threat. There, the defendant had sent eight email messages directly to Senate Majority Leader Mitch McConnell. Some of the messages are worth repeating here:

1. If you push this for Friday, the resistance is coming to DC to slash your throat. You will die in thestreet by DC resistance motherfucker!!!!!
2. turtle cum drinker, The yelling resistance should have put a bullet in your head and then kill all the people you love!  (following these two threats, a law enforcement officer contacted Weiss and told him to be mindful because his emails could be interpreted as threats)
3. Go fuck yourself. I have been furloughed and you heartless bastard could give a shit. You fucking criminal. Someone needs to kill you!  You are going to lose next election and we will get rid of your satanic evil ass you loser fuckhead  (once again, Weiss was told by law enforcement to be mindful)
4. Losers will die turtle, Go fuck yourself you fucking criminal motherfucker.  In 2020, You are fucking a closed case. You are a fucking dog who will be put down!!!
5. We need your chink whore to go back To where the fucking gook came from. You motherfucking racist scum. The Kentucky Resistance says they are going to cut your throat from ear to ear and then your gook wife's.
6. Subject:  The gravity of your nonexistence.  Whether you believe it or not, after watching Frontline the Kentucky Resistance is going to totally execute you. They have stated you are a deadman! And soon. We are so glad to hear that they are finally going to take action. We cannot wait to know you are dead.

*Id.* at 1020–23.

Senator McConnell's staff, who received the messages, flagged them as threatening. *Id.* at 1036. Still, the court found that no reasonable jury could find that Weiss's statements were true threats as, despite being directly sent to their recipient, they predicted that *other* people would do the harm to the Senator. In reaching its conclusion, the *Weiss* Court cited the Second Circuit's opinion in *New York ex rel. Spitzer v. Operation Rescue Nat'l,* 273 F.3d 184, 196 (2d Cir. 2001), for the proposition that no reasonable jury could find that statements predicting that "*other people* would harm Senator McConnell" met the definition of true threat. 475 F. Supp. 3d at 1037. The *Weiss* Court specifically cited this portion of *Operation Rescue Nat'l*:

> generally, a person who informs someone that he or she is in danger from a third party has not made a threat, even if the statement produces fear. This may be true even where a protestor tells the objects of protest that they are in danger and further indicates political support for the violent third parties.

*Weiss*, 475 F.Supp. at 1036.

The "if anybody has a gun" line should not change this analysis. Seeking a gun from others is simply not the same as conveying a threat to harm someone. Still, even if this line is viewed as a first-person threat rather than exhortation, it is worded too conditionally and wishfully to be treated as a true threat. The Second Circuit has specifically acknowledged that syntax is "a relevant fact for consideration in appropriate cases," *Turner*, 720 F.3d at 423, particularly when the alleged threats are short and unclear.

Another case worthy of discussion is *United States v. White*, 670 F.3d 438, 513 (4th Cir. 2012). There, the court ruled that "direction for *others* to kill a specific individual would only be a true threat if the speaker had some control over those other persons or if [their] violent commands in the past had predictably been carried out[.]"). This is similar to the notion in *Operation Rescue Nat'l,* 273 F.3d at 196, that the reasonable recipient of a true threat must be "fearful of the execution of the threat *by the speaker* (or the speaker's co-conspirators)."

In *White,* the defendant was the "Commander" of the American National Socialist Workers' Party, who posted on a white supremacist website an article describing the firebombing of a civil rights activist's house by a neo-Nazi group and wrote underneath the link, "Good. Now someone do it to Warman." He posted an entry on his own website entitled "Kill Richard Warman, man behind human rights tribunal's abuses should be executed." The posts read:

> Richard Warman, the sometimes Jewish, sometimes not, attorney behind the abuses of Canada's Human Rights Tribunal should be drug [sic] out into the street and shot, after appropriate trial by a revolutionary tribunal of Canada's white activists. It won't be hard to do, he can be found easily at his home, at [Warman's home address]…Richard Warman is an enemy, not just of the white race, but of all humanity, and he must be killed. Find him at home and let him know you agree: [Warman's home address]."

A few months later, White reiterated this call, posting a blog entry entitled "Kill Richard Warman," that included Warman's home address and the statement and read:

> I do everything I can to make sure everyone knows where to find this scum, particularly because it makes him so mad: Kill Richard Warman! [Warman's home address].

The recipient of the threats, Warman, testified at White's trial that he read these internet postings and considered them to be "death threats," and took extreme responsive steps such as moving his family, using other names to prevent his being found in public searches, and not giving his child daughter the Warman surname.

The Fourth Circuit affirmed White's 18 U.S.C. § 875 convictions as to private parties but reversed as to Warman, a public figure. In reaching its conclusion the *White* court found that "while a direction to others to kill Warman could have amounted to a threat if White had some control over those other persons or if White's violent commands in the past had predictably been carried out, none of that context exists in this case . . . and the communications fell short of being true threats." *White,* 670 F.3d at 515. Thus, while it is true that "neither direct communication nor personal or group involvement in the threat is an essential component to finding a true threat, the lack of both" makes "it impossible [to] conclude that a reasonable recipient would understand White's communications to be serious expressions of intent to commit harm." *Id.* at 513-14.

Of course, Mr. Hunt's Bitchute video was indirect (meaning not directed to the threatee), as were the threats *White* and *Turner.* But in both cases, *White* and *Turner,* the threats, though indirect, contained an attention to detail about the victim's identifying whereabouts. Most threat cases contain such detail, and don't involve an entire amorphous group, and cases that lack detail

8

make up for it in specific and direct targeting of the threatened victim. *See, e.g., United States v. Sovie*, 122 F.3d 122 (2d. Cir. 1997) (defendant called ex-girlfriend 22 times for two days making graphic threats on her life); *United States v. Malik*, 16 F.3d 45, 48 (2d. Cir. 1994) (defendant sent a letter threatening a judge overseeing his pending litigation, as well as the families of the defendant); *United States v. Davila*, 461 F.3d 298 (2d. Cir. 2006) (defendant sent an envelope with a threatening letter and a white powdery substance said to be anthrax to a prosecutor's office).

We believe that *White, Watts,* and *U.S. v. Bagdasarian*, 652 F.3d 1113 (9th Cir. 2011), are the most factually on point cases here. The Court will recall that no true threat was found in *Bagdasarian,* who had posted a threat to kill then-Presidential candidate Obama on an online message board two weeks before the election, stating "Re: Obama fk the niggar, he will have a 50 cal in the head soon" and "shoot the nig." A search of Bagdasarian's home uncovered six firearms, including a Remington model 700ML .50 caliber muzzle-loading rifle, as well as .50 caliber ammunition. A search of his computer also recovered emails sent on Election Day showing a link to a webpage advertising a large caliber rifle, saying "Josh needs to get us one of these, just shoot the nigga's car and POOF!," and another that showed a link to a video of blown up cars saying "when you use a 50 cal on a nigga car you get this."

Despite the unconditional, alarming, and dangerous nature of these statements, the Ninth Circuit ruled that "given any reasonable construction of the words in his postings" the statements could not be objectively perceived as a true threat. 652 F.3d at 1122-23.

As nothing in this record could prove that Mr. Hunt had the sort of control or influence over co-conspirators that the defendant enjoyed in *Turner,* the jury would be left with the plain language of the statement itself. Breaking it down past the indicative exhortations, only the "if anyone has a gun give me it" statement can possibly count as a threat. But there is nothing about this statement that suggested this was a serious request for a firearm. For one, it was made in a social media post to no one in particular. Nothing in the video instructed anyone on how, where, or when to provide the firearm.

The comments to the video further undermine the Government's theory that this statement is sufficiently serious, specific, unconditional, immediate, to be deemed a true threat. Importantly, of the 15 comments on the Bitchute video, not a one offered Mr. Hunt a gun or joined in a "plan" to go back to Washington and "Slaughter them All." DX 10.



9

The comments also video the clear over-the-top and non-serious nature of a video where an admittedly unarmed person who did not participate in the Capitol riot calls others to arms and "slaughter" the entire U.S. Congress.



Other commentators simply made fun of Mr. Hunt, or questioned his *veritas* as a right-winger (DX 10).

 

 

One commentator said "Absolutely!" and another responded that "It is time for secession. I don't understand why anyone would want to remain part of an America that exists in name only." DX 10. These suggest precisely what was intended – to spark a discussion among the viewers about the merits of revolution or secession – a legitimate political debate.

Context evidence similar to this was identified as one of the factors supporting reversal in *Bagdasarian.* There, as with Mr. Hunt's Bitchute video, only one reader of the post actually alerted law enforcement to it. 652 F.3d at 1121. The other reactions were negative comments that seemed to judge the defendant's post as offensive or encouraging of racism or violence. But negative reactions to the messages should not "be taken to mean that they or others interpreted them as a threat. It is certainly more significant that among the numerous persons who read [mr. Hunt's] messages, the record reveals only one who was sufficiently disturbed to actually notify the authorities." *Id.*

Rather than offering evidence of how regular people responded, or how any Members of Congress or their staff reacted *before* being told of Mr. Hunt's arrest, the Government's reaction evidence consisted entirely of that of the FBI, which was building a case against Mr. Hunt, not protecting the threat recipients. While it might seem that the goals of protection and prosecution are one and the same they are not. The Government focused on the reaction of law enforcement, which from the day the FBI was tipped off to the video, proceeded with a prosecution and culminated with a high profile arrest and press release. It bears emphasizing that the Government did not present the testimony of a single non-law enforcement witness who independently viewed the threat *prior to Mr. Hunt's arrest*.

How law enforcement agents react to a threat is perhaps the *least* probative of the reasonable person test for a true threat. As stated in *United States* v. *Hanna*, 293 F.3d 1080, 1086 (9th Cir. 2002):

> Hanna did not send his writings to the law enforcement and Secret Service agents. He distributed letters to neighbors, businesses and governmental organizations, which then forwarded the documents to the police or the Secret Service. The true threat test turns on whether a reasonable person would foresee that a statement would be interpreted as a threat "by those to whom the maker communicates." Because Hanna did not communicate with the law enforcement officers, their reactions to the documents had little bearing on the question at issue—what a reasonable person in Hanna's position would have foreseen with regard to the persons with whom he communicated. Indeed, the law enforcement officers were particularly unqualified to comment on what the "reasonable person" would have foreseen. Because of their extensive training, experience and expertise, law enforcement officers and especially Secret Service agents, would see potential dangers to the President which a reasonable person receiving Hanna's documents might not notice or would consider innocuous. In this case, using highly trained agents to determine what a reasonable person would foresee was like using a bloodhound to determine whether the average person would pick up a scent.

The *Hanna* court reversed and remanded for a new trial on this very point – that the law enforcement officer's threat assessment was not relevant to the reasonable person test and invited prejudicial reliance by the jury. This could not be harmless error, and *Hanna* court reversed and remanded for a new trial. 293 F3d. at 1087.

It is for similar reasons that a reasonable juror would need to discount the threat assessment perceptions of the other witnesses, such as the staff member working in Representative Ocasio-Cortez's office–whose knowledge of the threat *came from the FBI.* A reasonable person assessing the seriousness of a threat does not do so after being told that the threat resulted in the criminal prosecution and detention of the person making the threat. This is the antithesis of the reasonable person test. A person who is told that a criminal has been arrested and detained for a serious crime is naturally going to be afraid of the person and view their "threat" from a biased perspective.

Importantly, the Government did not call the tipster who called the FBI, despite having noticed him as a witness. He was the person who saw the video on Bitchute and would have been in the best position to amplify the reasonable person standard, being a real time viewer familiar with the context. That the Government did not call him at the trial must be considered in the assessment of the lack of proof on this point.

Also telling is the lack of response by the U.S. Capitol Police, the law enforcement body charged with protection of Members of Congress (as opposed to the FBI, charged with prosecuting individuals). The Capitol Police did not act on the purported "threat" at all. Nor did the Secret Service, despite the fact that the Bitchute video included reference to Joe Biden and the Inauguration – and despite the fact that the video was largely an exhortation for *others* – not Mr. Hunt himself – to act. The fact that Mr. Hunt was being surveilled during the 11 days between video and arrest does not neutralize the threat of the "we" or the "you" referred to time and time again in his postings.

The only evidence that the Capitol Police were involved, prior to Mr. Hunt's arrest, in dispatching their protection duties, was that an unnamed capital police agent learned about the social media post from the FBI but did not input that into the Capitol Police system at all. Tr. 409. This individual was not called as a witness, and instead the Government called a Capitol Police witness who testified that he did not in fact even *learn* of Mr. Hunt until March 2, 2021, when he was called by the NYPD – not the FBI. Tr. 403–404. He suggested in his testimony that the Capitol Police "defer[red] to the FBI" in this matter, but there is no evidence of that. Tr. at 381. Indeed, though Special Agent Desrosiers had been in contact with the FBI Special Agent assigned to the case, Agent Erica Dobin, *they never discussed the Hunt threat or the Bitchute video* prior to March 2, 2021. Tr. 406. Indeed, there is no evidence of any coordination at all between the Capitol Police with respect to the FBI's investigation of Mr. Hunt.

The evidence further showed that between January 8th and January 18th no one, not the Capitol Police, the FBI, or the Secret Service, contacted a single member of Congress or their staff with security concerns. *Id.* That they were busy does not explain that why they were not taking a threat to Members of Congress seriously while they were busy protecting Members of Congress from threats. A reasonable person charged with protecting Members of Congress,

aware of the context of this Bitchute video, if placed in fear by virtue of that information, would have acted on that information with respect to the victims. Instead, the FBI kept the case to themselves, proceeded full throttle toward a prosecution of Mr. Hunt, while not involving the Capitol Police – or any other agency – to protect the very people they claim were placed in harm's way by virtue of Mr. Hunt's Bitchute post.

The eleven-day FBI investigation and the aftermath also cuts against any finding that, under the circumstances, Mr. Hunt's Bitchute post could be viewed beyond a reasonable doubt as a true threat. It demonstrated that the FBI Domestic Terrorism Squad searched its databases and uncovered nothing to indicate that Mr. Hunt was connected to terrorist groups, or had any conspirators within his control. Tr. 290–294. Despite the in-depth investigation, agents were unable to identify any connections to extremist or terrorist groups, found no interest in or purchases of firearms, ammunition, or other weapons, and found no other evidence that Hunt ahd ties to any violent or extremist organization. Search warrants and a search of his home revealed no writings, emails, calls, or any such communications to any members of Congress. Tr. 300–302. He was not in possession of any maps or addresses, nothing to tie the statements made in the Bitchute video with any actual plan or even any research into how he might effectively impede or retaliate against any real Members of Congress. His obvious bluster in the Bitchute about going "back" to the Capitol and taking up arms, unsurprisingly turned out to be just that – as he never was at the Capitol.

The fact that Mr. Hunt's video was on Bitchute, and not the more ubiquitous Youtube, or Facebook, where Members of Congress are more likely to visit and see, is worthy of discussion at this point. Not a single witness testified that Bitchute was known in Congressional circles or that Members of Congress had Bitchute accounts. The Supreme Court has stated that when applying the reasonable person test, "[s]tatements on social media that are pointedly directed at their victims," are "much more likely to be taken seriously." *Elonis v. United States*, 575 U.S. 723 (2015) (concurrence); *see also United States v. Cassidy*, 814 F. Supp. 2d 574, 577–78 (D. Md. 2011) (no true threat found where defendant's statements were made on blog posts not directed to the recipient and therefore were less threatening). No such finding that Mr. Hunt pointedly directed his video to Members of Congress could be made here. In fact there was no evidence that Mr. Hunt made any effort to ensure that the video would be seen by (or that its contents would be relayed to) the supposed targets of the "threat." *Cf. Elonis*, 575 U.S. at 748 (noting evidence that the defendant made sure his wife saw the posted threat).

This more Bitchute context is important. While during the trial we often talked about a "comedy club," the better analogy for Bitchute might be the Internet version of the local pub where one might let down one's guard. Mr. Hunt's Bitchute About page suggests as much, given that his profile tagline is "fuck youtube." GX 4. In that sense, the facts of our case align in terms of place with in *United States v. Olson*, 629 F. Supp. 889, 892 (W.D. Mich. 1986), a case in which threatening statements against President Reagan were made in a bar. When listeners at the bar suggested he did not really mean to threaten the President, he told them they were wrong: "I'll blow him away," he said, "I am threatening the life of the President today. I will take down any fed that comes to get me and when you come down here, come with plenty of firepower." *Id.* at 890. Finding that no reasonable juror could convict on these threats, the *Olson* court noted that the defendant was railing about political topics that were unfolding in "the headlines of newspapers

13

across the country." The "context in which the 'threat' is made cannot be ignored," wrote the court, "Olson's ill-advised remarks were made in a bar . . . 970 miles from Washington; no weapons were discovered in his possession." *Id.* at 894.

For these reasons, we submit that no reasonable juror could have found that that the Bitchute video constituted a true threat.

**Third Element – Specific Intent**

We note at the outset that we maintain our position that *Virginia v. Black* and *U.S. v. Elonis* require the Government to charge and prove a subjective intent element here, and that the specific intent element of 18 USC 115 is a jurisdictional element that does not satisfy that requirement.

Nevertheless, the Government's evidence was insufficient as to the element of specific intent, such that no reasonable juror could find that the defendant acted with the intent to impede, intimidate, or interfere with the officials while they were engaged in the performance of their official duties, or with the intent to retaliate against the officials on account of the performance of their official duties. Tr. 1134-35 (jury instructions).

Perhaps the best evidence of intent – or rather lack of intent – was the absence of any indication that Mr. Hunt wanted his social posts to be viewed by Members of Congress. Had he actually intended for the BitChute video to impede, intimidate, interfere with, or retaliate against Members of Congress, he surely would have done something to ensure a Member Congress was made aware of the video or at least affected by it in some way. The Government provided no proof that he did so. Nothing in the evidence suggested that Mr. Hunt's posts were specifically designed to have any appreciable effect on a Member of Congress. Indeed, Mr. Hunt had absolutely no history of contacting or interacting with Members of Congress. To show intent the Government relied on Mr. Hunt's thoughts and conservative views, which cannot be substituted for the intent required by § 115(a)(1)(B).

The build up to the publishing of the Bitchute video by Mr. Hunt also provides strong evidence of its actual purpose being less about threats of violence than about sparking interest in revolution. The defense introduced DX PP, a timeline of the actions taken by Mr. Hunt with respect to that video. The information in this timeline was not in dispute at the trial.

| Video Name | Video File Name / Video ID | Visibility | Event Per BITCHUTE SEARCH WARRANT | Date (EST) | Thumbnail |
|---|---|---|---|---|---|
| Kill Your Senator | VID_20210107_221456.mp4 9fQV2Npp4w9D | PRIVATE TO USER | New video uploaded to private storage. Description: "Take up arms and shoot them all" Video category: Entertainment | 1/7/21 10:17 PM | |
| Kill Your Senator | VID_20210107_221456.mp4 9fQV2Npp4w9D | PRIVATE TO USER | Video hashtags set to "revolt revolution america." | 1/7/21 10:21 PM | |
| Kill Your Senator | VID_20210107_221456.mp4 9fQV2Npp4w9D | PRIVATE TO USER | Video category changed from Entertainment to News & Politics. | 1/7/21 10:21 PM | |
| Kill Your Senator | VID_20210107_221456.mp4 9fQV2Npp4w9D | DELETED BY USER | Video state changed to Deleted. (User Manage State) | 1/8/21 8:39 AM | |

14

This exhibit demonstrates that Mr. Hunt uploaded the video to private storage on Bitchute, meaning it was not publically displayed. It initially included a thumbnail image of a handgun. A stock image of a handgun (there was no evidence that Mr. Hunt ever had any weapons) was first chosen by Mr. Hunt as the thumbnail the video would display. It was still, however, in private storage and there is no dispute that no one ever saw the video with the firearm picture displayed.

What happens next is the significant evidence of Mr. Hunt's intent.

| | | | | | |
|---|---|---|---|---|---|
| Go Back to the Capitol | VID_20210107_221456.mp4 fdsOKAKBIEaM | PRIVATE TO USER | New video uploaded to private storage. Description: "Slaughter them all" Video category: Entertainment | 1/8/21 8:39 AM | |
| Go Back to the Capitol | VID_20210107_221456.mp4 fdsOKAKBIEaM | PRIVATE TO USER | Video hashtags set to "maga 2ndamendment zog." | 1/8/21 8:43 AM | |
| Go Back to the Capitol | VID_20210107_221456.mp4 fdsOKAKBIEaM | PRIVATE TO USER | Video category changed from Entertainment to News & Politics. | 1/8/21 8:43 AM | |
| Go Back to the Capitol | VID_20210107_221456.mp4 fdsOKAKBIEaM | PUBLISHED TO USERS PAGE | Video state changed to Visible (Published). (Upload - Published) | 1/8/21 8:43 AM | |
| Kill Your Senators | VID_20210107_221456.mp4 fdsOKAKBIEaM | PUBLISHED ON USERS PAGE | Video display_name changed from Go back to the Capitol on Jan 20 to Kill Your Senators. | 1/8/21 8:44 AM | |
| Kill Your Senators | VID_20210107_221456.mp4 fdsOKAKBIEaM | PUBLISHED ON USERS PAGE | Video description has been changed to "Slaughter them all" | 1/8/21 8:44 AM | |
| Kill Your Senators | VID_20210107_221456.mp4 fdsOKAKBIEaM | UNPUBLISHED AND MADE PRIVATE TO USER | Video state changed to Hidden (Unpublished). (User Manage State) | 1/9/21 9:51 PM | |

At 8:39 a.m. on January 8, 20201, Mr. Hunt makes several changes to his work. First, he changes the thumbnail. He deleted the thumbnail image of the handgun, and replaced the handgun with the Gadsen Flag – a revolutionary war image. He also makes a subtle but important change in the description of the video from "take up arms and shoot them all" to the more figurative "Slaughter them all." He also changes the title from "Go Back to the Capitol" to "Kill Your Senators," and he publishes the video at 8:43 a.m. that same day.

Bearing in mind the breathing room that the First Amendment requires, these actions say a good deal about Mr. Hunt's mindset. Rather than create an image of an actual gun and invoking the fear that would entail, he chooses instead a revolutionary image. Rather than giving people a specific destination for a shooting by entitling the video "Go Back to the Capitol," he exhorts no one in particular to "Kill Your Senators." These changes make sense only if his post is understood as political hyperbole and a figurative call to arms rather than actual threat.

The evidence of his intent is also evident from his exchange with this anonymous commentator on the video. DX 10.

15




It can be seen from this exchange that when pressed by someone who seems actually interested in discussing violent action "the smart way," that is, underground, Hunt resists, saying that discussion of revolution should be open, not in "encrypted code in deep web chat rooms or some shit." DX 10. From this exchange alone it can be inferred that he wants people to engage with his ideas, not to actually make them happen. The impulsivity of his revolutionary vitriol aside, Mr. Hunt's devotion to discussing the matter openly is inconsistent with an intent to actually achieve the stated goal of shooting senators.

Thus, no reasonable juror could find that the statements in the Bitchute video establish the specific intent element of 18 U.S.C. § 115(a)(1)(B) at all, as the plain message of the video does not seek to impede, intimidate, interfere with, or even retaliate against Congress. Instead, the message is that the entirety of Congress needs to be completely "replace[d] with patriots." He is calling for a grand "reset," not interference, impeding, intimidating, or retaliating with Congress in the discharge of its official duties. Several commenters on the video responded in kind, going with the shocking "Kill Your Senators" statement for what it was – a throw down to start the conversation. "Absolutely!" said one. DX 10. Another commenter said "It is time for secession. I don't understand why anyone would want to remain part of an America that exists in name only." DX 10. Still another engaged in the exercise with "Hahaha, it would be so funny if it weren't tragically true." *Id.*

These comments suggest that the outrageous Kill Your Senators video did precisely what was intended – to spark a discussion among the viewers about the merits of revolution or secession – a legitimate political debate.

The remainder of the Government's proof on intent had little to do with Mr. Hunt's intent with respect to the Bitchute video, and shows that the Government conflated proof of "motive" with the proof of specific intent required by the statute. That Mr. Hunt had plenty of motive to *criticize* the U.S. government does not mean he had the specific intent required. Criticizing public officials and wanting political change is not illegal – it is only if that motive is tied to the threat that it becomes a crime. While the Government tried to portray Mr. Hunt as racist and anti-Semitic, proof of isolated bigoted statements is not proof that he made a true threat.

16

To provide just one example, consider the Government's truncated presentation of a text between Hunt and his girlfriend, GX 41C, which left out half of the conversation. The first part of the conversation shows Hunt telling his girlfriend he found a copy of *Mein Kampf*, that he was interested in why Hitler did what he did, and discusses how the book is banned, and the irony of banning Hitler's books when he was a book banner himself. The Government introduced the text conversation only up until the part where the two discuss whether history is written by the winners or the losers, as if Hunt is saying that Hitler should have written history. GX 41C. This is not at all the tone of the conversation, as can be seen from the remaining section, which the Defense introduced as DX SS.

DX SS, which provides the rest of the text conversation between Hunt and his girlfriend reveals a much more nuanced discussion of the ways in which oppressors and oppressed fare in history's eye. In the full text, it can be seen that Hunt and girlfriend thoughtfully discuss how Hitler's genocide of the Jews is arguably comparable to the genocide of the Native Americans by the American colonists, or the massacre of the Aztec civilization, or slavery or the post-slavery treatment of Blacks by the KKK. *Id.* There is no inference that can be drawn here that Hitler was Mr. Hunt's "role model." Tr. 971. Even if there was – it does not prove that he intended to impede/interefere with/retaliate against Members of Congress by making a video entitled Kill Your Senators that has nothing to do with Hitler whatsoever.

Hunt's online presence is also inconsistent with both the criminal intent required under § 115(a)(1)(B), and the reasonable person's perception of the seriousness of the threat. Thus, his Youtube channel contains videos that eschew violence and extremism, a fact that might give a reasonable person pause about the seriousness of the Bitchute threat. *See, e.g.,* DX I (Youtube video) ("I would urge people to, whatever happens, don't get involved in some of the extremist groups or maybe uh you know violent stuff that you see. I mean if somebody, like, attacks you directly and you have to defend your loved ones or yourself or your home or something like that, you do what you got to do, but I would urge people not to join up with groups. And that goes for people on the left like if you're thinking about joining ANTIFA to get in the fight or whatever. Or people like thinking about stuff on the right, like Proud Boys or things like that. Those kinds of extremist groups are the mobs that get easily manipulated and you really you have to avoid that stuff. . .").

His online presence contains similarly non-threatening images of who he is – and were easily accessible by any Bitchute user who followed the link on his Bitchute "About" page, GX 4, which led to his website, DX KK. That website led to his other social media accounts, none of which would give a reasonable person any reason to think that this is a person whose threat to "Kill Your Senators" should be taken seriously. See DX KK1(Twitter); DX KK2 (Youtube); DX KK4 (personal website), DX LL (wiki site). For example, DX LL describes Mr. Hunt as an activist, artist, actor, musician, and journalist, and states that he "explores the sometimes uncomfortable truths of our society through art and activism." His wiki page discusses his social activism and anti-war stances. Nothing about these descriptions would suggest to a reasonable person that Mr. Hunt's Bitchute video was intended to frighten or retaliate against Members of Congress.







The Government ignored the fact that Mr. Hunt's postings online presented an entirely different picture to the reasonable listener, such as posts on social media that presented him as a much more nuanced thinker than the robotic extremist they sought to portray, such as this Facebook post, DX W:

> I am def not a liberal or an anarchist. i am a conservative and i 100% support our constitution/bill of rights. anarchy has always seemed real stupid to me. i registered dem during the bush years bc of his lies, but when i voted for obama in 2008 i soon found out what scum he was. i later got involved in occupy wall street when it seemed like more of a non-partisan movement, in 2011. but i dropped it within a year after i found out about leftist unions and pols controlling it. even at occupy i was more touting stuff like ron paul's end the fed/end the wars thing. i wrote ron pauls name in for 2012... i was in the nyc punk scene as a singer from 2015-2018, and I hung around a lot of anarchists, satanists, leftists, and so on. like occupy i didnt agree, but im open minded, and tried to get along. but folks went nuts after trump got elected and i am now blacklisted from playing at many venues bc i dont like socialism (the scene is pretty much dead now anyways bc covid closed all the bars haha). like a lot of folks, i initially thought trump was a joke and got into the election to help clinton, but he convinced me to vote for him in 2016 (more as a protest against everything: i was and am very suspicious of him). over time, i have come to think that Trump is amazing in certain respects, but i am totally DISGUSTED by his allegiance to political Zionism. if anything takes down the republicans it will be this fake conservative crowd who controls the party now, who embraces israel, who champions the persecution of the palestinians, and treats psuedo-history books like the old/new testament as the infallible "word of god" (im not like anti-bible or whatever, i just dont think its god's "word" and it was written by men. there is still alot of valuable info in the book from a historical and literary perspective, and should be studied in that context). i hope that clears some things up!

The question of intent must also be informed by the lack of evidence of any items such as guns, ammunition, or "how to" guides for carrying out the alleged threats. While this is not dispositive, such evidence is relevant to the intent element. Indeed, in *United States v. Bayon*, 838 F. App'x 618, 620–21 (2d Cir. 2021), the Circuit affirmed a conviction under 18 U.S.C. § 115 for voicemails threats to Members of Congress where the defendant's intent was partly proven by the introduction of evidence of his possession of bomb-making materials, a rifle, ammunition, and books on explosives and terrorism, all of which set forth methods by which Bayon might have sought to harm the recipients of his voicemail messages and thus make good on his threats. *Id.*

By contrast, in Mr. Hunt's case the Government offered evidence of "bad thoughts," as opposed to materials helpful in carrying out threats. The absence of any tools of the threat trade says far more about Mr. Hunt's intent and the seriousness of the alleged threat than a handful of unrelated politically-incorrect private thoughts separated in both time and place from the

19

Bitchute video charged. *See, e.g., U.S. v. Valle,* 807 F.3d 508, 511 (2d Cir. 2015) ("We are loath to give the government the power to punish us for our thoughts and not our actions") (citing *Stanley v. Georgia,* 394 U.S. 557, 565 (1969).

"First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end. The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought." *Ashcroft vs. Free Speech Coalition,* 535 U.S. 234, 253 (2002); *see also Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U.S. 557, 579 (1995) ("The very idea that a noncommercial speech restriction be used to produce thoughts and statements acceptable to some groups or, indeed, all people, grates on the First Amendment, for it amounts to nothing less than a proposal to limit speech in the service of orthodox expression. The Speech Clause has no more certain antithesis").

The Government's use of Mr. Hunt's private thoughts and communications in this case, purportedly to prove intent, comes dangerously close to criminalizing thought -- or at least opening the door to using one's private thoughts and expressions to prove a crime. This is a slippery slope and the chilling effect on speech, or even unorthodox thought, inevitable.

In any event, there was no intent evidence presented here from which a reasonable juror could find was sufficient to meet this element.

**Conclusion**

For all these reasons, we ask that Your Honor enter a judgment of acquittal in this matter.

Respectfully Submitted,

/s/

Jan Rostal, Esq.
Leticia Olivera, Esq

Cc: Counsel Of Record