DMP:DKK/ICR/FJN
F.#2021R00059

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -                                      21-CR-086 (PKC)

BRENDAN HUNT,

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

## GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S POST-CONVICTION MOTION FOR ACQUITTAL PURSUANT TO RULE 29

MARK J. LESKO
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

David K. Kessler
Ian C. Richardson
Francisco J. Navarro
Assistant United States Attorneys

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... i

PRELIMINARY STATEMENT .................................................................................. 1

THE EVIDENCE PRESENTED AT TRIAL ............................................................... 2

    I.       The 2020 Presidential Election Results Anger the Defendant.................... 2

    II.     The Defendant Threatens Members of Congress ........................................ 4

    III.    The Defendant's Threats Were Motivated by His View—Driven by White Supremacist and Anti-Semitic Beliefs—That Congress Was Illegitimate .. 7

    IV.    The FBI Investigates and Arrests the Defendant ........................................ 9

ARGUMENT ............................................................................................................... 11

    I.       Applicable Legal Framework ...................................................................... 11

    II.     A Rational Juror Could Have Found the Defendant Guilty....................... 13

    A.    A Rational Juror Could Have Concluded that the Defendant's Threat to Kill Members of Congress Two Days after the Capitol Riot Was a "True Threat" ........................................................................................................ 13

    B.    A Rational Juror Could Have Concluded the Defendant Intended to Impede Intimidate, Interfere with, or Retaliate against Members of Congress ...... 20

    III.    Evidence Presented after the Government Rested Further Proves the Defendant's Guilt ...................................................................................... 23

CONCLUSION............................................................................................................ 26

PRELIMINARY STATEMENT

The government respectfully submits this brief in opposition to the defendant's Motion for a Judgment of Acquittal under Fed. R. Crim. P. 29(a) (the "Motion" or "Mot.") following his conviction at trial for violating 18 U.S.C. § 115(a)(1)(B).

The defendant's conviction was based upon overwhelming evidence that his "Kill Your Senators" video, in which he promised to shoot members of Congress, was a true threat, made with the intent to retaliate against Congress for actions related to the November 2020 presidential election.  That evidence included extensive videotaped statements by the defendant, as well as his written communications about his desire to threaten members of Congress and to replace the U.S. government, testimony of civilian and law enforcement witnesses about the seriousness of the defendant's threat, and expert testimony.

The defendant now asks this Court to throw out the jury's considered verdict just because he disagrees with it.  The Motion paints an alternate reality by cherry-picking facts and then identifying various inferences that the defendant believes should have been drawn in his favor. In essence, the defendant argues that the trial evidence could have been interpreted in a way that a jury could have found him not guilty.  But that argument ignores the law.  For this Court to overturn the jury verdict, Rule 29 requires the Court to conclude that, when all the inferences are drawn in favor of the government, no rational jury could have found the defendant guilty.  The defendant has not come close to meeting what the Second Circuit has described as his "very heavy burden" to overturn the jury's verdict.  As a result, the Motion should be denied.

<u>THE EVIDENCE PRESENTED AT TRIAL</u>

The evidence presented during the government's case at trial overwhelmingly established that the defendant broadcast a series of videotaped and written threats against Members of Congress.  These threats included a video titled, "Kill Your Senators," in which the defendant stated that, if provided with a gun, he would himself "shoot" and "kill" Members of Congress. The defendant's actions were motivated by his desire to prevent a purportedly "illegitimate" Congress from certifying the winner of the 2020 Presidential election, or failing that, to stop the transfer of power to a new President.[1]

I.      <u>The 2020 Presidential Election Results Anger the Defendant</u>

The trial evidence showed that on November 3, 2020, the United States held a presidential election in which the leading candidates were then-President Donald J. Trump and now-President Joseph R. Biden, Jr.  Beginning shortly after the election, the defendant grew increasingly angry at the electoral victory of now-President Biden.  On November 4, 2020—the day after the presidential election—the defendant posted on Facebook:

> By the end of this week, it will be clear to the entire nation that
> President Trump has been reelected for another four years.  Even
> through massive cheating, the democrats still cannot stop the Trump
> Train.  Ive been saying it for years now, but we really need to do
> something about these fucking idiotic and deceitful leftists in our
> country, or they will soon destroy our great nation with their lunacy.
> . . .When Trump took office he made a solemn oath to protect
> America from enemies foreign and domestic and thats what these
> people are: domestic terrorists and enemies of our constitutional
> republic.  And they will be dealt with, one way or another.

(GX150B; Tr. at 191-92.)  That evening, the defendant wrote to his father that then-President Trump should follow in Adolf Hitler's footsteps and "cancel the transfer of power":

---

[1] As discussed below at pp. 23-24, the government is not relying on evidence presented during the defense case for purposes of this statement of facts.

2

> Trump should just declare martial law, cancel the transfer of power, and round up the domestic enemies of our republic. The military and the american people would back him. During hitlers first term in office, circumstances were such that it was necessary for him to override the democratic process and become the absolute leader of his country. Trump should prob do the same if necessary or they will throw his family in jail and destroy the country.

(GX 40A; Tr. 179.)  The defendant's father replied that the election issues would be resolved through a legal process, prompting the defendant to reply:

> as trump said: "The damage has already been done to the integrity of our system, and to the Presidential Election itself" – all these corrupt journos pols and disinfo traitors will still be in place to sabotage the country even if he wins. They have to be removed somehow or this will happen again in 4 years only worse.

(GX 40A; Tr. 180.)

> On November 5, 2020, the defendant reiterated in a text message to his father:

> The damage is done. Our election has already been contaminated. These treasonous democrats and their media/antifa cohorts need to be arrested and utterly destroyed. We also need to start rounding up illegals and just shipping them out of the US. They are domestic enemies to the republic, they are trying to kill our nation and they will not stop until someone makes them.

(GX40C; Tr. 183-84.)  The defendant also stated that:

> [t]he crime rate soar among second-generation immigrants. They are taking our jobs, our benefits, our birthright, and our culture. They refuse to assimilate and many if not most of them are actively supporting the overthrow of our president. I don't care if they are 'hard-working' they are low IQ mongoloids and they need to go.

(GX40E.)

II.      The Defendant Threatens Members of Congress[2]

The trial evidence showed that in a November 27, 2020 Facebook post, the defendant wrote, "Like ive been saying all along, biden will NEVER set foot in the white house. we will mow down any commies who try to run a coup on america! MAGA!"  (GX 150E.)

On December 6, 2020, in a Facebook post addressed to ex-President Trump, the defendant threatened a U.S. Senator and two members of the House of Representatives with death:

> we want actual revenge . . . Meaning, we want you to hold a public execution of [Speaker of the House Nancy Pelosi, Representative Alexandria Ocasio-Cortez, and Senator Charles Schumer] etc. And if you don't do it, the citizenry will.  We're not voting in another rigged election.  Start up the firing squads, mow down these commies, and lets take america back!"

(GX 150F.)  That same day, in another Facebook post, the defendant stated, "[i]f you're going to shoot someone tho, go after a high value target like [Speaker Pelosi, Senator Schumer, or Representative Ocasio-Cortez].  They really need to be put down.  These commies will see death before they see us surrender!"  (GX 150G.)  The defendant's Facebook account was then suspended for 30 days for violating "community standards."  (Tr. 257; GX 171.)

The trial evidence showed that the defendant also began looking for ways to undo the results of the election.  On December 21, 2020, he posted a video called, "What the Media Won't Tell You About January 6, 2021," in which he discussed the Congressional vote certification scheduled for January 6, 2021, which would confirm the victory of President Biden.  (See GX 22.)

On January 6, 2021, Congress gathered in joint session at the United States Capitol (the "Capitol") in Washington, D.C. to certify the election results.  (Tr. 388.)  A group of individuals purporting to protest the presidential election gathered and stormed the Capitol.  (Tr.

---

[2] It was not disputed that the defendant made all of these threats from Queens, New York. (See, e.g., Tr. 156-57; Tr. 203; Tr. 677-681; GX 100, 112, 405.)

390-93.) The individuals illegally occupied the Capitol and disrupted the certification of the election results for several hours. Members of Congress and the Vice-President of the United States sheltered in place during the occupation. (Tr. 393.) The violent attack resulted in the deaths of multiple individuals, including a United States Capitol Police officer, as well as tremendous damage to the Capitol. (Tr. 394-95.) Nevertheless, law enforcement expelled the attackers, the Capitol was secured, and Congress reconvened later that day and certified the results. (Tr. 394.)

In response to the certification, the defendant made more death threats. Two days after the attack on the Capitol—on January 8, 2021—the defendant posted an 88-second video titled "Kill Your Senators" on his BitChute page. Staring directly into the camera, the defendant threatened:

> we need to go back to the U.S. Capitol when all of the Senators and a lot of the Representatives are back there and this time we have to show up with our guns and we need to slaughter these motherfuckers. What I'm saying is that our government at this point is basically a handful of traitors, so what you need to go is take up arms, get to DC probably the inauguration . . . that's probably the best time to do this, get your guns, show up to D.C., and literally just spray these motherfuckers. Like, you know, that's the only option. They're gonna kill us. So we have to kill them first. So get your guns. Show up to D.C.; put some bullets in their fucking heads. If anybody has a gun, give me it, I will go there myself and shoot them and kill them. We have to take out these Senators and then replace them with actual patriots. Basically, I would trust anybody over them at this point uh this is a ZOG government . . .

(GX 21.) Later that day, the defendant publicly posted on Parler, ". . . enough with the 'trust the plan' bullshit. lets go, jan 20, bring your guns . . ." (GX151A, 151B; Tr. 248-51.)

The evidence at trial established that the defendant uploaded, but did not make public, the "Kill Your Senators" video on January 7, 2021 at 10:17 p.m., under the title "Kill Your Senator" and with the description, "Take up arms and shoot them all." (GX 109N.) The defendant also appended an image of a handgun. (GX 20P.) The next morning, at approximately 8:40 a.m.,

the defendant deleted that video and replaced it with a new version titled, "Kill Your Senators."
(GX 405.)  This time, the defendant did make the video public.  He also changed the description
from "Take up arms and shoot them all" to "Slaughter them all."  The defendant also added the
hashtags #MAGA, #2ndamendment, and #zog, and he replaced the photograph of the handgun
with a photograph of the Gadsden Flag.[3]  (GX 21P, GX109N; Tr. 214-220.)

The defendant's threatening video was viewed more than 500 times, and some of
the viewers commented on it.[4]  For example, one viewer stated,

> Dude delete this shit your about to get fucking charged big time
> seriously delete your fucking video  . . . murder is not a good thing
> you make them martyrs now . . . but seriously take ur video down i
> dont want to see u screw ur life up over a lousy bit chute video

(GX 110A, 110B; Tr. 247.)  Another viewer criticized the defendant's overt tactics and stated,

> Good way to put a target on your back and get arrested soon.  The
> smart way to do this is incognito, using guerilla warfare tactics,
> unconventional attacks.  This is just low IQ rambling, giving them
> warning of when you might attack, dumbass . . . Shouldn't alert
> people to what you might do.

(GX 110A, 110B; Tr. 245.)  The defendant then responded,

> of course you should alert people, fucking idiot.  how else should
> you get the word out?  talk in encrypted code in deep web chat rooms
> or some shit?  no, everyone should come to washington dc on
> january 20th wearing masks and camo, concealed carry, body armor,
> and just blast them all away while we still have a chance.

(GX110A, 110B; Tr. 246.)

---

[3] The Gadsden flag depicts a coiled rattlesnake and the words, "Don't Tread on Me."  (See GX 21P.)  Multiple individuals who stormed the Capitol on January 6, 2021 carried the Gadsden flag (Tr. 399), and the defendant posted multiple videos depicting individuals carrying the Gadsden flag at the Capitol during the attack (see, e.g. GX 25).

[4] One of those viewers reported the threat to the FBI.

In videos posted after the "Kill Your Senators" video, the defendant continued to express a desire for removal of Members of Congress through violence. In one video posted on January 9, 2021, the defendant stated,

> What can we do now, besides an open revolt against a Zionist Occupied Government? . . . There is a Million Militia March being spoken of for January 20th—I don't know what's going on with that—but, if the media, if the government, want to label a peaceful protest an insurrection, let's see what happens when people bring guns. There are only 100 senators, remember. They ride on planes like us, they go to restaurants. They should be really scared of being in public . . . ."

(GX 26.) In another video posted on January 9, the defendant reiterated that, "[t]hose 100 Senators should really be afraid about going into public now. . . . [l]ike the way these people behaved, they should have to walk around with bodyguards ten feet deep." (GX 27.) The defendant then stated:

> "[s]o start exercising your rights to take these corrupt politicians down. We have the first amendment, that's still around, remember? And we have the second as well. There are really only a hundred of these weakling Senators. They are mass murdering psychopaths who are intent on our destruction, and they form an illegitimate government. Every single one of them just needs to go."

(GX 27.)

Later on January 9, 2021, the defendant hid the "Kill Your Senators" video but left public his other videos. (See GX 405.) Notably, although the defendant posted the other videos discussed at trial on both his YouTube and his BitChute account, he posted the "Kill Your Senators" video only to his BitChute account. (E.g., GX 403.)

III.   The Defendant's Threats Were Motivated by His View—Driven by White Supremacist and Anti-Semitic Beliefs—That Congress Was Illegitimate

The trial evidence established that white supremacist and anti-Semitic beliefs directly motivated the defendant's threats to kill Members of Congress. Specifically, he believed that former President Trump was "the best chance to save" America from a Jewish-controlled

government and from infiltration by "low IQ" immigrant "mongoloids," and his "Kill Your Senators" video was motivated at least in part by disappointment that Members of Congress did not in fact stop that transfer of power on January 6, 2021.

Modern white supremacist ideology centers on the belief that the white race is on the verge of extinction, primarily because of immigration from non-white countries (Tr. 540-41) and anti-Semitism centers on hatred and hostility to the Jewish people and their religion. (Tr. 541.) The two belief systems overlap in that white supremacists are concerned that the white race will become extinct and blame Jews for making that happen because the Jews purportedly manipulate and control the government. (Tr. 542-43.) White supremacists and anti-Semites frequently share an affinity for Nazi imagery and for Adolf Hitler, and use propaganda and coded language to identify themselves to like-minded persons while maintaining plausible deniability to others who are unaware of the significance of the symbols and codes they use. (Tr. 543-44.)

The evidence established that the defendant consumed white supremacist and anti-Semitic propaganda, familiarized himself with white supremacist and anti-Semitic codes, symbols and beliefs, and expressed white supremacist and anti-Semitic beliefs in his own communications with others. He had viewed and downloaded white supremacist and anti-Semitic propaganda, including by visiting the Daily Stormer, a white supremacist website, by downloading a copy of the Protocols of the Learned Elders of Zion, and, two days after the Presidential election, downloading the manifesto of a white supremacist mass murderer. (Tr. 475-77, 554-55, GX 52.)[5] The latter document contained drawings of Nazi swastikas and the white supremacist numerical

---

[5] The manifesto was written by Dylann Roof, a white supremacist who was convicted of murdering nine African-American churchgoers in Charleston, South Carolina in 2015. Roof was not identified in the government's case-in-chief; the jury was told at that time only that the author of the manifesto, which was found on the defendant's computer, was not the defendant. (Tr. 551.)

code "88," which refers to "Heil Hitler." (GX 50, 50A; Tr. 549.) The defendant also expressed an affinity for Adolf Hitler in chats messages to his ex-girlfriend and his father. (E.g., GX 41B, GX 41C; Tr. 176-77.)

The defendant's "Kill Your Senators" video expressed the white-supremacist and anti-Semitic view that Members of Congress are part of a Jewish conspiracy, what the defendant referred to as "ZOG," or a "Zionist Occupied Government." (Tr. 555-56; see also GX 26 (stating "what can we do now besides an open revolt against a Zionist Occupied Government?").) The defendant also made the video exactly 88 seconds long, reflecting the white-supremacist numerical code for "Heil Hitler."

IV.    The FBI Investigates and Arrests the Defendant

The trial evidence showed that on January 8, 2021, the FBI National Threat Operations Center received a tip from a concerned citizen regarding the "Kill Your Senators" video. An FBI intake examiner reviewed the tip, classified it as a "threat to life," and dispatched it to the FBI's New York Field Office for further investigation. (Tr. 42-49.) The United States Capitol Police were also made aware of the threat on that day, although USCP understood that the FBI would lead the investigation. (Tr. 376, 413.) The FBI's New York Field Office investigated the tip (Tr. 158-59, 363-65), and arrested the defendant on January 19, 2021, 11 days after the threats were first reported to the FBI. (Tr. 149-51.) A search of the defendant's home in Queens, New York, identified the laptop and cellular telephone he used to create and broadcast his threats. (Tr. 265-72.) The search also recovered an external hard drive belonging to the defendant, as well as the sweatshirt the defendant wore in the "Kill Your Senators" video. (Tr. 270-72.)

On the day of his arrest, the FBI informed the offices of Members of Congress about the threats made by the defendant. (E.g., Tr. 705.) Daniel Bonthius, the civilian Deputy

District Director of Operations for Representative Alexandria Ocasio-Cortez, received that information, and testified that the defendant's threatening statements were concerning even though the defendant was in custody by January 19 because his office had prior experiences with people being arrested, released, and then returning to the office to make additional threats. (Tr 707-08.) Mr. Bonthius also explained why each of the defendant's statements was threatening. (Tr. 711.) He testified that the "Kill Your Senators" video was particularly concerning because it "put[] together all the concerns of the previous messages: Use of firearms. Planning to go to the Capitol. Inauguration when they're all together. To kill everybody." The defendant also "didn't seem mentally disturbed in that video. He seems calm and ready for the plan and announces to the viewers that the only thing stopping him from taking action is the fact that he doesn't have a gun." (Tr. 715-16.) Mr. Bonthius further testified that, as of April 26, 2021, Congresswoman Ocasio-Cortez's office maintained a file on the defendant in a folder labeled, "active threats." (Tr. 719.)

<u>ARGUMENT</u>

I.       <u>Applicable Legal Framework</u>

Rule 29(a) of the Federal Rules of Criminal Procedure provides that "the court on

the defendant's motion must enter a judgment of acquittal of any offense for which the evidence

is insufficient to sustain a conviction."  <u>See</u> Fed. R. Crim. P. 29(c).  As the Second Circuit has

observed, to upset a jury verdict, the defendant bears a heavy burden:

> In challenging the sufficiency of the evidence to support his
> conviction, a defendant bears a heavy burden.  In considering such
> a challenge, we must credit every inference that could have been
> drawn in the government's favor and affirm the conviction so long
> as, from the inferences reasonably drawn, the jury might fairly have
> concluded guilt beyond a reasonable doubt.  We defer to the jury's
> determination of the weight of the evidence and the credibility of
> the witnesses, and to the jury's choice of the competing inferences
> that can be drawn from the evidence.  Pieces of evidence must be
> viewed not in isolation but in conjunction, and the conviction must
> be upheld if any rational trier of fact could have found the essential
> elements of the crime beyond a reasonable doubt.

<u>United States v. Reifler</u>, 446 F.3d 65, 94-95 (2d Cir. 2006) (citations and quotation marks omitted);

<u>United States v. Rosenthal</u>, 9 F.3d 1016, 1024 (2d Cir. 1993) ("It is well established that a

defendant challenging the sufficiency of the evidence underlying a conviction bears a very heavy

burden.") (internal citations omitted).  In assessing sufficiency, a court is "obliged to view the

evidence in its totality and in the light most favorable to the prosecution."  <u>United States v. Florez</u>,

447 F.3d 145, 154-55 (2d Cir. 2006).

In resolving a Rule 29 motion, a court "must be careful to avoid usurping the role

of the jury."  <u>United States v. Autuori</u>, 212 F.3d 105, 114 (2d Cir. 2000) (internal citation omitted);

<u>see also</u> <u>Florez</u>, 447 F.3d at 154-55 (in evaluating evidence in connection with a Rule 29 motion,

courts must be "mindful that the task of choosing among permissible competing inferences is for

the jury, not a reviewing court"); <u>United States v. Rea</u>, 958 F.2d 1206, 1221-22 (2d Cir. 1992)

("Matters of the choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and [the court is] not entitled to second-guess the jury's assessments."); United States v. Barret, No. 10-CR-809 (KAM), 2012 WL 3229291, at *16 (E.D.N.Y. Aug. 6, 2012).  The Second Circuit has cautioned courts not to usurp the jury's role because "jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences."  United States v. Huezo, 546 F.3d 174, 182 (2d Cir. 2008).

In addition, as the Second Circuit has made clear, trial courts may grant a judgment of acquittal "only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'"  United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (quoting United States v. White, 673 F.2d 299, 301 (10th Cir. 1982)); see also United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003) (district court may grant a Rule 29 motion for insufficiency only "if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt").  "[I]f the court 'concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'"  Guadagna, 183 F.3d at 129.

Furthermore, "[d]irect evidence is not required; '[i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt.'"  United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (quoting United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir.2004)); see also United States v. Irving, 452 F.3d 110, 117 (2d Cir. 2006) ("A jury may convict on circumstantial evidence alone."); accord United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003); United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995).  When making

a case based on circumstantial evidence, the government need not "exclude every reasonable hypothesis other than that of guilt." Holland v. United States, 348 U.S. 121, 139 (1954); see also Rosenthal, 9 F.3d at 1024 ("The government need not eliminate every theory of innocence, and the reviewing court must consider pieces of evidence not in isolation, but in conjunction."); United States v. Puzzo, 928 F.2d 1356, 1361 (2d Cir. 1991).

II.     A Rational Juror Could Have Found the Defendant Guilty

There was more than sufficient evidence in the record from which a rational juror could find beyond a reasonable doubt that the defendant's video-recorded threat to kill Members of Congress was a "true threat" made with the required mens rea to sustain a Section 115 conviction. The defendant's arguments to the contrary—that no rational jury could possibly have found his threat to shoot members of Congress to be a "true threat"—are based on a flawed view of the law and the record.[6]

A.     A Rational Juror Could Have Concluded that the Defendant's Threat to Kill Members of Congress Two Days after the Capitol Riot Was a "True Threat"

The defendant does not dispute the test for whether conduct constitutes a "true threat": "[W]e ask whether an ordinary, reasonable recipient familiar with the context of the communication would interpret the speech as a threat of injury." New York v. Griepp, No. 18-2454-CV, 2021 WL 900682, at *19 (2d Cir. Mar. 10, 2021) (citing United States v. Turner, 720 F.3d 411, 420 (2d Cir. 2013)). The trial record provides a more than sufficient basis from which a rational juror could conclude that the defendant's "Kill Your Senators" video was a "true threat." The jury had before it the following evidence, among other things in the record:

---

[6] The defendant does not dispute that his statements were targeted at "U.S. officials" for purposes of Section 115.

- The words of the video conveyed a threat: "We have to show up with our guns and we need to slaughter these motherfuckers . . . So we have to kill them first . . . If anybody has a gun, give me it, I will go there myself and shoot them and kill them."[7]   The defendant also identified a specific time for an attack (the inauguration), further lending credibility to his threat.[8]

- The written title and other elements associated with the post conveyed a threat. The "description" of the video was "slaughter them all," the Gadsden flag imagery invoked flags brought to the attack on the Capitol, and the hashtag "#2ndamendment" emphasized that the video was not about political speech but rather about using firearms.

- The defendant's demeanor was serious, as he stared straight in the camera and repeatedly delivered his chilling message.

- The defendant invoked the violent storming of the Capitol—"we need to go back to the Capitol"—just two days after the attack had taken place. Any reasonable person considering that context would take the defendant's words as a promise that he and others would return to conduct another violent attack, similar to the one that had been committed two days earlier.  See Griepp, 2021 WL 900682, at *19 (relevant context for "true threat" analysis includes other recent violent events referenced by or alluded to in the threat).

- The video was posted on a web page that featured other videos showing violence at the Capitol on January 6.

- Every witness who testified at the trial—most notably Daniel Bonthius, a civilian former worker in the theater industry—testified that the "Kill Your

---

[7] The defense quibbles with the defendant's phrasing of his threat to shoot Members of Congress as too "conditional" (Mot. at 7), but conditional threats are still threats, as the Court properly instructed the jury, see Tr. 1129-30 (the Court's instructions to the jury); accord, e.g., Turner, 720 F.3d at 424 (statements may constitute legal threats even where they are "conditional and inexplicit").  That the defendant solicited a gun to carry out his threat did not transform the threat into protected speech—"if someone gives me a gun, I will kill you myself" is a threat to kill someone.

[8] The defense argues that the defendant did not obviously control a group of followers.  But the defendant's relative anonymity—he was not a public figure—does not detract from the threat, particularly because he made the threat only two days after the Capitol was stormed by a mass of largely unknown invaders.  A reasonable person watching the defendant's video would reasonably infer that the defendant was, in fact, speaking to a group of people who would go with him to the Capitol.  That inference would make the threat more disturbing.  See, e.g., Griepp, 2021 WL 900682, at *19 ("Nor is there any requirement that the statements on their face show that the defendant personally intended to take violent action," so long as the recipient would be "afraid of the threat's execution by the speaker or their co-conspirators.").

14

Senators" video was a serious threat.  (See, e.g., Tr. 715-16 (Bonthius); id. 41 (Holt), 363 (Smith).)  Written comments on the defendant's BitChute page generally took his threat seriously, although some posters mocked him as incapable of carrying it out, and others questioned whether his threat was over-the-top enough to be a law enforcement ruse.  No one engaged him in political dialogue or suggested he was making a joke.

A rational juror could have concluded from this record that an ordinary, reasonable recipient familiar with the context of the "Kill Your Senators" video—the Capitol riot—would have viewed the video as a threat of serious injury or death.

The defendant's arguments to the contrary—that no rational juror could possibly have found the video threatening—are unavailing.

First, the defendant attempts to distinguish the facts in this case from the facts in several other threat cases, including Turner.  With respect to Turner, the defendant argues that Turner was better known than he is, and that Turner's threats were more specific.  (Mot. at 5-6.) This argument fails for two reasons.  As an initial matter, Turner does not establish the only way for a defendant to be convicted of violating Section 115.  Even if the threat here could be viewed as less of a "true threat" than the one in Turner, that would not establish that no rational jury could have convicted the defendant.  And the differences between this case and Turner cut both ways— for example, Turner did not make his threat two days after a group of violent rioters had attacked the Seventh Circuit's courthouse, but this defendant threatened to "go back to the Capitol" two days after such a riot at the Capitol.  Ultimately, that this case has different facts is of no moment, because Section 115 requires a "true threat," not a threat that is exactly the same as in Turner.  See United States v. Carrier, 672 F.2d 300, 306 (2d Cir. 1982) ("whether words used are a true threat is generally best left to the triers of fact").

The defendant also relies on three out-of-circuit cases in which the defendants did not threaten to cause any harm themselves.  Because the defendant in this case threatened to kill members of Congress himself, those cases are inapposite:

- In United States v. Weiss, the district court granted a motion to dismiss the indictment charging "harassing use of a telecommunications device."  475 F. Supp. 3d 1015, 1036 (N.D. Cal. 2020).   The court explained that the government's briefing had consistently argued that the defendant, who sent messages suggesting that "other people would hurt" a U.S. senator, had been only "harassing" the senator; the government had "never mention[ed] an intent to threaten."   At oral argument, the government finally identified a single purported "true threat"—"You are going to lose next election and we will get rid of your satanic evil ass you loser fuckhead."  Id. at 1037.  The court held that statement was a reference to voting out the senator, not to killing him.  Id.

- In United States v. White, the Fourth Circuit upheld a district court's entry of a judgment of acquittal for a defendant charged with a violation of 18 U.S.C. § 875(c) because the defendant's two statements, directed at a Canadian civil rights lawyer did not constitute a "true threat."  670 F.3d 498, 513 (4th Cir. 2012).  Specifically, in response to a post about the firebombing of another civil rights activist, the defendant posted "Good. Now someone do it to [the civil rights lawyer]."  The defendant later posted that the lawyer "should be drug [sic] out into the street and shot" and that the lawyer "is an enemy, not just to the white race but of all humanity and he must be killed."  Id.  The Fourth Circuit held that, although the communications "clearly called for someone to kill" the lawyer, "neither communication actually provided a threat from [the defendant] that expressed an intent to kill" the lawyer.  Id.; see id. at 514 ("The principal message expressed in [the defendant's] communications was that *someone else* should kill" the lawyer) (emphasis in original).

- In United States v. Bagdasarian, the Ninth Circuit vacated the defendant's conviction for threatening to kill a major presidential candidate based upon (1) his posting on a web forum "Re: Obama fk the niggar, he will have a 50 cal in the head soon" and  (2) "shoot the nig country fkd for another 4 years+, what nig has done ANYTHING right? ? ? ? long term? ? ? ? never in history, except sambos."  652 F.3d 1113, 1115 (9th Cir. 2011).  The court held that no rational trier of fact could "reasonably have found either statement" as a threat that the defendant would harm President Obama.  As to the first statement, the court held that it "conveys no explicit or implicit threat on the part of [the defendant] that he himself will kill or injure Obama"; as to the second, the court said it was "an imperative intended to encourage others to take violent action, if not simply an expression of rage or frustration."  Id. at 1119 (emphasis added).

Here, in contrast, the defendant stated that he himself would act on his threat: "I will go there myself and shoot them and kill them." Thus, the cases on which the defendant relies are inapposite.

Second, the defendant argues that certain evidence supports inferences he wishes to draw in his favor. But Rule 29 requires the opposite. The Court "must credit every inference that could have been drawn in the government's favor." Reifler, 446 F.3d at 94-95.

For example, the defendant argues that certain comments posted on BitChute "undermine" the evidence that the "Kill Your Senators" video was serious because no one on BitChute offered the defendant a firearm. (Mot. at 9.) But to accept the defendant's argument that his viewers did not take the defendant's threat seriously because none posted a comment offering him a firearm would require the Court to draw an inference against the verdict, which flips the applicable legal standard on its head. A rational juror could infer that others did not offer the defendant a firearm in a public forum because such an action would have been risky and expose the actor to criminal punishment. The defendant also ignores that other commenters took the defendant so seriously that they gave him advice for successfully carrying out the attack, including that he "[s]houldn't alert people to what you might do." (GX 110A.) And some of the comments the defendant does cite, including the assessment that the defendant was "too stupid to take part in anything that takes planning," indicate that the commenter did not believe the defendant would be successful, not that the commenter thought he was joking. In any event, even if all of the commenters interpreted the defendant's threat as not serious, the determination whether the

defendant's threat constituted a "true threat" was one for the jury to make, not unidentified Internet commenters.[9]

Next, the defendant argues that a rational juror would necessarily ignore the testimony of Mr. Bonthius.  (Mot. at 12.)  The defendant does not explain why the testimony of Mr. Bonthius—who is not a law enforcement officer but a civilian with a degree in theater and a background in the restaurant and theater industries—should be dismissed as "biased" simply because he learned of the threat after the defendant's arrest.  (Id.; see Tr. 705.)  Mr. Bonthius testified about the seriousness of the "Kill Your Senators" threat, he explained that he was concerned about the threat notwithstanding the defendant's arrest (Tr. 707-08), and he was subject to cross examination.  A rational juror, having observed all of Mr. Bonthius's testimony, would be entitled to give it great weight in determining whether a "reasonable person" would view the "Kill Your Senators Video" as a serious threat to inflict injury.

Finally, the defendant argues that law enforcement witnesses should not have been allowed to testify at all about the seriousness of his threat, an argument about the admission of evidence that is misplaced in a motion contending that the defendant must be acquitted because the evidence was insufficient to support the jury's verdict.  The defendant relies solely on United States v. Hanna, 293 F.3d 1080, 1085 (9th Cir. 2002), in which "three Secret Service agents and one police commander testified to their extensive experience, training and expertise in protecting public officials and in assessing whether a particular person constitutes a serious threat to the President."  (See Mot. at 11.)  Hanna does not support the defendant's argument:

---

[9] Moreover, the jury was entitled to credit the testimony of individuals who appeared in Court to testify over the comments by unidentified BitChute users—who might live in other countries, or be a single person posting under multiple accounts, or be foreign operatives looking to create trouble.

- <u>Hanna</u> did not address a Rule 29 motion, and does not consider the question of how a rational juror would weigh law enforcement testimony.  To the extent <u>Hanna</u> is informative, it indicates that, in considering how a rational juror would approach law enforcement testimony, the court should presume that the rational juror was properly instructed not to give undue weight to law enforcement testimony.

- Unlike in <u>Hanna</u>, the law enforcement witnesses who testified in this case were not offered as "experts."  To the extent each of these witnesses commented on the seriousness of the "Kill You Senators" video, they did so in explaining the actions they took (or in responding to cross-examination).

- Unlike in <u>Hanna</u>, this Court did not "endorse[]" any law enforcement testimony about the "Kill Your Senators" video, <u>id.</u> at 1085.  To the contrary, the Court instructed the jury that "the fact that a witness is or was employed as a law enforcement official does not mean that his or her testimony is deserving of more or less consideration or greater or less weight than that of an ordinary witness" and that testimony from law enforcement officers who viewed defendant's alleged threats "may inform your view of the context in which a particular statement was made" but that "it is ultimately for you to - and not any witness, law enforcement or otherwise - to determine whether an ordinary, reasonable recipient who's familiar with the context of the statement would interpret it as a threat of bodily injury."  (Tr. 1113-14, 1130.)

- Unlike in <u>Hanna</u>, the government here did not "vouch[] for its witnesses by positing that it was unlikely the officers would lie or make a mistake in judgment given their extensive experience and commitment to law enforcement."  <u>Id.</u> at 1087.  Indeed, the government made only very limited references in its summation and rebuttal to testimony from law enforcement witnesses to the effect that the "Kill Your Senators" video was a serious threat.

In the end, the defendant does not show that a properly instructed, rational juror would be required to ignore testimony from law enforcement witnesses.

But even as the defendant urges the Court to ignore law enforcement testimony about the seriousness of the threat as irrelevant and biased, the defendant also argues that a rational juror would consider purported law enforcement <u>inaction</u> as evidence that law enforcement did not believe the threat was serious.  (Mot. at 12-13.)  The defendant does not even acknowledge these inconsistent, and incompatible, arguments about the role of evidence related to law enforcement. And, as detailed at the trial, there was no inaction by law enforcement—the FBI vigorously

investigated the threat and arrested the defendant in less than two weeks, and the Capitol police,

dealing with the immediate aftermath of the Capitol riot, deferred to the FBI.  A rational jury could

infer from that evidence that law enforcement took the defendant's threat seriously.  Ultimately,

the defendant urges this Court to draw all law-enforcement-related inferences in his favor.  Neither

the evidence nor the law governing Rule 29 motions supports that effort.[10]

### B.  A Rational Juror Could Have Concluded the Defendant Intended to Impede, Intimidate, Interfere with, or Retaliate against Members of Congress

A rational juror could have concluded from the trial record that the defendant made

the threats in the "Kill Your Senators" video with the intent to impede, intimidate, or interfere with

Members of Congress, and to retaliate against them.

<u>First</u>, the defendant deliberately used graphic language to threaten Members of

Congress, including by cursing and calling for the "slaughter" of Members of Congress by

"spraying" them with bullets, and by deliberately invoking the violent assault on the Capitol just

two days before.  The defendant chose these words to scare and intimidate his targets and to attract

attention to his video, and as he spoke them looking directly into the camera, his demeanor was

serious and confident.  Beyond demonstrating his intent to scare and intimidate, the defendant's

words also showed that he was focused on replacing Members of Congress, whom he called

---

[10] The defendant also argues that the court should consider that the government did not call as a witness the tipster who alerted the FBI to the defendant's threat.  (Mot. at 12.)  Essentially, the defendant asks the Court to find the evidence supporting the jury's verdict insufficient because the government could have, but did not present *more* evidence.  The law, however, is clear that the "totality" of the evidence considered by the Court in assessing the sufficiency of the evidence supporting the verdict is "the totality of the evidence presented to the jury."  United States v. Dhinsa, 243 F.3d 635, 677 (2d Cir. 2001).  Indeed, the jury itself was properly instructed "that all persons who may have been present at any time or place mentioned in the case, or who may appear to have some knowledge of the issues in this case, need not be called as witnesses." (Tr. 1116.)  Thus, the government's decision not to call a particular witness to testify has no bearing at all on the sufficiency of the evidence that actually was presented to the jury to support the jury's verdict.

"traitors," with "actual patriots," indicating that his threats were tied to the defendant's dissatisfaction with how Members of Congress had carried out their official duties. Indeed, the defendant further conveyed the seriousness of his purpose in intimidating Members of Congress by invoking the white-supremacist and anti-Semitic conspiracy theory of Jewish control of the U.S. government, when he justified his threat to murder Members of Congress and replace them with "actual patriots" by describing them as members of a "ZOG government."

Second, the defendant chose to post the "Kill Your Senators" video publicly on BitChute, a website that would not take the video down, unlike other social media websites that had previously deleted the defendant's comments and videos after he had posted them. (Tr. 194-95, GX 150K; see also GX 30 (defendant's explanation that you get "banned" from YouTube for talking about "who rules the world" and discussing the need to use coded language, such as "kill the juice," when discussing "really banned things")). Indeed, in May 2020 he had told his girlfriend that he was "getting more views" posting his videos to BitChute than he had from posting his videos to YouTube. (GX 41B.) And to further maximize the number of people who would see his video and the threats he made in it, he gave it the terrifying title "Kill Your Senators" and description "Slaughter them all." (GX 3.) As the defendant himself explained in the comments, he posted the video publicly with the purpose "to get the word out." (GX 110A.) The defendant's plan worked: in the approximately 37 hours between when he published the video and when he hid the video from public view, the video was viewed 502 times. (GX 109N.)

Third, the defendant made contemporaneous statements in other videos that made clear his desire to scare and intimidate Members of Congress in retaliation for their actions related to the election. On January 9, he said that "[l]et's see what happens when people bring guns. There are only 100 senators, remember. They ride on planes like us, they go to restaurants. They

should be really scared of being in public . . . ."  (GX 26.)  He also said that "[t]hose 100 Senators should really be afraid about going into public now. . . .[l]ike the way these people behaved, they should have to walk around with bodyguards ten feet deep."  (GX 27.)  And he said "[s]o start exercising your rights to take these corrupt politicians down.  We have the first amendment, that's still around, remember?  And we have the second as well.  There are really only a hundred of these weakling Senators.  They are mass murdering psychopaths who are intent on our destruction, and they form an illegitimate government.  Every single one of them just needs to go."  (GX 27.)  In one video the defendant also included a video clip of people actively attempting to intimidate a U.S. senator in an airport, further showing his own motivation to intimidate Members of Congress.

In sum, a rational juror could conclude from the forgoing evidence, and the other evidence in the government's case, that the defendant made his threats against the Members of Congress mentioned in his video in order to impede, intimidate, or interfere with them, and to retaliate against them for performing their official duties.  The defendant's arguments to the contrary simply identify inferences the defendant wants to draw in his favor—they do not show that a rational juror was required to conclude he lacked the requisite intent for Section 115.

First, the defendant argues that, had he actually meant to intimidate or retaliate against Members of Congress, he would have sent his threat directly to a Member of Congress. (Mot. at 13-14.)  Section 115 does not require such proof.  Here, the evidence showed that, in order to threaten all Members of Congress at once, the defendant broadcast his threat over BitChute, a platform he believed would not take the threat down.  A rational jury could have inferred that the defendant believed such a mode of distribution to be an effective way of threatening all Members of Congress at once.  (See, e.g., Tr. 1074 (government rebuttal: "And, you know, not for nothing, posting a video may be a more effective way than exposing yourself by mailing a letter.  And

certainly, the law does not expect that the defendant would call members of Congress and threaten each of them directly.  The defendant used his weapon of choice, his internet platform.").)

Second, the defendant argues that certain edits he made to the "Kill Your Senators" video post on BitChute show that the video should have been "understood as political hyperbole and a figurative call to arms."  (Mot. at 14-15.)  But he does not, and cannot, explain why a rational juror was required to ignore his literal call for arms to carry out his threat.  Nor does the defendant explain how the inferences the government (and later the jury) drew from his editing—that the defendant considered for more than 10 hours whether to post his threat, then posted it, and edited the posting to make it more threatening—were unreasonable.  (See, e.g., Tr. 1072-73 (discussion in government's rebuttal of evidence about the defendant's careful thought in posting and editing the "Kill Your Senators" video).)

Third, the defendant contends that, from his BitChute comments, "it can be inferred that he wants people to engage with his ideas, not to actually make them happen."  (Mot. at 16.)  Again, the defendant merely identifies what he believes is a favorable inference that could be drawn from the evidence.  He fails to show that no rational juror could have drawn the opposite inference.  Indeed, a rational juror could easily have concluded that, when the defendant wrote, "of course you should alert people, fucking idiot.  how else should you get the word out?", the defendant meant what he said—he wanted to disseminate broadly his threat, which he placed on a social media platform that would not take it down.

III.   Evidence Presented after the Government Rested Further Proves the Defendant's Guilt

The defendant relies at various points on the jury's verdict, as well as evidence presented during his own case.  For example, the Motion refers to the jury's conclusion that the government had not proved beyond a reasonable doubt that three of the four alleged threats were

"true threats."  See Mot. at 1-2.  The Motion also discusses Defense Exhibits LL, II, SS, and W, all of which were admitted on the defense case, during the redirect examination of the defendant. Compare Motion at 17-19 with Tr. 940 (DX SS), Tr. 946 (DX W), Tr. 950-51 (DX I), and Tr. 955 (DX LL).  These arguments are misplaced.

First, a court in evaluating a motion pursuant to Rule 29(a) should rely on the record at the time the court reserved decision on the Rule 29 motion.  Fed. R. Crim. Pro. 29(b) ("If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.").  As a result, developments after the government has rested are arguably irrelevant to the defendant's motion, first made at the close of the government's case.

Second, in any event, the record after the government rested strongly supports the jury's ultimate verdict and further shows that the defendant's motion is meritless.  As an initial matter, the fact that the jury found the "Kill Your Senators" video to constitute a "true threat," but not the other alleged threats, shows that the jury carefully considered the evidence and applied the Court's instructions.  That verdict shows that a rational jury could—and indeed, did—find the defendant guilty.  Thus, the defendant credits the jury where he agrees with its decision, but asserts that the very same jury acted irrationally when he disagrees with the result.

Moreover, the defendant's recitation of evidence from the defense case ignores his own testimony.  The defendant chose to testify, and thereby to put his credibility at issue, and he denied both making a threat and trying to influence or retaliate against the Members of Congress. (See, e.g., Tr. 821 ("I was using deliberately outlandish language precisely because I didn't want people to take me serious in that respect.").)  A rational jury assessing the substance of the defendant's testimony, as well as his demeanor, could have found his testimony incredible and convicted him on that basis.  For example, the defendant denied that stating he would "stick a

knife" in a relative's newborn child was a threat.  (Tr. 915.)  And, in response to a question from defense counsel—"Mr. Hunt, are you on a stage right now?"—the defendant said "Yeah, I would tend to think of it that way. There's an audience here and there's lighting, you know, so I think it's not just this kind of stage but it's almost a national stage . . . ."  (Tr. 959.)  As a result, even a full consideration of the defense case does not support his Rule 29 argument but rather is fatal to the defendant's motion.[11]

---

[11] Even the defendant had to admit, in a moment of understatement, that "[a]nybody I think who looked at some of these things that I was saying could say that it's concerning in ways."  (Tr. 851.)

<u>CONCLUSION</u>

For the reasons set forth herein, the Court should deny the defendant's motion.

Dated:     Brooklyn, New York
           May 28, 2021

                                        MARK J. LESKO
                                        Acting United States Attorney
                                        Eastern District of New York

                              By:       _____/s/_____
                                        David K. Kessler
                                        Ian C. Richardson
                                        Francisco J. Navarro
                                        Assistant United States Attorneys
                                        (718) 254-7000

cc:      Clerk of Court (PKC) (via ECF)
         Defense Counsel (via ECF)

26