# Federal Defenders
## O F   N E W   Y O R K ,   I N C.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

June 11, 2021

Via Email and ECF
The Honorable Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *United States v. Hunt*, 21 CR 86 PKC

Your Honor:

We write in reply to the Government's Opposition papers, ECF No. 104 ("Opp."), to Mr. Hunt's Motion for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure Rule 29(a)–(c).  ECF. No. 97 ("Mot.").

**Introduction**

The Government's opposition misunderstands the standard of review for this Rule 29 motion.  It is true that the Court must "view the evidence in the light most favorable to the prosecution," Opp. at 11-12, but this is only half of the equation.  Here, the elements of the crime in dispute -- "true threat" and intent -- are inference-based elements, and binding precedent requires that inferences be reasonable based on fact, reason, and logic, and that they be permissible under the law.  The inferences the Government seeks to draw do not so qualify and must be rejected as a matter of law.  Absent these inferences, the Government can point to no evidence – beyond the Bitchute video itself – that provides sufficient context to make out a "true threat" or the criminal *mens rea* from which a reasonable juror could infer proof beyond a reasonable doubt.

**Standard for Analyzing Rule 29(a) and (c)**

Our Motion for Judgment of Acquittal is made under both Rule 29(a) or 29(c).  If the motion must be granted under Rule 29(c), where the evidence presented during the defense case may be considered, it must be granted, *a fortiori*, under Rule 29(a), where the defense case must be ignored. *See* Rule 29(b).  The complete trial record, including the defense case, should be considered since the Defendant put on a case.

**Analyzing Inferences in the Second Circuit:  *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019):  Only Reasonable, Permissible and Logical Inferences Count**

 "[W]here a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible." *United States v. Pauling*, 924 F.3d 649, 656–57 (2d Cir. 2019).  Inferences must also be sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *Id.; United States v. Martinez,* 54 F.3d 1040, 1043 (2d Cir. 1995); *see also* Sand et al., supra, § 6.01 ("[W]hether based upon direct or circumstantial evidence, or upon logical, reasonable inferences drawn from such evidence, [the jury] must be satisfied of the guilt of the defendant beyond a reasonable doubt before [it] may convict."). "[I]t would not satisfy the Constitution to have a jury determine that the defendant is probably guilty." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (internal quotation marks and alterations omitted).

Thus, courts "may not credit inferences within the realm of possibility when those inferences are unreasonable." *United States v. Quattrone*, 441 F.3d 153, 169 (2d Cir. 2006).  No deference is owed to "impermissible speculation." United States v. D'Amato, 39 F.3d 1249, 1256 (2d Cir. 1994).  Rule 29 only has teeth if  courts "take a hard look at the record and [] reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." *United States v. Blasini-Lluberas*, 169 F.3d 57, 62 (1st Cir. 1999) (internal quotation marks omitted) (quoting *United States v. Woodward*, 149 F.3d 46, 56 (1st Cir. 1998)). Isolation of facts from other relevant facts that upset the proffered inference ("cherry-picking") is not permitted. as the Court is obliged to "consider the evidence presented at trial in its totality, not in isolation.'" *United States v. Kapelioujnyj*, 547 F.3d 149, 154 (2d Cir. 2008) (emphasis added) (quoting *United States v. Zhou*, 428 F.3d 361, 369-70 (2d Cir. 2005).

The proper analysis in this inference-driven case is set forth in *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019).  The *Pauling* case began as a trial in the SDNY, where Judge Oetken granted a Rule 29 motion and conditional new trial following a jury verdict convicting the defendant of conspiracy to distribute and possess with intent to distribute at least 100 grams of heroin.  *United States v. Pauling*, 256 F.Supp.3d 329 (SDNY 2017) (Oetken, J.).  There was a disputed issue of fact about whether the drug weight reached the level required for the conviction, and the government argued that the weight could be inferred from coded conversations between established co-conspirators.  But Judge Oetken found that the government's spin on the phone conversations did not lead to a reasonable and permissible inference about the actual weight of drugs.

The ruling was appealed, and the Second Circuit offered the following useful language guiding the careful balancing of permissible inferences:

An "inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *Siewe v. Gonzales*, 480 F.3d 160, 168 (2d Cir. 2007) (alterations omitted) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999)).  At times it

may be difficult to distinguish between inference and speculation, as some speculation may indeed be reasonable. Reasonable speculation occurs when the finder of fact concludes that a disputed fact exists that is within the realm of possibility, but the conclusion reached is nevertheless unreasonable because it is not logically based on another fact known to exist. *See Langston v. Smith*, 630 F.3d 310, 314, 319 (2d Cir. 2011) (noting distinction between "reasonable speculation" and "sufficient evidence"); Leonard B. Sand et al., Modern *657 Federal Jury Instructions § 6.01 (2011) ("The process of drawing inferences from facts in evidence is not a matter of guesswork or speculation. An inference is a deduction or conclusion which ... the jury [is] permitted to draw ... from facts which have been established by either direct or circumstantial evidence."); *see also O'Laughlin v. O'Brien*, 568 F.3d 287, 301-02 (1st Cir. 2009); *Newman v. Metrish*, 543 F.3d 793, 796-97 (6th Cir. 2008). Indeed, we "may not credit inferences within the realm of possibility when those inferences are unreasonable." *United States v. Quattrone*, 441 F.3d 153, 169 (2d Cir. 2006).

*Pauling,* 924 F.3d

The key point here is that the line between permissible inference and impermissible speculation "is drawn by the laws of logic," and not "idiosyncrasies." *Pauling*, 924 F.3d at 657 (citations omitted). Such speculative and impermissible considerations as political judgment and ideological moral outrage cannot be "allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked." *Galloway v. United States*, 319 U.S. 372, 395, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943).

To permit ideological idiosyncrasies to "do the duty of probative facts" invites the hazards of confirmation bias.

### The Role of Confirmation Bias

In *Pauling,* Judge Oetken gently reminded the government of the hazards of confirmation bias. He pointed out, for example, that the government had offered a chart summarizing the evidence but omitted a detail, that, while arguably irrelevant to their analysis, might have offered a competing inference. This implied, wrote Judge Oetken, that the Government "had trouble reconciling its desired inference with the only evidence in the record of a previous sale." *United States v. Pauling,* 256 F. Supp. 3d 329, 337 (S.D.N.Y. 2017), aff'd and remanded, 924 F.3d 649 (2d Cir. 2019*); see also U.S. v. Cook*, 472 F.Supp.3d 326 (N.D. Miss. 2020) (N.D. Miss. 2020) ("Interestingly, when you compare the "posts" the government presented to the grand jury in the indictment, to the full posts reproduced above, it appears that the government "cherry picked" certain statements and re-arranged them in a different sequence and context to give the posts a more ominous effect.")

Desired inferences *are* the very definition of confirmation bias, which is legally defined as the "the well-documented tendency, once one has made up one's mind, to search harder for evidence that confirms rather than contradicts one's initial judgment." *See ,e.g., Goswami v. DePaul Univ.,* 8 F. Supp. 3d 1004, 1018 (N.D. Ill. 2014) (quoting Richard Posner, How Judges Think, 111 (2008); *see also* Raymond S. Nickerson, Confirmation Bias: A Ubiquitous Phenomenon in Many Guises, 2 Review of General Psychology 175 (1998). Decades of behavioral research confirm this. "Once an individual or group has made a decision to take a particular course of action, it becomes harder and harder to change course, even in the face of powerful conflicting evidence and reasons." *Carmody v. Bd. of Trustees of Univ. of Illinois*, 747 F.3d 470, 475 (7th Cir. 2014); Daniel Kahneman, Thinking Fast and Slow 80–85, 245–54 (2011) (describing confirmation bias, biased assimilation, and sunk-cost effects on decision-making); Geir Kirkeben, Erik Vasaasen & Karl Halvor Teigen, Revisions and Regret: The Cost of Changing Your Mind, 26 J. Behavioral Decision Making 1, 1 (Jan.2013) (summarizing large body of research that demonstrates "people's reluctance to change their minds"); Craig A. Anderson, Belief Perseverance, in Encyclopedia of Social Psychology 109, 109–10 (Roy F. Baumeister & Kathleen D. Vohs eds.2007).

There were many examples of this phenomena in Mr. Hunt's trial. So much so that it began to seem at times that the Government believed itself to be prosecuting Dylann Roof. It was a disservice to the jury and the public to overplay Mr. Hunt's dangerousness – both as a matter of constitutional law and common sense.

### Competing Inferences -- How to Handle a Tie

A second way in which the Government's Opposition misunderstands the standard of review is with respect to how the Court must resolve a battle among competing inferences. In the event of a tie, the Government would award the win to itself. Opp. at 12. But in a criminal case, "the government must do more than introduce evidence 'at least as consistent with innocence as with guilt.'" *D'Amato*, 39 F.3d at 1256 (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991)). In *United States v. Coplan,* 703 F.3d 46, 69 (2d Cir. 2012), a case not cited by the Government, the stated rule is the opposite of the Government's "tie goes to us" formulation: "If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Id.*

Thus, the binding authority on this point is that "a district court must grant a defendant's Rule 29 motion where the evidence is viewed in the light most favorable to the government, remains, at best, in equipoise." Id. (quoting *Caplan*, 703 F.3d at 69); *see also United States v. Hassan*, 578 F.3d 108, 122 (2d Cir. 2008) ("[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.") (internal quotation marks and citation omitted). In other words, a tie goes to the defense.

Another case that offers guiding analysis is the "Cannibal Cop" case, *United States v. Valle,* 301 FRD 53, 80 (SDNY 2014); aff'd in part, rev'd in part, 807 F.3d 508 (2d Cir. 2015). There, both the district and appellate courts applied the rule of equipoise to overturn a jury verdict and declare defendant Valle legally innocent. Mr. Valle had been charged with a crime that was committed using online words, just as in Mr. Hunt's case. Like Mr. Hunt's Bitchute video, Mr. Valle's words, taken literally, easily made out the crime charged, which was conspiracy to kidnap, in furtherance of which Mr. Valle had engaged in online exchanges with anonymous co-conspirators planning to torture, rape, kidnap and murder women that he knew and even stalked, and whose identities and pictures he offered up to his co-conspirators. Yet in reality Mr. Valle, like Mr. Hunt, wrote his online words from his home and the terrible crimes threatened never actually happened.

The Government made the same argument in *Valle* that it makes here*: that there was no legal requirement of proof that "an actual kidnapping took place," that the defendant actually met any of his anonymous online conspirators "in person, spoke over the telephone," or shared information about the victims. *Valle,* 301 FRD at 61. This was certainly true, but misapplied the law of competing inferences. Even though the words spoken literally *sounded like* conspiracy to murder and kidnap women, it was the inferences that did the work needed to decide whether the defendant's words were criminally cognizable.

In *Valle,* the inferential question posed was whether the literal plan to kidnap was more consistent with fantasy or with criminal agreement. Because the Government did not produce enough evidence to win that logical battle of inferences, the tie went to Mr. Valle, and the Second Circuit upheld the directed verdict. *Id.* at 508 (2d Cir. 2015). With the evidence against him in equipoise, the district court declared Mr. Valle legally innocent.

But where "a fact to be proved is also an element of the offense," which was drug quantity in *Pauling*, "it is not enough that the inferences in the government's favor are permissible." Id. at 657. The Government must also show that the proffered inference would permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt," as it "would not satisfy the Constitution to have a jury determine that the defendant is probably guilty." Id. (citing *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (internal quotation marks and alterations omitted).

The evidence at Mr. Hunt's trial was, at best for the Government, in equipoise. Accordingly, a Judgment of Acquittal is required.

**Reliance on First Amendment Principles When Scrutinizing Inferences**

These principles applied to justify the result in *Valle* even though that case lacked even the faintest involvement of core First Amendment principles as are present in Mr. Hunt's case. Here the inferences required to be drawn are not between criminal agreement and fantasy, but between "true threat" and political hyperbole. We submit this is and should be subject to even stricter scrutiny than that which applied in *Valle.* Mr. Hunt's case, like the others before it, will set a data point on the line between political hyperbole/mere advocacy" and criminally

unprotected speech.   We know from *Pauling* and other cases that only reasonable, non-speculative and permissible inferences are permitted. We discussed how *U.S. v. Valle,* 807 F.3d 508 (2d Cir. 2015), decided that the tie in reasonable inferences had to go the defendant.   But it is in *Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 246 (2002), that we see how interconnected are the concepts of permissible inferences and the First Amendment.

## Application of *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) and *R.A.V. v. City of St. Paul,* 505 U.S. 377 (1992).

We submit that under *Ashcroft v. Free Speech,* the Government's inferences must be tested against the burden upon one's First Amendment rights, which includes the "right to think," which is the "beginning of freedom." *Ashcroft*, 535 U.S. at 253.  In *Ashcroft* the Government argued vigorously, and understandably, that virtual child pornography presents the same harms and potential harms as "actual child pornography. *Ashcroft,* 545 U.S. at 236.

> While the Government asserts that the images can lead to actual instances of child abuse, the causal link is contingent and indirect. The harm does not necessarily follow from the speech, but depends upon some unquantified potential for subsequent criminal acts. The Government's argument that these indirect harms are sufficient because, as *Ferber* acknowledged, child pornography rarely can be valuable speech, see *id.,* at 762, 102 S.Ct. 3348, suffers from two flaws. First, *Ferber's* judgment about child pornography was based upon how it was made, not on what it communicated. The case reaffirmed that where the speech is neither obscene nor the product of sexual abuse, it does not fall outside the First Amendment's protection. See *id.,* at 764–765, 102 S.Ct. 3348. Second, *Ferber* did not hold that child pornography is by definition without value. It recognized some works in this category might have significant value, see *id.,* at 761, 102 S.Ct. 3348, but relied on virtual images—the very images prohibited by the CPPA—as an alternative and permissible means of expression, *id.,* at 763, 102 S.Ct. 3348. Because *Ferber* relied on the distinction between actual and virtual child pornography as supporting its holding, it provides no support for a statute that eliminates the distinction and makes the alternative mode criminal as well.

*Ashcroft v. Free Speech Coal.,* 535 U.S. at 236.

If the First Amendment protects the production and consumption of virtual child pornography (*Ashcroft*), with all the grooming and the desensitizing and the appetite whetting that involves, it would be a strange result indeed if one were not at least equally free to "consume" political content and discuss political topics in the privacy of one's own home without fear of criminal repercussions.  Unless the protected content is so logically tied to the crime that it can no longer be viewed as content discrimination, there is a danger of constitutional significance that speech, indeed thought, will be chilled.

Thus, there comes a point when the use of certain inferences comes so close to the line of content discrimination that it "raises the specter that the Government may effectively drive

certain ideas and viewpoints from the marketplace." *R.A.V. v. City of St. Paul,* 505 U.S. 377, 387 (1992). The central purpose of the First Amendment is to "prevent[] government from proscribing speech, or even expressive conduct because of disapproval of the ideas expressed." *R.A.V.*, 505 U.S. at 382.

The *R.A.V.* Court it overturned a conviction of a defendant who had burned a makeshift cross on a Black family's lawn, which had been found to violate a St. Paul, Minnesota Bias-Motivated Crime Ordinance. The Ordinance criminalized the display of symbols known to arouse "anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." 505 U.S. at 379. The Court that ordinance facially invalid under the First Amendment, and requires vigilance in the prevention of even subtle forms of content discrimination in the application of our laws:

> When the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists. Such a reason, having been adjudged neutral enough to support exclusion of the entire class of speech from First Amendment protection, is also neutral enough to form the basis of distinction within the class. To illustrate: A State might choose to prohibit only that obscenity which is the most patently offensive *in its prurience—i.e.,* that which involves the most lascivious displays of sexual activity. But it may not prohibit, for example, only that obscenity which includes offensive *political* messages. *Kucharek v. Hanaway,* 902 F.2d 513, 517 (CA7 1990), cert. denied, 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991). And the Federal Government can criminalize only those threats of violence that are directed against the President, see 18 U.S.C. § 871—since the reasons why threats of violence are outside the First Amendment (protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur) have special force when applied to the person of the President. See *Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (upholding the facial validity of § 871 because of the "overwhelmin[g] interest in protecting the safety of [the] Chief Executive and in allowing him to perform his duties without interference from threats of physical violence"). But the Federal Government may not criminalize only those threats against the President that mention his policy on aid to inner cities. And to take a final example (one mentioned by Justice STEVENS, *post,* at 2563–2564), a State may choose to regulate price advertising in one industry but not in others, because the risk of fraud (one of the characteristics of commercial speech that justifies depriving it of full First Amendment protection . . . But a State may not prohibit only that commercial advertising that depicts men in a demeaning fashion.

505 U.S. at 388-89.

Mr. Hunt's case illustrates how easily the Government's zeal to prosecute unprotected speech can burden protected speech. For example, the Government's entire cross was designed to shame Brendan Hunt for his political views, including thoughts he expressed in private. The zeal and outrage of the Government toward Mr. Hunt's words must be viewed with a clinician's eye to weigh competing inferences -- in order to compete at all the inferences must be permissible. The emotion and disgust must be removed from the analysis. The Court so instructed the jury:

### SYMPATHY, FEAR, PREJUDICE, BIAS Instruction O (Tr. 1120):

Instruction O. <u>No sympathy, fear, prejudice or bias.</u> In reaching your verdict, you are to be guided solely by the evidence in this case, and not be swayed by sympathy, fear, prejudice, or bias for one side or the other. The crucial question you must ask yourselves as you sift through the evidence is: Has the Government proven the guilt of Defendant beyond a reasonable doubt?

### POLITICAL VIEWS INSTRUCTION Instruction M (Tr. 1119):

Instruction M. <u>Consideration of Political Views</u>. You have just heard testimony and actually received some exhibits related to what might be considered Defendant's political views. You must treat this evidence with caution. This evidence alone cannot be used to find Defendant guilty of any of the offenses charged in the indictment. I should say, guilty of the offense charged in the inictment. It may, however, be considered by you for limited purposes, such as considering the context in which statements attributed to Defendant were made, what Defendant's intent was in making the statement, and his expectation regarding the effects of his statement. You cannot find Defendant guilty because you disagree with or find distasteful his political views.

The Court also instructed the jury how it could use uncharged acts;

### UNCHARGED ACTS INSTRUCTION Instruction L (Tr. 1118)

Instruction L. <u>Uncharged acts considered for a limited purpose</u>**.** Defendant is charged with making four statements that the Government claims are "true threats" under the law. I admitted evidence of other statements, expressions, beliefs, opinions, acts, or communications, allegedly made by Defendant, for the limited purpose of determining whether Defendant acted with the required intent in regard to the charged offense. **You may consider evidence of uncharged acts or statements, expressions, beliefs, opinions, acts, or communications, as evidence of Defendant's motive, knowledge, absence of mistake, or lack of accident with respect to the four charged threats.** Evidence of uncharged conduct by Defendant may not be considered by you for any purpose other than the ones I have just listed. Specifically, you may not consider this evidence as

proof that Defendant has a criminal propensity; that is, that he likely committed the crime charged in the indictment because he was predisposed to criminal conduct. You also may not substitute uncharged statements, expressions, beliefs, opinions, acts, or communications for the four statements that the Government alleges are the threats.

**A Judgment of Acquittal Does Not Condone the Contested Speech**

A Rule 29 Judgment of Acquittal here would not condone the speech at issue. These are not easy cases, but no one would suggest that the Justices and Judges in *Ashcroft v. Free Speech* or *Valle* were condoning those sickening practices, or that Judge Reinhardt was condoning the ugly N-word speech in *United States v. Bagdasarian*, 652 F.3d 1113 (9th Cir. 2011), or that Chief Justice Roberts was happy to uphold the right of a religious zealot to display ugly "God Hates Fags" signs at Iraq War Veterans funerals in *Snyder v. Phelps,* 562 U.S. 443 (2011). We know that the entire point of exempting "true threats" from First Amendment protection is to ensure that officials can do their jobs free from fear of violence and the "the possibility that the threatened violence will occur[.]'" *Turner*, 720 F.3d at 42 (quoting *Virginia v. Black*, 538 U.S. 343, 359–60). Here, there is nothing from which to infer that this statutory harm would have come to be. Not a single Member of Congress – or their staff -- was placed in fear, much less made aware, of that Brendan Hunt made a Bitchute Video *until* the FBI – not Hunt or anyone associated with him – advised them they had a man in custody who had threatened their lives.

**Insufficiency of the Evidence on "True Threat"**

The Court's instruction on this element is as follows:

**TRUE THREAT INSTRUCTION. (Tr. 1127)**

The first element that the government must prove beyond a reasonable doubt is that defendant made a threat to assault or murder. As this is a case involving speech, I advise you that the First Amendment protects vehement scathing and offensive criticism of public officials, included Members of Congress. The First Amendment therefore protects political exaggeration or expressions of the opinion. Further, the First Amendment protects mere advocacy of the use of force or violence. But the First Amendments does not protect "true threats" as I will now define the phrase. For a statement to be a true threat, it must been made under such circumstances that an ordinary, reasonable person who heard or read the statement, and who is familiar with the context of the statement, would understand it as a serious expression of an intent to inflict bodily injury. This question is informed by whether the statement is, on its face and under the circumstances, so unequivocal, unconditional, immediate and depending on the circumstances, even if conditional and implicit statement can be threat. And an example of such a statement is "your money or your life," which although conditional and not containing explicitly threatening language, could

nonetheless constitute a threat specific as to the person threatened as to convey seriousness and imminence.

The Government does not seriously dispute that the only legally cognizable "true threat" in the video is the conditional statement: "If anybody has a gun, give me it, I will go there myself and shoot them and kill them," GX 21. *See* Opp. at 16–17. A statement that is "an imperative intended to encourage others to take violent action, if not simply an expression of rage or frustration," is not cognizable under a threat statute. *United States v. Bagdasarian*, 652 F.3d 1113, 1119 (9th Cir. 2011).

The rest of the words in the video at best merely exhort others to action, thus suggesting prosecution under one of the incitement laws – such as the Riot Act,18 U.S.C. § 2101 and 2102, 18 U.S.C. § 2383 (Rebellion), 18 U.S.C. 2384, 18 U.S.C. § 2384 (Sedition), or 18 U.S.C. § 2385 (Violent Overthrow). But these are not charged here and the jury was instructed of the lawfulness of "mere advocacy."

It is true that even a conditional threat can be a true threat under certain circumstances. *United States v. Malik*, 16 F.3d 45, 49 (2d Cir. 1994). "So long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution, the statute may properly be applied." *U.S. v. Kelner*, 534 F.2d 1020 (1976). Let us not forget that *Kelner* offers a "narrow construction" of the word in the 18 USC 875(c) context, because that is what was approved in *Watts,* 394 U.S. at 708. We do not disagree that the *Kelner* factors can be flexibly applied, but when the facts miss the mark on every *Kelner* factor *but for* the literal words of the video – and those being conditional – flexibility bends too far.

**No Factors Exist to Transform the Conditional, Indirect Threat to a True Threat**

The Court's "your money or your life" example, Tr. 130, illustrates this point. While the statement "your money or your life" may be conditional, it is directed at "you" – it is a conditional, yet direct, threat. The Bitchute video, on the other hand, was a conditional *and* indirect threat. By analogy, had a video entitled "Dear Congress: Rob Your Senators: Your Money or Your Life If I Don't Get My Stimulus Check" been posted on social media, absent some aggravating factor, e.g. the speaker had previously robbed someone for their stimulus check, this conditional and indirect threat would not be a "true threat."

In order to sustain the verdict here, the Government must downplay the aggravating factors in *Turner*, and it does. Opp. at 15. *Turner* is the only case in this Circuit that suggests Mr. Hunt's conviction under Section 115(a)(1)(b) is even possible, and it is, admittedly, one of the more enigmatic opinions in this area of the law. But the Government cannot explain what "Hunt factors" compare to "*Turner* factors,"[1] apart from unreasonable impermissible inferences.

---

[1] The aggravating contextual circumstances in *Kelner* are worthy of repeating. There the speaker, a Jewish Defense League (JDL) leader, called a major news station to a press conference the day that Yassar Arafat was to speak at the United Nations and said he planned to

In its opposition, the Government concedes that Mr. Hunt is not a public figure. Opp. at 14, n. 8. It identifies no co-conspirators over whom Mr. Hunt exerted control. In this regard, the Government's speculations about why Mr. Hunt might have used Bitchute because he believed it an effective way to threaten Members of Congress can be easily debunked, especially when contrasted with the facts in *Turner*, which turned on contextual facts from which one *could* reasonably infer that an *indirect* threat (posted on a blog instead of sent to the victims) was intended to get to the victims. The fact that took Turner's indirect threat to the next level were actually chilling. Compare Mr. Hunt's name-calling of the most well-known Democrats "AOC, Pelosi, and Schumer" (and those in acquitted threats) to *Turner,* where the defendant targets three particular judges (all of whom testified at his trial) and provided detailed information about their locations. 720 F.3d at 411. Turner also *described himself* as having control over followers such that he took responsibility for the *prior murder of a federal judge* just like the ones he was threatening. *Turner,* 720 F.3d at 417 (defendant boasts on his blog that through his shock jock radio and internet show he has gotten "in touch with enough of the right people to get it done," and refers to the killing of a judge in Chicago as "proof" of his influence.)

Nothing approaches that level of personalization here, and the stronger inference is that Mr. Hunt used the names "AOC, Pelosi, and Schumer" in the acquitted threats because they are the household names of the Democratic Party at the moment. *See generally* Tr. 853 (Mr. Hunt's testimony that these were names that he had "kind of picked out of the air, like AOC, Pelosi, Schumer, it wasn't that I was trying to target them, you know, in real life; I was just picking out the most popular names on the left-hand side of the political spectrum.") In any event the Bitchute video named only Joe Biden, who is not a named victim of this crime.

Another aggravating contextual factor in *Turner* was Turner's sending of emails to another state court official and the New York Times, bragging about how his identification of judges on his blog got them killed. Hunt was like the opposite of *Turner* – meandering and malleable in his political theories and opinions, saying such non-threatening things as "I'm trying to reason in my mind because I don't know. I don't know any more than anybody else does." DX 19/20. There is no evidence that Mr. Hunt once claimed control of a single person in the furtherance of any perceived threat, and chose to post it on Bitchute, rather than the far more popular YouTube because Bitchute was more friendly to free speech – and he felt he could be outlandish there.

Mr. Hunt explained in his testimony:

---

assassinate Arafat . CBS news anchor John Miller (a well known New York journalist back in the day) interviewed Kelner at the Waldorf-Astoria Hotel, where Arafat was expected to stay. When Miller arrived, Kelner was "seated in military fatigues behind a desk with a .38 caliber pistol "police special" in front of him," and to his right was another man dressed in military fatigues. *Kelner*, at 1021. Mr. Hunt, by contrast, was all alone in the Bitchute video, against the drapes in his living room, wearing a comic book sweatshirt. GX 203.

YouTube was cracking down on things like free speech and controversial ideas and conspiracy theories. So I felt a bit more free on BitChute. BitChute described itself as a freedom of speech platform. So I felt a little more entitled to post some conspiracy-theory documentaries. I think I had one or two up there at the time. And especially the Capitol stuff, I felt those things weren't going to get taken down or censored in the way that YouTube might do that. And especially a video like Kill your Senators, I knew that kind of stuff wouldn't fly on YouTube. And plus, that wasn't really a message I was trying to get out to people. I had thousands of subscribers on YouTube, but I didn't want to broadcast that kind of thing to a lot of people. So I went on BitChute, just threw that out there into the ether. And I think I had about 100 subscribers at the time. So I knew that a lot of people weren't going to watch or listen to me, and I didn't think anybody would take me seriously.

Tr. 858.

He further explained:

Q:  I mean, when you saw the comments coming in on the Kill your Senators video, did you think you were going to be able to galvanize people to start maybe a war?

A No. I was taking a more, I guess, you know, outlandish approach to the whole thing, where I think that one of the commenters was actually a bit more serious than me. He was like all right, this is the way to do it. We have to go to these secret chat rooms and stuff. And I was like hell, no, if you want to do it, get out there and say what you mean, things like that. And it wasn't really a serious proposition that I was saying; it was kind of just like playing along with this sort of rhetoric that was going around at the time, and there wasn't any kind of intent on my part to sort of galvanize a militia.  I'm not a political leader or a military leader of any kind. I'm sort of just a YouTube guy who makes controversial content and clickbait videos.

Tr. 859.

Mr. Hunt's explanation makes far more sense than the inference about why Mr. Hunt posted on the more obscure Bitchute rather than Youtube or sending his video directly to Members of Congress.  The Government's only attempt to explain the lack of direct communication is to argue that Mr. Hunt believed that posting on BitChute would transmit the Video to Members of Congress: "[a] rational jury could have inferred that the defendant believed such a mode of distribution to be an effective way of threatening all Members of Congress at once." Opp. at 22. They also make the implausible claim that Mr. Hunt chose to post the video on BitChute "in order to threaten all Members of Congress at once." *Id.*  In the battle of inferences, this one does not even seem like a tie.  This is not to say that proof of direct threat was required. But the Government's view is not only speculative, it ignores facts that contradict it.  It makes no room for the tussle Mr. Hunt had with the commenter to the Bitchute video who seemed to want to make actual violence happen but *underground*, while Mr. Hunt wanted to talk about revolution in the open.  Nor can it explain how Mr. Hunt considered, but did not post, the picture of the firearm.  DX RR.  There was no evidence that suggested Mr. Hunt or *anyone*

12

believed BitChute could serve a threatening purpose, as opposed to a freedom of expression purpose. DX Z (Hunt discussing his use of Bitchute over text in April 2020: "I could be just another lame youtuber talking about harmless topics, or I could be a pioneer of new media platforms and a champion of free expression…that's the choice I see before me.") In short, the notion that Mr. Hunt "believed" BitChute would provide an effective "mode of distribution" is not a reasonable, non-speculative inference that could have been drawn from the evidence presented at trial. As such, it cannot be considered for purposes of this motion. *See Blasini-Lluberas,* 169 F.3d at 62.

Even if these conflicting states of mind were in equipoise (which they are not), the inference cannot compare to the much more aggravating facts in *Turner* that showed exactly why Turner viewed his blog as "an effective mode of distribution": he credited his blog for having led to the actual killing of a judge. *Turner,* 720 F.3d at 411.

### Words/Context of Video

The Government claims that a reasonable juror could find "true threat" from the defendant's "serious demeanor" in the video and the literal "words of the video," including its "written title." Opp. 16.

Under Second Circuit law, "it is not enough to show the use of language that is literally threatening." *See United States v. Sovie*, 122 F.3d 122, 125 (2d Cir. 1997). Here, when comparing the competing inferences to be drawn, it is the Government's that fail. The failure of 499 viewers and 15 commentors to report the video to law enforcement "blunts any perception that statements made [in an online posting instead of directly to the victim] were serious expressions of intended violence." *Bagdasarian,* at 1121 (noting that three out of four commenters on Bagdasarian's online post wrote that they planned to alert authorities, but only one actually reported it).

The Government chose not to call that witness, instead calling Jordan Holt, an FBI employee in the Social Media Exploitation Team of the FBI National Threat Operations Center. Tr. 42. Ms. Holt followed protocol of that unit in looking at the publicly available information on the internet, what "anyone can do," to identify the speaker and assess whether to open a "Guardian" tip in the FBI system. *Id.* There were no previous mentions of Hunt in the tip system. Tr. 111. Ms. Holt also testified that she had never worked up any threats on Bitchute through the Social Media Exploitation Unit of the FBI, Tr. 112, so there was no evidence that Bitchute was known to be a place for making threats. Moreover, in reviewing Mr. Hunt's online presence, she did not note any other threatening material, Tr. 123.

In her position since March 2019, Ms. Holt handled about 4 calls a day. Tr. 104. Between June of 2020 and the January 8, 2021 tip, she recalled that she had handled about 50 tips involving threats to politicians, and about 25 of those had been referred to the "Guardian" system. Tr. 105.

Just over two months later, on March 18, 2021, three federal prosecutors interviewed her about her handling of the Bitchute video and tip. Tr. 106, 126. Despite the fact that she had been shown a press release about Mr. Hunt's arrest *prior* to this interview, she *still* could not recall the Kill Your Senators video. Tr. 135-136. It was only after the prosecutors' interview that she remembered the video and even then could not recall putting it into the Guardian system. *Id.* Asked on cross examination if this failure of memory was because she worked so many politician video cases, Ms. Holt testified as follows:

> Q Now how many Guardian cases involving video threats of politicians you think you have personally worked on either as an intake person or the social media exploitation unit?

> A Just a couple.

Tr. 106.

Ms. Holt conceded that even *after* she remembered that the Kill Your Senators video was put into the Guardian system, she still could not remember which supervisor she had discussed it with, and gave a name of who she "probably" spoke to about it. Tr. 111.

This failure of memory of the only person to testify who saw the video before the prosecution began is significant. If this video was so objectively terrifying, how could Ms. Holt have simply forgotten about it within two months? It is not as if she saw hundreds of such videos. She testified that she had only seen a "couple" of video threats to politicians in her job, and it was the only one that prompted a meeting with prosecutors. Tr. 106. This testimony supports the opposite inference from that which the Government promotes – that the video in question was not so remarkably chilling or memorable that she could remember it when summoned by prosecutors two months later.

The "literal seriousness" is also reduced when viewed in the context of Mr. Hunt's online presence, as any reasonable viewer would, a fact that the Government ignores in its inferential calculus. Mr. Holt admitted she saw nothing threatening during her review of Mr. Hunt's social media. Tr. 123. The online presence set forth in DX KK1-4, and DX LL, all of which was publically available and much of which was accessed by Ms. Holt, contain not a single suggestion that Mr. Hunt has the capacity, the firearms, the plan, or the ability to carry out the conditional threat made in the Bitchute video. Even his Bitchute profile suggest that he is a provocateur about free speech, using the description of his channel as "fuck youtube", GX 3, which is hardly a threat to Members of Congress.

Moreover, Mr. Hunt's Bitchute profile does nothing to hide his identity. This too raises the opposite inference from that drawn by the Government, that in "some circumstances a speaker's anonymity could influence a listener's perception of danger. *Bagdasarian*, 652 F.3d at 1120.







None of these contextual cues suggest seriousness, or add to the context any indication that Mr. Hunt was capable of or planning to carry out any acts of violence.  Mr Hunt's online presence suggests he is an activist, musician, actor, comic artist, shows his cartoon-inspired videos, and more. Most of Mr. Hunt's Bitchute videos were acting videos, including Shakespeare performances and videos questioning Government involvement in tragic events such as 9/11, Sandy Hook, and the Boston Bombing.  Tr. 857.  His interest in these events, not rebutted in any way by the Government, was patently motivated (as expressed in the videos themselves) by his belief that the Government might have had some hand in the event.  Tr. 924-25.  The context

therefore is more consistent with the performative nature of the Bitchute video, rather than the seriousness of the threat.

The Government claims that the implicit reference to the January 6, 2021 events in the BitChute Video made the video more objectively threatening. Opp. 16. But this requires an inference that the threat at issue here ("if anyone has a gun . . .") involves getting a gun from someone so that Mr. Hunt could take it to the Capitol (where he had clearly never been). It also borrows from *Turner,* but in a way that disproves rather than proves the Government's point. There being no dispute that Mr. Hunt was never at the Capitol or that he had any control over those who were, the events at the Capitol are hardly like the reference in *Turner* to the killing of Judge Lefkow, for which Mr. Turner took credit. *Turner,* 720 F.3d at 417 (Turner connected the prior frightening event -- the killing of a judge -- to *his own ability to carry out the threat* by saying "I know how to get it done. Federal District Judge Joan Humphrey Lefkow in Chicago is proof.")

In fact, unlike Turner's blog posts, Mr. Hunt's videos portrayed the events at the Capitol (the equivalent of the Lefkow killing for these purposes) as being distinctively *non-threatening.* The way Mr. Hunt portrayed it on his Bitchute videos, it was the Capitol protestors who were victimized and attacked, not the Capitol police or Members of Congress. *See* GX 27 (Bitchute video entitled "DC cops LET THEM IN to Capitol, Pushed Man Off Balcony"); GX 23 (Bitchute video entitled: HORRIFIC: DC cops Shoot Unarmed Patriot Girl Thru Neck in Capitol Building).

Whatever else can be said about the events of January 6, 2021, the only shooting that was done was of protestor Ashleigh Babbitt who was shot by Capitol Police. GX23. The events at the Capitol were not brought about by Brendan Hunt, and he offered no explanation in the video why those events would make *his* threat seem more serious. *Cf.* No reasonable viewer of the BitChute Video would assume Mr. Hunt was capable of accomplishing anything close to what happened on January 6, 2021, and the 15 comments to the video do not suggest that anyone else is in the least bit interested in his proposal. The context evidence also shows videos prominently displayed on his channel that discuss the opposite of what the Government claims -- that people avoid violent conflict and association with extremists. DX 19 (urging people on the left and the right not join up with groups, describing "extremist groups [as] the mobs that get easily manipulated.")

Because context is important, it should also be noted that in the months following the election of 2020 and preceding the 2021 Inauguration emotions among people in general were very high. "[W]ords or phrases take their character as threatening or harmless from the context in which they are used, measured by the common experience of the society in which they are published." *Malik,* 16 F.3d 45, 50 (2d Cir. 1994) (quoting *United States v. Prochaska*, 222 F.2d 1, 2 (7th Cir. 1955)). There was a sense of doom or Armageddon that permeated the country. Mr. Hunt testified about his own growing frustration being fueled by that environment, his viewing of others on the political left who engaged in threatening-sounding rhetoric without reprisal, including celebrities saying they wanted to kill Trump or showing the execution of

Trump. Tr. 620-21. The Government presented no evidence to rebut this testimony. Indeed, their own expert witness testified that "Democrats and republicans alike have portrayed America's choice in the 2020 election in apocalyptic terms," and that "both sides portrayed the potential end of time, unless their candidate won." Tr. 602.

### Lack of Specificity as to Time/Place

The indirect, conditional nature of the threat might have been overcome had the video contained other information so specific as to place and time for executing the threat that a reasonable person would fear its "seriousness and imminence." On this point, the government claims that Mr. Hunt lent "credibility to his threat," Opp. At 14, by making it specific as to time and place, i.e. the inauguration of President Biden. But the statement says the opposite. The actual statement in the Bitchute video regarding time and place is: "probably the inauguration . . . that's probably the best time to do this." GX 21. The government cannot dismiss this as mere syntax, as the Second Circuit has recognized that syntax is a relevant factor in cases, like this one, where the alleged threat is vague and brief. *See Turner*, 720 F.3d at 423, n.6.

Two uses of "probably" in one threat should probably make the threat be taken less, not more, seriously. With no specific date, time, or place (other than "the Capitol") for any act of violence to occur, and given so ambitious a threat ("slaughter them all"), a reasonable listener would expect some coordination in order for the threat to be taken seriously.

But the comments show the opposite – that Mr. Hunt was all about the principle of revolution, not the threat to Members of Congress. It was revolution he wanted to discuss, not the planning of a slaughter. It is significant that the one comment the government choose to focus on in its opposition – the one that says "we do this on the dark web" – Mr. Hunt pushes back, not on logistics (like someone who truly wanted to make good on violent threats) but on lofty principles of revolution. Even his debate with that commentor suggest that he is not to be taken seriously. There is nothing about this video that indicates Mr. Hunt expects a response from anyone who might join him. There is no follow up the video, no further instructions. After it is deleted the next day, Mr. Hunt goes right back to posting videos about politics as if the "Kill Your Senators" video never happened. No rational juror could have concluded beyond a reasonable doubt that a reasonable person would view the BitChute Video and assume a co-conspirator might engage in violent acts.

### Reaction of the Crowd

Contrary to the Government's argument, the proof at trial not only failed to show the seriousness of the Bitchute video, it showed the opposite – that the real time listeners did *not* take it seriously. As the threat was made on the medium of Bitchute, the most probative evidence of reasonable reaction to that context for the threat is in the comments, which are the modern day equivalent of the crowd in *U.S. v. Watts*. In *Watts*, the crowd listened to the defendant's conditional threat that if given a gun he would shoot then-president Lyndon Johnson. No one offered Watts a gun or joined in his call to action – the Court noted that many laughed. *U.S. v. Watts*, 394 U.S. 705, 707 (1969). Likewise, the crowd to Mr. Hunt's Bitchute video offered no

firearm, no ride to Washington, no contact information to coordinate plans. To the contrary, the comments ranged from comical ("soi boy twat") to skeptical ("he must be Antifa or FBI") to pitying ("you seem like a young kid, don't mess up your life") to insulting ("this is not how we do it"). When a commenter commented on the literal words "I don't have a gun," it was not to offer a gun, but rather to state how that his threat was clownish: "what a clown. He doesn't even own a gun and he is telling people to go sho[o]t others." Def. Ex. RR. To this, Mr. Hunt did not respond by claiming his access to guns; rather he took the video down from public view that day. DX RR.

### Law Enforcement and Lay Assessment of Threat/Not Calling the Tipster

We continue to believe that the Court should not have permitted testimony of law enforcement or law witnesses about their reaction to the Bitchute video *post*-dated Mr. Hunt's arrest. Tr. 94-98; 363:30-25, 687:12-702:14, 772:7-775:13.

Still, even taking that evidence at face value, a reasonable person reference has to be a person who would have been familiar with the threat around the time it was made – not with the *prosecution* for the making of the threat. To permit the jury to rely on post-prosecution impressions of witnesses as to the seriousness of the threat is the ultimate form of bootstrapping. Other than the FBI threat intake examiner, who was by definition *not* the audience for the threat, is a classic example of the cart pulling the horse, especially where the Government chose not to call as a witness the one person who could have offered that evidence.

The Government's claims that "its decision not to call a particular witness to testify has no bearing at all on the sufficiency of the evidence that actually was presented to the jury to support the jury's verdict." Opp. 20 n. 10. But the absence of the tipster is glaring given that the only other witness to testify about seeing the Bitchute video *prior* to Mr. Hunt's arrest was FBI Intake examiner Jordan Holt, and while she testified that she found it merited a "Threat to Life" designation, as discussed above could not remember it even after being shown a press release about it, and despite the fact that it was the only "threat" that she worked on in her tenure with the FBI that resulted in a prosecution, prompted prosecutors to contact her, or resulted in the placement of a "success story" in her employment file. Tr. 106. And yet, up until the moment the video was played for her a month after the date of the crime, she still could not remember it. Tr. 135-36.

This failure of recollection is inconsistent with how a reasonable person could see this video and find it so "serious and imminent" as to be a crime. That Ms. Holt put it into the Guardian system as a "threat to life" was her *job,* not evidence of how a reasonable person would react to the threat. Even if she *had* remembered the video independently (because it was so strikingly serious as opposed to all the other threats she was seeing), she testified that she entered about half of the threats she received into the system. Even at this rate – there is insufficient evidence – a 50/50 threat-to-report ratio in and of itself is inconsistent with the reasonable doubt standard. And if *she* could not even remember the Bitchute Video when questioned by prosecutors until after she saw it, there is no evidence from her testimony that can qualify as

sufficient to permit a reasonable juror to find the reasonable person standard met by Ms. Holt's testimony.

The Government states that a rational juror would have relied on the testimony of professional law enforcement officers to determine how an ordinary person would have viewed the threat: "Every witness who testified at the trial . . . testified that the "Kill Your Senators" video was a serious threat." Opp. at 16. The government's blunt admission that the jury would have relied on law enforcement witnesses or Mr. Bonthius, the Congressional staffer whose job it is to respond to threats, to determine how an ordinary person would have understood the Bitchute video underscores the highly prejudicial nature of this evidence. *See United States v. Hanna*, 293 F.3d 1080, 1086 (9th Cir. 2002) (ruling that "law enforcement officers were particularly unqualified to comment on what the 'reasonable person' would have foreseen" regarding the seriousness of a threat). And, both Mr. Bonthius and Capitol Police witness Derosseiers heard about Brendan Hunt through his arrest, not through his threat.

Mr. Hunt's argument is not that a rational juror would have ignored the testimony of the Government's witnesses. It is that the Government would not have defeated the "tie goes to the defense" rule. In the battle of competing inferences, it is the inference that viewers did *not* take it seriously that must prevail. Only 1 out of 500 viewers of the video on Bitchute called law enforcement. Those numbers speak for themselves. *See* Mot. 9–11.

Based on this lack of evidence of context supporting an inference of seriousness, no rational juror could have determined beyond a reasonable doubt that a reasonable person would have understood Mr. Hunt's conditional, indirect threat of the Bitchute video was a crime. *See* GX 21.

**Insufficiency On Specific Intent Element**

The Court instructed the jury on this element as follows:

**THIRD ELEMENT:  INTENT (Tr. 1134-1135).**

Third element: Intent.  The government must prove beyond a reasonable doubt that defendant acted with the intent to impede, intimidate, or interfere with the officials while they were engaged in the performance of their official duties, or with the intent to retaliate against the officials on account of the performance of their official duties. "Impede" means to stop the progress, obstruct or hinder. "Intimidate" means to make timid or fearful, to inspire or affect with fear, to frighten, to deter or to overawe. To "interfere with" means to come into collision with, to intermeddle, to hinder, to interpose, or to intervene. To "retaliate against" means to return like for like, or to act in reprisal for some past act. Direct proof of a defendant's intent is almost never available. It would be a rare case where it could be shown that a person wrote or stated that as of a given time, he or she committed an act with a particular intent. Such direct proof is not required. The ultimate fact of intent, though, subjective -- sorry, the ultimate fact of intent, though subjective, may be established by circumstantial evidence based upon the defendant's

outward manifestation, his or her words, conduct, acts, and all of the surrounding circumstances disclosed by the evidence and the rational or logical inferences may be drawn from them. You may consider, for example, whether there's evidence that defendant intended or did not intend any of his statements to reach the officials in question. The government, however, does not need to prove that the alleged threats actually reached those officials.

Tr. 1134-1135

At the outset, we reiterate our position that a general *mens rea* should have been charged in this case, pursuant to *Virginia v. Black* and the reasoning in *Elonis,* which applies because the specific intent in 18 USC 115 is jurisdictional), and that an acquittal would have resulted based on the failure to tie any of the highly prejudicial "other act" evidence to a true criminal motive (rather than a jurisdictional element). However, even without the *Virginia v. Black/Elonis mens rea* element to overcome, the Government's proof and the Defendant's case, taken together, cannot lead to reasonable, non-speculative inferences that favor guilt. Instead the inferences that can both legally and reasonably be drawn here require a finding of legal innocence.

The evidence adduced at trial did not make out even the nearly strict-liability "intent to obstruct or retaliate against" that the Court instructed. To prove his intent, the Government relied exclusively on "background evidence," as will be discussed, *infra.* But the foreground evidence was his testimony, and the Government was determined not to let him explain his own state of mind.

The failure of Congress to get the message (until the Government delivered it) was precisely because of Mr. Hunt's inaction, and this speaks volumes to his intent. He testified about this without challenge:

Q And did you have any expectation, Mr. Hunt, that your BitChute video or your Facebook posts or your Parler posts would somehow be seen by any members of Congress or their security details?

A No, I had no expectation of that. Frankly, if I really was intent th on doing that, I could have easily sent these things out to people. If I wanted to really put out a message that you should kill your senators, it would have been easy for me to possibly make an anonymous channel and put out messages that way. But instead, I put it out on a channel that I had my name plastered all over the place. The Government I think, in one of their arguments, said that I was posting under an alias, which isn't really true. I had my name associated with X-ray Ultra on the pages and everywhere, and I was pretty open about who I was. I wasn't trying to intimidate any Congress people with these messages. I wasn't posting these messages on their social media accounts. I wasn't interacting in that way at all.

Tr. 860-61.

Instead of probing Mr. Hunt himself on this point, the Government sought yet another inference – that "[a] rational jury could have inferred that the defendant believed such a mode of distribution to be an effective way of threatening all Members of Congress at once." Opp. at 22. How would a rational jury have inferred that? Based on what facts? On what logical foundation can the Court sanction the inference that someone believes a mode of communication with no known link whatsoever to the victim threatened would be an "effective way" of threatening the victim, especially in the face of their unchallenged denial under oath?

The law requires that the Government prove that the threat was communicated through "means reasonably adapted to [the] purpose" of carrying out the threat. *United States v. Sovie,* 122 F.3d 122, 125 (2d Cir. 1997). No such inference can be rationally drawn here.

The Government also makes the absurd claim Mr. Hunt succeeded in using BitChute to "get the word out" because 500 people viewed the video and so the "the defendant's plan worked." Opp. at 21. The evidence shows the opposite – it did not work at all. Not a single Member of Congress or their staff viewed the video while it was publicly available and Mr. Hunt had no reason to think they did before he took it down. The only reason the video "worked" is because the Government – not Mr. Hunt – publicized in such a way as to cause the precise sort of fear that the law seeks to avoid.

The Government's opposition also argues that "[i]n videos posted after the 'Kill Your Senators' video, the defendant continued to express a desire for removal of Members of Congress through violence." Opp. at 7, pointing to Mr. Hunt's January 9, 2021, query to the internet: "What can we do now, besides an open revolt?" GX26. This is clearly constitutionally protected by *Brandenburg v. Ohio,* 395 U.S. 444, (1969) and its progeny, as are his statements that Members of Congress "need to go" and "should be scared." At most, these statements suggest that Mr. Hunt is floating the idea of revolution, which he is legally entitled to do. The Court's jury instruction prohibits the very inference that the Government promotes: "The First Amendment protects mere advocacy of the use of force or violence." Tr. 1127. Protected incitement cannot be used to prove unprotected threat, and Mr. Hunt's protected advocacy should raise no inference that he intended to make unprotected threats, and to allow such an inference results in an unlawful burden on speech. *Ashcroft v. Free Speech Coalition,* 535 U.S. at 255. ("Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter.").

Without any meaningful evidence of "intent," the Government resorted to relying exclusively on evidence of background motive evidence involving Mr. Hunt's supposed "white supremacist and anti-Semitic beliefs directly motivated" the BitChute Video. *See* Opp. 7. The Government does not seem to dispute that this requires inferential reasoning, as opposed to Mr. Hunt's plainly expressed motivation for his video – his political disagreement with the 2020 Election and the treatment of protesters at the Capitol on January 6, 2021. *See* Opp. 2 (conceding that the "defendant's actions were motivated" by the election and upcoming transfer of power). The Government chooses to ignore this expressed intent and engage in inferential

gymnastics instead in order to prove a malicious intent.  This is a strategy that cannot be sanctioned applying the principles of *Pauling, Ashcroft, R.A.V.,* and the First Amendment.

Finally, it is worth noting that the Government Opposition's only comment on Mr. Hunt's testimony was to belittle him for saying that he felt that the courtroom was like stage, even a national stage, and that he said things he regretted and for which he took responsibility. Opp. At 24.  This, from a man with a theater degree from Fordham University, most of whose published videos were of him performing, with his particular emphasis on Shakespeare, Tr. 857, who observed this long before he met the prosecuting attorney cross examining him in a highly publicized case.  "Not just politicians," he wrote, "the whole world is a stage[,] each one of us is just an actor, exiting and entering, and playing different parts."  DX U (Facebook Post, November 24, 2020).

The Government's cross examination, while humiliatingly focused on making Mr. Hunt repeat or confirm his offensive words they had no evidence to rebut his thoughtful testimony about what led him to the utter stupidity of his Bitchute post:

> If I had to describe what was going through my mind at the time, I felt like I was in sort of a football stadium where the democrats and the republicans were really slugging it out and tackling each other, and it was getting rough. And I felt like I was in the stands with everybody drinking beer saying, yeah, yeah, #millionmilitiamarch, you know. And I didn't really take it seriously any more than a sports fan would say, yeah, I want the Yankees to murder the Red Sox or something.  And then all of a sudden I felt like the lights in the stadium went out and the spotlights all came on me. And I a lot of the awful things that I said started getting broadcast on the big screen for everybody.  And I -- after reflecting on a lot of the stuff, I see that there's been a very negative impact on the country . . . and I think that the incendiary language that I was using ended up adding a lot more fuel to an already raging political inferno in this country. And going forward, I'd like to be the kind of guy who throws water fire and doesn't inflame anything.

Tr. 824.

After that the Government proceeded to make Mr. Hunt repeat in "yes or no" fashion the bad words he never denied uttering.

The Government's cross examination failed to show how Mr. Hunt would have a motive to issue a true threat given that he had a stable job of four years in the local court system and his utter lack of interest in the weapons that would be necessary for a coup.  They could not dispute his candid description of how during the COVID lockdown he became increasingly isolated, was drinking and smoking cannabis to an excessive degree, and not talking to anybody.  Tr. 821-823. "I think that a lot of that stuff affected my judgment," he testified, "as far as what I thought was funny, what I thought, you know, people would understand."  Tr. 823.

**The Proper Weight and Inferences to be Drawn From Background Evidence**

**Background Evidence**

We now come to the "background evidence." The Government here relies upon evidence that Mr. Hunt "consumed white supremacist and anti-Semitic codes, symbols, and beliefs," and that "these provided motive for his threats to kill Members of Congress." Opp. 7. It further infers from the use of the term "ZOG" that he was "conveying a seriousness of his purpose." Opp. 21.

Had the background evidence consisted of actions – not political motivations – these might potentially add to the seriousness of the conditional, indirect threat at issue. Had the Government proof of Mr. Hunt's interest in obtaining guns, learning how to set up a firing squad, shoot, kill, stab or any of the other methods of violence that they claim he uttered that prove he acted with a criminal *mens rea*, such evidence might have been probative, as can be seen from another indirect threat case, *United States v. Parr*, 545 F.3d 491, 498 (7th Cir. 2008). There, the Seventh Circuit considered an indirect threat made by one prison inmate to another regarding bombing a federal building. The court found sufficient evidence to justify the verdict despite the fact is was not made directly to a victim, by pointing to evidence of "background and context" about the defendant Parr's "pervasive interest in explosives and domestic terrorism, including his long history of building pipe bombs, storing explosives, and experimenting with chemicals." 545 F.3d at 498. The court reasoned that, while the government need not prove that the defendant intended to carry out the threat, the jury could infer the seriousness of the threat based on the fact that he actually had the ability to make a bomb. *Id*. ("A person who says he is going to bomb a building is more likely to give the impression he is serious if he actually is serious—if he actually plans to carry out his threat and is able to do so.") The opposite conclusion is the most logical to draw here based on the *absence* of such evidence, indeed evidence to the contrary that Mr. Hunt was more interested in collecting vintage comic art and working on his conspiracy theory videos, and the 475 pictures taken at his apartment the day of his arrest confirmed just that.

 

DX CC. So did his spending habits, and his internet habits, none of which indicated anything more than an interest in theater, art, comics, and "explor[ing] the sometimes uncomfortable truths of our society through art and activism." DX KK3. The Government, which had access to his financial records, his online purchases, his entire house, his social media, his digital devices, including 2 computers, 7 or 8 hard drives, and two phones (not password protected), found no communications between Mr. Hunt and anyone about the Capitol or any plans to make good on the alleged threats. Tr. 339-334; Tr. 471-472; Tr. 943-944.

Instead of evidence of any actual seriousness of Mr. Hunt's posts, the Government's inferences deride him for being politically incorrect in that he had several memes on an external hard drive that were ethnic jokes in exceedingly poor taste. But these had nothing to do with the Bitchute video or the case. The Government was not interested in the hundreds of other items on the external hard drive, or any of the other 7 drives they seized from Mr. Hunt's house, but rather wanted only to focus on the "offensive material" in the memes. Tr. 895, with no connection begin made to the Bitchute video. Nor did the memes have anything to do with Members of Congress, President Biden's inauguration, or the Capitol. They were not on either the computer or the phone that Mr. Hunt used to commit the alleged crime. *Id.* They were on back up hard drives that contained hundreds of archived files, including videos and pictures, and they demonstrated no pattern from which one could infer anything relevant to the Bitchute video. In fact the opposite inference is warrant – that memes were of little consequence to him, given that Mr. Hunt demonstrated attention to other items on the external drive in question, including a full excel spreadsheet of his "Wish List." That Wish List had no threatening materials on it, but rather comic art that he wanted to buy. DX QQ; Tr. 945-946. Even that wish was the subject of derision by the Government. Tr. 866 (Q: So you paid $311 for a Justice Society book because you were interested in the content? A Yeah.).

The Government's Opposition also argues that "[i]n videos posted after the 'Kill Your Senators' video, the defendant continued to express a desire for removal of Members of Congress through violence." Opp. at 7. The videos contain statements suggesting that Members of Congress "need to go" and "should be scared," but do not state a desire for them to be removed through violence. In fact, unlike the defendant in *Turner,* Mr. Hunt does not suggest he has any special knowledge to impart about the politicians or that any specific harm should befall them, and the one image shown is of a woman following a politician at an airport and calling him a "traitor." As rude and inappropriate as the activity is, it is a far cry from the killing of Judge Lefkow discussed in the blog posts in *Turner.*

### Inferences to Be Tested

The probative value of the "other act" evidence, to the extent there is any, depends on both the existence of the fact in question as well as some demonstrated permissible inference regarding either contextual clues for "true threat" or intent required to commit the crime.

As to the existence of a fact upon which inferences must rely, the Government's proof falls short.

Here, the Government choice to call a "non-expert" forensic examiner who limited her forensic analysis only to those question asked of her by the FBI and the prosecution -- is telling about its desire to avoid inconvenient facts. The only motivation for calling a examiner with such limited knowledge of the full forensic analysis that could be done of the computer is to give the witness deniability if asked exculpatory questions by the defense.

This played out on the record in the testimony of Ms. Kwasnaza, an FBI CART examiner whose testimony was limited to only the buttons she pushed at the behest of the FBI and the prosecution. For example, when asked for information about Mr. Hunt's activities on his computer and phone that might shed light on the questions of context and intent by showing an interest in following through on threats or planning any activities or associations that might further his supposedly criminal intent, Ms. Kwasnaza was the perfect choice for a prosecution that wanted to avoid inconvenient facts, as shown by the following questions and answers given during cross examination:

Q And did the case team tag any searches on retail websites like Amazon or eBay or any others?

A I don't recall if those types of searches were included in the final report.

Q Do you recall if the agents involved in this asked you to or tagged any cookies that reflected website visits to stores that sold tactical gear or anything like that?

A I don't recall.

Q Do you recall any cookies that showed on the phone that showed access to stores or to any organizations that appeared to be involved in any kind of violence?

A I don't recall.

Q Do you recall that there was tags for anything involving travel to Washington, D.C.?

A I don't recall.

Q Do you recall any items that were tagged for purchases of tickets -- airplane, bus, train -- anything like that?

A I don't recall those, no.

Q And were any items tagged on the computer with respect to guns, ammunition, tactical gear, travel, anything like that?

A I'm not sure.

Q You're not -- you mean you don't recall any being tagged.

A I don't recall the specific items that were tagged.

Q When you were asked to testify today, did anyone ask you to look into that to see if there were any visits to stores that I have mentioned or purchases of those types of items?

A No, I did not conduct that sort of review.

Q And if the agents wanted to tag something like that, they could have told you that, right?

A They could have tagged it.

Tr. 472-473.

**Hunt's Alleged "Affinity for Hitler, Antisemitism, and the Conspiracy Theory of "88". Opp. 7-9.**

The Government was particularly interested in evidence that they claimed established the defendant as a white supremacist and anti-Semite. First they claim an inference that he had a guilty *mens rea* based on his visits the "Daily Stormer" website seven times over a ten month period. GX 51. But the Government did not show the jury a single article from that legal website that could link those visits to the Bitchute video or to threats in general in any non-speculative way. Nor did it rebut the testimony of expert Segal that the Daily Stormer website is not only legal to visit but contains a disclaimer eschewing hate speech or violence. Tr. 624. So, too, must any inference about reading *Mein Kamp* be rejected, as it is both legal to read, is studied by academics, and is required reading in some college class. Tr. 629.

Next they claim that a guilty motive can be inferred from the downloading of a copy of the Protocols of the Learned Elders of Zion, a document that was once in Mr. Hunt's downloads folder but had been deleted by the user of the phone -- Mr. Hunt -- months before the Bitchute video was posted. There was no testimony that supported a reasonable, non-speculative inference that Mr. Hunt did a single thing with the document -- other than delete it. On this point, examiner Ms. Kwasnaza offered nothing but strategic deniability, as can be seen from the following testimony on cross examination:

Q Okay. So, when you look at the file path there, it's got download before the protocols of Learned Elders. What does that mean exactly?

A It was in a download folder.

Q Okay. Was that document ever moved to any other folder?

A I don't know.

Q Did you look to see whether that document was ever moved

to another folder?

A I did not.

Q So when somebody downloads a document from a public internet site, it goes into automatically your download folder?

A That depends on how the web browser or device is configured, and I don't know how this device was configured and whether that was automatic placement.

Q Was there any evidence that you found that this document had ever been moved out of the download folder?

A I'm sorry. Can you repeat that.

Q Was there any evidence that you found that this document had ever been moved from the download folder to any other folder?

A I did not look into any of that, no.

Tr. 475-76.

This document has no bearing at all on the "true threat" element. For that to happen there would have been proof of some other fact -- that the document was sent to someone else, published, posted, or used in some way that would have influenced a "reasonable person" assessing the seriousness of the Bitchute video. Thus, the document has zero relevance to the "true threat" question.

As for intent, the Government claims that expert Oren Segal's testimony is the fact needed to draw the inference that the Protocols of the Elders of Zion is evidence of Mr. Hunt's criminal intent -- that is to obstruct or retaliate against Members of Congress. But Mr. Segal's testimony makes no such claim. Rather, his testimony was in service of the effort to put Mr. Hunt in the same boat as the unnamed white supremacists that Mr. Segal discusses:

The Protocols of the Elders of Zion is a booklet that was created over a hundred years ago that claims to was created over a hundred years ago that claims to be a recording, a written recording of a secret meeting of Jews as they were planning to find ways to manipulate and control the world. This was a very popular document for anti-Semites in different parts of the world, from Russia, even in the United States in the '30s; in Germany during the Nazi era and continues to be a piece of propaganda that is often cited and used by anti-Semites and White Supremacists to explain their world views; even though it is one of the more well-known forgeries, fake booklets in extremist history.

Tr. 554-55.

The Government asked only one follow up question to this testimony:

Q And does [the Learned Protocols of the Elders of Zion] still have significance to White Supremacists and anti-Semites today?

A Yes.

Tr. 555.

But that simply highlights the *lack* of evidence that Mr. Hunt communicated with or identified with the whatever "anti-Semites and White Supremacists" Mr. Segal had in mind. Mr. Segal's testimony has probative value on the question of Mr. Hunt's intent only if it could be linked to those generalized beliefs of others. Lacking such a connection, there could be many reasons one might be interested in the document, including Mr. Hunt's First Amendment protected views that are anti-Zionist and anti-Israeli occupation of Palestine. It would be impermissible to confuse protected political views with criminal intent -- which is precisely what the Government Herculian logical leaps require.

Mr. Segal's testimony -- speculating about the connection between Mr. Hunt and what unnamed "White Supremacists and anti-Semites" believe by extrapolating from the short-lived presence of this document on Mr. Hunt's device is precisely what *Pauling* and *Valle* says cannot happen.

As a final point here. Given the law that a tie in the battle of inferences must go to the Defendant, it should be noted that the inference to be drawn here by the Government -- even if reasonable, non-speculative, and permissible, is negated by other evidence. To choose just one item: DX OO:



Mr. Hunt testified why this and many other works by the famous comic artist Jack Kirby were in his collection. He explained the significance of this to him, and identified it in the pictures taken by the FBI during the search of his house.

> If you look at some of my comic collection, you'll see that I have a number of books by a man named Jack Kirby, also known as Jacob Kurtzberg. He's my favorite artist and also a creator of Captain America. And one of the things Captain America is famous for is fighting Nazis. The first issue of Captain America from back in 1941 is Captain America giving a right hook to Hitler, and it's a very iconic image. And pretty much everything that that man, Jack Kirby, ever produced had a bit of anti-Nazi themes to it.. . I have five large bookshelves in my room, like the one I am looking at right now, that contain graphic novels, which are collections of comic books. And the comic book industry itself is basically built by European Jewish men, everybody from Superman – I assume everybody is familiar with that. That was created by Siegel and Shuster, who were two Jews. And I believe that Superman is an actual representation of the Jewish people, like an outcast of society in some ways. Guys like Gil Kane, who drew the Green Lantern comic for a very long time, he is a Jewish man. Stan Lee of Marvel Comics, you may know him from the movies, but his real name is Stanley Lieber, he worked closely with Jack Kirby many years to create the Marvel Universe. And other artists that worked on things like Mad Magazine, Harvey Kurtzman, Al Jaffee, all these guys, I really admire their work and I collect it.

Tr. 834-35.

The Government offered no serious dispute that Mr. Hunt's an *actual* for the artist Jack Kirby. But what is most interesting about this fact is how it undermines the inferences the Government seeks to draw about Mr. Hunt's affinity for Nazis (whatever that means). Referring to Jack Kirby's iconic image of Captain America punching Hitler, Mr. Hunt testified how this image served to galvanize America against Hitler in World War II:

> So that's the image, that you see there. And as I was saying, it was a bit shocking at the time because in 1941 Hitler was still a world leader. Over time, we've gotten used to, I think, seeing Nazis depicted in things like Indiana Jones movies where they're almost a cartoonish representation of evil. But this kind of cover, it was like if somebody drew a cover of Captain America punching out Vladimir Putin or something. It was shocking at the time. And from my understanding, the Marvel Comics offices received a few death threats and the mayor, Fiorello La Guardia, offered NYPD protection to that comic book company at the time.. . [So the Captain America series by Jack Kirby influenced the American response to the German actions in World War II [by] galvaniz[ing] the war effort. It showed what America was capable of. It showed the fighting spirit of America. And it shown a spotlight on something that maybe a lot of people weren't aware of, which was the tyranny that was going on in Germany.

Tr. 837-39.

Mr. Hunt spent his time and his money on studying and collecting art that is celebrated for its role in turning the tide against Hitler in World War II, an inconvenient fact that disrupts the Government's proffered inferences that Mr. Hunt is a "Nazi" or has an "affinity for Hitler."

**DYLANN ROOF and the Number 88**

Next the Government claims guilty motive can be inferred from the downloading of the the manifesto of Dylann Roof, a famous mass murderer.  GX 52; Tr. 901.  The Roof document – which the defendant obviously had nothing to do with creating -- contained drawings of Nazi swastikas and symbols including the number "88," the Government leaps to the conclusion that Mr. Hunt deliberately made the Bitchute video 88 seconds long.

This is absolutely wrong..  FBI Agent Smith testified that she and 16 other agents searched Mr. Hunt's home on January 8, 2021, took 475 picture and collected evidence, and not a single drawing or reproduction of "88" was found.  While the Government offered a private (unpublished) video, GX 30, of an apparently drunk Mr. Hunt speaking about codes for 9/11, "Shady Hook" (Sandy Hook), Juice (Jews), that video proves the opposite of what the Government claims – that he deliberately made an "88" second video as code to white supremacists.  Nowhere in the so-called "code" video is there a discussion of 88. None of the commentators said a word about 88.  The only people thinking about 88 when they watched the Bitchute video were in the Government.

This was plain from the testimony of FBI Agent Smith, who stated on direct that the Bitchute video was "88 seconds" long.  Tr. 221 (Direct Exam:  Q:  Special Agent Smith, do you know how long that video was?  A 88 seconds.)

But on cross examination the 88 turned out to be an extrapolation of math on her part:

Q Do you see the number "88" anywhere on the BitChute video player right now?

A Not right now.

MS. OLIVERA: Go ahead and play that again. (Video played in open court.) (Pause in proceedings.) (Video played in open court.)

BY MS. OLIVERA:

Q Now, Special Agent Smith, can you look at the video player now and tell me if you see the number "88" anywhere on the screen?

A It's 1 minute, 28 seconds.

Q My question was a little more specific. Do you see the number "88" on the video player right now?

A No.

Q Did Mr. Hunt say anything about the number "88" in the video?

A No.

Q But the FBI has reviewed Mr. Hunt's BitChute content, correct?

A Yes.

Q Are there any other videos that are 1 minute and 28 seconds long?

A Not that I'm aware of.

Q Are there any comments or posts where Mr. Hunt references

the number "88"?

A Not that I've seen.

Tr. 346.

*United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019, discussed supra, also involved a magic number:  14.  That was the number of grams of herion.  hat were needed to source in the evidence or inferences from the evidence in order to justify the drug quantity verdict.  The *Pauling* court rejected the government's inferences from the "drug code" conversations between the defendant and co-conspirator as insufficiently supportive of the inference that a prior drug transaction involved 14 grams.

Here, the only evidence of that the Bitchute video had some deliberate "88" message in it is in the Government's mind.  First of all, it would have been out of character for Mr. Hunt, who was otherwise quite the envelope pusher, to be so subtle.  Secondly, the expert Mr. Segal testified of his knowledge about the number "88" on things like banners and tattoos, but had never heard of it being used in a video, which would mean that the unnamed "white supremacists" about whom Mr. Segal testified would not be looking for it.  Tr. 637.  And as Mr. Hunt said, the Bitchute video was unedited raw video from his phone (which the Government would know because they seized the devices) and that if it turned out to be 1 minute and 28 seconds it was coincidence.  Tr. 836.  Besides, he said "I honestly don't even think that Nazis are smart enough to add up to and 28 to get to 88, so it would be a very, very occult reference to do that."  Tr. 836.

The Government next claims a guilty motive based on Mr. Hunt's private texts with loved ones.  These have nothing to do with the Bitchute video.  The texts with his father prove only that Mr. Hunt was passionately defending his position on the 2020 election results.  It requires tortured logic to say that those texts show he idolized Hitler.  He was not afraid to talk about or try to understand Hitler, to be sure.  But there is no basis for presuming an "affinity" from that.

The texts between Mr. Hunt and his girlfriend discuss Hitler, but their significance is in what the Government left out of its exhibit GX 40B-C.  The texts, which took place in May,

2020, some eight months prior to the Bitchute video, say nothing about Mr. Hunt's guilty state of mind, and if anything undercut the Government's other claims that he is racist against non-whites in that they express empathy toward oppressed people of color who have been colonized or occupied. The following table shows how the omission of a critical part of the conversation renders it useless for the Government's intended purpose:

| FROM GX 40B-C | FROM DX SS |
|---|---|
| Girlfriend: What have you been up to ? | Girlfriend: What have you been up to ? |
| Hunt: Reading some real books and also some comics. Working on my BitChite channel, that sorta stuff ☺ | Hunt: Reading some real books and also some comics. Working on my BitChite channel, that sorta stuff ☺ |
| Hunt: *BitChute<br>Hunt: Im almost caught up to where i was on youtube, and even tho i had over 500 subs there, im actually getting more views doing things this way! | Hunt: *BitChute<br>Hunt: Im almost caught up to where i was on youtube, and even tho i had over 500 subs there, im actually getting more views doing things this way! |
| Girlfriend: Which real book?! | Girlfriend: Which real book?! |
| Girlfriend: Oh wowza honey | Girlfriend: Oh wowza honey |
| Girlfriend: Good for you<br>☺☺☺☺☺☺☺☺☺☺☺ | Girlfriend: Good for you<br>☺☺☺☺☺☺☺☺☺☺☺ |
| Hunt: A few actually, i brought them up from my basement ☺ the most interesting one so far was Mein Kampf by Hitler. I wanted to know more about why he did what he did. | Hunt: A few actually, i brought them up from my basement ☺ the most interesting one so far was Mein Kampf by Hitler. I wanted to know more about why he did what he did. |
| Girlfriend: Didn't know he had published a book... hmm interesting | Girlfriend: Didn't know he had published a book... hmm interesting |
| Hunt: I also read thru the first 10 amendments to the constitution and some of the founding fathers papers... Yes Hitler's book is one of the best selling books of all time next to the bible | Hunt: I also read thru the first 10 amendments to the constitution and some of the founding fathers papers... Yes Hitler's book is one of the best selling books of all time next to the bible |
| Girlfriend: Now I want to read it also lol | Girlfriend: Now I want to read it also lol |
| Girlfriend: Ahhh the Bill of Rights ☺☺ | Girlfriend: Ahhh the Bill of Rights ☺☺ |

Hunt: Its hard to get now! They just banned it from amazon and audio book spots like audible. Which is weird because a big criticism of hitler is that he organized book burnings of commie propaganda, so this is sort of like digital book burning in my view

Girlfriend: Oh, goodness that's silly!

Hunt: Yes the bill of rights is pretty simple but then the amendments after get really long lol.

Girlfriend: Tsk tsk .. tolerance people, have more tolerance and be less hypocritical

Girlfriend: Hahahhaha yes, they do

Hunt: The hitler book gets interesting when he starts talking about the leftists and Jews that he felt were ruining Germany and Austria by promoting Marxist literature and producing books and plays that had too much sex and drugs etc in them.

Hunt: The same could be said of todays leftists, but obviously hitler took this in the way wrong direction

Hunt: History books are written by the winners not the losers

Girlfriend: well, that statement is too strong I'd say.. losers will tell their stories also but may not sell as much as the winners

Hunt: The losers are all dead tho

Girlfriend: Well, today they may be. But not all losers die during times like that - some escape as was the case for many Jewish who went abroad, etc.

Hunt: The jews won tho. Thats why they get

| | |
|---|---|
| to decide what goes in history books, and that hitlers books get banned.<br><br>Girlfriend: And some who participate on the winners side, where the side is deemed to be evil, they may live to regret what they experienced and write a book about the truth of what took place<br><br>Girlfriend: Ahhhhhhh I see what you mean<br><br>Girlfriend: Yeah, yeah<br><br>Girlfriend: But i think it still applied<br><br>Girlfriend: Applied*<br><br>Girlfriend: Applies* but in that case, what they say or write about may not be given much credit or it could<br><br>Hunt: Thats why there are no nazi history books in our schools. They lost. They will never be given any credit and our books and media always depict german nazis as awful inhuman monsters. If one was to suggest otherwise, they themselves would be labeled nazi and ostracized<br><br><br>Government Omits From GX 40 portion of text | to decide what goes in history books, and that hitlers books get banned.<br><br>Girlfriend: And some who participate on the winners side, where the side is deemed to be evil, they may live to regret what they experienced and write a book about the truth of what took place<br><br>Girlfriend: Ahhhhhhh I see what you mean<br><br>Girlfriend: Yeah, yeah<br><br>Girlfriend: But i think it still applied<br><br>Girlfriend: Applied*<br><br>Girlfriend: Applies* but in that case, what they say or write about may not be given much credit or it could<br><br>Hunt: Thats why there are no nazi history books in our schools. They lost. They will never be given any credit and our books and media always depict german nazis as awful inhuman monsters. If one was to suggest otherwise, they themselves would be labeled nazi and ostracized<br><br><br>Hunt: Same thing with Saddam Hussein for example. You will never see a history book with Saddam's side of the story. Or Osama bib laden. History books are written by the winners.<br><br>Hunt: Same thing with the Native American genocide. You will never see an accurate portrayal in a history book of the brutality the settlers inflicted upon them. It will always be slanted towards pro America stuff<br><br>Girlfriend: Really? I beg to differ. I think we often do realize how brutal Americans were |

35

towards the Natives

Girlfriend: As for the two you mentioned previously, I wouldn't know but I suspect you're right

Hunt: Then why are settlers not regarded in the same way as Nazis? What they did was on par if not worse than Nazi Germany.

Hunt: *on par if not worse

Girlfriend: I see your point. But I'd say that because we (obviously not people like myself, or other minorities) directly belong to that lineage of people (the settlers) then it's easier to be more forgiving

Girlfriend: Not forgiving but ignore it. Put it under the rug

Girlfriend: But I do see Americans today show a lot of compassion and trying to ameliorate the effects of it today

Girlfriend: There are laws that gives descendants of Natives land etc

Girlfriend: Then there is slavery too

Girlfriend: We're still trying to make up to African Americans because of the past

Hunt: For example, when was the last time you saw a history book from the Aztecs? Their empire was utterly destroyed, millions of people just wiped out, centuries of culture gone. But we dont give that the same significance as say the holocaust.

Girlfriend: But i know that in this case, African Americans "won" in that slavery was abolished so we get to read and learn about the "winners"

| | |
|---|---|
| | **Girlfriend:** Perhaps because the Holocaust happened more "recently"<br><br>**Girlfriend:** The LSAT included tons of articles about the Aztecs actually lol<br><br>**Hunt:** How many black people were murdered by whites and kkk during the years of ww2? ldk but it might be just as bad.<br><br>**Girlfriend:** That was the last time I read about it but dont ask me for details because it's been a while now …. |

Taken in its entirety, the conversation is a classic political discussion unworthy of the absurd inference that the Government seeks, and serves to underscore why permitting the Government to judge private political discussions like this is so very dangerous.

**Hunt's View on Government Sponsored Zionism, Opp. 9 (GX26)**

The use of Mr. Hunt's political stance on Zionism as evidence of a crime is particularly incompatible with the breathing room expected under the First Amendment. Conflating evidence of protected political opinion with criminal intent is impermissible, and as a matter of law should not be permitted to establish the a criminal *mens rea* element for § 115(a)(1)(B). For example, the government claims that Mr. Hunt "conveyed the seriousness of his purpose" by saying Congress is a "ZOG government." Opp. 23. But they provide no reason why this description suggests Mr. Hunt was serious about frightening Members of Congress. Use of the term ZOG is a statement of political opinion, and that by definition is not a threat. is a statement of his political view not an instrumentality of a threat. Indeed, the facts at trial did not establish that anyone who uses the term "ZOG government" is more likely to intend to frighten or retaliate against Members of Congress. Expert witness Oren Segal testified that being anti-Zionism is a legitimate political point of view held by some who think that Israel should not be occupying Palestinian territory. Tr. 621. He acknowledged the existence of entire organizations devoted to that cause, such as Jewish Voice of Peace and BDS (Boycott, Divestment, Sanctions), with the latter organization's political advocacy is precisely that encompassed by the term ZOG – to advocate for th elimination of Zionist interests from American foreign policy. Tr.658-660.

**Hunt's View on Illegal Immigration. Opp. 7.**

The Government also claims a reasonable inference to be drawn from its cherry picked version of Mr. Hunt's private conversations with his father on the topic of immigration. This is a red herring and has no relevance at all to the crime charged. It is no secret that many people think illegal immigrants, especially those who commit crimes should be rounded up and deported, including the Department of Justice:

**JUSTICE NEWS**

Department of Justice

Office of Public Affairs

FOR IMMEDIATE RELEASE                                    Thursday, October 17, 2019

## Department of Justice Prosecuted a Record-Breaking Number of Immigration-Related Cases in Fiscal Year 2019

The Justice Department today announced that in fiscal year 2019 (FY19), its U.S. Attorneys' Offices prosecuted the highest number of immigration-related offenses since record keeping began more than 25 years ago. These numbers successfully reverse the trend in previous years of declining prosecutions for felony Illegal Reentry defendants, misdemeanor Improper Entry defendants and felony Alien Smuggling defendants.

"These record-breaking numbers are a testament to the dedication of our U.S. Attorneys' Offices throughout the nation, especially our Southwest border offices," said Deputy Attorney General Jeffrey A. Rosen. "In addition to the usual workload of each case the Department prosecutes, this effort was made possible after our U.S. Attorneys' Offices restored essential partnerships with national, state and local law-enforcement partners."

The newly announced numbers show the U.S. Attorneys' Offices charged 25,426 defendants with felony Illegal Reentry (8 U.S.C. §1326) in FY19, an increase of 8.5 percent from FY18.

The chain of inferences the Government seeks to draw against Mr. Hunt could just as easily be drawn against the Department of Justice, which eagerly rounds up and deports illegal immigrants and is especially punitive against those illegal aliens who commit crimes. *See, e.g.* Brookings Institute, "US Immigration Policy a Classic Underappreciated Example of Structural Racism," Published March 26, 2021.[2]

Ever the equal-opportunity cynic, Mr. Hunt was quick to point out this very hypocrisy, as he did in November 4, 2021 Facebook post in which he opined

> Biden voters have acted horribly by tearing apart their own families bc they label us fascist, racist monsters. They have tried to get us fired for being Trump voters. They have filled their heads for years with communist propaganda from CNN, MSNBC, etc going back thru the Obama admin. They even try to stop us from protecting our own borders, spreading bs about kids in cages when it was obama who built those things. The democrats burn down our cities and make up lies about the police to foment disorder and even deadly conflict.

GX 150B.

Just as Mr. Hunt said in November of 2020, the immigration policies in this country began under Democratic leaders, and, with all due respect to President Obama, he has been one

---

[2] https://*www.brookings.edu/blog/how-we-rise/2021/03/26/us-immigration-policy-a-classic-unappreciated-example-of-structural-racism/*

of the worst offenders.  *See, generally,* "Yes Obama Deported More People than Trump, But Context is Everything, CNN, July, 2019.[3]  Context is everything in the evaluation of these inferences, and the one the Government seeks to draw about Mr. Hunt ignores the inconvenient fact that being anti-immigration and anti-criminal does not make one racist, and saying it is so defeats the entire purpose of open national debate of these core political topics.

Consider the following colloquy between prosecution and Mr. Segal:

BY MR. RICHARDSON:

Q Now, just talking generally about what white supremacy, what white supremacists believe, is there a feature of modern white supremacy in this country that relates to immigration?

A So, yes. White supremacists believe that their race is on the verge of extinction, that the white race is in peril, it will not exist in several years, primarily because immigration from nonwhite countries, because of immigration from, you know, Muslim countries, because of the demographic changes in this country, what they sometimes, people refer to as the browning of America.

Tr. 540.

Mr. Hunt's views on immigration say nothing about either "true threat" or intent, unless it could be equally inferred, from the "browning of America" that the United States Government is just, if not more, racist than they accuse Mr. Hunt of being.  The deeds, if not the words, support that inference.

Probed about his immigration views, Mr. Hunt described a classic conservative approach to the issue:

Q Do you remember writing "previous generations were right to be suspicious of immigrants"?

A I believe I singled out the Irish in that text.

Q You write that "crime rates have soared among second generation immigrants," correct?

A Yes.

Q You wrote that "immigrants are taking our jobs, our      benefits, our birthright, and our culture"?

A Yes. I do believe that mass illegal immigration is a big problem. You can't have open borders and a welfare state.

---

[3] https://www.cnn.com/2019/07/13/politics/obama-trump-deportations-illegal-immigration/index.html

Q You meant white jobs, white jobs, white birthright, right?

A No. I meant Americans, American citizens. Illegal immigration affects more than just white people. It affects black people. If you have a bunch of immigrants from South America come in, it affects the jobs of black people who are now competing with that.

Tr. 877.

Mr. Hunt deported no one. He rounded no one up at the border. He committed no crimes against immigrants. He stated his point of view, one apparently held by at least half of the country, assuming that Trump's immigration policies appealed to those who voted for him. Nowhere in the Bitchute video did Mr. Hunt make any threats related to immigration. His words targeted no Members Congress particularly (and the only public official named was the white and American-born Joe Biden), and not a single video he made of the many the Government offered contained a reference to targeting immigrants or immigrant Members of Congress. The references in acquitted threats and "other act" evidence to AOC, Pelosi, and Schumer leads to an opposite inference than the Government would have a reasonable juror draw - that is that Mr. Hunt was an equal opportunity critic, and his political position on anti-illegal immigration cannot prove criminal *mens rea.*

### Dylann Roof Manifesto

The Government's cognitive bias is also evident on the Dylann Roof Manifesto, which was a lot of smoke but no substance. To begin with, the FBI examiner Kwasnaza, despite having had the digital evidence for 3 months was not asked by agents or prosecutors to determine if there was evidence that Mr. Hunt interacted with (opened, downloaded) the document for more than 3 seconds:

BY MS. ROSTAL:

Q Have you done any analysis that would indicate to the jury that there was any user touching of this document after 11-6-2020?

A I did not do that type of analysis.

Q Nobody asked you to see whether this document was opened after 11-6-2020 at 5:48 and 33 seconds?

A No.

[]

Q Would you be able to go back to the analysis of this computer to see whether this document was opened up after 11-6-2020 at 5:48 and 33 seconds?

A There are certain locations within a forensic environment that you can go to see evidence of file openings; but I do not recall if for this specific file that type of

information would be available, because I never started that type of analysis on this particular item.

Q And Agent Dobin never asked you to do that?

A Correct.

Q And none of the other agents asked you to do that?

A Correct.

Q So, according to what analysis you have run, this document was possibly downloaded -- would you agree that's a possibility -- at 5:48:30 seconds?

A It was -- the file was downloaded, yes.

Q The file was downloaded at 5:48:30 seconds. Would you agree with that?

A Yes. I don't know if that 5:30 was the time the download was completed or the time it was initiated. I'm not sure. But the file was downloaded.

Q And is it possible that the file began downloading at 30 seconds and completed downloading at 33 seconds?

THE COURT: Based on the record.

THE WITNESS: It's possible but I would need to do -- I would need to look into that further to confirm.

Q And as you sit here today, you have been on this case since January of 2021, right?

A Yes.

Q And you've met with [case agent] Agent Dobin in connection with this investigation, right?

A: Yes.

Q And you have emailed with her a number of times, correct?

A Correct.

Q You met with her. The two of you have sat down at this computer together, right?

A Yes.

Q And you have emailed with her a number of times, correct?

A Correct.

Q You met with her. The two of you have sat down at this computer together, right?

A Correct.

Q There are other agents who have worked with you to find out about the results of your analysis, correct?

A I discussed the portions that I reviewed with them, yes.

Q And in preparation for your testimony here, did you meet with the United States Attorneys, Mr. Richardson, Mr. Kessler --

A Yes, I did.

Q -- Mr. Navarro? How many times?

A A couple of times. I don't recall specifically the number. A couple of phone calls and in-person meetings.

Q So would you say that there were two or three in-person meetings?

A At least two in-person meetings before today.

Q Did they come to the lab?

A I met with them in Special Agent Dobin's squad space, and I met with them at the attorney's office yesterday.

Q And would you say Special Agent Dobin's squad space, that's at the FBI field office in New York?

A Correct.

Tr. 483-484.

FBI Case Agent Dobin and Ms. Kwasnaza worked on the case together since January of 2021, and in the same physical space of the FBI NY Field Office. There was ample opportunity and indeed discussion among them to analyze the forensic data to determine if there was evidence of Windows user interactions with the Dylann Roof manifesto that made the required logical connection between the document and the intent required for the crime. The testimony showed that Ms. Kwasnaza and Special Agent Dobin, the case agent, had actually *discussed* the question of the 3-second interaction of Mr. Hunt with the Dylann Roof document well before trial started, Tr. 486. It is fair to draw the inference -- given the Government's burden of proof -- that no such evidence existed.

But let us assume, for purposes of following the inferential logic here urged by the Government, that even if the "3 second rule" applies to documents and dropped food alike, the Roof document adds nothing to the narrow intent question here: whether there was proof beyond a reasonable doubt that Mr. Hunt acted with the intent to impede, intimidate, or interfere with the officials while they were engaged in the performance of their official duties, or with the intent to retaliate against the officials on account of the performance of their official duties. The Roof document was legal and Mr. Hunt obtained it from the FBI website and never looked at it again. Tr. 901. There was no connection drawn between the Roof document and the Bitchute video at

all, and the connection between Roof's drawings and a 1 minute and 28 second video is pure speculation. As with the Protocols of Zion document, the Roof document has relevance only if there is proof of another fact -- that the document was used, shared, or organized -- anything -- that might be used to connect the dots between the Roof document and the intent needed for the Bitchute video.

**Conclusion**

The Government's Opposition is emblematic of its approach to this case since the FBI first opened the case on January 8, 2021 and began planning a high profile takedown of Brendan Hunt. Their "shoot first and don't let anyone ask questions later" approach to the FBI investigation, the press release ready criminal charge, the curated witness list designed to prevent meaningful cross examination, the hunger for detention and now apparently lengthy prison time. It is all reminiscent of a prosecutorial zeal that, not so long ago, was reserved for the War on Drugs. Most reasonable people now see how the Drug War produced decades of mass incarceration and destabilization of entire demographics of people – mostly Black and Brown. What will the War on Speech cost?

First Amendment scholars, like Former American Civil Liberties Union president (1991 to 2008), Nadine Strossen, have argued that it is 'counterspeech' (or shaming) in the marketplace of ideas, not speech repression, that is best calculated to address hate speech. *See, e.g.,* N. Strossen, Nadine, *Counterspeech in Response to Changing Notions of Free Speech,* 43 Hum. Rts. 18 (2018). "Counterspeech" admittedly seems a somewhat dangerous concept, especially to those politicians and celebrities who routinely feel its wrath. There are myriad examples of speech triggering actual emotional harm, such as Prince Harry, Duke of Sussex (or former Duke of Sussex), who recently used a podcast to say that he thought our First Amendment was "bonkers."[4] Prince Harry's criticism of the First Amendment has some support in our law, but it is the dissenting -- not precedential -- view. *See, e.g. Terminiello v. City of Chicago*, 337 U.S. 1 (1949) ("There is danger that, if the Court does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact.") (Justice Jackson, dissenting). When one remembers that Prince Henry dressed up as Hitler for a costume party in his past,[5] it might be asked whether the "counterspeech" he experienced for that act was precisely what he needed to move him forward on his political journey toward a more "woke" world view.

_____

[4] https://pagesix.com/2021/05/16/prince-harry-takes-heat-for-calling-first-amendment-bonkers/
[5] *https://www.news.com.au/entertainment/celebrity-life/royals/photo-of-prince-harry-dressed-in-nazi-costume-reveals-royal-double-standard/news-story/ef09414cb22d6862485d82d28a8a4977*

For all the reasons stated herein, we respectfully submit that the Government's evidence is insufficient as a matter of law and seek the Court's entry of a Judgment of Acquittal.

Respectfully Submitted,

/s/

Jan Rostal, Esq.
Leticia Olivera, Esq

Cc: Counsel Of Record