

U.S. Department of Justice

United States Attorney
Eastern District of New York

DMP:DKK/ICR/FJN
F. #2021R00059

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 8, 2021

By ECF and Email

The Honorable Pamela K. Chen
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re: United States v. Brendan Hunt
      Criminal Docket No. 21-086 (PKC)

Dear Judge Chen:

  The government respectfully submits this memorandum in advance of sentencing in the above-captioned case, which is scheduled for November 22, 2021, at 12:00 p.m., and in response to the defendant's objections to the Presentence Investigation Report's ("PSR") Guidelines calculations (Def. Guidelines Obj., ECF No. 121) and to certain facts listed in the PSR (Def. Fact Obj., ECF No. 122 Exh. A). For the reasons discussed below, the government recommends that the Court impose a sentence within the applicable advisory United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 51 to 63 months' imprisonment calculated in the PSR and the PSR Addendum.

  I. Factual and Procedural Background[1]

  The trial evidence showed that, on November 3, 2020, the United States held a presidential election in which the leading candidates were then-President Donald J. Trump and now-President Joseph R. Biden, Jr. Beginning shortly after the election, the defendant grew increasingly angry at the electoral victory of now-President Biden. On November 4, 2020—the day after the presidential election—the defendant posted on Facebook:

---

[1] In light of the trial in this matter, the briefing submitted with respect to the defendant's motion pursuant to Rule 29 of the Federal Rules of Criminal Procedure, see Dkt. No. 104 (government's opposition) at 2-12, and the extensive factual section in the PSR, the government assumes the parties' familiarity with the underlying facts, and thus summarizes facts here only as necessary to address the issues disputed at sentencing.

> By the end of this week, it will be clear to the entire nation that President Trump has been reelected for another four years. Even through massive cheating, the democrats still cannot stop the Trump Train. Ive been saying it for years now, but we really need to do something about these fucking idiotic and deceitful leftists in our country, or they will soon destroy our great nation with their lunacy. . . .When Trump took office he made a solemn oath to protect America from enemies foreign and domestic and thats what these people are: domestic terrorists and enemies of our constitutional republic. And they will be dealt with, one way or another.

(GX 150B; Tr. at 191-92.)[2] That evening, the defendant wrote to his father that then-President Trump should follow in Adolf Hitler's footsteps and "cancel the transfer of power":

> Trump should just declare martial law, cancel the transfer of power, and round up the domestic enemies of our republic. The military and the american people would back him. During hitlers first term in office, circumstances were such that it was necessary for him to override the democratic process and become the absolute leader of his country. Trump should prob do the same if necessary or they will throw his family in jail and destroy the country.

(GX 40A; Tr. 179.) The defendant's father replied that the election issues would be resolved through a legal process, prompting the defendant to reply:

> as trump said: "The damage has already been done to the integrity of our system, and to the Presidential Election itself" – all these corrupt journos pols and disinfo traitors will still be in place to sabotage the country even if he wins. They have to be removed somehow or this will happen again in 4 years only worse.

(GX 40A; Tr. 180.)

> On November 5, 2020, the defendant reiterated in a text message to his father:

> The damage is done. Our election has already been contaminated. These treasonous democrats and their media/antifa cohorts need to be arrested and utterly destroyed. We also need to start rounding up illegals and just shipping them out of the US. They are domestic enemies to the republic, they are trying to kill our nation and they will not stop until someone makes them.

---

[2] Citations to "GX" refer to government exhibits admitted at trial, and citations to "Tr." refer to the transcript of the trial.

(GX 40C; Tr. 183-84.)  The defendant also stated that:

> [t]he crime rate soar among second-generation immigrants.  They are taking our jobs, our benefits, our birthright, and our culture.  They refuse to assimilate and many if not most of them are actively supporting the overthrow of our president.  I don't care if they are "hard-working" they are low IQ mongoloids and they need to go.

(GX 40E.)

The trial evidence showed that in a November 27, 2020 Facebook post, the defendant wrote, "Like ive been saying all along, biden will NEVER set foot in the white house. we will mow down any commies who try to run a coup on america! MAGA!"  (GX 150E.)

On December 6, 2020, in a Facebook post addressed to ex-President Trump, the defendant threatened a U.S. Senator and two members of the House of Representatives with death:

> we want actual revenge . . . Meaning, we want you to hold a public execution of [Speaker of the House Nancy Pelosi, Representative Alexandria Ocasio-Cortez, and Senator Charles Schumer] etc.  And if you don't do it, the citizenry will.  We're not voting in another rigged election.  Start up the firing squads, mow down these commies, and lets take america back!

(GX 150F.)  That same day, in another Facebook post, the defendant stated, "[i]f you're going to shoot someone tho, go after a high value target like [Speaker Pelosi, Senator Schumer, or Representative Ocasio-Cortez].  They really need to be put down.  These commies will see death before they see us surrender!"  (GX 150G.)  Facebook then informed the defendant that his Facebook account was being suspended for 30 days for violating "community standards."  (Tr. 257; GX 171.)

The trial evidence showed that the defendant also began looking for ways to undo the results of the election.  On December 21, 2020, he posted a video called, "What the Media Won't Tell You About January 6, 2021," in which he discussed the Congressional vote certification scheduled for January 6, 2021, which vote would confirm the victory of President Biden.  (See GX 22.)

On January 6, 2021, Congress gathered in joint session at the United States Capitol (the "Capitol") in Washington, D.C. to certify the election results.  (Tr. 388.)  A group of individuals purporting to protest the presidential election gathered and stormed the Capitol.  (Tr. 390-93.)  The individuals illegally occupied the Capitol and disrupted the certification of the election results for several hours.  Members of Congress and the Vice President of the United States sheltered in place during the occupation. (Tr. 393.)  The violent attack resulted in the deaths of multiple individuals, including a United States Capitol Police officer, as well as tremendous damage to the Capitol.  (Tr. 394-95.)  Nevertheless, law enforcement expelled the attackers, the Capitol was secured, and Congress reconvened later that day and certified the results.  (Tr. 394.)

In response to the certification, the defendant made more death threats. Two days after the attack on the Capitol—on January 8, 2021—the defendant posted an 88-second video titled "Kill Your Senators" on his BitChute page. Staring directly into the camera, the defendant threatened:

> [W]e need to go back to the U.S. Capitol when all of the Senators and a lot of the Representatives are back there and this time we have to show up with our guns and we need to slaughter these motherfuckers. What I'm saying is that our government at this point is basically a handful of traitors, so what you need to go is take up arms, get to DC probably the inauguration . . . that's probably the best time to do this, get your guns, show up to D.C., and literally just spray these motherfuckers. Like, you know, that's the only option. They're gonna kill us. So we have to kill them first. So get your guns. Show up to D.C.; put some bullets in their fucking heads. If anybody has a gun, give me it, I will go there myself and shoot them and kill them. We have to take out these Senators and then replace them with actual patriots. Basically, I would trust anybody over them at this point uh this is a ZOG [Zionist occupied] government . . .

(GX 21.) Later that day, the defendant publicly posted on Parler: ". . . enough with the 'trust the plan' bullshit. lets go, jan 20, bring your guns . . ." (GX 151A, 151B; Tr. 248-51.)

The evidence at trial established that the defendant had originally uploaded, but did not make public, the "Kill Your Senators" video on January 7, 2021 at 10:17 p.m., under the title "Kill Your Senator" and with the description, "Take up arms and shoot them all." (GX 109N.) The defendant also appended an image of a handgun. (GX 20P.) The next morning, at approximately 8:40 a.m., the defendant deleted that video and replaced it with a new version titled, "Kill Your Senators." (GX 405.) This time, the defendant did make the video public. He also changed the description from "Take up arms and shoot them all" to "Slaughter them all." The defendant also added the hashtags "#MAGA," "#2ndamendment," and "#zog," and he replaced the photograph of the handgun with a photograph of the Gadsden Flag.[3] (GX 21P, GX109N; Tr. 214-220.)

The defendant's threatening video was viewed more than 500 times, and some of the viewers commented on it.[4] For example, one viewer stated,

---

[3] The Gadsden flag depicts a coiled rattlesnake and the words, "Don't Tread on Me." (See GX 21P.) Multiple individuals who stormed the Capitol on January 6, 2021 carried the Gadsden flag (Tr. 399), and the defendant posted multiple videos depicting individuals carrying the Gadsden flag at the Capitol during the attack (see, e.g. GX 25).

[4] One of those viewers reported the threat to the FBI.

> Dude delete this shit your about to get fucking charged big time seriously delete your fucking video . . . murder is not a good thing you make them martyrs now . . . but seriously take ur video down i dont want to see u screw ur life up over a lousy bit chute video[.]

(GX 110A, 110B; Tr. 247.)  Another viewer criticized the defendant's overt tactics and stated,

> Good way to put a target on your back and get arrested soon.  The smart way to do this is incognito, using guerilla warfare tactics, unconventional attacks.  This is just low IQ rambling, giving them warning of when you might attack, dumbass . . . Shouldn't alert people to what you might do.

(GX 110A, 110B; Tr. 245.)  The defendant then responded,

> of course you should alert people, fucking idiot.  how else should you get the word out? talk in encrypted code in deep web chat rooms or some shit?  no, everyone should come to washington dc on january 20th wearing masks and camo, concealed carry, body armor, and just blast them all away while we still have a chance.

(GX110A, 110B; Tr. 246.)

The next day, January 9, 2021, while the "Kill Your Senators" video was public, the defendant published two additional videos to BitChute in which he threatened Members of Congress.  In the first video, posted at approximately 2:57 a.m. Eastern Time, the defendant stated:

> What can we do now, besides an open revolt against a Zionist Occupied Government? . . . There is a Million Militia March being spoken of for January 20th—I don't know what's going on with that—but, if the media, if the government, want to label a peaceful protest an insurrection, let's see what happens when people bring guns.  There are only 100 senators, remember.  They ride on planes like us, they go to restaurants.  They should be really scared of being in public . . . .

(GX 26, 405.)  In the second video, at approximately 1:35 p.m. Eastern Time, the defendant reiterated that, "[t]hose 100 Senators should really be afraid about going into public now. . . . [l]ike the way these people behaved, they should have to walk around with bodyguards ten feet deep," (GX 27, 405.)  The defendant then stated:

> So start exercising your rights to take these corrupt politicians down.  We have the first amendment, that's still around, remember?  And we have the second as well.  There are really only a hundred of these weakling Senators.  They are mass murdering psychopaths who are

intent on our destruction, and they form an illegitimate government.
Every single one of them just needs to go. Rise up.

(GX 27.)

Later on January 9, 2021, the defendant hid the "Kill Your Senators" video but left public his other videos. (See GX 405.) Notably, although the defendant posted the other two videos on both his YouTube and his BitChute accounts, he posted the "Kill Your Senators" video only to his BitChute account. (E.g., GX 403.)

The trial evidence established that white supremacist and anti-Semitic beliefs directly motivated the defendant's threats to kill Members of Congress. Specifically, he believed that former President Trump was "the best chance to save" America from a Jewish-controlled government and from infiltration by "low IQ" immigrant "mongoloids," and his "Kill Your Senators" video was motivated at least in part by disappointment that Members of Congress did not in fact stop the transfer of power on January 6, 2021.

Modern white supremacist ideology centers on the belief that the white race is on the verge of extinction, primarily because of immigration from non-white countries (Tr. 540-41), and anti-Semitism centers on hatred and hostility to the Jewish people and their religion. (Tr. 541.) The two belief systems overlap in that white supremacists are concerned that the white race will become extinct and blame Jews for making that happen because the Jews purportedly manipulate and control the government. (Tr. 542-43.) White supremacists and anti-Semites frequently share an affinity for Nazi imagery and for Adolf Hitler, and use propaganda and coded language to identify themselves to like-minded persons while maintaining plausible deniability to others who are unaware of the significance of the symbols and codes they use. (Tr. 543-44.)

The evidence established that the defendant consumed white supremacist and anti-Semitic propaganda, familiarized himself with white supremacist and anti-Semitic codes, symbols and beliefs, and expressed white supremacist and anti-Semitic beliefs in his own communications with others. He viewed and downloaded white supremacist and anti-Semitic propaganda, including by visiting the Daily Stormer, a white supremacist website, by downloading a copy of the Protocols of the Learned Elders of Zion, and, two days after the Presidential election, downloading the manifesto of a white supremacist mass murderer. (Tr. 475-77, 554-55, GX 52.)[5] The latter document contained drawings of Nazi swastikas and the white supremacist numerical code "88," which refers to "Heil Hitler." (GX 50, 50A; Tr. 549.) The defendant also expressed an affinity for Adolf Hitler in chats messages to his ex-girlfriend and his father. (E.g., GX 41B, GX 41C; Tr. 176-77.)

The defendant's "Kill Your Senators" video expressed the white-supremacist and anti-Semitic view that Members of Congress are part of a Jewish conspiracy, what the defendant

---

[5] The manifesto was written by Dylann Roof, a white supremacist who was convicted of murdering nine African American churchgoers in Charleston, South Carolina in 2015. Roof was not identified in the government's case-in-chief; the jury was told at that time only that the author of the manifesto, which was found on the defendant's computer, was not the defendant. (Tr. 551.)

referred to as "ZOG," or a "Zionist Occupied Government." (Tr. 555-56; see also GX 26 (stating "what can we do now besides an open revolt against a Zionist Occupied Government?").) The defendant also made the video exactly 88 seconds long, reflecting the white-supremacist numerical code for "Heil Hitler."

The trial evidence showed that on January 8, 2021, the FBI National Threat Operations Center received a tip from a concerned citizen regarding the "Kill Your Senators" video. An FBI intake examiner reviewed the tip, classified it as a "threat to life," and dispatched it to the FBI's New York Field Office for further investigation. (Tr. 42-49.) The United States Capitol Police ("USCP") were also made aware of the threat on that day, although USCP understood that the FBI would lead the investigation. (Tr. 376, 413.) The FBI's New York Field Office investigated the tip (Tr. 158-59, 363-65), and arrested the defendant on January 19, 2021, a mere 11 days after the threats were first reported to the FBI. (Tr. 149-51.) A search of the defendant's home in Queens, New York, identified the laptop and cellular telephone he used to create and broadcast his threats. (Tr. 265-72.) The search also recovered an external hard drive belonging to the defendant, as well as the sweatshirt the defendant wore in the "Kill Your Senators" video. (Tr. 270-72.)

On the day of his arrest, the FBI informed the offices of Members of Congress about the threats made by the defendant. (E.g., Tr. 705.) Daniel Bonthius, the civilian Deputy District Director of Operations for Representative Alexandria Ocasio-Cortez, received that information. Bonthius later testified that the defendant's threatening statements were concerning even though the defendant was in custody by January 19 because his office had prior experiences with people being arrested, released, and then returning to the office to make additional threats. (Tr. 707-08.) Mr. Bonthius also explained why each of the defendant's statements was threatening. (Tr. 711.) He testified that the "Kill Your Senators" video was particularly concerning because it "put[] together all the concerns of the previous messages: Use of firearms. Planning to go to the Capitol. Inauguration when they're all together. To kill everybody." The defendant also "didn't seem mentally disturbed in that video. He seems calm and ready for the plan and announces to the viewers that the only thing stopping him from taking action is the fact that he doesn't have a gun." (Tr. 715-16.) Mr. Bonthius further testified that, as of April 26, 2021, Congresswoman Ocasio-Cortez's office maintained a file on the defendant in a folder labeled "active threats." (Tr. 719.)

The defendant was convicted following a two-week jury trial on April 28, 2021, of threatening to murder Members of Congress, in violation of 18 U.S.C. § 115(a)(1)(B) and § 115(b)(4), the sole count charged in the indictment. (PSR ¶ 1.) The jury found that that the government had proven beyond a reasonable doubt that the defendant's "Kill Your Senators" video constituted a "true threat," but also concluded that the government had not proven beyond a reasonable doubt that three other threats presented to the jury were "true threats."

II.   Guidelines Calculation

The government submits that the PSR and the PSR Addendum set forth the applicable Guidelines calculation:

| | |
|---|---|
| Base offense level (U.S.S.G. § 2A6.1(a)(1)) | 12 |
| More than two threats (U.S.S.G. § 2A6.1(b)(2)(A)) | +2 |
| Substantial risk of incitement to violate 18 U.S.C. § 115 (U.S.S.G. § 2A6.1(b)(5)) | +2 |
| Official victim (U.S.S.G. § 3A1.2(b)) | +6 |
| Obstruction of justice (U.S.S.G. § 3C1.1) | +2 |
| Total: | <u>24</u> |

The total offense level is 24, which, based on a Criminal History Category of I, carries an advisory Guidelines sentencing range of 51 to 63 months in custody. (PSR ¶¶ 18, 25-35, 91.)

III.   The Defendant's Objections to the PSR

The defendant raises five objections to the calculation of his Guidelines sentencing range in the PSR: (1) he objects to the application of a two-level enhancement because the defendant's offense involved more than two threats under U.S.S.G. § 2A6.1(b)(2)(A); (2) he objects to the application of a two-level enhancement because the defendant knew or should have known that his public threats carried a substantial risk of inciting others to commit violations of 18 U.S.C. § 115; (3) he objects to the Probation Department's decision not to apply a four-level reduction under U.S.S.G. § 2A6.1(b)(5) because his conduct evidenced little or no deliberation; (4) he objects to the application of a six-level adjustment because the defendant threatened official victims under U.S.S.G. § 3A1.2(b); and (5) he objects to the application of a two-level enhancement for obstructing the administration of justice by perjuring himself in his testimony at trial under U.S.S.G. § 3C1.1. As detailed below, the Probation Department correctly concluded that the defendant's objections to the calculation of the Guidelines sentencing range are without merit and should be rejected.

A.   Enhancement for More than Two Threats (U.S.S.G. § 2A6.1(b)(2))

In addition to the "Kill Your Senators" threat that the jury found proved beyond a reasonable doubt, the PSR identified the two Facebook posts made by the defendant on December 6, 2020, as set forth above, as true threats against Members of Congress that triggered the application of the enhancement under U.S.S.G. § 2A6.1(b)(2) (PSR ¶¶ 8, 18.) The defendant objects to the Probation Department's determination that those Facebook posts support the Section 2A6.1(b)(2) enhancement for three reasons: (1) the additional threats listed in the PSR are not within the scope of this enhancement because they lack a sufficiently substantial and direct connection to the threats made in the defendant's "Kill Your Senators" video; (2) in identifying

8

additional threats made by the defendant, the Court may not rely upon threats that the jury concluded the government had not proven beyond a reasonable doubt; and (3) other threats made by the defendant are not "true" threats. (Def. Guidelines Obj. at 2-7.) As discussed below, these arguments are without merit.

First, the defendant is wrong in arguing that the additional threats identified in the PSR lack a substantial and direct connection to the offense under the facts of the case taken as a whole. The indictment charged the defendant with threatening Members of Congress in or about and between December 6, 2020, and January 8, 2021. The defendant made the two threats identified in the PSR as the basis for this enhancement on December 6, 2020, after the election of President Joseph R. Biden, Jr., an event that, as detailed at trial, precipitated the defendant's anger at Members of Congress, whom he understood would certify the results of the election on January 6, 2021. (PSR ¶¶ 8, 18.)

Indeed, days before the December 6 threats, the defendant posted to Facebook on November 27, 2020, a defiant message reflecting his commitment to prevent a Biden presidency, "Like ive been saying all along, biden will NEVER set foot in the white house. we will mow down any commies who try to run a coup on america! MAGA!" (GX 150E.) And not long after the December 6 threats, on December 21, 2020, the defendant posted a video called, "What the Media Won't Tell You About January 6, 2021," in which he discussed the Congressional vote certification scheduled for January 6, 2021, which would confirm the victory of President Biden. (See GX 22.)

The evidence is clear that, when the defendant's December 6, 2020 threats specifically targeted the Speaker of the House of Representatives, the future Senate Majority Leader and Congresswoman Alexandria Ocasio-Cortez, such threats were in relation to their performance of their duty to certify the result of the presidential election, just as his "Kill Your Senators" video threatened to retaliate against all Members of Congress for having performed that duty. Thus, there is substantial and direct connection between the two December 6 threats and the "Kill Your Senators" threat.

Second, the Court's authority to consider at sentencing threats that the jury did not find to be proven beyond a reasonable doubt is well-established. "Because the quantum of proof required for a verdict of guilt is higher than the quantum required for sentencing, it is established that 'a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence.'" United States v. Delva, 858 F.3d 135, 160 (2d Cir. 2017) (quoting United States v. Watts, 519 U.S. 148, 157 (1997)).[6]

---

[6] In his objections to the PSR's Guidelines calculation, the defendant cites a "carefully watched" petition for certiorari to the U.S. Supreme Court that presented the question whether so-called "acquitted conduct" may be considered by a sentencing judge as a basis for this Court to conclude that the practice is controversial. (Def. Guidelines Obj. at 3.) The Supreme Court subsequently denied that cert. petition. See Osby v. United States, No. 20-1693, 2021 WL

Despite this, the defendant suggests that, because the jury answered questions about the basis for their verdict on a special verdict form, the Court is bound to adopt the findings indicated on the special verdict form at sentencing. But this is no basis to distinguish the Supreme Court's decision in Watts. Watts relied on the fact that the standard of proof at sentencing is less onerous than that applied by a jury that finds facts in a criminal trial. The jury in this case was instructed on the special verdict form "For each of the following statements indicate whether you unanimously find that the Government has proved beyond a reasonable doubt that Defendant made the statement and that the statement constituted a true threat. . . ." (ECF No. 93 (emphasis added).) Thus, when the jury checked "No" for the defendant's two Facebook threats on December 6, 2020, the jury was applying the higher reasonable doubt standard, and not the preponderance standard that this Court will apply at sentencing. Accordingly, there is no reason to disregard the settled law that this Court may consider the two acquitted threats dated December 6, 2020, in determining the Guidelines sentencing range.

Third, even if the Court were to determine that the acquitted threats that were put to the jury in the special verdict form should not be considered at sentencing, the trial evidence demonstrated that the defendant made at least two additional threats against Members of Congress in videos he posted to BitChute while his threatening "Kill Your Senators" video was publicly accessible: the threats in his two January 9, 2021 videos. As discussed above, at approximately 2:57 a.m. Eastern Time, the defendant stated:

> There is a Million Militia March being spoken of for January 20th—I don't know what's going on with that—but, if the media, if the government, want to label a peaceful protest an insurrection, let's see what happens when people bring guns. There are only 100 senators, remember. They ride on planes like us, they go to restaurants. They should be really scared of being in public . . . .

(GX 26, 405.) In another video posted on January 9, at approximately 1:35 p.m. Eastern Time, the defendant reiterated that, "[t]hose 100 Senators should really be afraid about going into public now. . . . [l]ike the way these people behaved, they should have to walk around with bodyguards ten feet deep," (GX 27, 405.) The defendant then stated:

> So start exercising your rights to take these corrupt politicians down. We have the first amendment, that's still around, remember? And we have the second as well. There are really only a hundred of these weakling Senators. They are mass murdering psychopaths who are

---

4507779, at *1 (U.S. Oct. 4, 2021). Thus, the law that authorizes the Court to consider acquitted conduct at sentencing remains well established.

>   intent on our destruction, and they form an illegitimate government.
>   Every single one of them just needs to go.  Rise up.

(GX 27.)

Because the "Kill Your Senators" video was still being broadcast when the defendant posted those additional videos, his statements in the videos are conduct that "occurred during the offense" for purposes of the offense guideline, and are considered in determining the application of this enhancement. U.S.S.G. § 2A6.1 cmt. n.1.

Moreover, both of the January 9 videos contain true threats. The two videos depict the defendant threatening Members of Congress with violence. In each of these two videos the defendant makes clear that he wants every member of the United States Senate to be afraid to go out in public. In each video, the defendant references the use of firearms against Members of Congress, much as he did in the "Kill Your Senators" video. For example, he refers to the "Second Amendment" (meaning the use of firearms) as a way to deal with Members of Congress in addition to the First Amendment (meaning through political activity). Particularly in context with the "Kill Your Senators" video that the defendant published to the same website, the two January 9 videos cannot be understood as anything other than a serious expression of intent to inflict bodily injury. (See Tr. 1129-30.)

Accordingly, the Court should apply a two-level enhancement because the defendant's offense involved more than two threats. U.S.S.G. § 2A6.1(b)(2).

> B.  Enhancement for Creating a Substantial Risk of Inciting Others to Violate 18 U.S.C. § 115 (U.S.S.G. § 2A6.1(b)(5))

The defendant objects to the Probation Department's determination that the defendant knew or should have known that his public threats created a substantial risk of inciting others to commit violations of 18 U.S.C. § 115, under U.S.S.G. § 2A6.1(b)(5). (Def. Guidelines Obj. at 7-9.) Specifically, the defendant claims that (1) the enhancement is unconstitutional because "law regarding incitement is a matter of constitutional interpretation by the Supreme Court, not the Sentencing Commission" (id. at 7); and (2) the defendant's sentence cannot be enhanced for the risk his threats would incite others because the government did not charge the defendant under an incitement theory and there was no evidence presented at trial that anyone had actually been incited by the defendant to violate 18 U.S.C. § 115. The objections are without merit.

The defendant's conclusory assertion that the advisory Guidelines enhancement for "Inciting Others" is unconstitutional because the Supreme Court has prescribed a legal test that applies in cases in which a defendant is charged with inciting others to violence, ignores the Supreme Court's teaching that constitutional principles do not necessarily apply to the Guidelines in the same way that they apply to criminal statutes that proscribe conduct or fix punishment. Cf. Beckles v. United States, 137 S. Ct. 886, 892 (2017) (holding that because "the advisory Guidelines do not fix the permissible range of sentences" and "merely guide the exercise of a court's discretion in choosing an appropriate sentence within the statutory range . . . the Guidelines are not subject to a vagueness challenge under the Due Process Clause"). In Brandenburg v. Ohio, 395 U.S. 444,

11

447 (1969), the Court clarified that a State may not "forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." The purpose of the Brandenburg test is to define the scope of the First Amendment's protections for speech when the speaker advocates violence, and thus to define the limits on a state's power to regulate such speech.

By contrast, U.S.S.G. § 2A6.1(b)(5) does not purport to regulate conduct or define the scope of the First Amendment's protections. As a part of the advisory Sentencing Guidelines regime, Section 2A6.1(b)(5)'s enhancement applies only to a person who has already been convicted of making a true threat against a U.S. official. Section 2A6.1(b)(5) is not concerned with whether the underlying threatening statements are protected by the First Amendment—because the enhancement only applies to conduct based on unprotected speech. Instead, Section 2A6.1(b)(5) reflects a sentencing factor that the Court should consider in assessing the severity of the threats and in choosing a sentence within the statutory sentencing range fixed by 18 U.S.C. § 115. Thus, there is no constitutional infirmity with applying an enhancement as part of the calculation of the defendant's advisory Guidelines sentencing range where "knew or should have known that the public threatening communication created a substantial risk of inciting others to violate 18 U.S.C. § 115." U.S.S.G. § 2A6.1(b)(5).

Although the government did not charge the defendant under an incitement theory, there was nevertheless significant evidence that the defendant knew that his threatening BitChute videos created a substantial risk of inciting others to violate 18 U.S.C. § 115. First, the trial evidence showed the defendant chose to publish the "Kill Your Senators" video only on BitChute (rather than YouTube) because he believed that others on BitChute would be more receptive to his message. The defendant allowed the video to remain publicly accessible for approximately 37 hours, during which time the video was viewed 502 times. The defendant answered criticisms from a small handful of those viewers in the commentary to the video by explicitly declaring his intent to "get the word out" and again urging his viewers to participate in an attack on Congress at the presidential inauguration on January 20, 2021:

> of course you should alert people, fucking idiot. how else should you get the word out? talk in encrypted code in deep web chat rooms or some shit? no, everyone should come to washington dc on january 20th wearing masks and camo, concealed carry, body armor, and just blast them all away while we still have a chance.

(GX 110A.) The content of the defendant's video, which evoked the January 6 insurrection at the Capitol and came just days after the event, further amplified the risk that other like-minded individuals would be inspired by the defendant's explicit calls to murder Members of Congress on January 20th.

Thus, while the record does not show whether the defendant's threats actually incited others to violate 18 U.S.C. § 115, the defendant's actions were calculated to broadcast his call to murder Members of Congress to a receptive audience, to amplify those threats by deliberately invoking the very recent violent assault on the Capitol by a mob of like-minded individuals, and to provide a specific date on which members of the defendant's audience could travel to the Capitol to carry them out. This evidence is sufficient to establish by a preponderance

12

that the defendant knew or should have known that his "Kill Your Senators" video created a substantial risk of inciting others to violate 18 U.S.C. § 115. See U.S.S.G. § 2A6.1(b)(5). Accordingly, the defendant's objection to the application of the enhancement should be overruled.

### C. Reduction for an Offense Involving a Single Instance Evidencing Little or No Deliberation (U.S.S.G. § 2A6.1(b)(6))

The defendant objects to the Probation Department's determination that the defendant is not entitled to a four-level reduction under U.S.S.G. § 2A6.1(b)(6). (Def. Guidelines Obj. at 11-13.) That argument should be rejected for two reasons.

First, because, as explained above, the enhancements under U.S.S.G. §§ 2A6.1(b)(2) and (b)(5) apply, the defendant is not eligible for the reduction under (b)(6). See U.S.S.G. § 2A6.1(b)(6)(A) (reduction applies only if "subdivisions (1), (2), (3), (4), and (5) do not apply").

Second, even if the enhancements under (b)(2) and (b)(5) do not apply to the defendant, the record evidence demonstrates that the defendant engaged in significant deliberation in making the "Kill Your Senators" threat. See U.S.S.G. § 2A6.1(b)(6)(B) (reduction applies only where "the offense involved a single instance evidencing little or no deliberation"). Indeed, the defendant's deliberation in posting the "Kill Your Senators" video and making it public, evidenced by the defendant's BitChute editing history, was a significant point of argument throughout the trial. (See, e.g., Tr. 981-82 (observing that the defendant "slept on it" before making his threats public.) The defendant created the exactly 88-second-long "Kill Your Senators" video late at night on January 7 and then posted it to BitChute without making it public under the title "Kill Your Senator" with an image of a handgun. (Tr. 215-22; GX 71A, 109N, 403, 405.) The next morning, approximately ten hours later, the defendant deleted the first iteration of the video from BitChute, then posted it to BitChute again, this time under the title "Kill Your Senators," and accompanied by hashtags that referred to the Second Amendment and "ZOG," and made it public. (Tr. 215-22; GX 109N, 405.) Over the next 37 hours, the video was publicly accessible, broadcasting the defendant's threats to the hundreds of viewers who watched it, until the defendant hid the video from public view late in the evening on January 9, 2021. (Tr. 215-22; GX 109N, 405.) While the video was accessible, the defendant repeatedly defended his decision to make his threats publicly to commenters who criticized him in the comments below the video. (Tr. 243-48; GX 110A.) The defendant also published at least two other BitChute videos containing threats against Members of Congress while the "Kill Your Senators" video was publicly accessible on BitChute. (GX 26, 27, 405).

Accordingly, the defendant is not entitled to a four-level reduction under U.S.S.G. § 2A6.1(b)(2) both because other enhancements apply to this offense, and because the defendant's commission of the offense did not evidence "little or no deliberation."

### D. Official Victim Adjustment (U.S.S.G. § 3A1.2(b))

The defendant objects to the Probation Department's determination that the six-level enhancement under U.S.S.G. § 3A1.2(b) applies because his offense was motivated by his congressional victims' official status. (Def. Guidelines Obj. at 9-11.) Specifically, the defendant

argues that Members of Congress are too numerous or identifiable with "the government" to be considered individual victims under Application Note 1, which provides that "This guideline applies when specified individuals are victims of the offense. This guideline does not apply when the only victim is an organization, agency, or the government." U.S.S.G. § 3A1.2 cmt. n.1. The defendant is wrong.

In arguing that the defendant's target was the institution of the Congress as a whole, instead of its individual members, the defendant ignores his own language. First, the defendant did not threaten the institution of the Congress, instead he referred to the hundred individual Senators and the hundreds more Representatives themselves as his targets. The hope he articulated was that he could "slaughter them all" at the presidential inauguration on January 20, when the defendant expected most individual members of Congress to be there. Moreover, in his threatening videos, the defendant talked about placing individual Senators in fear. Indeed, the defendant described the individual Senators as achievable targets, stating, "[t]here are only 100 senators, remember. They ride on planes like us, they go to restaurants. They should be really scared of being in public . . . ." In his December 6 threats he was even more specific, singling out the Speaker of the House, the future Senate Majority Leader and Representative Ocasio-Cortez as his targets. Indeed, a staff member of Representative Ocasio-Cortez's office testified at trial that he viewed the threats as sufficiently credible and specific that the office maintained a file listing the defendant as an "active threat."

The defendant's words evinced an intent to target Members of Congress as individuals and to place individual Members of Congress in fear for their lives, including by repeatedly describing those individuals as achievable targets who walk among us in society. Threats of this nature, directed against the individual members of a legislative body in personal terms, are not comparable to threats leveled against an abstract concept ("the government") or a particular agency ("the police"). Therefore, the Guideline commentary's exclusion for organizational victims does not preclude the application of a six-level upward adjustment under U.S.S.G. § 3A1.2(b).

E. Obstruction of Justice Adjustment (U.S.S.G. § 3C1.1)

The defendant objects to the Probation Department's determination that an enhancement under U.S.S.G. § 3C1.1 applies because he obstructed the administration of justice by perjuring himself during his testimony. (Def. Guidelines Obj. at 13-14.) The defendant claims that, when the jury convicted him despite his testimony that he did not intend to retaliate against or interfere with Members of Congress, the jury's verdict did not necessarily amount to a finding that the defendant had perjured himself. The record shows otherwise.

The Court instructed the jury that, to find the defendant guilty, the government had to prove beyond a reasonable doubt that the defendant "acted with the intent to impede, intimidate, or interfere with the officials while they were engaged in the performance of their official duties, or with the intent to retaliate against the officials on account of the performance of their official duties." (Tr. 1134.) Here, the defendant denied that he had intended to intimidate or interfere with Members of Congress in making the threatening statements. (See, e.g., Tr. 843 ("I wasn't sending this message out to anybody. I didn't intend to interfere or intimidate anybody with this. I was

14

letting off steam and it was more online blather than anything."); Tr. 846 ("I wasn't trying to use that [Kill Your Senators] video to intimidate any politicians or affect their job in any way.").)

Contrary to the defendant's arguments, the defendant's untruthful testimony was not confined to a collateral issue, nor to an affirmative defense on which the defendant bore the burden of proof. (See Def. Guidelines Obj. at 14 (arguing that "Mr. Hunt's testimony that he did not *subjectively intend to threaten* anyone was not a defense").) The defendant's testimony was tailored to dispute directly one element of the crime that the government was required to prove; he chose words drawn directly from Section 115 itself. See Tr. 843 ("I didn't intend to interfere or intimidate anybody."). Had the jury credited the defendant's testimony, they would have been bound to acquit him under the Court's instructions. In other words, by convicting the defendant, the jury necessarily concluded he was not telling the truth about his intent to interfere with or retaliate against Members of Congress when he posted the "Kill Your Senators" video.

Accordingly, the jury's verdict necessarily reflects their determination that the defendant "(1) willfully and (2) materially (3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter," United States v. Rosario, 988 F.3d 630, 633 (2d Cir. 2021) (internal quotation marks omitted), in his testimony at trial. The Probation Department properly applied the two-level upward adjustment for the defendant's Obstruction of Justice under U.S.S.G. § 3C1.1.

### F. The Defendant's Factual Objections to the PSR

As clarified at the status conference in this case on November 2, 2021, the defendant seeks modifications to paragraphs 1, 57, 78 and 82 of the PSR.[7] The government does not object to the defendant's requested modifications to paragraphs 1, 78 and 82. The government does object to the requested modification for paragraph 57, which lists the defendant's disciplinary history in Bureau of Prisons ("BOP") custody. The defendant, as the proponent of facts in conflict with the official records of the BOP regarding the defendant's disciplinary history at the Metropolitan Detention Center ("MDC"), bears the burden of establishing the existence of those facts by a preponderance of the evidence. Here, his objection consists only of his own self-serving statements disputing the factual basis for the BOP's determination that the defendant violated the regulations of the MDC and its resulting imposition of discipline.

## IV. The Section 3553(a) Factors

The government respectfully submits that a sentence within the Guidelines sentencing range of 51 to 63 months' imprisonment would be sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case. See 18 U.S.C. § 3553(a).

First, a Guidelines sentence would accurately reflect the seriousness of the defendant's conduct in repeatedly threatening to murder the 535 individuals who are Members of Congress in retaliation for their performance of their official duties. See 18 U.S.C. § 3553(a)(1),

---

[7] The Probation Department has advised the parties that it will issue a Revised PSR Addendum that will address only these four of the defendant's factual objections.

15

(a)(2)(A). The evidence at trial demonstrated that the defendant made these threats over a period of weeks that gave him the opportunity to reflect on the wrongfulness of his conduct and reconsider his course of action. But despite the time that the defendant had to consider his actions, he persisted, and in fact escalated his threats. Even after the defendant was arrested and charged for threatening Members of Congress, the defendant testified in his own defense and implausibly attempted to characterize his behavior as a joke, a harmless provocation, or "clickbait" intended to draw attention to his videos. (Tr. 859.)

The defendant's threats to murder Members of Congress are even more serious because he made his "Kill Your Senators" threat video just days after angry supporters of former President Trump violently stormed the Capitol on January 6, 2021. The defendant deliberately used the shock of this event to amplify his own threats by invoking the breach of the Capitol building and calling on supporters to go back to the Capitol for the presidential inauguration on January 20 with guns and a mission to murder the Members of Congress who had certified President Biden's victory. The defendant's "Kill Your Senators" video was no poorly worded off-the-cuff statement. Rather, the evidence at trial showed that the defendant waited approximately ten hours after making the video before publishing it the next morning, and he did so only after modifying the video on BitChute to increase its shock value.

The video itself was 88-seconds long, an apparent coded reference to the white supremacist slogan "Heil Hitler," and included references to a "ZOG government," or "Zionist Occupied Government," reflecting the anti-Semitic conspiracy theory of a government controlled by Jews. This too, was no mistake. It bears heavily on the Court's consideration of the seriousness of the offense and the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1), that white supremacist and anti-Semitic conspiracy theories formed the basis of the defendant's offense conduct. The evidence at trial showed that the defendant had studied white supremacist and anti-Semitic symbols, propaganda and ideology in the months leading up to the 2020 presidential election, including by reading Hitler's book "Mein Kampf," the website "Daily Stormer" and "the Protocols of the Learned Elders of Zion," and by downloading to his computer a number of offensive white supremacist and Nazi memes he found on the Internet. After President Biden became the presumptive winner of the 2020 presidential election, the defendant sent messages to his father espousing white supremacist beliefs, including condemning the ethnic groups he blamed for President Trump's defeat and lamenting the loss of the opportunity that he believed Trump offered to save the United States from being overrun by immigrants. Just days after the election, the defendant downloaded the jailhouse manifesto of white supremacist mass murderer Dylann Roof.

After publishing the "Kill Your Senators" video, the defendant allowed his call to murder Members of Congress to remain publicly accessible for 37 hours, in which period it was viewed 502 times. But he did not stop there. On January 9, 2021, while the "Kill Your Senators" video was still publicly accessible, the defendant published two more videos that contained similar threats against Members of Congress, and in one called for a revolt against the Zionist Occupied Government.

Second, a Guidelines sentence is necessary to deter the defendant from committing future crimes and to protect the public from him. The defendant's extreme response to his anger over the result of the 2020 presidential election is only the latest example in a pattern of defiant

16

behavior in which the defendant verbally or physically lashes out against real and imagined adversaries and authority figures at the slightest provocation. The PSR documents a pattern of behavior in which the defendant spirals out of control over minor perceived slights and frustrations, and even around family and friends, retaliates by threatening violence or by cutting off contact with close family members. (PSR ¶¶ 48, 50-51, 57, 61-64, 66-67.) Among the most relevant examples of this behavior in the PSR is the defendant's December 2020 threat to "stick a knife in [his cousin's] kid" because his cousin unfriended the defendant on Facebook. (PSR ¶ 63.) Since his incarceration in connection with this case, the Bureau of Prisons' disciplinary records indicate that the defendant has persisted in this pattern, accumulating at least four disciplinary violations in approximately ten months. (PSR ¶ 57.) The defendant's history of defiant behavior and demonstrated inability to control his anger indicate that he is a higher risk to re-offend, and that a substantial term of imprisonment is warranted to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant. 18 U.S.C. §§ 3553(a)(2)(B) and (C).

Moreover, the defendant's attempt in his testimony at trial to dismiss his vivid and violent threats against Members of Congress as mere "clickbait" demonstrates that a substantial term of imprisonment is necessary to impress upon the defendant the seriousness of his offense and deter the defendant from again using threats as a means to an end. At trial, the defendant claimed under questioning that his BitChute threats were just deliberately "outlandish" statements that were intended to draw attention to himself and were not "really a serious proposition." (Tr. 859.) The jury necessarily rejected that implausible and self-serving testimony when it convicted the defendant. But the defendant's absurd claim in sworn testimony that his threat was little more than a harmless stunt to garner attention only increases the need for the sentence imposed by the Court to promote respect for the law and to adequately deter the defendant from further criminal conduct. 18 U.S.C. §§ 3553(a)(2)(B) and (C).

Other aspects of the defendant's trial testimony further support the need to deter him from committing future crimes. When asked on cross examination whether he believed he was "on a stage right now," the defendant responded,

> Yeah, I would tend to think of it that way. There's an audience here and there's lighting, you know, so I think it's not just this kind of stage but it's almost a national stage in a way where people all around the country are paying attention. I don't mean to elevate this into proportions that it doesn't take on. But I think some it's generated some interest and people are looking forward to the outcome one way or another.

(Tr. 959-60.) In other words, in the middle of his own trial for threatening to murder Members of Congress, the defendant viewed himself favorably, performing for an audience. He could not be brought to take seriously his own actions even under those circumstances.

Third, a Guidelines sentence is appropriate in this case for purposes of general deterrence. Much was made by the defense, and by the defendant himself, about heated rhetoric on the Internet and about extreme statements lobbed out in chat groups and on platforms such as Twitter. The prevalence of angry rhetoric on the Internet is, of course, not a defense to a Section

17

115 violation, and the frequency with which Members of Congress across the political spectrum receive death threats is not a mitigating factor in this case. To the contrary, the government respectfully submits that, in sentencing this defendant, the Court should weigh heavily the extent to which the sentence it imposes will deter those in the future who seek to threaten Members of Congress with murder and slaughter in order to interfere with their work. The sentence imposed by the Court must make clear that the threats to U.S. officials prohibited by Section 115 are not protected political speech, and that threatening to murder Members of Congress will be met with significant punishment.

V. <u>Conclusion</u>

For the foregoing reasons, the government respectfully requests that the Court impose a term of imprisonment within the Guidelines range of 51 to 63 months' imprisonment to provide just punishment for this serious offense, to promote respect for the law, to deter the defendant from future criminal conduct, to protect the public from further crimes of the defendant, and to deter others from engaging in similar conduct in the future.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/ Ian C. Richardson
David K. Kessler
Ian C. Richardson
Francisco J. Navarro
Assistant U.S. Attorneys
(718) 254-7000

cc:    Clerk of Court (PKC) (by ECF)
      Jan A. Rostal, Esq. and Leticia Olivera, Esq. (by ECF and Email)
      Gregory Giblin, United States Probation Officer (by Email)