# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

November 9, 2021

**<u>ECF and Electronic Mail</u>**
The Honorable Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   *United States v. Brendan Hunt*, 21-cr-86

Your Honor:

We respectfully submit this letter on behalf of our client, Brendan Hunt, who was convicted by a jury of only one true threat in violation of 18 U.S.C. 115(a)(1)(B).  We have considered the seriousness of the conduct at issue, and acknowledge how very wrong it was, regardless of the ultimate constitutional issues at stake.

Consequently, Mr. Hunt has served 10 months in prison at the MDC Brooklyn, a jail that has become singularly notorious for hard time.  He has lost freedom, a job, his reputation. Yet he has emerged a far different man than the one who came into the criminal justice system on January 19, 2021, and we believe that the purposes of incarceration have already been accomplished in the time he has served.

We have concluded that the correct guideline range calculation is 0 to 6 months, though advisory in any event, and so we think the Parsimony Clause guides the critical question:  how much is enough to satisfy the purposes of punishment?

We believe that a 10 month sentence with appropriate supervision and treatment to follow would be most appropriate. Community service also seems a worthwhile condition as it could be a positive, restorative means of achieving the purposes of punishment. Mr. Hunt has enormous artistic skills and that could be put to service to others. He can also clean like nobody's business, and so if the service is picking up garbage or scrubbing floors, he can do that too.

We provide the following materials:
1) Exhibit A -- Declaration of Maureen P. Baird (MDC)
2) Exhibit B -- Defendant's Text Messages
3) Exhibit C -- Social Media Page of FBI Tipster

1

4) Exhibit D -- Defendant's Papers (filed under seal)
5) Exhibit E -- Responses/Additions to PSR Information
6) Exhibit F -- Defendant's Comics
7) Exhibit G -- MDC Videos (filed under seal)

**Background and Preliminary Statement**

Mr. Hunt is a very different man today than the one who posted the "Kill Your Senators" video and took it down a few hours later. He testified he wants to be a peacemaker, and his digital footprint supports that this is his ideal. That he failed in specific instances to control his resentments and his anger makes him a flawed person. That he is full of contradictions, human. That he was put on a very public trial for things he said in his worst moments, humiliating.

But at this final sentencing stage, we are confident that Your Honor will look at the whole person. At an earlier stage of the case, Your Honor remarked:

I certainly appreciate where his father's coming from; a protective, devoted father who wants to help his son get out of jail, which is a horrible place, no question. I wouldn't wish it on anybody. Nobody would. But even within that, when the father is being candid, there is a history here that I cannot ignore that Mr. Hunt, when he gets angry, does act out. And to me, there are two dangers he presents. It's not just -- and we've been focusing on actual violence, but it's making threats against people...I agree with you, this implicates some serious, I think, mental health issues. It goes beyond just loose language or losing one's temper. This bespeaks to me a very dark sense of frustration or violence, or volatility I guess is the best way of saying it.

Tr. 3/26/21, at 41-42.

What led to that dark sense of frustration?  Was it an enduring and dangerous ideology? Or was it a perfect storm of factors that triggered an online rant into the void of an obscure social media platform removed by its maker before a single Member of Congress knew it existed.

We believe this trial was never intended to, nor did it, present him as a whole person, and a deeper dive into his writing and work do not support the notion that he is a dangerous extremist whose next step is continued threats or even violence. We offered Mr. Hunt up for psychological testing and evaluation through Pretrial Services' contract provider, claiming no privilege in that regard, and await the report once the evaluator has reviewed the materials the government provided him last week.

At his bail hearings and at trial, the  government pointed to events that have either turned out to be untrue (assault on cellmate) or have been unfairly isolated from their context (redacted texts that change the meaning of the discussion).  Ignoring any contradictory information, the government presented their case as if they were just showing the tip of the iceberg of a Nazi-loving white supremacist. Looking back at the trial, we recall how large the isolated texts and memes loomed, and think back to Your Honor's remarks on them: " The Government, I think, is being pretty restrained in what I imagine they might ask him about the universe of his postings and conversations." Tr. 861.

2

But, as it turns out, the universe of his postings and conversations shows something quite different, and does not support a belief in an enduring embrace of violent extremism.  That in his worst moments he exploded with ugly words is something to address through rehabilitation. That his writings are full of the opposite ideals -- words of peace, reconciliation, racial harmony, equality -- shows he is a man who has much to offer the world.  However you cut it, this is not someone who poses a realistic danger of future violence, hate crimes, and certainly no proven ability to incite violence in others.

But the government portrayed him as a one-dimensional character leading to headlines like this: "New York Court employee who threatened to "slaughter" NY Democrats is also a racist, anti-semite:  Feds."[1]  So overwhelming were the suggestions of bigotry that the one juror said to the media:  "It bothered me to see that he was racist."[2]

Mr. Hunt's digital footprint is vast.  It does not bear out the enduring nature of these various suggestions or charges, however they can be described, of these nefarious sentiments as representative of anything more than isolated comments.  That the government does not like the content of much of what he says is not a reason to see it as nefarious or worthy of heightened punishment.  The Supreme Court and Second Circuit have warned against the slippery slope of policing thought crimes, and the Supreme Court and Second Circuit have discussed this in the *Ashcroft* and *Valle* cases.  Historically a "radical thinker," Mr. Hunt has pushed the envelope with questions and political positions that have proved personally costly.  This is the price that people who test the bounds of free speech pay.  But like the line between illegal fantasy and conspiracy in *Valle* or that between legal and illegal pornography in *Ashcroft,* any such line drawing  must be drawn with sensitivity to consitutional limitations on government control of thought.   And even more so in the case of political thought.

## I. Application of 18 U.S.C 3553(a) Sentencing Factors Applied to the Particular Circumstances of this Case.

## A.  18 U.S.C. § 3553(a)(1) – History and characteristics of the Defendant.

## Atmosphere of Political Discourse on the Internet

---

[1]https://www.nydailynews.com/new-york/nyc-crime/ny-brendan-hunt-democrat-threats-parents-anti-semite-racist-congress-20210408-77ako76uv5b7pinstrd5jf2o6a-story.html; see also *See, e.g.*, *Evidence in Trump supporter's trial suggests he espoused Nazi ideals*, The Washington Post (Apr. 22, 2021),
https://www.washingtonpost.com/national-security/brendan-hunt-trial-capitol-riot/2021/04/22/6bfb7cc0-a398-11eb-a774-7b47ceb36ee8_story.html.
[2] *Brendan Hunt Guilty of Threatening to Kill Lawmakers After Capitol Riot*, Courthouse News Service (Apr. 28, 2021)
https://www.courthousenews.com/brendan-hunt-found-guilty-of-threatening-to-kill-democrat-lawmakers-after-capitol-riots/

We first offer some observations about the atmosphere of political discourse into which the "kill your senators" video was posted.

Mr. Hunt testified at trial:  "I had been listening over the last two years to a lot of rhetoric. A lot of political rhetoric on both sides of the aisle.  I spent a lot of time listening to the news 24 hours a day almost and getting wrapped up in it. If I had to describe what was going through my mind at the time, I felt like I was in sort of a football stadium where the democrats and the republicans were really slugging it out and tackling each other, and it was getting rough and I felt like And I felt like I was in the stands with everybody drinking beer saying, yeah, yeah, millionmilitiamarch, you know. And I didn't really take it seriously any more than a sports fan would say, yeah, I want the Yankees to murder the Red Sox or something.  And then all of a sudden I felt like the lights in the stadium went out and the spotlights all came on me." Tr. 823.

The "rah rah" nature of the discussions online during this time can be seen from a read of the social media posts of the tipster, as seen from Exhibit C (attached).  These show the normalization of these sorts of crude statements that Mr. Hunt was talking about in his testimony, supporting the notion that this had become a norm that users understood was the nature of that medium.

The painfully ugly level of discourse reached in the political realm cannot be denied.  It predated the tweets of former President Trump.  Whether from the "right" or the "left," the days of polite and reasoned speech, even in moments of national stress and tragedy, are seemingly gone. How nostalgic seem eloquent remarks like those of Robert F. Kennedy given in a speech the day after the assisnation of Dr. Martin Luther King, Jr.:  "Some Americans who preach nonviolence abroad fail to practice it here at home. Some who accuse others of inciting riots have by their own conduct invited them. Some look for scapegoats, others look for conspiracies, but this much is clear; violence breeds violence, repression brings retaliation, and only a cleaning of our whole society can remove this sickness from our soul...No wrongs have ever been righted by riots and civil disorders. A sniper is only a coward, not a hero; and an uncontrolled, uncontrollable mob is only the voice of madness, not the voice of the people.[3]

Compare the eloquence of RFK's words to those of our elected leaders in the public crises we have faced.  During the summer of 2020, Hunt described what he perceived as the lawlessness of the political left.  He was vocal about his view that rioting and looting is not "political expression," and his resentment of the content-related double standard he believed was being applied.  He was not alone in making these observations, and there will long be debates about whether the BLM Protests (or riots depending on who is describing them) were comparable to the Capitol Protests (or riots, again depending on one's perspective).  It may be unpopular in certain circles to say either of these things, but that these judgments are driven by what is considered socially acceptable to *say* has always been an undercurrent of this case, and why the First Amendment exists..

Mr. Hunt posted often about this sense of double standard, and the resentment he felt when Democrats seemed able to say and do outlandishly threatening things.  He devotes entire videos to this topic and in one post reposts this video, "How did you think it would end?

_____

[3] https://www.cityclub.org/blog/2016/07/11/on-the-mindless-menace-of-violence#

4

Democrats and Progressives Inciting Violence," showing just how low it had gone.  The video shows various news clips such as House Speaker Pelosi ("I just don't even know why there aren't uprisings all over the country and maybe there will be"); Chris Cuomo ("Show me where it says that protests are supposed to be polite and peaceful."); Eric Holder ("When they go low we kick *&*"); Don Lemon ("The biggest terror threat in this country is white men, most of them radicalized to the right."); Johnny Depp ("when was the last time an actor assassinated a president?"); NBC Commentator ("They're still going to have to go out and put a bullet in Donald Trump, and that's a fact."); Footage of Public Theater Julius Cesar depicting assisination of a "Trumplike" character; Congresswoman Maxine Waters ("I will go and take Trump out tonight.") ("If you see anybody from that Cabinet in a restaurant, in a department store, at a gasoline station, you get out and you create a crowd and you push back on them, and you tell them they're not welcome anymore, anywhere.");   House Speaker Pelosi ("And sadly, the domestic enemies to our voting system and our honoring our constitution are right at 1600 Pennsylvania Avenue.")



And as Mr. Hunt testified, the rhetoric crossed the aisles.  Experts have noted that former President Trump's rhetoric has made it "more acceptable among more people to denigrate and attack other human beings." "Conservative websites and political leaders, especially at the state and local level, now regularly use violent rhetoric and demonize their political opponents."[4]

---

[4] *How hateful rhetoric connects to real-world violence*, Brookings (Apr. 9, 2021), https://www.brookings.edu/blog/order-from-chaos/2021/04/09/how-hateful-rhetoric-connects-to-real-world-violence/

"The use of violent rhetoric has grown more mainstream in right-wing circles, from conservative websites and think tanks to congressmen like Louie Gohmert and Madison Cawthorn."[5] Congressman Gohmert has encouraged his supporters to "go to the streets and be as violent as antifa and BLM," while Congressman Cawthorn has encouraged his supporters to threaten Members of Congress: "Please, get on the phone. Call your congressman. And feel free - you can lightly threaten them and say... Say, you know what? - if you don't start supporting election integrity, I'm coming after you."[6]   Other notable examples include prominent conservative lawyer, Lin Wood, who told his 500,000 Parler followers "Get the firing squads ready. Pence goes FIRST"[7] and Congresswoman Marjorie Taylor Greene who "repeatedly indicated support for executing prominent Democratic politicians in 2018 and 2019 before being elected to Congress[.]"[8] None of the aforementioned individuals, who are well-known and have dedicated followings, have recanted or apologized for making these statements or been criminally prosecuted.

This incendiary rhetoric by political leaders has shifted discourse norms in our country. Where have we come as a nation that words like these are the exception rather than the rule in the political sphere, especially  in times of national crisis?  And how does the First Amendment bend to protect speech when the bar for appropriate public discourse has been lowered so far?

The appetite for insulting and even threatening content that has emerged over the past few years would leave anyone confused about the bounds of decency, much less of law, in the political arena.

**Mr. Hunt's Archives**

Mr. Hunt has always created.  Whether it was theater or art, his self expression is transparent and accessible because he archived everything.  Gigabytes of data exist from which

---

[5] *Violent Rhetoric Grew More Mainstream In Conservative, Intellectual Circles*, NPR, (Jan. 28, 2021) https://www.npr.org/2021/01/28/961470082/violent-rhetoric-grew-more-mainstream-in-conserva tive-intellectual-circles.

[6] *Id.*

[7] *Parler Nixes 'Firing Squad' Post by Pro-Trump Lawyer Lin Wood After His Twitter Suspension*, Newsweek (Jan. 9, 2021) https://www.newsweek.com/parler-nixes-firing-squad-post-pro-trump-lawyer-lin-wood-after-his-twitter-suspension-1560259; *Trump-Supporting Lawyer Lin Wood Has Been Permanently Banned From Twitter*, BuzzFeed (Jan. 7, 2021) https://www.buzzfeednews.com/article/ryanmac/twitter-bans-lin-wood

[8] Em Steck and Andrew Kaczynski, *Marjorie Taylor Greene indicated support for executing prominent Democrats in 2018 and 2019 before running for Congress*, CNN (Jan. 26, 2021) https://www.cnn.com/2021/01/26/politics/marjorie-taylor-greene-democrats-violence/index.html

to examine his interests, his plans, his dreams, his relationships.  And yet it is just a chosen few things that the government pulls from this to make their various points.

But the archives show otherwise, and this was precisely why the government so narrowly tailored the testimony of its "CART Examiner" witness, so that she could not be questioned about anything except the discrete, isolated items that the FBI chose to place in relief.

Of the 3 phones, 3 computers, and 8 external drives seized, gigabytes of data exist to see inside this defendant's mind.

There are music folders, including for every band he has played in.

There are folders for songs and lyrics (e.g. "Blood for Oil:  *Children, soldiers die by statistics, Corporate kill filled with twisted statistics, Still can't believe that you start a war, I'm putting your dinosaur blood in my car, Subversion, tyranny, because the oil don't allow, Idea are enemies of those that hold us down*.



Then there are video collections, containing every theater performance he has done (e.g. Hamlet, Twelfth Night, Wizard of Oz, etc).

There are family pictures, work pictures and girlfriend pictures (including holidays spent with his girlfriend and her family).



There are folders for art, for literature, with volumes set out in Excel spreadsheets, catalogued and color coded.

There are folders for fiction stories he was writing  ("In any story, even a fantasy, there should be truth to it.  It's a great place to start.  Overarching themes could be God and spirituality.  Not a He or a She, or a particular race or breed, but an understanding of all.  Our confrontations with the mystical God question, which is never really explained in our reasoning minds, the existential crisis, and the implications it has on us, can be a focus.  Eventually we reach the concept of 'veritas' which I am working on.  It is the act of substituting fantasy for reality, in order to explain something better. It's a contract the storyteller makes with the audience, in which they allow themselves to connect to the fiction, in order to communicate a message that could not be told any other way.  This is true for any type of story, whether it be around a campfire or in a theater." )

There are folders for his Occupy Wall Street days, stories, videos, pictures, of his experience with the movement.  Even his 2012 arrest is depicted from many different angles and sources.  In that he is seen playing his drum when police cuff him and take him to a van.  The crowd cries "Shame Shame" on the police, but Hunt does not resist the arrest (which was later dismissed).

Then there are folders for the protests he attended, such as the Republic National Convention protest, and a 100 Human Rights Walk from Philadelphia to New York honoring Arlo Guthrie's Birthday,  Egypt Open Rafah protests and more.

There are  folders for documents laying out his life plans:

(2047 RETIRE FROM COURT SYSTEM, UPKEEP PUBLISHING TIL I DIE (or retire again at like 86/2070); DURING RETIREMENT PERHAPS WRITE/DRAW ONE MORE VOLUME OF XRU COMIX (GN14).  I would also like to act in/produce movies, shorts, and series, and leave behind some plays and poetry.  *Brendan Hunt was*

8

*an aspiring actor before getting into political activism and starting a Youtube channel*
*focused on conspiracy theories. After the sudden death of his friend Jen, Brendan*
*refocused his energies and joined the band Skum City. He gained employment with the*
*NYS court system, produced the long-running XRU Comix series, and acted in many*
*other productions. Brendan retired from producing music and comics at age 63,*
*continuing to publish the back catalog of books, music, and videos until his death.*

There are folders for content he called "Strategy of Tension," involving mass casualty events in which he questions official narratives such as whether there was a single gunman or the involvement of others.

There are folders for his social media content where he even notes what and why he was deplatformed, such as the time Youtube took down a video showing abuse of prisoners by Brazilian police.



There are folders for memes, well over a thousand of them on just the one drive alone. Unlike his other folders, there is little organization in the meme folder. The "bad" memes are dropped in with all the rest. The cherry picking of certain ones makes no sense given that they are all thrown together in ways that suggest nothing unique or noteworthy about any in particular. They cover a wide variety of tasteless and sometimes legitimately funny or quotable content.

But there are no pro-white supremacy folders. No pro-Nazi/Hitler folders. There are no Anti-Semitism or milita or extremism folders. There are no folders for weapons or violence.

The government has simply combed through and picked out what they wanted, not what he highlighted, color coded, highlighted, sent to anyone, or paid any special attention to whatsoever.

The enduring themes of his archives: he loves music, art, literature, theater, and politics. He has a longstanding opposition to war, a critical eye on his government, and a clear need to express himself creatively and politically.






His texts show similar patterns.  He can be generous and loving to his family, his girlfriend.  His text with his cousin is a sad unfortunate mistake and he is well aware of that.  But his texts with his cousins in the past showed a different relationship, a more loving one, as he was visiting their father in the hospital when he was sick and reporting back to the cousins.

The government tried to portray Mr. Hunt as a single minded racist, based on, basically one angry text with his father.  This text came on the heels of pages of texts showing Mr. Hunt's frustration that his father was not reacting to his son's distress about the civil unrest in NYC in the Summer of 2020.  The text reads like that scene in Spike Lee's *Do the Right Thing,* where there is a quick cutting montage of different ethnic groups pointing fingers at each other with

10

classic racial slurs.  Each character is clearly reacting to the insults from the last in a ping-pong ball like cascade.  From this one text the government concludes Mr. Hunt  is a racist at the exclusion of everything else he has ever done or said.

What is most interesting about Mr. Hunt's rant to his father, which was private of course and not directed at anyone, is how it was never repeated and nothing like it exists in any of his writings.  People with enduringly racist tendencies tend to use this type of language frequently. It comes easy to them.  But Hunt's writing and postings are replete with sentiments that place this one into the isolated angry place where it should have stayed.

**Periods of Abstention from Drug**

Mr. Hunt's drug use has been a longstanding problem for this family that have led to anger issues, and so it is no surprise that they seem to have played some role in the crime as well. The Court can take some comfort in the fact that during periods of abstinence, it can be seen that Mr. Hunt is a much more grounded person, as reflected in the diaries sent to the Court under separate cover.  For example:

> *Feb. 23, 2016 -- I finally quit smoking about a month ago and I feel totally awesome. I'm getting back to the gym now as well, after not going for several months. . .  leasing car...job interview with PC Richard's yesterday. I think I made a good  impression and should be hearing back from them next week (fingers  crossed)...Hoping  for city job courts or maybe teaching. Need paycheck and benefits to plan for future. Chasing after pipe dream while working shit jobs not cutting it. Hoping I can  finally get my comic book idea off the ground. Too much time on character lists and not  enough time on story elements. band playing a bunch of live shows over next few  months. Should be fun!*

> *Feb 25 2016 -- ever since I stopped smoking, I have crazy vivid dreams. Today marks  one year since Jennifer Oda passed away. She was/is the only girl I've ever been with  who I truly loved. Both in life and death she has impacted me in an incredibly profound  way. I made a promise to her a year ago that I would always love her and honor her. The  last piece was quitting my smoking habit at least the last major piece. I wish I didn't  have to cry every time I think about her now but I can't help it.  She is so tied to my  spiritual growth. ... It took me a bit but I feel like I'm now honoring my commitment to  her. I need to do a lot more to get to place I really want to be, but now that I'm not  hurting myself I feel anything is possible. I wish life wasn't so cruel though. I mean there's good stuff but this was just so awful. All I can do is be a really good person and  maybe one day I'll see Jen again.*

The diaries are a particularly compelling read and will not be recounted here, but present the promise of what Mr. Hunt can be, once this case is behind him and he can return to living the life of a person with a sober mind, unencumbered by obsessions with politics:

11

*Dec. 9, 2017: "All lot of people complain that all women are bitches, men are pigs,  conservatives are ignorant, liberals are snowflakes, straight vs. gay, black vs. white, etc.  I try not to see the world in these hardline terms, though I am guilty of it at times. These  expressions signify a deep sadness, and I wish we might break free coming to understand  and respect one another totally…immersed in that atmosphere our souls can become corrupted and it feeds the pain. So much hatred and war has resulted from a refusal to  acknowledge different opinions or why the other side exists. Humans are such beautiful  creatures. Why must these narrow primitive views hold us back from our potential. If we can stop from destroying ourselves, perhaps an evolution can occur."*

**Experiences in Prison/Planning for the Future**

        None of Mr. Hunt's experiences up to this point could have prepared him for the extremes of prison life, especially during the pandemic and especially given the publicity surrounding his case.  In these past 10 months he underwent a transformation not unlike someone put through a boot camp.  The first night there he shared a cell with a broken toilet that began overflowing with human waste. He and his cellmate, a perfect stranger, had to bond together to remediate the situation as best they could, as the guards would not open the door until the next morning.  He has shared a cell with a revolving series of perfect strangers from walks of life many miles from his, and learned about their lives, their stories. He has been moved from cell to cell during his prison stay, and each time had to recreate the tiny domains of control a prisoner forges over his few personal possessions, a toothbrush, a book, toilet paper, maybe some papers and books.  But the clanging of the keys and pounding of the boots was a constant reminder that there was no control, and off he would go to a new cell where he would once again have to rebuild.

        While it took him time, he learned to normalize and adjust to the widely publicized injustices and mistreatment of inmates at MDC Brooklyn,  He learned to look down, not ask questions, accept his subservience.  He also learned to recognize how hard the job is on prison staff and to observe the level of disrespect they, too, must endure.  He regrets a moment of despair when, thinking he could speak to psychology staff about what he was feeling, he was offered a crossword puzzle in what he felt was a tone deaf response to his cry for help.  That was a mistake that probably had a lot to do with the assaults that occurred later.  He has had many positive experiences with MDC staff.  Not every guard abuses their power or denies inmates' basic necessities and respect, but that some do must be acknowledged, and Mr. Hunt has learned that he cannot overreact to this as it is he and his fellow inmates, not staff, who will suffer.

        Mr. Hunt has spoken to us often about the positive and eye-opening moments he has had during his incarceration.  He has made  lasting friendships with some of the most unlikely characters, and talks meaningfully and empathetically about their plights and struggles with an understanding of the privilege he has enjoyed in his life.  "I realize how insignificant the problems I had were in comparison."  He shakes his head now at the thought of how angry it made him that the showerhead didn't work or the doorbell hadn't been fixed.  From people who

really have come up from nothing, he took some inspiration about how to manage when you feel powerless, and to find positive ways to endure troubles.  He shared comic books sent to him from family and friends with cellmates ("I cannot believe how much everyone loves these 60's vintage comics!")  Putting his artistic talents to work, he created a Prison Comics strip, which has been enjoyed by many, and we offer a few episodes here as Exhibit F.  These are comics and intended to be light.  But we think they capture something more profound about the humanizing communality that can be found even in the most dehumanizing conditions.

Mr. Hunt deserves to be understood as a full spectrum human being and not packaged as a villain who is to be feared and loathed.  He has learned lessons that could have been learned an easier way, to be sure.  He has had to examine himself; he has come to a better understanding of the dangers of letting simple discussions and exchanges morph into  political or  personal outrage.

For the reasons stated below, we believe that the retributive and deterrence purposes of punishment have been served.  Now it is time to let the rehabilitation begin.

## B.  18 U.SC. § 3553(a)(2).  Purposes of punishment applied to Defendant.

### 1.  Just Punishment/Retribution; Specific and Objective Deterrence

#### Punishment for the fear instilled

The Government has argued that the culpability inherent in a true threat is not the likelihood of actions, but rather the fear it instills in others. ECF 31, at 3.  If Mr. Hunt had intended to instill fear that would justify some measure of retribution, to be sure.  Even more culpability would presumably rest on his shoulders had he, like many Section 115 defendants, engaged in actions (the means of making the threat) that was calculated to *cause* such fear (such as a classic stalking case).  Then the injury that the law proscribes would be vindicated.

But here, given the lack of evidence that the Kill Your Senators video was designed to *reach* a single intended victim, no intended victim was actually put in fear by Mr. Hunt.  The only fear by an intended victim in this record is from Mr. Bonthius, who testified that he was afraid *when the FBI showed him the video,* not that the video as put out by Mr. Hunt himself posed the threat.  This is culpability bootstrapping.  Mr. Hunt can and will be punished for saying an inconceivably outrageous and ugly thing about Senators.  But he should not be punished more harshly for causing fear in these victims when his actions were not designed to reach them.

#### Punishment For Inciting Others

Then there is the question of whether "incitement," taken in and of itself can be a basis for a longer term of incarceration under the retribution umbrella.  But to do so would be to punish Mr. Hunt for a different crime than the one for which he was convicted.  And that would require, in our view, a jury finding on that charge.  So important is precision when dealing with First Amendment -laden terms such as "incitement" that it cannot be that the government substitute the dangerousness associated with an uncharged crime for the charged crime without a

jury passing on the question of whether there was proof to satisfy the legal definition of "incitement," applying *Brandeberg* and its progeny.

No such facts can be found and the 18 commenters to the Kill Your Senators video are proof positive that Mr. Hunt's words did not incite anyone.  The commenters served, as the marketplace of ideas should, to silence Mr. Hunt, and that is as it should be.

None of this is to say that threatening to murder elected officials is acceptable political commentary.  But to call it a "frontal attack,"  ECF 31, at 8 (Government Detention Memo), diminishes true full frontal attacks.  This was more of a back door hit and run, if anything, and then in an echo chamber of words.  That does not take away all of its sting, but it hardly belongs in the same category as action, or even threats directed *to* the public officials themselves.

### Punishment for Nefarious Intent

The government made much at trial of the use of the term "ZOG" in the "kill your senators" video.

Supreme Court authority is clear that a defendant's abstract beliefs, however obnoxious to most people, may not be taken into consideration at sentencing.  *Wisconsin v. Mitchell*, 508 U.S. 476, 485–86 (1993) (citing *Dawson v. Delaware*, 503 U.S. 159  (1992).  In *Dawson,* the prosecution introduced evidence at a capital sentencing hearing that the defendant was a member of a White Supremacist prison gang. Because "the evidence proved nothing more than [the defendant's] abstract beliefs," the Supreme Court held that its admission violated the defendant's First Amendment rights. *Id*. at 167.

Here, the group specified in the threat of conviction included *all* members of Congress, with no specification by race or religion.  The inclusion of the term ZOG was cited as being anti-Semitic and assoicated with white supremacist views.   ZOG is a distasteful connotation but Mr. Hunt's digital footprint shows he used it and believed it was  a political concept driven by religious precepts with which he disagreed.  Opposition to any governmental or official embrace or endorsement of Zionism would, under that point of view. be legal and, even more, protected by law *largely because* of its minority view.

The Government presented expert witness Oren Segal, who testified about ZOG, and his testimony coincides with the Defendant's testimony and digital footprint -- they both agree that Zionist does not equal Jewish, and that not all Jews are Zionists.  Tr. 661 (testimony of Expert Segal); BH 8 (Hunt saying same thing as Expert Segal). Hunt's work is replete with examples of his criticism of Zionism as a political/religious ideology, regardless of who practices it

Mr. Hunt's criticism of his country's and other's support of Zionism reads as a political position and therefore impermissible as a basis for increasing punishment.  There are countless examples of this expressed in Mr. Hunt's digital footprint, in which he discussed similar views endorsed by groups as the Jewish Voice for Peace, B.D.S. (Boycott, Divestment, and Sanctions), and others, which criticizes Zionism as the "ideological pillar of Israel's regime of occupation, settler colonialism and apartheid."  Tr. 619-622.

14

.https://www.nytimes.com/2019/07/27/world/middleeast/bds-israel-boycott-antisemitic.html
(quoting spokesperson as saying that Israeli laws favoring Jews are racist and discriminatory).

It must be noted, for context, that in May 2021, Representative Alexandria Ocasio-Cortez publicly took issue with her country's support of Israel, and with language that, while less



To our NY-14 community,

Yesterday, the House called to the floor a rushed, $1 billion supplemental military funding bill for Israel's Iron Dome defense system. I want to be clear with our community that I am opposed to this bill, but ultimately cast a PRESENT vote. My job as your representative is to first and foremost serve with transparency and remain accountable to you, the people of New York's 14th Congressional District.

First, let me begin with why I believe this bill should have been opposed: contrary to popular narrative, this bill was not for all U.S. funding of the Iron Dome, and opposing it would not defund U.S. financing of the system in any way, shape, or form. Since 2011, the U.S. has provided $1.7 billion for the Iron Dome and is already financially committed to continuing these funds through 2028. This bill adds an additional $1 billion in funding in one year to this system alone - for context, that is an amount in one year that approaches all the funding to this system we have provided over the last decade - and this is in addition to $3 billion authorized earlier this year in other forms of military funding to the Israeli government. I believe strongly that Congress should take greater scrutiny with all military funding across the world. I also believe that, for far too long, the U.S. has handed unconditional aid to the Israeli government while doing nothing to address or raise the persistent human rights abuses against the Palestinian people, and that this imbalance of power must be centered in any honest conversation about Israel and Palestine - in addition to the many other governments we militarily fund with a pattern of human rights abuses, such as the Saudi and Colombia related amendments I introduced last week as well.

offensive than "Zionist-occupied government," makes a similar point about her government's support of Israel.



If a U.S. Representative uses her political position to voice an unpopular political opposition to Zionism, there can be no disputing the political nature of this discussion. "Zionist-Occupied

Government" is a phrase that must be viewed as a hyperbolic expression of political opinion and anyone who espouses it is protected by the First Amendment *precisely because of its offensive nature*. *See, e.g., Koontz v. Watson*, 283 F. Supp. 3d 1007, 1012-13 (D. Kan. 2018) (finding that a state law that limits state contracts to those who held anti-Zionist beliefs and engaged in activities involving criticism of Israeli policies violates the First Amendment). Thus, it is impermissible to discriminate against people and groups that oppose Zionism and their own government's support for Zionism (or, hyperbolically, ZOG), regardless of the discomfort that some groups might feel as a result. *Id.* at 1022 (D.Kan., 2018) (citing *Matal v. Tam,* —— U.S. ——, 137 S.Ct. 1744, 1763, 198 L.Ed.2d 366 (2017) ("We have said time and again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *(quoting Street v. New York*, 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969)).

Mr. Hunt has suffered the social consequences of the use of the term ZOG. That Mr. Hunt can be punished for a true threat is one thing, but to punish him harder because the crime was motivated by an abstract political view cannot be.

**Prison Abuse**

In the first days of his incarceration, Mr. Hunt learned the hard way that prisoners do not have very little control over their lives, and complaining about that will make it worse. His first day he was asked to a medical test and, unschooled in the prison culture, sought more information. He was told that if he did not submit he would be held down and have it forcibly administered. This seemed inappropriate to him, and he asked to speak to his attorney about the test and about the staff member threatening to "hold him down." . BH 2428. That resulted in a write up for which he was sanctioned. (He later submitted to the TB test, as medical records show). By that point, Mr. Hunt was learning that there was no reliable redress in custody and his continuing efforts to get forms and make requests

Next came his learning what it is like in prison to try to make requests, and he began seeking forms from a particular officer, who, annoyed with his requests, announced to other inmates that he was KKK, This had the expected response from inmates on the block. Mr. Hunt tried to seek redress for this, writing to the prison staff about what the guard had done, and trying to make it clear that he no longer felt safe because of the guard's actions. "I am not a member of any group/gang including this "KKK" nonsense," he wrote, and explained how the officer had told him she would be "his worst nightmare" before announcing to the block of inmates that he was (wrongly) KKK. BH 2468. Somehow, despite Mr. Hunt's handwritten statement, the BOP record contains a "summary" that, contrafactually, says that he was complaining about feeling threatened by inmates for being a Trump support "and a member of the KKK." BH 2462. This summary record -- however wrong -- will follow him through the prison system and any staff casually reading it will be left with incendiary and mistaken impression that he is KKK.

The MDC Brooklyn staff has subjected Brendan to two serious uses of force—both were spearheaded by Lieutenant Dale Kietzman. The Court is familiar with the first use of force on February 24, 2021 when Brendan was pepper sprayed by Lt. Kietzman. The government brought

this incident to the Court's attention as an example of Brendan's "dangerousness" because Lt. Kietzman justified this use of force by claiming Brendan assaulted his cellmate. The evidence in the record suggests Lt. Kietzman fabricated the assault to hide the fact that he pepper sprayed Brendan in retaliation for questioning a commissary restriction. The second use of force was on July 13, 2021, when Lt. Kietzman ordered a team of eight individuals fully equipped with riot gear to forcibly remove Brendan from his cell after he refused a cell mate. Lt. Kietzman justified the use of force by claiming Brendan barricaded himself in his cell. Again, the record failed to corroborate his justifications for the use of force. During both of these incidents, Brendan was stripped down to his underwear, physically restrained for an extended period of time, and suffered bodily injury.

The BOP records and surveillance video for both of these incidents was reviewed by Maureen Baird, who worked for the BOP for 27 years, and served as a warden at FCI Danbury, MCC New York, and USP Marion. *See* Exhibit A (Declaration of Maureen P. Baird), 1–2. Relying on her training and experience with BOP Policies and Procedures, Ms. Baird assessed "the reliability of the official accounts of use of force contained in the [BOP] records" for both incidents. *Id.* at 2. Based on her review, Ms. Baird found Lt. Keitzman's justifications for the uses of force against Brendan to be "concerning" and of "questionable reliability." *Id.* at 54.

Ms. Baird's review of surveillance video and records surrounding the February 24, 2021 incident found evidence that seriously undermined Lt. Keitzman's claim to have spontaneously pepper sprayed Brendan after seeing him assault his cellmate during a routine cell search. Instead, she found Brendan and his cellmate's claims that they were pepper sprayed in retaliation for a dispute involving Brendan's commissary to be more credible. *Id* at Exhibit 2. Her findings were based on surveillance video that did not show any bags or items typically carried by officers performing a routine cell search; a lack of any indication in the video that Lt. Kietzman or any of the other officers observe an unexpected and alarming assault; video showing Kietzman calmly approach the cell door with a canister of pepper spray in his hand and deploying it right after he asks Brendan to come to the door; and the cellmate's statement to a BOP investigator that he was not assaulted. *Id.* Despite the obvious problems with Lt. Keitzman's claim to have observed an assault, Brendan was subject to sanctions based on the lieutenant's claims, including a loss of 27 days of good conduct time. PSR 57.

She also found that the decontamination process suggested that Brendan "was being targeted for retaliation" because his cellmate was decontaminated first even though Brendan was more severely injured. *Id.* Surveillance video shows that after being pepper sprayed guards pinned Brendan to a wall in his underwear while his cell mate was being decontaminated. "He is offered neither a water or a towel for cleanup, nor medical assistance for 15 minutes, and when eventually goes through decontamination it is apparent he is in pain." *Id.*

Ms. Baird similarly found a lack of evidence supporting Lt. Keitzman's claim that Brendan barricaded his cell on July 13, 2021 and had to be forcibly removed. *Id.* at 45. "The [surveillance] video shows clear sight into Hunt's cell with no barricade in place and no signs that the mattress and bedding had been previously used as a barricade." *Id.* In the video, Brendan

17

can be heard stating that he does not want to be inside a cell with a particular inmate who threatened him. *Id.* at 47. According to Ms. Baird, "[e]ven if an inmate does refuse a cellmate, there is absolutely no need for any use of force, or use of force team assembled for such an incident." *Id.* It would be sufficient under these circumstances to simply prepare an incident report. However, there was no incident report claiming Brendan committed a disciplinary infraction by refusing a cellmate.

In the end, Ms. Baird's review of the evidence determined that "the official justifications offered for the two use of force incidents raise questions about the motivations of the Lieutenant who ordered and executed them." *Id.* at 20. She concluded that "the official justifications given are unreliable" and that further investigation was necessary to determine whether Lt. Kietzman's actions "[were] used as punishment or retaliation" against Mr. Hunt.

We will provide the Court a copy of the videos of these two uses of force, which are under Protective Order.

**2. 18 U.S.C. Section 3553(a)(2)(D)  -- Provide the defendant with needed educational, or vocational training, medical care, or other correctional treatment in the most effective manner.**

18 USC 3553(a)(2)(D)  requires the Court to consider the need for mental health treatment or how to implement treatment in the "most effective manner."

We will await the results of the psychological testing and evaluation, but to the extent that Mr. Hunt suffers from any conditions or what therapies are recommended, they are not going to be available in custody.

### C.  18 U.S.C. §3553(a)(3) - Kinds of Sentences Available

The Court must consider the kinds of sentences available.  There is no mandatory minimum sentence for this offense, so all sentences are available, including probation or time-served with  Supervised Release.

### D.  18 U.S.C. §3553(a)(4) -- Guidelines

The Court is required to consider the Sentencing Guidelines, but need not follow them. *United States v. Genao,* 869 F.3d 136, 147 (2d Cir. 2017) (citing *Gall v. United States*, 552 U.S. 38 (2007)

### E.   18 U.S.C. §3553(a)(5) -- Policy Statements

The Court must consider whether there are any pertinent policy statements issued by the Sentencing Commission that would affect the sentence.   In this regard, Congress has made clear that a policy favoring non-prison sentence for non-violent first offender.

In this regard, in its Introduction to the 2012 Guideline Manual, USSG Introduction, Ch. 1 Pt. A., p. 8, the Sentencing Commission acknowledges that departure authority may be necessary to comply with the statutory directive of 28 U.S.C. 994(j), which states:

> The Commission shall insure that the guidelines reflect the general inappropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense.

18 U.S.C. 994(j).

This recommendation is in line with U.S. Sentencing Commission (the "Commission") data showing that offenders with zero criminal history points generally pose the lowest risk of recidivism.[9] That risk is lowest for true first offenders like Mr. Hunt that have no recorded criminal history at all.  The Commission examined the recidivism risk posed by "first offenders."[10] Dividing first offenders into three groups – those with no prior arrests,[11] those with prior arrests, and those with prior convictions that did not count toward criminal history, it was determined that first offenders in all three group have less violent instant offenses, receive shorter sentences, and are less likely to go to prison.   They are less likely to use illicit drugs, more likely to be employed, more likely to have a high school education (or beyond), and more likely to have financial dependents. Finally, [first] offenders . . . compared to other guideline offenders, have instant offenses that are less culpable and less dangerous.[12]

But there were several things that made the group with no prior arrests particularly stand out. For one, they had the lowest primary recidivism rate of 6.8 percent.[13] This led the Commission to conclude that "as indicated by their extremely low recidivism rate of 6.8 percent, they are easily the most empirically identifiable group of guideline federal offenders who are the least likely to re-offend."[14]

---

[9] *See, e.g.*, U.S. Sent. Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview*, at 18 (March 2016), http://www.ussc.gov/research/research-publications/recidivism-among-federal-offenders-comprehensive-overview.

[10] U.S. Sent. Comm'n, *Recidivism and the "First Offender*," Summary (May 2004) https://www.ussc.gov/research/research-publications/recidivism-and-first-offender (hereinafter "First Offender").

[11] The Commission defined the members of this group as those that "have had no recorded contact with the criminal justice system prior to their instant federal offense." *Id.* at 17.

[12] *Id.* at 11.

[13] *Id.* at 14.

[14] *Id.* at 17.

The Commission also concluded that offenders with no prior arrests are also more likely to receive probation. They found that about a third of offenders in this group received a sentence of probation.[15] That is almost twice the rate at which first offenders in the other groups received probation, and six times higher than the rate at which offenders in higher criminal history categories receive probation.[16]

For a first offender like Mr. Hunt the collateral consequences of a felony conviction in itself are enormously punitive.[17] The alleged offense conduct already cost him his job with the state court system. Especially for Mr. Hunt, employers will not need to run a record check, a simple google search will reveal dubious facts over which Mr. Hunt has no control.  Indeed one article pictures a man (presumably, to the casual reader, Mr. Hunt) in a cowboy hat holding a flag at the Capitol on January 6.  .



During a time when the average person "googles" anyone new to them, it's hard to imagine there are many potential employers, coworkers, friends, or romantic partners that won't be deterred by the media coverage of this case.

---

[15] *Id*.

[16] *Id*.

[17] *See* Sarah Berson, U.S. Dep't of Just., Nat'l Inst. of Just., Beyond the Sentence-Understanding Collateral Consequences, 272 Nat'l Inst. of Just. J. 24 (2013), https://www.nij.gov/journals/272/Pages/collateral-consequences.aspx (a conviction "brings with it a host of sanctions and disqualifications that can place an unanticipated burden on individuals trying to re-enter society and lead lives as productive citizens").

**F.  18 U.S.C. §3553(a)(6) – Unwarranted Disparity**

The Court must seek to avoid unwarranted sentencing disparity among defendants, while bearing in mind that the individualized application of the sentencing factors is the goal.  *United States  v. Dorvee*, 616 F.3d 174 (2ⁿᵈ Cir 2010).

*United States v. Lucio Celli*, 19-CR-127 (E.D.N.Y.): The defendant in this matter sent multiple emails to the Honorable Chief Judge Margo K. Brodie, the Honorable Brian M. Cogan, and the late Honorable Robert A. Katzmann, threatening to kill them. ECF No. 175, Government's Sentencing Memorandum, 1–2. He was arrested after sending at least four emails to Judges Brodie and Cogan and other individuals "promising" and threatening to "hunt down and kill" them. *Id.* at 2. During the eight months preceding his arrest, "the defendant sent increasingly hostile emails to Judge Brodie, Judge Cogan and Judge Katzmann" in connection with his pending civil cases. He was arrested after having been interviewed by the U.S. Marshals regarding these emails and asked to stop.

The defendant pled guilty to one count of transmitting threats to injure, 18 U.S.C. § 875(c), after years  of changing lawyers and the filing of pretrial motions. *Id.* at 1. Although the guidelines recommended a sentence of 24 to 30 months, the government agreed that a sentence of time served (4.5 months of incarceration) and two years of supervised release was appropriate. *Id.* at 3–4. The defendant was sentenced consistent with the government's recommended sentence. ECF No. 178.

*United States v. Troy Smocks*, 21-CR-198 (D.C.D.): The defendant in this matter traveled to Washington D.C. on January 5, 2021; the morning of the Capitol Riot he posted a message on social media "containing a threat to injure law enforcement officers" "*that reached tens of thousands of users*, from an account that falsely purported to identify the defendant as a retired military officer." ECF No. 59, Government's Sentencing Memorandum, 1–2 (emphasis added). The message threatened that "millions" would "return on January 19, 2021, carrying Our weapons[.]" *Id.* at 2. After the Riot, the defendant sent "another threatening message on the social media service" that was "again viewed by tens of thousands of other users" threatening to "hunt down" and murder "RINOS, Dems, and Tech Execs" "over the next 24 hours." *Id.* at 3. According to the government, "defendant has a lengthy criminal history, with approximately 18 prior criminal convictions spanning from the early 1980s to 2006." *Id.* at 6.

The defendant pled guilty to one count of transmitting threats to injure, § 875(a). *Id.* at 1. The government agreed that the defendant was subject to base offense level 12, with no enhancements, and that he was subject to a guideline range of 8 to 14 months or 10 to 16 months depending on his criminal history category. *Id.* at 4. The government took the position that "a term of imprisonment at the low end of the Sentencing Guidelines range," either 8 months or 10 months, was sufficient. *Id.* The defendant was ultimately sentenced to 14 months' imprisonment and 3 years of supervised release. Minute Entry dated October 21, 2021.

*United States v. Dawn Bancroft*, 21-cr-00271-EGS-1 (D.D.C.): The defendant in this matter participated in the U.S. Capitol Riot on January 6, 2021 and entered the building through

21

a window. *See* Complaint, ECF No. 1. Upon exiting, the defendant filmed a video where she "stated, 'We broke into the Capitol…we got inside, we did our part.' BANCROFT continued, 'We were looking for Nancy to shoot her in the friggin' brain but we didn't find her.' [The complaint] affiant believe[d] that the 'Nancy' BANCROFT is referencing is Speaker of the House, Nancy Pelosi." Despite having threatened to murder House Speaker Nancy Pelosi while standing on the steps of the Capitol, the defendant was never charged with threatening to murder a federal official. Instead, she was permitted to plead guilty to unlawfully Parading, Demonstrating, or Picking in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G), a misdemeanor that carries a maximum sentence of six months in prison. She is currently out on bond and scheduled for sentencing in February of 2022.

*United States v. James Dale Reed*, No. 20-CR-406 (D. Maryland): The defendant in this matter delivered letters to homes with democratic signs that included graphic death threats against U.S. President Joe Biden and Vice President Kamala Harris when they were candidates during the 2020 campaign. ECF No. 35, Government's Sentencing Memorandum, 2. The letters also threatened to murder any "Biden/Harris supporter[s]" and their children in their homes. *Id.* The defendant was known to the U.S. Secret Service for having emailed a nonprofit organization several times in 2014 with death threats against then-President Obama, Michelle Obama, former New York Governor Andrew Cuomo, and former New York City Mayor Michael Bloomberg. *Id.* at 5. Around the time he made the threats, the defendant traveled to Gettysburg, PA on the same day as then-candidate Biden. *Id.* at 3.

During a search of the defendant's home, the defendant's "M4, 9mm S&W pistol, Highpoint 9mm rifle, and 12-gauge shotgun were seized along with eight canisters of ammunition for these weapons." *Id.* at 4. The defendant was also in possession of grenades, military gear, "a highlighted list of attendees at a conference about 10 years ago (many of whom are/were U.S. government protectees), and a hand-drawn map of Frederick Police Department Special Response Team tactical responses." The government believed his possession of these items "show[ed] an ability to carry through on his threaten [*sic*] behavior." *Id.*

The defendant pled guilty to making a Threat to a Major Candidate for the Office of the President or Vice-President, 18 U.S.C. § 879. The government recommended "[a] sentence of eighteen months followed by a three-year term of supervised release." *Id.* at 5. The defendant was ultimately sentenced to 7 months in prison and three years of supervised release. ECF No. 37. The sentence was consecutive to four months the defendant served in state custody for the same conduct.

*United States v. Brogan*, No. 19-CR-00207-NGG (E.D.N.Y.): The defendant in this matter called the office of a sitting United States Senator and left a lengthy voicemail calling her a "stupid bitch" and repeatedly stating that he would "put a bullet in [her]" and "light her up with [] bullets" because of her views on reproductive rights. ECF No. 21, Government's Sentencing Memorandum, 1–2. "The voice message also ma[de] explicit reference to Defendant Brogan's potential travel to Washington, D.C., a fact that is made more alarming by a past social media post discussing a previous" trip to the nation's capital and, as discussed above, a potential future

trip to Washington, D.C. the next month." *Id.* at 4. The government's investigation confirmed that he had recently traveled to Washington D.C. twice. *Id.* at 2. The defendant's criminal history included at least five arrests and two convictions, including one where he traveled a woman's home after a traffic accident, tried to extort her, and then assaulted her husband. *Id.* at 4–5.

The defendant pled guilty to one count of threatening to murder a federal official, § 115(a)(1)(B) and the government recommended a sentence of 6 to 12 month's imprisonment. *Id.* at 3. The defendant was ultimately sentenced to three years of probation. ECF No. 27, Judgment.

*United States v. Kao Xiong*, 18-CR-00235 (E.D. Ca.): The defendant in this matter "mailed over 150 threat and/or hoax letters targeting the United States President (POTUS), a Federal Law Enforcement Officer (FLEO), family of POTUS and a FLEO, FBI Offices, State Agencies, private businesses and civilians since January 2017. The hoax/threat letters include death threats, bomb threats, assassination, extortion demands, and white powder." ECF No. 1, Complaint. Many of the letters reached their intended recipients, and caused serious disruptions to the White House, airports, companies, law enforcement. *Id.* "Each of the letters sent to a former POTUS required substantial law enforcement resources to properly assess, document, and preserve the evidence." *Id.* The defendant continued sending threatening communications after being interviewed by the U.S. Secret Service and being asked to stop.

The defendant pled guilty to Conveying False Information Concerning Use of an Explosive, 18 U.S.C. § 844(e). ECF No. 46, Plea Agreement. The government agreed he was subject to a total offense level of 12, *id.*, which resulted in a guideline range of 10 to 16 months. The government "recommend[ed] that the Court sentence defendant to a sentence at the low-end of the guideline range" and "that the Court impose a split sentence as permitted by U.S.S.G. § 5C1.1(d)(2), allowing the defendant to serve part of his sentence on home detention." ECF No. 50, Government Response to Presentence Report. The defendant was ultimately sentenced to time served (five months) and five months on home detention, followed by three years of supervised release.

*United States v. Partick Carlineo*, No. 19-CR-6140 (W.D.N.Y.): The defendant in this matter contacted the office of Congresswoman Ilhan Omar and "[d]uring the ensuing conversation with a staff member, the defendant asked if the staff member worked for the Muslim Brotherhood, called Congresswoman Omar 'a fucking terrorist,' and threatened to 'put a bullet in her fucking skull.'" ECF No. 44, Government Sentencing Memorandum, 1–2. When the FBI went to his home, the defendant—a convicted felon—admitted he "illegally possessed six firearms and hundreds of rounds of ammunition." *Id.* at 7. The defendant pled guilty to one count of threatening to murder a federal official, § 115(a)(1)(B). In its sentencing submission, the government noted that "it is troubling that the defendant—who, in addition to this case, has other criminal convictions involving threatening and/or harassing behavior []—possessed a cache of firearms and ammunition." *Id.* The government nevertheless recommended a sentence within the advisory guideline range of 12 to 18 months. *Id.* at 3. The defendant was ultimately sentenced to a year and a day and 3 years of supervised release. ECF No. 70.

23

**Conclusion**

The grandson of a New York City firefighter, all Brendan Hunt wanted to be was a hero who spoke truth to power, challenged the establishment, and threw a right hook at Nazi mentalities, as was drawn by his hero, Jack Kirby.   During a pandemic concurring with highly charged 2020 election, one of the most stressful stretches of our nation's history, he brought shame upon himself and his name.  "I think that the incendiary language that I was using ended up adding a lot more fuel to an already raging political inferno in this country. And going forward, I'd like to be the kind of guy who throws water fire and doesn't inflame anything. Tr. 824.

We urge the Court to give him a chance to make good on that promise.

Respectfully submitted,
/s/
Jan A. Rostal, Esq.
Leticia M. Olivera, Esq.

enc.
Cc:  Counsel of Record