UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,

      - against -

                                      **MEMORANDUM & ORDER**

BRENDAN HUNT,                           21-CR-86 (PKC)

                   Defendant.
-------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

On January 18, 2021, Defendant Brendan Hunt was charged by complaint with "threaten[ing], or incit[ing] others, to murder members of Congress who were engaged in the performance of their official duties and in retaliation for such officials' performance of their official duties." (Complaint and Affidavit in Support of Application for Arrest Warrant ("Compl."), Dkt. 1, ¶ 3.) The Complaint was based on four statements Defendant had made via social media websites between December 6, 2020, and January 12, 2021. Defendant was indicted on February 16, 2021 on one count of threatening to assault and murder members of the United States Congress in violation of 18 U.S.C. § 115(a)(1)(B). (Indictment, Dkt. 6.) On April 28, 2021, after a six-day trial, a jury convicted Defendant on the sole count of the Indictment, based on one of the four statements that had been alleged in the Complaint, and acquitted him with respect to the other three.[1] (Jury Verdict Form, Dkt. 93.)

Before the Court are Defendant's motions for acquittal under Federal Rules of Criminal Procedure 29(b) and (c). (Defendant's Motions for Acquittal ("Def. Mot."), Dkt. 97.) For the reasons below, the Court denies Defendant's motions.

---

[1] Though indicting Defendant on only one count of violating Section 115(a)(1)(B), at trial, the Government argued that each of the four statements alleged in the Complaint violated the statute.

## BACKGROUND

### I.    Underlying Facts

At trial, the jury heard testimony from eight witnesses, including Defendant, who chose to

testify in the defense case.[2]  The facts were established as follows:

From 2017 until January 19, 2021, Defendant was employed as an assistant court analyst

at the New York State Court System.  (Trial Transcript ("Tr.") 155:9–16.)  During that time, he

maintained a social media presence, with accounts and profiles on Facebook, Youtube, Bitchute,

Twitter, and Parler, a social media platform with few regulations.  (Tr. 125:4–131:8, 145:5–146:12,

248:13–19.)  Defendant also maintained a personal website under the URL BrendanHunt.com.

(Tr. 129:10–130:14.)  In a text message conversation with a friend on May 12, 2020, Defendant

described his expanding audience on Bitchute: "I'm almost caught up to where I was on YouTube

and even though I had over 500 [subscribers] there, I'm actually getting more views doing things

this way."  (Tr. 174:22–24; Government's Exhibit ("GX") 41B.)

---

[2] The Government called as witnesses: Jordan Holt, an employee at the FBI National Threat Operations Center (Tr. 36:10–52:22, 101:14–140:1); Jaqueline Smith, an FBI special agent (Tr. 149:20–186:1, 190:17–223:12, 243:3–305:12, 330:7–372:24); Christopher Desrosiers, a United States Capitol Police special agent (Tr. 373:21–385:10, 387:7–416:1); Nicole Kwasnaza, an FBI Computer Analysis Response Team forensic examiner (Tr. 416:17–459:16, 465:21–505:7); Oren Segal, Director and Vice President of the Center on Extremism at the Anti-Defamation League and the Government's expert witness on white supremacists and anti-Semitic propaganda, beliefs, and symbols (Tr. 528:15–551:17, 554:2–558:12, 598:21–631:6, 636:1–639:15, 654:3–663:24); John Hauger, an FBI special agent and the Government's expert witness on historical cell site analysis (Tr. 664:11–686:11); and Daniel Bonthius, the Deputy District Director of Operations in Congresswoman Alexandria Ocasio-Cortez's Jackson Heights District Office in Queens, New York (Tr. 704:6–728:25).  The defense called as its sole witness Defendant Brendan Hunt (Tr. 818:19–877:15, 892:11–910:11, 912:1–928:11, 937:3–958:19), who confirmed on the record that he was choosing to testify voluntarily and after ample consultation with his attorneys (Tr. 804:14–818:21).

The 2020 Presidential election took place on November 3, 2020.  (Tr. 387:9–16, 389:8–10.)  According to the Government's expert witness at trial,[3] members of both political parties "portrayed America's choice in the 2020 election in apocalyptic terms," and as "the potential end of time, unless their candidate won."  (Tr. 602:6–8, 602:14–18.)  After the states counted the ballots and reported the electoral votes to Congress, Congress was scheduled to certify the winner of the electoral college in a joint session on January 6, 2021, and the winner was to be inaugurated on January 20, 2021.  (Tr. 387:21–389:19.)

On December 6, 2020, Defendant posted on his Facebook account a link to a Daily News article entitled "Defiant Staten Island pub owner slams Jeep into sheriff deputy while trying to escape arrest over COVID rules."  (Tr. 195:20–196:9.)  The article reported that Daniel Presti, the owner of Mac's Pub in Staten Island, had been given several citations for violating COVID-19 restrictions by allowing customers to dine inside.  (Tr. 196:22–197:1.)  According to the article, police approached Presti after discovering that he was again allowing customers to dine inside the pub, after which Presti "hit the sheriff with his car and continued to drive with the law enforcement officer on the hood of his car for a while before other officers stopped the vehicle."  (Tr. 197:2–7.)  In his post linking to the article, Defendant wrote:

> Fuck the lockdown po-lice!  Yeah booiii run those pigs over!  Anyone enforcing this lockdown mask vaccine bullshit deserves nothing less than a bullet in their fucking head!  Including cops!  If you're going to shoot someone tho, go after a high value target like pelosi schumer or AOC.  They really need to be put down. These commies will see death before they see us surrender!  USA!!

---

[3] As noted, the Government presented Oren Segal, Director and Vice President of the Center on Extremism at the Anti-Defamation League, as its expert witness on white supremacists and anti-Semitic propaganda, beliefs, and symbols.  (Tr. 528:15–551:17, 554:2–558:12, 598:21–631:6, 636:1–639:15, 654:3–663:24).

(Tr. 197:11–19; GX 150G.)   "[P]elosi" refers to Speaker of the United States House of Representatives, Nancy Pelosi.  (Tr. 197:20–25, 902:24–903:1.)  "[S]chumer" refers to United States Senator Charles Schumer.  (Tr. 198:1–4, 903:5–7.)  "AOC" refers to United States Member of Congress Alexandria Ocasio-Cortez.  (Tr. 198:5–11, 903:2–4.)

A few minutes after posting the Daily News article on Facebook, Defendant commented on a post from December 6, 2020, writing:

> Trump, we want actual revenge on democrats.  Meaning, we want you to hold a public execution of pelosi aoc schumer etc.  And if you dont do it, the citizenry will.  We're not voting in another rigged election.  Start up the firing squads, mow down these commies, and lets take america back!

(Tr. 199:1–12; GX 150F.)

On January 6, 2021, the day the United States House of Representatives and Senate were meeting for a joint session of Congress to vote on the certification of Electoral College results of the 2020 presidential election, the Capitol was "stormed by a mob."  (Tr. 206:11–24; *see also* Tr. 387:21–389:4, 389:11–13.)  Violence broke out at the Capitol.  Several Capitol Police Officers were killed.  Further, a woman named Ashli Babbitt was shot by Capitol Police as she tried to enter an area of the Capitol where members of Congress were.  (Tr. 206:25–207:8.)  In the days following the January 6, 2021 riot at the Capitol, Defendant posted several videos on his Bitchute account, including videos entitled "What the Media Won't Tell You," "Horrific D.C. Cops Shoot Unarmed Patriot Girl Thru Neck In Capitol Building," "REVOLT! Four Dead in DC as Patriots Swarm Capitol," and "CNN: Trump Made Video Only Because He Was Threatened."  (Tr. 207:20–25, 208:4–6, 208:21–23.)

At 11:09 p.m. on January 7, 2021, Defendant uploaded on Bitchute—but did not publish— a video entitled "Kill Your Senator," with a thumbnail image of a handgun.  (Tr. 217:6–15, 221:3–7, 248:1–8, 287:19–21, 916:14–21; GX 20P.)  In the video, he stated:

Hey guys, so we need to go back to the U.S. Capitol when all of the Senators and a lot of the Representatives are back there and this time we have to show up with our guns and we need to slaughter these motherfuckers.

What I'm saying is that our government at this point is basically a handful of traitors, so what you need to do is take up arms, get to DC probably the inauguration—so called inauguration—of this uh motherfucking communist Joe Biden. That's probably the best time to do this. Get your guns show up to DC and literally just spray these motherfuckers. Like, you know, that's the only option. They're gonna come after us. They're gonna kill us. So we have to kill them first. So get your guns. Show up to DC; put some bullets in their fucking heads.

If anybody has a gun, give me it. I will go there myself and shoot them and kill them. We have to take out these Senators and then replace them with actual patriots. Basically I would trust anybody over them at this point uh this is a ZOG government um, you know, that that's basically all I have to say. Let's, uh, take up arms against them.

(Tr. 221:17–21; GX 21, 21T.)

Defendant added the hashtags "revolt, revolution, America," and changed the video category from "entertainment" to "news and politics." (Tr. 217:1–24.) Ten hours later, at 8:30 a.m. on January 8, 2020, Defendant deleted the video, having never published it, and at 8:39 a.m., published the same video under the title "Kill Your Senators," with a thumbnail image of a the "Don't tread on me flag," which many rioters had flown at the Capitol two days prior.[4] (Tr. 217:25–218:7, 219:9–11, 221:12–16, 287:22–288:12, 917:2–4, 918:19–23; GX 21P.) Defendant added the hashtags "MAGA, Second Amendment, ZOG," and the description "Go back to the Capitol on January 20th." (Tr. 218:22–219:8, 219:15–16, 917:5–918:11.) Defendant then changed the video description to "Kill Your Senators," and then to "Slaughter them all." (Tr. 218:9–14, 219:17–19, 220:6–8; 917:11–918:3.) This video was 88-seconds long. (Tr. 221:23–24; GX 21.)

---

[4] The "Don't Tread on Me" or "Gadsden" Flag depicts a coiled rattlesnake and the words, "Don't Tread on Me." (*See* GX 21P.)

Though Defendant published his other Bitchute videos on Youtube as well, he did not post this "Kill Your Senators" video on Youtube.  (Tr. 253:11–18.)

Later that day, someone with the username "Deeds not words" wrote on the platform, Parler:

> I am tired of this ambiguous bullshit.  Our feet are in the fire.  If there is a plan tell us it, if not get the hell out of our way.  The Republic will not survive lukewarm platitudes and half hearted action. #stopthesteal #millionmilitiamarch.

 (Tr. 250:13–25, 355:13–25; GX 151A, 151B.)  Defendant responded:

> exactly, enough with the "trust the plan" bullshit.  lets go, jan 20, bring your guns #millionmilitiamarch

(Tr. 251:1–6; GX 151A, 151B.)

Defendant's January 8, 2021 "Kill Your Senators" Bitchute video received more than 500 views in the first two days it was online.  (*See* GX 109N.)

On January 8, 2021, the FBI's National Threat Operations Center received an anonymous tip about Defendant's Bitchute video (Tr. 47:8–11), which it forwarded to its New York field office (Tr. 49:5–6).  The FBI's domestic terrorism squad in New York began its investigation into Defendant, which involved physically surveilling him and his home, obtaining cellphone data regarding his location, and reviewing his social media and video sharing accounts.  (Tr. 158:19–159:17.)  In the 11 days during which Defendant was being surveilled, FBI agents did not observe him travel to Washington, D.C., enter a gun store, go to a shooting range, or meet with any known extremists.[5]  (Tr. 293:21–294:7; *see also* Tr. 681:22–682:5.)  The United States Capitol Police were notified of this investigation when it began on January 8, 2021, but did not enter Defendant

---

[5] Special Agent Smith testified that, to her knowledge, Defendant was observed doing only "regular things."  (Tr. 294:8–11.)

into the Capitol Police database or notify any members of Congress about Defendant's statements or the FBI investigation.  (Tr. 408:20–409:8.)

On January 19, 2021, at around 6:30 a.m., approximately 17 FBI agents arrived at Defendant's home to conduct a search and arrest Defendant.  (Tr. 261:21–262:3, Tr. 297:24–298:11, 298:19–25. 338:2–8.)  During the search, agents did not find firearms, ammunition, bomb-making devices, or documents such as a map to the offices of the targeted members of Congress, but came across many books and comic books, action figures, empty beer bottles, coffee cups, a water pipe, and electronic devices including hard drives, flash drives, laptops, and cellphones.  (Tr. 263:5–24, 299:5–301:21, 303:11–17, 333:23–24, 335:20–25, 336:7–9.)  The agents also found a laptop that contained, among other things, scripts featuring the names of members of Congress, but no addresses.  (Tr. 302:12–19.)

Defendant was arrested and charged with one count of threatening to assault and murder members of the United States Congress in violation of 18 U.S.C. § 115(a)(1)(B) for the following four statements: (1) the December 6, 2020 Facebook post linking the Daily News article; (2) the December 6, 2020 Facebook comment; (3) the January 8, 2021 Bitchute video entitled "Kill Your Senators"; and (4) the January 8, 2021 Parler comment.  (*See* Compl., Dkt. 1; Indictment, Dkt. 6.)

## II.   Trial

At trial, the Government presented evidence including the videos Defendant posted to Bitchute in January 2021 (*see, e.g.*, GX 21; GX 22); comments from viewers of the Bitchute video (*see, e.g.*, Tr. 243, 244:9–12, 245:1–8, 347:3–7, 350:9–11; GX 110A); text messages between Defendant and his girlfriend in May 2020 (Tr. 172:9–178:5); text messages between Defendant and his father in November 2020 (Tr. 178:13; GX 40A, GX 40B); testimony from law enforcement witnesses (Tr. 36:10–52:22, 101:14–140:1; 149:20–186:1, 190:17–223:12, 243:3–305:12, 330:7–372:24; Tr. 373:21–385:10, 387:7–416:1); testimony from a forensic examiner (Tr. 416:17–

459:16, 465:21–505:7); testimony from an expert on white supremacist and anti-Semitic propaganda, beliefs, and symbols (Tr. 528:15–551:17, 554:2–558:12, 598:21–631:6, 636:1–639:15, 654:3–663:24); testimony from a staff member in the office of Congresswoman Alexandria Ocasio-Cortez (Tr. 704:6–728:25); and evidence of items in Defendant's possession (*see, e.g.*, Tr. 548:23–549:9). Below, the Court details the following evidence: (A) the comments to the Bitchute video, (B) the testimony of the Government's expert witness, (C) the testimony of Congresswoman Ocasio-Cortez's staff-member, and (D) Defendant's testimony.

A.     **Bitchute Comments**

The Government introduced evidence of comments made by other Bitchute users in response to Defendant's January 8, 2021 "Kill Your Senators" video. (Tr. 243; GX 110A.) The comments that the parties emphasized at trial included:

- "Fuck you you clownish Antifa wanker. Do you think people are stupid? This is exactly what the deep state wants to see so they can shut right leaning media down,"

to which Defendant responded:

> o   They already shut down right leaning media amber man. Just stay out of our way ya little [anti-gay slur] or we'll below your head off too.

(Tr. 244:9–12, 245:1–8, 347:3–7, 350:9–11.)

- "Good way to put a target on your back and get arrested soon. The smart way to do this is incognito, using guerilla warfare tactics, unconventional attacks. This is just low IQ rambling giving them a warning of when you might attack." (Tr. 245:14–18, 352:5–13.)

- "Yeah. People are pretty stupid. Shouldn't alert people to what you might do and what you are saying can also be deep state bullshit to stop people from rising up because there are plenty of alternative sites to communicate from if you do it in a smart way." (Tr. 245:24–246:3.)

to which Defendant responded:

> o   Of course you should alert people, fucking idiot. How else should you get the word out? Talk encrypted code in deep

> web chat rooms or some shit?  No, everyone should come to
> Washington, D.C. on January 20th wearing masks and camo,
> concealed carry,[6] body armor and just blast them all away
> while we still have a chance.

(Tr. 246:11–17, 369:6–9.)

- "Dude, delete this shit.  You're about to get fucking charged big time seriously.  Delete your fucking video.  You seem like a young kid.  And by the looks of how dirty you look, I would think you're Antifa, as Antifa.  I know you guys work for the police, but if you act like a Trump supporter or a patriot, they will arrest you or take you out, so stop being an idiot and delete this video.  You don't talk about killing fake elected officials whether they are Democrat or Republican.  Most politicians are pedos.  They are blackmailed.  That's the only way you get them to do what's right, either wave a child in front of them, some cash or use their lusts against them with blackmail but murder is not a good thing.  You make them martyrs now.  If we had declaration of war that is different story.  But seriously, take your video down.  I don't want to see you screw up your life over a lousy Bitchute video." (Tr. 247:5–20; 347:9–13, 350:12–15.)

- "You seem like a young kid." (Tr. 247:21–23.)

- "STFU.  Soyboy twat." (Tr. 289:22.)

- "You're too stupid to take part in anything that takes planning.  Make me a sandwich and be quiet." (Tr. 289:23–290:2.)

- "This guy is either Fed or Antifa." (Tr. 290:3–5, 347:14–17, 350:16–18.)

- "What a clown.  He doesn't even own a gun, and he is telling people to go shoot others.  Flag this fucker." (Tr. 290:6–9.)

- "You're on right-leaning media, you imbecile.  This type of rhetoric is exactly what the deep state wants to see.  Do not organize online.  There are smarter ways.  Get smart." (Tr. 350:19–24.)

The Government also introduced evidence that:

---

[6] "Concealed carry" refers to carrying a weapon, typically a handgun, in a way that is not visible to others.  (Tr. 246:18–247:1.)

- On January 13, 2021, Defendant made a comment on Bitchute stating that "trump is a zionist puppet.[7] grab yo guns."  (Tr. 260:24–261:3; GX 110C.)

- On January 18, 2021, Defendant made a comment on Bitchute, referencing then-Vice President of the United States, Mike Pence, stating that "itd be funny if pence got a nice fat bullet in the head lol." (Tr. 261:4–20; GX 110D.)

**B.      Government Expert Witness on White Supremacist and Anti-Semitic Propaganda, Beliefs, and Symbols**

The Government's expert witness on white supremacists and anti-Semitic propaganda, beliefs, and symbols, Oren Segal, testified that white supremacy is

> a term that is used to characterize a set of beliefs that include one or more of the following: That white people are culturally superior to nonwhites; that white people are genetically superior to nonwhites; that they should have power, that white people should have power and control over nonwhites or in some cases should be completely separate from nonwhites.

(Tr. 539:17–25.)

> Segal also testified that anti-Semitism is a

> hatred and hostility to the Jewish people because they're Jewish; and it can take multiple different forms, whether it's views that Jews are inferior because of their religion or political views where characteristics that need to be isolated are used to discriminate against the Jewish people.

(Tr. 541:18–542:5.)

Segal further testified that people who hold white supremacist and anti-Semitic beliefs often use propaganda (Tr. 543:10–23) and coded language (Tr. 543:24–545:1, 656:19–658:3).  He explained that an item in Defendant's possession, the manifesto of Dylann Roof, included the symbol "88," which "is relevant . . . for white supremacists and anti-Semites because it is a numerical code" that "stands for 'Heil Hitler.'"  (Tr. 548:23–549:9.)  He also explained that the

---

[7] Defendant testified that though he initially supported Trump and believed him to be the rightful winner of the 2020 presidential election, he later became disillusioned with Trump.  (Tr. 855:12–13; 872:21–873:4; 874:8–10; 948:13–19.)

term "ZOG," which Defendant used in his January 8 Bitchute video, "stands for Zionists Occupied Government," and that "[i]t's a common anti-Semitic and White Supremacist code word."  (Tr. 555:15–24.)

Relatedly, the Government's forensic examiner witness testified that, on August 20, 2020, Defendant downloaded to his cell phone a file entitled "Protocols of Learned Elders of Zion, part 01 of 01.PDF," which he deleted on September 7, 2020 (Tr. 441:8–16, 443:1–4, 444:4–8; GX 52), and that he had visited a website called "Daily Stormer" (Tr. 438:20–439:18, 470:3–22; GX 51), which Segal explained is "a website where you would find references to the [n]umerical [c]ode 88 and the acronym Z-O-G" (Tr. 557:14–16).

## C. Testimony by Employee in the Office of Congresswoman Alexandria Ocasio-Cortez

Daniel Bonthius, Deputy District Director of Operations in Congresswoman Alexandria Ocasio-Cortez's Jackson Heights District Office in Queens, New York (Tr. 704:6–14, 704:22–23), explained that he was "the law enforcement coordinator for the office," meaning he "liaise[s] with the various law enforcement agencies with regard to threats to [the] office" (Tr. 705:6–12).  He testified that on January 19, 2021, he received an email from the FBI that Defendant had been arrested in connection with threats he had made about the Congresswoman.  (Tr. 705:23–706:3.) In response, Bonthius logged the statements in the office's internal system, and shared information about Defendant's statements and arrest with other employees, including the Congresswoman's chief of staff and director of operations in Washington, D.C.  (Tr. 706:12–707:11.)  He signed Congresswoman Ocasio-Cortez up with the FBI's Victim Notification System to receive progress updates on the instant case.  (Tr. 718:11–719:3.)

Bonthius testified that he was concerned by all of Defendant's statements because, among other things, they "target[ed] the congresswoman and . . . g[ave] [him] concern about [his] own

personal well-being and [his] staff's well-being"; they referenced specific members of Congress as "high-value targets," indicating that there was "thought [put] in determining why they should be shot[,] not just random members of Congress"; were made in the aftermath of the January 6 riot at Capitol, making it "more real than it ever would have been previously"; they repeatedly referenced firearms; they referenced "the inauguration, which was the next time that all of these elected officials could be expected to be in one place"; and Defendant calmly made the statements in the Bitchute video without any attempt to hide his identity.  (Tr. 711:3–14, 713:5–16, 714:19–715:5, 715:17–716:13.)  Bonthius explained that his concern was not mitigated by the fact that the statements were made over social media, because:

> We get threats in lots of different forms.  Over the phone.  Via email.  Through our online platforms that constituents communicate with us.  Over social media.  Or in person at the office or events.  And we—they're all equally concerning.  The content is what's concerning not the method the [sic] communicating.

(Tr. 716:14–23.)  He also testified that Defendant's arrest did not diminish his concern, because the office has experienced, in the past, people "com[ing] back and threaten[ing] [them] again" even after being arrested.  (Tr. 716:24–717:10.)

On cross examination, Bonthius testified that he did not report Defendant to Capitol Police. (Tr. 725:24–726:1.)  Bonthius also admitted that Defendant had never contacted or visited Congresswoman Ocasio-Cortez's office.  (Tr. 726:18–727:8.)

### D.    Defendant's Testimony[8]

After the Government rested its case, defense counsel called Defendant Brendan Hunt as a witness.  (Tr. 818:19–877:15, 892:11–910:11, 912:1–928:11, 937:3–958:19.)  Defendant explained that he had been a part-time actor for many years, and had "been involved in protest

---

[8] As explained below, the Court considers Defendant's testimony only with respect to his Rule 29(c) motion and not with respect to his Rule 29(b) motion.

movements and activism for many years," including the Occupy Wall Street protest movement in 2011, and protesting the Republican National Convention in 2012.  (Tr. 825:3–25, 828:7–8.) Defendant testified that he initiated his social media presence by uploading videos he had taken during the Occupy Wall Street movement on Youtube in 2012, but later began making and uploading films about "mass casualty events" like the Boston Marathon bombing, the Sandy Hook shooting, and 9/11.  (Tr. 827:5–9, 827:23–828:5, 858:2–6.)  He explained that most of the videos on his Bitchute page were "acting videos from [his] days as an actor," including "a bunch of Shakespeare stuff."  (Tr. 857:11–24.)

Defendant further testified that, through the course of 2020, he had been "getting increasingly concerned . . . over things like first the lockdowns and all this COVID hysteria that was going on."  (Tr. 822:12–15.)  In the context of what he described as the "contested election where a lot of people either thought it was legitimate or thought it was fraught with election scams," Defendant "started posting what [he] thought was really important at the time, which was talking about what was going on in the world."  (Tr. 822:22–25, 855:25–856:4, 857:21–23.)  He became consumed in the news cycle, "listening to the news 24 hours a day almost[,] and getting wrapped up in it."  (Tr. 823:19–22.)  He testified:

> [a]nd so over that course of time, I was becoming increasingly isolated in my apartment.  I was frankly a little bit lonely, too.  I wasn't talking to anybody.  The jury saw the evidence that I wasn't moving around very much outside of my neighborhood other than to go to lower Manhattan to where I worked.[9]  And I was sort of masking a lot of that frustration with a lot of drinking and smoking. Everybody has my text messages with my weed guy, and I was contacting him quite a bit.  And I think that a lot of that stuff affected my judgment, as far as what I thought was funny, what I thought, you know, people would understand.

(Tr. 823:1–13.)

---

[9] At the time, Defendant worked as an assistant court analyst for the New York State Office of Court Administration.  (Tr. 155:9–16; 831:7–14.)

Defendant further explained:

> If I had to describe what was going through my mind at the time, I felt like I was in sort of a football stadium where the democrats and the republicans were really slugging it out and tackling each other, and it was getting rough.  And I felt like I was in the stands with everybody drinking beer saying, yeah, yeah, million[ ]militia[ ]march, you know.  And I didn't really take it seriously any more than a sports fan would say, yeah, I want the Yankees to murder the Red Sox or something.  And then all of a sudden I felt like the lights in the stadium went out and the spotlights all came on me.  And . . . a lot of the awful things that I said started getting broadcast on the big screen for everybody.

(Tr. 823:22–824:10.)

When asked about his beliefs on anti-Semitism, Defendant testified about his political opposition to Israel, which he sees as "an occupation of Arab land or Palestinian land," but that he "hate[s] Nazis" and has "encouraged people in [his] videos . . . not to be involved with Nazis." (Tr. 833:8–20, 834:8–14.)  Defendant further testified about his comic book collection, noting that "the comic book industry itself is basically built by European Jewish men."  (Tr. 835:2–18.)  He explained that it was "pure coincidence" that the Bitchute video he uploaded was one minute and 28 seconds, *i.e.*, 88 seconds, long, as he did not edit the video to be that length.  (Tr. 836:5–11.)

As to his purpose in posting the Bitchute video, Defendant explained that he "was letting off steam and it was more online blather than anything," and that he "us[ed] deliberately outlandish language precisely because [he] didn't want people to take [him] serious in that respect."  (Tr. 821:17–19, 843:13–23.)  He explained that he posted the video on Bitchute, not Youtube, because Bitchute was a self-described "freedom of speech platform," and he "felt those things weren't going to get taken down or censored in the way that YouTube might do that.  And especially a video like Kill your Senators, I knew that kind of stuff wouldn't fly on YouTube."  (Tr. 856:8–22.)  He further testified, however, that:

> that wasn't really a message I was trying to get out to people.  I had thousands of subscribers on YouTube, but I didn't want to broadcast that kind of thing to a lot of people.  So I went on BitChute, just threw that out there into the ether.  And I think

14

> I had about 100 subscribers at the time. So I knew that a lot of people weren't going to watch or listen to me, and I didn't think anybody would take me seriously.
>
> . . .
>
> [I]t was kind of just like playing along with this sort of rhetoric that was going around at the time, and there wasn't any kind of intent on my part to sort of galvanize a militia. I'm not a political leader or a military leader of any kind. I'm sort of just a YouTube guy who makes controversial content and clickbait videos.

(Tr. 856:23–857:5, 857:18–24.)

Defendant explained that he "had no expectation" that his posts and video would be seen by members of Congress or their staff, and that "if [he] really was intent [] on doing that, [he] could have easily sent these things out to people." (Tr. 858:14–20.) He further stated, "I wasn't trying to intimidate any Congress people with these messages. I wasn't posting these messages on their social media accounts. I wasn't interacting in that way at all." (Tr. 859:5–8.)

On cross-examination, Defendant was asked about whether he believed he could "persuade people" by "talk[ing] in a smancy way," to which he responded:

> Yeah, if you dress right and have a quick way of speaking, you can convince people of a lot of bullshit.

(Tr. 866:10–13.) Defendant acknowledged that he knew that "88" was a code for "Heil Hitler" (Tr. 866:18–24), and that he had previously made—but did not publish online—a video in which he stated "kill the juice" as a reference for "kill the Jews," but that it was a "joke . . . in very poor taste" (Tr. 867:8–868:5). He testified about other videos that he had made, including one in which he stated that "George Floyd was a porn star and a drug addict who died of his drug addictions" (Tr. 868:7–17), and one in which he referred to the victims of the Sandy Hook elementary school shooting as "alleged victims" (Tr. 869:1–14). Defendant testified that he thought the November 2020 presidential election was "stolen" and "rigged" (Tr. 870:21–871:4), that he was angry at

15

Democrats, and thought that, in some ways, the Democratic and Republican parties were "treasonists" (Tr. 871:5–14).

The Government also cross-examined Defendant about a text message he had sent his cousin on December 14, 2020, in which he stated:

> Unfriending someone and saying that you have nothing further to say to them is the exact same thing.  You are full of it.  I have nothing further to say to you and if you text me again, I'll stick a knife in your kid.

(Tr. 913:8–16.)[10]  When asked whether he considered that statement to be a threat, Defendant responded, "No, . . . I was pretty drunk at that time and I was mouthing off, in my opinion."  (Tr. 913:8–21.)

## III.    Procedural History

Defendant was arrested pursuant to a warrant on January 19, 2021 (*see* Dkt. 5) and arraigned on the indictment on March 1, 2021 (*see* 3/1/2021 Minute Entry).  Jury selection commenced on April 19, 2021 (*see* 4/19/2021 Minute Entry), and trial began on April 21, 2021 (*see* 4/21/2021 Minute Entry).  After the Government closed its case, Defendant moved for acquittal under Federal Rule of Criminal Procedure 29.  (Tr. 799.)  The Court reserved its ruling under Rule 29(b).  (Tr. 800.)

After six days of testimony and the presentation of other evidence, the jury returned a verdict on April 28, 2021, convicting Defendant of the one count in the indictment based on the January 8, 2021 Bitchute video entitled "Kill Your Senators."  The jury acquitted him with respect to the other three charged statements.  (4/28/2021 Minute Entry; Jury Verdict Form, Dkt. 93.)

---

[10] The Court permitted these questions, over defense counsel's objection, after Defendant testified that he did not consider statements he had made to family members to be threats.  (Tr. 911:19–24; 912:1–913:23.)

16

Briefing in connection with the Rule 29 motions was completed on June 21, 2021 (Dkts. 97, 104, 109, 111), and oral argument was held on July 21, 2021 (7/21/2021 Minute Entry).  In his Rule 29 briefing, Defendant also raised a Rule 29(c) motion seeking acquittal based on all of the evidence. (*See* Def. Mot., Dkt. 97, at 1.)

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  "In evaluating a sufficiency challenge, [courts] must view the evidence in the light most favorable to the government, credit[] every inference that could have been drawn in the government's favor, and defer[] to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (quotations and alteration omitted).  Courts "will uphold the judgment of conviction if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (quotation and brackets omitted).  That is, "[a] judgment of acquittal is warranted only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *Id.* (quotations omitted).  "[A] defendant challenging the sufficiency of the evidence bears a heavy burden."  *Id.*  (quotations omitted).

When a defendant moves for acquittal at the close of the prosecution's case and the court reserves ruling under Rule 29(b), the Court may consider only the evidence the prosecution presented.  *See United States v. Velasquez*, 271 F.3d 364, 371 (2d Cir. 2001) ("The 1994 Amendments to Rule 29 specifically provide that if a district court reserves decision on a motion for a judgment of acquittal, 'it must decide the motion on the basis of the evidence at the time the ruling was reserved.'" (quoting Fed. R. Crim. P. 29(b))).  If a defendant moves for acquittal after

17

the jury convicts, the court considers all evidence presented at trial, including the defense case. *See, e.g.*, *United States v. Bonventre*, No. 10-CR-228 (LTS), 2014 WL 3673550, at *3 (S.D.N.Y. July 24, 2014) ("[U]nder Rule 29(c), the court may consider the defense case and if a defendant testifies[,] . . . the jury is entitled to draw negative inferences from the defendant's trial testimony or use it 'to reach contrary conclusions.'" (quoting *United States v. Roldan–Zapata*, 916 F.2d 795, 803 (2d Cir.1990))), *aff'd in part*, 646 F. App'x 73 (2d Cir. 2016).

## DISCUSSION

In his motion, Defendant argues that the Government presented insufficient evidence that he (1) made a true threat (2) with the requisite intent under Section 115(a)(1).  Throughout his briefing, he also invokes general free speech principles.  The Court finds that Defendant has failed to meet his burden under either Rule 29(b) or (c) to justify overturning the jury's verdict.

## I.  Legal Standard – 18 U.S.C. § 115(a)(1)(B) and True Threats

### A.  18 U.S.C. § 115(a)(1)(B)

The jury convicted Defendant under 18 U.S.C. § 115(a)(1)(B), which provides that

> [w]hoever . . . threatens to assault, kidnap, or murder, a United States official, a United States judge, a Federal law enforcement officer, or an official whose killing would be a crime under such section, with intent to impede, intimidate, or interfere with such official, judge, or law enforcement officer while engaged in the performance of official duties, or with intent to retaliate against such official, judge, or law enforcement officer on account of the performance of official duties, shall be punished . . . .

18 U.S.C. § 115(a)(1).

### B.  True Threats

"Although [Section 115(a)(1)(B)] criminalizes certain speech, the Supreme Court has held that the First Amendment does not afford protection to speech that constitutes a 'true threat.'" *United States v. Santos*, 801 F. App'x 814, 816 (2d Cir. 2020) (summary order) (quoting *Watts v. United States*, 394 U.S. 705, 708 (1969)).  "This Circuit's test for whether conduct amounts to a

true threat 'is an objective one—namely, whether an ordinary, reasonable recipient who is familiar with the context of the communication would interpret it as a threat of injury.'"  *United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013) (brackets omitted) (quoting *United States v. Davila*, 461 F.3d 298, 305 (2d Cir. 2006)).

"In general, whether a given writing constitutes a threat is an issue of fact for the trial jury." *Id.* at 419 (quotations omitted); *see also United States v. Carrier*, 672 F.2d 300, 306 (2d Cir. 1982) ("Most cases [involving alleged threats] are within a broad expanse of varying fact patterns which may not be resolved as a matter of law, but should be left to a jury."); *United States v. Amor*, 24 F.3d 432, 436 (2d Cir. 1994) ("[W]hether [the] words used are a true threat is generally best left to the triers of fact." (quotations omitted)).  Courts "therefore affirm the conviction if 'the evidence at trial was sufficient to permit a reasonable jury to find that [the defendant's] conduct constituted a threat.'"  *Turner*, 720 F.3d at 419 (quoting *United States v. Davila*, 461 F.3d 298, 305 (2d Cir. 2006) (ellipses omitted)).

C.    ***Virginia v. Black*, 538 U.S. 343 (2003), and *Elonis v. United States*, 575 U.S. 723 (2015)**

Before considering the substance of Defendant's challenge to the sufficiency of the evidence, the Court notes that Defendant maintains "that [*Virginia v. Black*, 538 U.S. 343 (2003),] and [*Elonis v. United States*, 575 U.S. 723 (2015),] require the Government to charge and prove a [separate] subjective intent element" under the true threat test—*i.e.*, that Defendant intended his statement to be a threat.  (Def. Mot., Dkt. 97, at 14.)  The Second Circuit has not squarely addressed "whether the objective test for a true threat has been supplemented with a subjective test by [*Black* and *Elonis*]."  *United States v. Wright-Darrisaw*, 617 F. App'x 107, 108 n.2 (2d Cir. 2015) (summary order) (citing, among others, *Black*, 538 U.S. at 359; *Elonis*, 575 U.S. at 739); *see also Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 514 (S.D.N.Y. 2021)

(noting that "it remains unresolved whether 'true threats' must be *intended* as such" by the defendant).  Still, although *Turner* did not expressly foreclose the reading Defendant proposes, 720 F.3d at 420 n.4, the panel there reiterated that "[t]his Circuit's test for whether conduct amounts to a true threat 'is an objective one,'" *id.* at 420 (quoting *Davila*, 461 F.3d at 305).  This Court thus is bound to apply the objective test unless convinced that *Black* or *Elonis* requires something more.  At trial, the Court was not persuaded by Defendant's argument that a subjective element should be read into the true threat test or Section 115(a)(1)(B), so the Court gave an objective instruction like the one in *Turner*.  (*See* Tr. 801:8–11; 966:17–19; 1096:6–1097:22 (explaining that "there's no clear case law requiring" Defendant's proposed instruction).)  The Court pauses now to further explain its reasoning.

In *Black*, the Supreme Court upheld a portion of a statute that prohibited burning a cross with the intent to intimidate.  It began by affirming the principle that the First Amendment "permits [the government] to ban a 'true threat.'"  538 U.S. at 359.  It then explained that "[t]rue threats *encompass* those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence."  *Id.* (emphasis added).  But the Court did not say such intent is *necessary* to all true threats.  *See id.*  It thus elaborated that "[i]ntimidation in the constitutionally proscribable sense of the word is *a type* of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death."  *Id.* at 360 (emphasis added).  Most courts to consider the issue therefore have concluded that *Black* did not impose a subjective-intent requirement in all threat statutes.  *See, e.g.*, *United States v. Jeffries*, 692 F.3d 473, 479–80 (6th Cir. 2012) ("[*Black*] sa[id] nothing about imposing a subjective standard on other threat-prohibiting statutes, and indeed had no occasion to do so: the Virginia law itself required subjective 'intent.'"), *abrogated on other grounds by Elonis*, 575 U.S.

723; *United States v. White*, 670 F.3d 498, 508–09 (4th Cir. 2012) (interpreting *Black*'s "use of the word 'means' in 'means to communicate' to suggest '*intends* to communicate,' so that the speaker must *intend* to communicate [the statement], the general intent standard," as opposed to specifically intending to make a threat), *abrogated on other grounds by Elonis*, 575 U.S. 723.  *But see United States v. Cassel*, 408 F.3d 622, 632–33 (9th Cir. 2005) ("[E]ight Justices [in *Black*] agreed that intent to intimidate is necessary and that the government must prove it in order to secure a conviction.").

Defendant also misreads *Elonis*.  The defendant in *Elonis* was charged with violating 18 U.S.C. § 875(c), which proscribes "transmit[ting] in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another."  That provision, however, has no express scienter requirement.  575 U.S. at 732 (quoting Section 875(c)).  The Supreme Court in *Elonis* rejected the defendant's argument "that the word 'threat' itself in Section 875(c) imposes . . . a requirement" that "the defendant must intend that his communication contain a threat."  *Id.*  The Court observed that the term "threat"—as conventionally defined—does not contemplate "the mental state of the author," and that "[a] victim who receives [an objectively intimidating] letter in the mail has received a threat, even if the author believes (wrongly) that his message will be taken as a joke."  *Id.* at 733.

In overturning the defendant's conviction, *Elonis* merely reiterated the principle that courts presume a scienter requirement in "federal criminal statutes that *are silent* on the required mental state."  *Id.* at 736 (emphasis added) ("When interpreting federal criminal statutes that are silent on the required mental state, we read into the statute 'only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct.'" (quoting *Carter v. United States*, 530 U.S. 255, 269 (2000)).  In other words, the Court acknowledged that the term "threat" does not

inherently encompass the intent to threaten, but Section 875(c) is presumed to include an implicit scienter requirement because Congress did not specify a *mens rea*.  The *Elonis* Court therefore invalidated the defendant's conviction as a matter of statutory interpretation, and not based on a finding that the term "threat" as proscribed under federal law requires a showing of subjective intent to threaten or intimidate.  *See also Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 517, 524 (1994) (holding that 21 U.S.C. § 857(a), which prohibits selling drug paraphernalia but "does not contain an express scienter requirement," implicitly requires "that the defendant knew that the items at issue are likely to be used with illegal drugs"); *Staples v. United States*, 511 U.S. 600, 604–05, 620 (1994) (holding that 26 U.S.C. § 5861(d), which prohibits "receiv[ing] or possess[ing]" an unregistered machinegun, but "is silent concerning the *mens rea* required for a violation," requires that a defendant know the qualities that make his or her firearm a machinegun).

Similarly, "when Congress includes a general scienter provision in the statute itself . . . without distinguishing among the material elements thereof," courts presume that scienter requirement applies to each element of the offense that separates innocent from wrongful conduct.  *See Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019) (citation and quotations omitted).  For example, when a statute specifies that a defendant must act "knowingly," and then "simply lists the elements that make a defendant's behavior criminal," courts interpret the "knowingly" requirement to apply to "each of the statutory elements that criminalize otherwise innocent conduct."  *Id.* at 2195–96 (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994)); *see also Morissette v. United States*, 342 U.S. 246, 270–71 (1952) (holding that, under 18 U.S.C. § 641, "knowing conversion requires more than knowledge that [the] defendant was taking the property into his possession.  He must have had knowledge of the facts, though not necessarily the law, that made the taking a conversion"); *Liparota v. United States*, 471 U.S. 419,

425 (1985) (holding that 7 U.S.C. § 2024(b)(1), which prohibits "knowingly" using or possessing food stamps in an unauthorized manner, "requires a showing that the defendant knew his conduct to be unauthorized by statute or regulations"); *X-Citement Video*, 513 U.S. at 78 (holding that 18 U.S.C. § 2252, which prohibits "knowingly" distributing a visual depiction involving the sexually explicit "use of a minor . . . extends both to the sexually explicit nature of the material and to the age of the performers"); *Rehaif*, 139 S. Ct. at 2195 (holding that 18 U.S.C. § 924(a)(2), which prohibits "knowingly violat[ing]" a separate provision criminalizing possession of firearms by people who are unlawfully in the United States, requires that a defendant know not only that he or she possesses a firearm, but also that he or she is unlawfully in the United States).

Courts thus "read criminal statutes that are *silent or ambiguous* as to the required standard of mens rea to demand knowledge of enough facts to distinguish conduct that is likely culpable from conduct that is entirely innocent." *United States v. Wasylyshyn*, 979 F.3d 165, 174 (2d Cir. 2020) (emphasis added) (quotations and brackets omitted). By contrast, courts do not read additional scienter requirements into statutes that unambiguously specify the requisite *mens rea*— *i.e.*, when Congress expressly delineates what combination of acts and mental states a given statute is intended to prohibit. *See, e.g.*, *United States v. Fitzgerald*, No. 15-CR-55-01 (GWC), 2015 WL 9582144, at *3 (D. Vt. Dec. 30, 2015) ("Because of the specificity of § 115(a)(1)(B), there is no need to add implied elements of mental intent to the offense. The statute provides these explicitly.").

In Section 115(a)(1)(B), unlike Section 875(c), Congress specified the scienter requirement that applies to the provision at issue. To violate the statute, a person must "threaten[] to assault, kidnap, or murder, a United States official, . . . *with intent* to impede, intimidate, or interfere with such official . . . while engaged in the performance of official duties, or *with intent* to retaliate

23

against such official . . . on account of the performance of official duties."   18 U.S.C. § 115(a)(1)(B) (emphasis added).  Rather than the "silence" as to scienter in 18 U.S.C. § 875(c) (*Elonis*), 26 U.S.C. § 5861(d) (*Staples*), and 21 U.S.C. § 857(a) (*Posters 'N' Things*), Section 115(a)(1) specifies that a defendant must carry out the proscribed acts with the intent to impede, intimidate, interfere, or retaliate.  And there is no ambiguity as to what acts those terms modify, as existed with respect to the term "knowingly" in 18 U.S.C. § 924(a)(2) (*Rehaif*), 18 U.S.C. § 2252 (*X-Citement Video*), 7 U.S.C. § 2024(b)(1) (*Liparota*), and 18 U.S.C. § 641 (*Morissette*).  Congress expressed its desire to criminalize a specific combination of conduct and intent.

Further, although "[n]either the Supreme Court nor [the Second Circuit] has decided whether *Elonis* extends beyond 18 U.S.C. § 875(c)," *United States v. Kirsch*, 903 F.3d 213, 233 (2d Cir. 2018), other courts have declined to extend *Elonis* to Section 115(a)(1)(B), *see e.g.*, *United States v. Ivers*, 967 F.3d 709, 720–21 (8th Cir. 2020); *United States v. Nicholas*, No. 19-CR-5 (JPJ), 2019 WL 3774622, at *2 (W.D. Va. Aug. 12, 2019) ("18 U.S.C. § 115(a)(1)(B) . . . already contains an express specific intent requirement, and thus *Elonis* does not apply."); *Fitzgerald*, 2015 WL 9582144, at *3 ("Because of the specificity of § 115(a)(1)(B), there is no need to add implied elements of mental intent to the offense.  The statute provides these explicitly.").  The Eighth Circuit in *Ivers*, for example, noted that *Elonis* "did not announce a universal definition of 'threat' that always requires the same mens rea," and that "the only mens rea requirement in 18 U.S.C. § 115(a)(1)(B) is the intent to retaliate against the [federal official] on account of the performance of official duties." 967 F.3d at 720 (citations and quotations omitted).  "Accordingly, the government was not required to prove that [the defendant] subjectively intended his statement to be a threat—rather, the government needed to prove that [he] made a true threat with the intent to

retaliate against [the federal official] on account of the performance of her official duties." *Id.* at 721.

Thus, for now in the context of Section 115(a)(1)(B), "[t]his Circuit's test for whether conduct amounts to a true threat" remains "an objective one," allowing Congress to "'protect [public officials] from the fear of violence' and 'from the disruption that fear engenders.'" *Turner*, 720 F.3d at 420 (quoting *Black*, 538 U.S. at 360). That is, a person who intends to intimidate, impede, interfere with, or retaliate against a public official is prohibited from carrying out that goal by making a statement that a reasonable recipient, familiar with the context, would view as a threat to murder, assault, or kidnap that official. While Defendant's challenge here reflects a perhaps justified criticism of Section 115(a)(1)'s scope as a policy matter, that question is not before the Court, nor is it necessarily one for the courts to decide. The only issue before this Court is whether there is an additional scienter requirement implicit in the threat element of Section 115(a)(1), as there is in Section 875(c). Because Congress specified the necessary culpable mental state in Section 115(a)(1), the statute belies the inference that Congress intended an additional subjective requirement.

Adopting this reasoning in instructing the jury, the Court, as noted, declined to read *Black* and *Elonis* as Defendant proposed and rejected Defendant's requested jury instruction. The Court declines to revisit that decision now.[11]

---

[11] In any event, as in *Turner*, the Court cannot see how the jury here could have inferred from the evidence that Defendant (1) issued a statement that "an ordinary, reasonable recipient . . . familiar with the context of the communication would interpret" as a threat to murder, assault, or kidnap public officials and (2) did so with the intent to intimidate, impede, interfere with, or retaliate against those officials, but (3) did not realize that "an ordinary, reasonable recipient . . . familiar with the context of the communication would interpret it as a threat of injury." *See Turner*, 720 F.3d at 420 & n.4 (quotations and brackets omitted); *see also Elonis*, 575 U.S. at 740 (noting that the "the mental state requirement [for the threat element presumed] in

## II.     The Evidence Was Sufficient for the Jury to Find Defendant Guilty of Violating Section 115(a)(1)(B)

The Court concludes that the evidence presented at trial, summarized above, was sufficient for a rational jury to find Defendant guilty beyond a reasonable doubt of violating Section 115(a)(1)(B).  First, the evidence was sufficient to show a true threat.  Second, the evidence was sufficient to show that Defendant intended to impede, intimidate, or interfere with a United States official while engaged in the performance of official duties, or intended to retaliate against such official on account of the performance of official duties.  *See* 18 U.S.C. § 115(a)(1).

### A.     The Evidence Was Sufficient to Show a True Threat

Relying heavily on *Turner*, Defendant argues that no rational jury could have found that he made a true threat in his January 8, 2021, "Kill Your Senators" Bitchute video.  The Court disagrees.

#### 1.     *Turner* Does Not Undermine the Jury's Verdict in this Case

In *Turner*, the Second Circuit upheld a Section 115(a)(1)(B) conviction on appeal of the district court's denial of a Rule 29 motion.  At trial, the jury heard evidence that the defendant hosted a radio show popular with white-supremacist groups.  720 F.3d at 427.  After the Seventh Circuit decided *National Rifle Association of America v. Chicago*, 567 F.3d 856 (7th Cir. 2009), the defendant issued a blog post saying, among other things, "These Judges deserve to be killed." *Turner*, 720 F.3d at 415.[12]  The post referenced the recent killing in the Chicago area of a federal district judge's husband and mother, said "another lesson is needed," and stated that "[i]f they are

Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, *or with knowledge that the communication will be viewed as a threat*." (emphasis added)).

[12] Although the events underlying Turner's case occurred in the Northern District of Illinois, the case was tried in this district on Turner's motion, and thus appealed to the Second Circuit.  *Turner*, 720 F.3d at 418.

allowed to get away with this by surviving, other Judges will act the same way." *Id.* The next day, the defendant posted an "update" providing the Seventh Circuit judges' work addresses, chambers' room numbers, photographs of the courthouse, a map with red arrows for "Anti-truck bomb barriers," and the judges' names, photos, and home addresses. *Id.* at 415–16. After making the post, the defendant wrote on his website: "While I can't legally undertake killing, I may—just MAY—be able to say enough of the right things, to enough of the right people, to make it happen." *Id.* at 416–17. He referenced his previous statement that the district judge whose husband and mother had been killed was "worthy of death." *Id.* at 417.

At trial, the government introduced two emails Turner had sent before his alleged threat, in which he said: (1) "[M]aybe I ought to abuse *my* power and give out [the judge's] home address.[] Having done such things in the past, I know this is an effective way to cause otherwise immune public servants to seriously rethink how they use the power lent to them by We The People"; and (2) "Of late, I have been naming the key players in the financial meltdown as people 'worthy of being dealt with.' Sooner or later, perhaps some distraught person who lost everything to the shyster bankers, may decide to go after them. If that happens ...... I won't shed a tear." *Id.* (alterations in original).

The Second Circuit found that this was sufficient evidence of a true threat and under Section 115(a)(1)(B). It explained that, "[g]iven that Turner's statements publicly implied a causal connection between [his] calls for judges' deaths and actual murders, his statements about [the judges], were quite reasonably interpreted by the jury as the serious expression of intent that these judges, too, come to harm." *Id.* at 422. The court also noted that Turner "post[ed] . . . the judges' photographs and work addresses" after "admi[tting] in an email a few weeks earlier that releasing

addresses was an 'effective way to cause otherwise immune public servants to seriously rethink how they use [their] power.'" *Id.* (fourth alteration in original).

In rejecting Turner's counterarguments, the Second Circuit first explained that the jury could have found the statements to be threats despite Turner's use of passive voice (rather than saying "I will kill them"), given that threats may be "both conditional and inexplicit." *Id.* at 422–24.  Second, the panel reasoned that Turner's "intent to interfere with these judges—to intimidate them through threat of violence—could not have been more clearly stated in his pointed reference to their colleague, whose family members had been killed." *Id.* at 423.  Third, the court concluded that the jury reasonably could have found the statements to be threats despite being "publicly issued—particularly given Turner's own boasting that public dissemination of address information is 'an effective way' to instill fear, 'to cause otherwise immune public servants to seriously rethink how they use the power lent to them by We The People.'" *Id.*  Fourth, the court deferred to the jury's conclusion that the statements were threats despite being facially addressed to third parties, and it noted that Turner's argument to the contrary "relie[d] overmuch on the literal denotation and syntax of [his] statements, refusing to acknowledge that threats—which may be prohibited, consistent with the First Amendment—need be neither explicit nor conveyed with the grammatical precision of an Oxford don." *Id.* at 425.

As Defendant here points out, the relevant statements in *Turner* were more specific than Defendant's statements in his Bitchute video, insofar as the *Turner* defendant provided maps of the courthouse and anti-truck-bomb barriers.  Further, Turner apparently had a wider following than Defendant, and Turner sent emails revealing that he anticipated that his statements would "instill fear" and cause people to attack the public officials in question.  Finally, Defendant notes

that the statements in *Turner* were "targeted against specific individuals," whereas his Bitchute video did not specify individual public officials.  (Def. Mot., Dkt. 97, at 6.)

But to convict, the jury here did not need to find the same facts presented in *Turner*.  That some of the *Turner* evidence may have been stronger than the evidence presented in this case does not mean that the evidence in this case was insufficient.  Further, much of the evidence the Government introduced here was more incriminating than what was presented in *Turner*.  While Turner's threat suggested that the judges "deserved to die" and should not be "allowed" to survive, it did not imply that Turner himself intended to commit any act of violence.  By contrast, Defendant repeatedly emphasized his intent to personally engage in violence, variously stating that "*we* need to go back to the U.S. Capitol," "*we* have to show up with our guns," "*we* need to slaughter these motherfuckers," "*I* will go there myself and shoot them and kill them," and "[*w*]*e* have to take out these Senators."  (Tr. 221:17–21 (emphases added); GX 21, 21T (emphases added).)  The jury rationally could have concluded that "an ordinary, reasonable recipient" familiar with the context of this statement would have viewed it as a threat of injury, perhaps even more than the statements at issue in *Turner*.

The Government also presented substantial evidence at trial that resembled what the *Turner* court found significant.  For example, Defendant's statements in the January 8 Bitchute video referenced past violence directed at the officials in question (the January 6, 2021 attack at the Capitol), provided details about the time and place of another attack ("probably the inauguration— so called inauguration—of this uh motherfucking communist Joe Biden.  That's probably the best time to do this"), and specified the intended victims ("all of the Senators and a lot of the Representatives").  Defendant's statement also contained substantial indicia of seriousness, including calls to "slaughter these motherfuckers," to "literally just spray these motherfuckers," to

"put some bullets in their fucking heads," and to "shoot them and kill them."  (Tr. 221:17–21; GX 21, 21T.)

Defendant points out that he said the inauguration was "probably" the "best time to do this."  (Defendant's Reply, ("Def. Reply"), Dkt. 109, at 18.)  He argues that by using the word "probably," his "threat [should have been] taken less, not more, seriously."  (*Id.*)  But even if a reasonable recipient could have viewed the use of the word "probably" as diminishing the seriousness of Defendant's statement, that consideration is precisely the kind reserved for the jury. Regardless of whether the jury found that Defendant's use of the words "probably" or "best time" mitigated the seriousness of the threat, the Court must "defer[] to the jury's . . . assessment of the weight of the evidence."  *Martoma*, 894 F.3d at 72 (quotations omitted).  Defendant's use of "probably" was merely a factor the jury was entitled to weigh and did not render the evidence insufficient to find a true threat.

Defendant also attempts to distinguish *Turner* based on his (Defendant's) testimony at trial that, for example, he "didn't think anybody would take [his statement] seriously."  (Def. Reply, Dkt. 109, at 12 (quoting Tr. 858).)[13]  But, here again, the Court must "defer[] to the jury's assessment of witness credibility," *Martoma*, 894 F.3d at 72 (quotations omitted), and Defendant put his credibility in issue by testifying, *see, e.g.*, *United States v. Tran*, 519 F.3d 98, 106 (2d Cir. 2008) (noting that "[w]hen [the defendant] testified at trial . . . , he placed his own credibility in issue," and that "[a] reasonable jury could have found [his] explanation incredible, as th[e] jury obviously did"); *United States v. Heras*, 609 F.3d 101, 103 (2d Cir. 2010) (noting that the district court was required to "assume that the jury did not credit [the defendant's] self-serving protestation

---

[13] As noted, Defendant's trial testimony is relevant to his Rule 29(c) motion but not to the Court's Rule 29(b) inquiry.

that he had 'nothing to do' with [a] drug deal"). Here, the Court emphasizes the importance of a witness's appearance, tone, inflection, and body language—none of which can be conveyed through the written transcript—to the jury's assessment of credibility.[14]

Finally, Defendant argues that "the events at the Capitol are hardly like the reference in *Turner* to the killing of [another judge]," because "[Defendant] was never at the Capitol" and "had [no] control over those who were." (Def. Reply, Dkt. 109, at 17.) He also argues that he portrayed the events at the Capitol on January 6, 2021 as "distinctively *non-threatening*." (*Id.*)

Again, however, the Government did not need to prove that this case is identical or even similar to *Turner*. And even to the extent *Turner* is a valuable reference point, there is no evidence that Turner ever went to the home of the judge who was killed or the Seventh Circuit courthouse, and thus he, in fact, is no different from Defendant, who was "never at the Capitol." Further, as the Court instructed the jury, the Government was not required to show that Defendant took any steps to carry out the alleged threats, though the jury was also instructed that they could consider the absence of such evidence in determining whether Defendant's statements constituted a "true threat." (Jury Instructions, Dkt. 92, at 18 ("The Government does not need to prove that Defendant attempted to carry out the alleged threat or threats, or even that he intended to carry them out or had the ability to do so . . . . But evidence, or lack of evidence, that Defendant made plans, efforts, or had the means and know-how to follow through on the alleged threats may inform your view of the circumstances in which he made the statements and the effect he intended the statements themselves to have.").)

---

[14] Although the Court cannot say what parts of Defendant's testimony gave the jury pause, the transcript reveals ample reason for doubt, including Defendant's answer of "Yeah" to the question, "Mr. Hunt, are you on a stage right now?" (Tr. 959.)

And although Defendant's allegedly minimal control over those at the Capitol may be probative of the seriousness of his statement, there is evidence that Defendant had, and knew he had, a substantial audience on Bitchute.  (*See, e.g.*, Tr. 174:22–24 (Defendant's statement regarding his Bitchute followers: "I'm almost caught up to where I was on YouTube and even though I had over 500 [subscribers] there, I'm actually getting more views doing things this way"); GX 109N (showing that the Bitchute video received more than 500 views in the first two days it was online).)  As noted, the Court must "defer[] to the jury's . . . assessment of the weight of the evidence."  *Martoma*, 894 F.3d at 72 (quotations omitted).

Further, regardless of how Defendant sought to portray the events of January 6, he said in his Bitchute video that "we need to go back to the U.S. Capitol when all of the Senators and a lot of the Representatives are back there and *this time* we have to show up with our guns and we need to slaughter these motherfuckers."  (Tr. 221:17–21; GX 21, 21T (emphasis added).)[15]  The jury rationally could have interpreted this language as an attempt to convey the very prospect of deadly violence that Defendant claims was absent at the Capitol on January 6, 2021.[16]

_____

[15] The Court also is not convinced that *Defendant*'s portrayal of the events at the Capitol on January 6 as non-threatening is relevant to the issue of true threats.  Even if Defendant's portrayal of those events could suggest that he did not intend to invoke violence when he said, "we need to go back to the U.S. Capitol" (GX 21, 21T), that intent would, as discussed, be irrelevant to the objective true threat question.  Rather, it was for the jury to decide whether, and to what extent, to consider Defendant's self-described perception of the January 6 Capitol events in determining whether a reasonable person would have perceived his January 8 statements about "going back" to the Capitol as a threat, as well as in determining his credibility, given the other evidence about the January 6 events that was presented at trial.

[16] Defendant also references *United States v. Malik*, 16 F.3d 45 (2d. Cir. 1994), *United States v. Sovie*, 122 F.3d 122 (2d. Cir. 1997), and *United States v. Davila*, 461 F.3d 298 (2d. Cir. 2006), three Second Circuit cases that addressed the true threat issue before *Turner*.  (*See* Def. Mot., Dkt. 97, at 9.)  In *Malik*, the court upheld Section 115(a)(1)(B) convictions with respect to two threatening letters the defendant sent to judges.  16 F.3d at 52.  In *Davila*, the court found the evidence "more than sufficient" to uphold a Section 875(c) conviction where the defendant sent an envelope containing white powder to the Connecticut State Attorney's Office.  461 F.3d at 305.

2.      Additional Cases and Arguments

In addition to his reliance on *Turner*, Defendant argues that *United States v. White*, 670 F.3d 498 (4th Cir. 2012), *United States v. Bagdasarian*, 652 F.3d 1113 (9th Cir. 2011), and *Watts v. United States*, 394 U.S. 705 (1969), "are the most factually on point cases here." (Def. Mot., Dkt. 97, at 9.) Because the courts in those cases found that the statements at issue were not threats, he contends that his statement was not a threat either. Defendant also relies on *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184 (2d Cir. 2001), *United States v. Weiss*, 475 F. Supp. 3d 1015 (N.D. Cal. 2020), and *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir. 1976). The Court considers each.

In *White*, the defendant was convicted under 18 U.S.C. § 875 for making threats against a civil rights attorney. The statements in question were two posts the defendant made on a white-supremacist blog. The first was an article by a third party describing the firebombing of a civil rights activist's house by a neo-Nazi group. Underneath the link, the defendant wrote, "Good. Now someone do it to [the civil rights attorney]." 670 F.3d at 505. The second statement was the defendant's post on his own website, entitled "Kill [the civil rights attorney], man behind human rights tribunal's abuses should be executed." *Id.* The post began:

> [The civil rights attorney], the sometimes Jewish, sometimes not, attorney behind the abuses of Canada's Human Rights Tribunal should be drug [sic] out into the street and shot, after appropriate trial by a revolutionary tribunal of Canada's white activists. It won't be hard to do, he can be found easily at his home, at [address].

*Id.* at 506. As context for the alleged threats, the government introduced other violent statements the defendant had made about the civil rights attorney. *Id.* It also introduced evidence that the

---

In *Sovie*, the court upheld a conviction where the defendant called an ex-girlfriend 22 times and threatened to kill her. 122 F.3d at 125. These cases do not help Defendant here, because although they reflect situations where evidence was sufficient to find a true threat, they neither say nor establish what evidence is necessary.

civil rights attorney considered the statements to be "death threats" and took extensive measures to protect himself and his family.  *Id.*

The jury convicted the defendant under Section 875(c),[17] but the district court vacated the conviction under Rule 29.  The Fourth Circuit affirmed.  It explained that although the defendant's "communications clearly called for someone to kill [the attorney], . . . neither communication actually provided a threat from [the defendant] that expressed an intent to kill [the attorney]."  *Id.* at 513.  The court reasoned that, "[w]hile a direct threat of that type would not always be necessary, for [the defendant] to have called on others to kill [the attorney] when the others were not even part of [the defendant's] organization, amounted more to political hyperbole of the type addressed in [*Watts v. United States*, 394 U.S. 705 (1969)] than to a true threat."  *Id.*  The court also noted that "the two communications forming the basis for [the count] were posted to neo-Nazi websites and not sent directly to [the attorney]."  *Id.*

The crucial difference between *White* and this case is that, as discussed, Defendant here made statements that the jury could have found—even though, as per *White*, not required to prove a threat, *id.*—showed Defendant's intent to *personally* harm members of Congress, *e.g.*, "*we* need to go back to the U.S. Capitol," "*we* have to show up with our guns," "*we* need to slaughter these motherfuckers," "*I* will go there myself and shoot them and kill them," and "[w]e have to take out these Senators."  (Tr. 221:17–21 (emphases added); GX 21, 21T (emphases added).)  By contrast, in *White*, the court found that "neither communication actually provided a threat from [the defendant] that expressed an intent to kill [the attorney]."  670 F.3d at 513.  Thus, the critical defect in *White* is absent here.

---

[17] As noted, Section 875(c) prohibits "transmit[ting] in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another."  18 U.S.C. § 875(c).

Defendant's reliance on *Bagdasarian* is inapposite for similar reasons.  There, the Ninth Circuit vacated a Section 879(a)(3)[18] conviction based on the defendant's anonymous post to a "'Yahoo! Finance—American International Group' message board," saying: "Re: Obama fk the [racial slur], he will have a 50 cal in the head soon," and his anonymous post, 20 minutes later, on the same message board: "shoot the [racial slur] country fkd for another 4 years+, what [racial slur] has done ANYTHING right? ? ? ? long term? ? ? ? never in history, except [racial slur]."  652 F.3d at 1115.

The Ninth Circuit found this to be insufficient evidence of a threat under Section 879(a)(3) because (1) the first statement "convey[ed] no explicit or implicit threat on the part of [the defendant] that he himself will kill or injure Obama"; (2) "the second statement . . . [was] an imperative intended to encourage others to take violent action, if not simply an expression of rage or frustration"; (3) "the financial message board to which [the defendant] posted [the statements] [was] a non-violent discussion forum that would tend to blunt any perception that statements made there were serious expressions of intended violence"; and (4) it was "significant that among the numerous persons who read [the defendant's] messages, the record reveal[ed] only one who was sufficiently disturbed to actually notify the authorities."  *Id.* at 1119–21.

Although there are similarities between *Bagdasarian* and this case, there are crucial differences.  As noted, Defendant here referred to the violent actors as "we," and said, "I will go there myself and shoot them and kill them."  (Tr. 221:17–21; GX 21, 21T.)  Notably, the jury acquitted Defendant on the three statements that did not include such expressions of personal

---

[18] Section 879(a)(3) prohibits "knowingly and willfully threaten[ing] to kill, kidnap, or inflict bodily harm upon . . . a major candidate for the office of President or Vice President, or a member of the immediate family of such candidate."  18 U.S.C. § 879(a)(3).

intent.  In that respect, the jury's verdict comports with *Bagdasarian* and reflects its consideration of the very issue the jury in *Bagdasarian* overlooked.[19]

Defendant's reliance on *Watts* is even less compelling.  There, the Supreme Court reversed the denial of a motion for acquittal after a jury convicted the defendant for allegedly threatening the President.  The jury had heard evidence that, during a public rally against police brutality at the Washington Monument, the defendant said: "I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming.  I am not going.  If they ever make me carry a rifle the first man I want to get in my sights is L.B.J."  394 U.S. at 706.  The defendant and the people listening laughed.  *Id.* at 707.

The Supreme Court deemed this statement "political hyperbole" because it "was made during a political debate, . . . was expressly made conditional upon an event-induction into the Armed Forces-which petitioner vowed would never occur, and . . . both petitioner and the crowd laughed after the statement was made."  *Id.* at 708.  The statement thus was one of protected "political opposition," albeit "vituperative, abusive, and inexact," given the "context, and regarding the expressly conditional nature of the statement and the reaction of the listeners."  *Id.*

Here, by contrast, Defendant's statement was premeditated, solemn, longer, titled "Kill Your Senators," advocated "slaughter," specified "go[ing] back to the U.S. Capitol" after an attack on the Capitol, was not part of a political rally against violence, and contained repeated references to violence.  (Tr. 221:17–21; GX 21, 21T.)  Defendant's statement thus differed materially from the defendant's statement in *Watts*, which was entirely conditional and elicited laughter from the speaker and audience.

---

[19] Although arguably less of a constraint in the context of courts' fact-specific determinations, this Court is bound by *Turner*, not by *White* or *Bagdasarian*.

Defendant compares the commentary on his Bitchute video to the crowd's reaction in *Watts*, arguing that "[t]he comments also video [sic] the clear over-the-top and non-serious nature" of Defendant's statement.  (Def. Mot., Dkt. 97, at 10.)  But the comments Defendant identifies far from resemble the laughter that followed the defendant's statement in *Watts*.  For example, two commenters wrote:

- "Good way to put a target on your back and get arrested soon.  The smart way to do this is incognito, using guerilla warfare tactics, unconventional attacks.  This is just low IQ rambling giving them a warning of when you might attack."  (Tr. 245:14–18.)

- "Yeah.  People are pretty stupid.  Shouldn't alert people to what you might do and what you are saying can also be deep state bullshit to stop people from rising up because there are plenty of alternative sites to communicate from if you do it in a smart way."  (Tr. 245:24–246:3.)

Defendant responded:

> o  Of course you should alert people, fucking idiot.  How else should you get the word out?  Talk encrypted code in deep web chat rooms or some shit?  No, everyone should come to Washington, D.C. on January 20th wearing masks and camo, concealed carry, body armor and just blast them all away while we still have a chance.

(Tr. 246:11–17, 369:6–9.)  Although some jurors could read these comments as mocking, others could see them as reflecting a serious threat.  And even if some of the comments make jokes at Defendant's expense, they do not seem to suggest that the viewers of the video interpreted *it* as a joke.  Indeed, the jury could have agreed with the Government's argument in summation that no one who saw Defendant's January 8 Bitchute video thought he was making a joke.  (*See* Tr. 1069:3–4.)  Regardless, the responses to Defendant's January 8 video do not have the same unequivocal mitigating effect of the universal laughter that followed the defendant's statement in *Watts*.

In *Operation Rescue*, the Second Circuit found that statements made by the defendant, an anti-abortion protester, did not constitute true threats.  There, the defendant told a doctor:

(1) "[K]illing babies is no different than killing doctors"; (2) "You won't be laughing when the bomb goes off"; and (3) "You're next, I hope you're next, you're next."  273 F.3d at 196 & n.5. With respect to the statement that "killing babies is no different than killing doctors," the court explained that the defendant's "expression went to the core of her protest message, and the statement (even in context) did not suggest that [the defendant] was engaged in a plan to harm the clinic doctor."  *Id.* at 196–97.  Further, "[t]his statement did not indicate the unequivocal immediacy and express intention of a true threat," as it "was not a direct or even veiled threat, but expression of a political opinion."  *Id.* at 197 (citation and quotations omitted).  With respect to the "bomb" comment, the court noted that the "clinic worker who testified . . . waited two weeks before reporting the comment to the police," and "[w]ere it not for the fact that the recipient of this alleged threat reacted without apparent alarm," the court would have been "more likely to conclude that this statement constituted a true threat."  *Id.* at 196 n.5.  Defendant contends that this case is comparable to *Operation Rescue*, in that his January 8 video statement "is worded too conditionally and wishfully to be treated as a true threat."  (Def. Mot., Dkt. 97, at 7.)  He further argues that "the lack of response by the U.S. Capitol Police" is "[a]lso telling."  (*Id.* at 12.)  The Court disagrees.

Here, a rational jury could have concluded that Defendant's statement "suggest[ed] that [he] was engaged in a plan to harm" public officials.  *See Operation Rescue*, 273 at 196–97. Further, a rational jury could have concluded that statements such as, "I will go there myself and shoot them and kill them" (Tr. 221:17–21; GX 21, 21T), were not the "core of [a] protest message" or an expression of "political opinion," *see Operation Rescue*, 273 F.3d at 196–97.  And unlike the two-week delay in reporting the statement in *Operation Rescue* to law enforcement officials, the FBI was alerted to Defendant's Bitchute video the same day Defendant posted it and

immediately began investigating.  (*See* Tr. 158–59, 290.)  Finally, the issue of law enforcement's delayed notification of the victims was extensively explored at trial.  For example, FBI Threat Intake Examiner Jordan Holt and FBI Special Agent Jacqueline Smith testified that the FBI began investigating and surveilling Defendant after they were alerted to his statement, and that this mitigated any danger Defendant posed to Congressmembers before his arrest.  (Tr. 158:19–159:17; 292:19–293:6; 364:2–20.)  Therefore, in contrast to *Operation Rescue*, the jury here had evidence from which it could have concluded that the statement was taken seriously despite the delay in notifying the victims.  Finally, the question in *Operation Rescue* was whether the district court clearly erred in preliminarily enjoining the protestor, not whether the evidence at trial supported a rational conviction.

In *Weiss*, the Northern District of California dismissed an indictment under 47 U.S.C. § 223(a)(1)(C) that charged the defendant with using a telecommunications device to harass then-Senate Majority Leader Mitch McConnell.  The statement in question was an email from the defendant's alias to Senator McConnell saying: "You are going to lose next election and we will get rid of your satanic evil ass you loser fuckhead."  475 F. Supp. 3d at 1021.  The defendant sent various other emails to Senator McConnell suggesting that he would be killed by the "DC Resistance" and the "Kentucky Resistance."  *Id.* at 1020–22.  Although "[t]he government did not assert the 'true threat' category at all in its briefing," the district court considered the issue at the end of its analysis.  *Id.* at 1033.  The court rejected the true-threat argument because although the first statement "use[d] the pronoun 'we' to describe the primary actors[,] . . . the complete sentence was: 'You are going to lose next election and we will get rid of your satanic evil ass you loser fuckhead,'" which the court described as "a political message familiar, in substance if not in form, to most political incumbents."  *Id.* at 1037.  And relying on *Bagdasarian*, the court also found that

the defendant's other statements were not true threats because, "read in context, [they] predicted that *other* people would hurt Senator McConnell, not that [the defendant] would." *Id.* at 1036.

Here, as noted, Defendant said, "I will go there myself and shoot them and kill them." (Tr. 221:17–21; GX 21, 21T.) There was no evidence that Defendant meant this metaphorically or in reference to an upcoming election. And the jury acquitted Defendant on the three statements that did not include such an expression of personal intent. This case thus materially differs from *Weiss*.

Finally, Defendant invokes the Second Circuit's language in *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir. 1976), a pre-*Turner* decision, emphasizing that the jury was required to consider whether his statement, "on its face and in the circumstances in which it [was] made [was] so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." Defendant argues that the evidence at trial "miss[ed] the mark on every *Kelner* factor." (Def. Reply, Dkt. 109, at 10.)

The Court disagrees with this argument. First, the "interpretation of *Kelner*[] that *only* communications that facially threaten unequivocal, unconditional, immediate, and specific injury may be prohibited consistent with the First Amendment[] is contrary to the Supreme Court's" precedent. *Turner*, 720 F.3d at 424 (emphasis added). As *Turner* noted, a threat can be inexplicit and conditional. *See id.* at 424. Second, the Court here instructed the jury on the importance of the *Kelner* factors. (*See* Jury Instructions, Dkt. 92, at 17 (explaining that the true threat "question is *informed* by whether the statement is, on its face and under the circumstances, so unequivocal, unconditional, immediate, and specific as to the person threatened as to convey seriousness and imminence" (emphasis added)). "[T]o convict under the charge given," therefore, "the jury had

40

to, and [the Court] *must assume did*, find that the statements" satisfied the threat standard despite these limitations.  *Kelner*, 534 F.2d at 1025 (emphasis added).[20]

Defendant next argues that the jury could not reasonably have found his statement to be a true threat because the FBI Intake Examiner who designated the statement a "threat to life" did not remember the statement until she met with prosecutors more than a month later.  (Def. Reply, Dkt. 109, at 19; *see also* Tr. 133–38.)  But the Court instructed the jury that "it is ultimately for you— and not any witness, law enforcement or otherwise—to determine whether an ordinary, reasonable recipient who is familiar with the context of the statement would interpret it as a threat of bodily injury."  (Jury Instructions, Dkt. 92, at 17–18.)  Further, the fact that the Intake Examiner forgot about Defendant's January 8 Bitchute video for a period of time certainly does not mean that no rational juror could have credited her testimony about having initially perceived it as threatening, or that no rational juror could have found the video threatening.  Given the limited purpose for which the Court instructed the jury it could consider the reaction of law enforcement officers to Defendant's statements, Defendant points to no evidence suggesting that the FBI Intake Examiner's failure to remember Defendant's statements made the jury's finding unreasonable.

Defendant also contends that no rational jury could have found his January 8 video to be a threat because "[o]nly 1 out of 500 viewers of the video on Bitchute called law enforcement" (Def. Reply, Dkt. 109, at 20), and the jury did not hear testimony from the person who reported the statement to the FBI (Def. Mot., Dkt. 97, at 19).  But although "the reaction of the victim and other

---

[20] At oral argument on Defendant's Rule 29 motion, Defendant also directed the court to *United States v. McCrudden*, No. 11-cr-61 (DRH), 2015 WL 1198544 (E.D.N.Y. Mar. 16, 2015), *aff'd*, 655 F. App'x 23 (2d Cir. 2016).  There, the defendant sent letters that allegedly violated conditions of his supervised release, and the judge found, as the trier of fact, that the statements were not true threats.  But the Court here is not the trier of fact.  The trier of fact in this case—the jury—already has found that Defendant made a true threat, and the question is whether that decision was rational.  *McCrudden* sheds little light on that question.

41

listeners may be probative" of whether a statement is a threat, *see United States v. Hunt*, No. 21-CR-86 (PKC), 2021 WL 1428579, at *9 (E.D.N.Y. Apr. 15, 2021) (quotations omitted), the jury was capable of weighing the fact that only one viewer reported the statement, even without the testimony of that person.  And despite Defendant's emphasis on the number of viewers who did not contact the FBI, one viewer *did* contact the FBI the same day Defendant posted the Kill Your Senators video to Bitchute.  (*See* Tr. 158–59.)  That most Bitchute patrons did not take the step of calling the FBI to report Defendant's video does not mean the jury was irrational for determining that the video contained a threat or for discounting the fact that 499 viewers did not call the FBI. And, of course, the jury had far more evidence on which to rely than the reactions of Bitchute patrons.

In a similar vein, Defendant relies on the comments to the Bitchute video, which he argues show "that [he] was all about the principle of revolution, not . . . the planning of a slaughter."  (Def. Reply, Dkt. 109, at 18.)  First, even if *some* of the comments are susceptible to Defendant's characterization, others are not.  For example, one commentor wrote: "Good way to put a target on your back and get arrested soon.  The smart way to do this is incognito, using guerilla warfare tactics, unconventional attacks.  This is just low IQ rambling giving them a warning of when you might attack."  (Tr. 245:14–18, 352:5–13.)  Second, a rational jury could have interpreted Defendants' *responses* to some of the comments as belying the impression that Defendant "was all about the principle of revolution," and instead showing that Defendant, in fact, was "all about" "the planning of a slaughter."  (Def. Reply, Dkt. 109, at 18.)  Defendant responded to one commentor: "They already shut down right leaning media amber man.  Just stay out of our way ya little [anti-gay slur] or we'll below [sic] your head off too."  (Tr. 244:9–12, 245:1–8, 347:3–7, 350:9–11.)  As noted, Defendant also responded to another commentor, "everyone should come

to Washington, D.C. on January 20th wearing masks and camo, concealed carry, body armor and just blast them all away while we still have a chance." (Tr. 246:11–17, 369:6–9.)

Finally, Defendant notes that "context is important," and that, "following the election of 2020," there "was a sense of doom or Armageddon that permeated the country." (Def. Reply, Dkt. 109, at 17.) Defendant appears to argue that this minimizes the seriousness of his Bitchute video. But even accepting Defendant's characterization of the national sentiment after the 2020 election, the Court fails to see how the "sense of doom or Armageddon" *mitigated* the threatening nature of the "Kill Your Senators" video. If anything, the jury could have found that this "sense of doom" heightened the threatening nature of the video, especially since Defendant timed its publication to occur two days after the violent insurrection at the Capitol on January 6, 2021. Regardless, the jury was entitled to consider this factor and any mitigating (or exacerbating) weight it might have had, and the Court must "defer[] to the jury's . . . assessment of the weight of the evidence." *Martoma*, 894 F.3d at 72 (quotations omitted).[21]

---

[21] Defendant also cites *United States v. Rundo*, 990 F.3d 709, 719 (9th Cir. 2021), where the Ninth Circuit severed as unconstitutionally overbroad statutory provisions prohibiting "speech tending to 'organize,' 'promote,' or 'encourage' a riot," and expanding "the prohibition to 'urging' a riot and to mere advocacy." *Rundo* relied on the principle that the First Amendment protects "advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *See id.* at 713 (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam)). But as Defendant here admits, the Court in this case instructed the jury, consistent with *Rundo*, that "the First Amendment protects mere advocacy of the use of force or violence." (Jury Instructions, Dkt. 92, at 17.) The Court therefore can conclude only that the jury's reason for convicting Defendant was not that it deemed his statement "advocacy of the use of force or of law violation," *see Brandenburg*, 395 U.S. at 447, but because it found that his statement fell into a category of unprotected speech: true threats. That is, the jury found that "an ordinary, reasonable person who heard or read the statement, and who is familiar with the context of the statement, would understand it as a serious expression of an intent to inflict bodily injury." (Jury Instructions, Dkt. 92, at 17). Defendant's reliance on *Rundo* to challenge the jury's verdict therefore is unavailing.

## B.    The Evidence Was Sufficient to Show Intent Under Section 115(a)(1)

Next, Defendant challenges the evidence supporting his intent "to impede, intimidate, . . . interfere with . . . or . . . retaliate against [public officials] on account of the performance of official duties."  18 U.S.C. § 115(a)(1).  After reviewing the record, the Court does not agree that this evidence "is nonexistent or so meager that no reasonable jury could find [the requisite intent] beyond a reasonable doubt."  *Martoma*, 894 F.3d at 72 (citation and quotations omitted).

Defendant first contends that the evidence was insufficient to prove the requisite intent because there is no "indication that [he] wanted his social posts [sic] to be viewed by Members of Congress."  (Def. Mot., Dkt. 97, at 14.)  While Defendant is correct that there was no direct evidence that he intended his posts to reach members of Congress, the Court ultimately agrees with the Government that the evidence was nonetheless sufficient for the jury to find the requisite intent to impede, intimidate, interfere, or retaliate beyond a reasonable doubt.  First, the Court specifically instructed the jurors that, in determining whether Defendant had the requisite intent, they could "consider . . . whether there is evidence Defendant intended or did not intend any of his statements to reach the officials in question."  (*See* Jury Instructions, Dkt. 92, at 21.)[22]  Second,

---

[22] The complete instruction on intent that the Court gave was as follows:

Direct proof of a defendant's intent is almost never available.  It would be a rare case where it could be shown that a person wrote or stated that as of a given time he or she committed an act with a particular intent.  Such direct proof is not required.  The ultimate fact of intent, though subjective, may be established by circumstantial evidence, based upon the defendant's outward manifestation, his or her words, conduct, acts, and all of the surrounding circumstances disclosed by the evidence, and the rational or logical inferences that may be drawn from them.

You may consider, for example, whether there is evidence Defendant intended or did not intend any of his statements to reach the officials in question.  The Government, however, does not need to prove that the alleged threats actually reached those officials.

44

the Government introduced evidence that Defendant intended to communicate his message to as many people as possible. For example, the Government introduced Defendant's statement regarding his expanding Bitchute audience: "I'm almost caught up to where I was on YouTube and even though I had over 500 [subscribers] there, I'm actually getting more views doing things this way." (Tr. 174:22–24.) The jury also learned that the Bitchute video received more than 500 views in the first two days it was online. (*See* GX 109N.) And Defendant commented that he intended to "get the word out." (Tr. 246:11–17, 369:6–9.)[23] Even though this evidence was indirect, "[t]he law has long recognized that criminal intent may be proved by circumstantial evidence alone." *Heras*, 609 F.3d at 106; (*see* Jury Instructions, Dkt. 92, at 21 ("Direct proof of a defendant's intent is almost never available. It would be a rare case where it could be shown that a person wrote or stated that as of a given time he or she committed an act with a particular intent. Such direct proof is not required.").

Although the evidence that Defendant intended to communicate his January 8 Bitchute statements to members of Congress is limited, the Court "must view the evidence in the light most favorable to the government, credit[] every inference that could have been drawn in the government's favor, and defer[] to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Pauling*, 924 F.3d at 656 (quotations omitted). And as the *Turner* court noted, a statement can meet the requirements of Section 115(a)(1) despite being, "on its face, purported[ly] . . . directed at third parties," and despite the defendant's posting it to the internet without sending it to the alleged targets. 720 F.3d at 424. Applying these standards to the

---

(Jury Instructions, Dkt. 92, at 21.)

[23] In their opening statement, defense counsel emphasized Defendant's "really prolific online presence." (Tr. 31:7–9.)

evidentiary record here, the Court cannot conclude that the jury's finding of intent was irrational simply because Defendant did not send his message directly to the intended victims.[24]

Defendant next points to changes he made to his January 8 video before posting it on Bitchute, as undermining the requisite finding of intent. He notes, for example, that he posted a picture of the "Don't Tread on Me" Flag instead of a gun, changed the description from "take up arms and shoot them all" to "Slaughter them all," and changed the title from "Go Back to the Capitol" to "Kill Your Senators." (Def. Mot., Dkt. 97, at 15.) According to Defendant, "[t]hese changes make sense only if his post is understood as political hyperbole and a figurative call to arms rather than actual threat." (*Id.*)

A rational jury could disagree. To begin with, these changes do not seem to diminish the threatening nature of the post. How "Kill Your Senators" is *less* indicative of harmful intent than

---

[24] Although the Court concludes that there was sufficient circumstantial evidence of intent to reach members of Congress here, and although Defendant does not raise the issue, there remains some question of whether intent to reach the target public officials is necessary or merely relevant under Section 115(a)(1). For example, in *United States v. Fenton*, 30 F. Supp. 2d 520, 530 (W.D. Pa. 1998), the Western District of Pennsylvania granted a judgment of acquittal based on insufficient evidence under Section 115(a)(1)(B), where the defendant made statements about a Congressperson while in a private argument with an insurance adjuster. The court explained that "intent to retaliate within the meaning of § 115(a)(1)(B) can exist only when the speaker intends that his threat be communicated to its object." *Id.* at 530; *accord United States v. Rendelman*, 495 F. App'x 727, 732 (7th Cir. 2012) (unpublished) (observing in dicta that, "to be guilty [of intending to retaliate] under 18 U.S.C. § 115 (a)(1)(B), [the defendant] must have intended to communicate a threat to an official, but the communication can be through a third person and the threat need not actually reach the victim"). By contrast, in *Ivers*, the Eighth Circuit held that intent to communicate a threat to the alleged victim is relevant, but not necessary, to discerning "true threats" in the Section 115(a)(1)(B) context. 967 F.3d at 718–20. There, a jury convicted the defendant for threatening to murder a federal judge based in part on evidence that he privately told his attorneys he had planned to kill the judge. The Eighth Circuit sustained the conviction, explaining that the defendant's "belie[f] [that] his communications to [the attorneys] would remain confidential is not dispositive." *Id.* at 720. Given the uncertainty surrounding this issue, the Court, as noted, instructed the jury that, in determining whether Defendant had the requisite intent to violate Section 115(a)(1)(B): "You *may* consider, for example, whether there is evidence Defendant intended or did not intend any of his statements to reach the officials in question." (Jury Instructions, Dkt. 92, at 21 (emphasis added).)

"Go Back to the Capitol" is unclear, especially given that the first line in the video remained, "We need to go back to the U.S. Capitol." Nor is it clear how changing, "take up arms and shoot them all," to "Slaughter them all" is anything more than an edit for concision and perhaps dramatic effect. Finally, a flag that featured prominently at the January 6 attack on the Capitol, wielded by some of the violent protesters, seems as indicative of intent to retaliate against government officials as an image of a gun. Regardless, as noted, the Court "must view the evidence in the light most favorable to the government, credit[] every inference that could have been drawn in the government's favor, and defer[] to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Pauling*, 924 F.3d at 656 (quotations omitted). Defendant fails to explain how the changes he made to the Bitchute video foreclose a rational finding of intent to retaliate, intimidate, interfere, or impede.

Defendant also returns to his exchange with an anonymous commentor on his video, which he argues suggests he did not have the requisite intent under Section 115(a)(1). As noted, one commentor posted below the Bitchute video: "Yeah. People are pretty stupid. Shouldn't alert people to what you might do and what you are saying can also be deep state bullshit to stop people from rising up because there are plenty of alternative sites to communicate from if you do it in a smart way." (Tr. 245:24–246:3.) Again, Defendant responded:

> Of course you should alert people, fucking idiot. How else should you get the word out? Talk encrypted code in deep web chat rooms or some shit? No, everyone should come to Washington, D.C. on January 20th wearing masks and camo, concealed carry, body armor and just blast them all away while we still have a chance.

(Tr. 246:11–17, 369:6–9.) Defendant argues that "[f]rom this exchange alone it can be inferred that he want[ed] people to engage with his ideas, not to actually make them happen." (Def. Mot., Dkt. 97, at 16.)

This argument is patently flawed since Defendant's response seems to make clear that he is not interested, or at least less interested, in promoting an exchange of ideas than he is in promoting violence.  And even if one possible inference from this exchange is that Defendant meant his statement innocuously, the Court must "credit[] every inference that could have been drawn in the government's favor."  *Pauling*, 924 F.3d at 656 (quotations omitted).  A rational jury could have interpreted Defendant's reply to this comment as suggesting exactly what Defendant said—*i.e.*, that "everyone should come to Washington, D.C. on January 20th wearing masks and camo, concealed carry, body armor and just blast them all away while we still have a chance."  (Tr. 246:11–17, 369:6–9.)

Defendant next argues that the jury improperly inferred his intent by relying on his "alleged affinity for Hitler, antisemitism, and the conspiracy theory of '88.'"  (Def. Reply, Dkt. 109, at 27.)  He contends that his possession of such materials cannot give rise to more than speculation about his intent to retaliate against the officials for performance of their duties.[25]

This argument reiterates the contention that the Court already rejected in deciding the parties' motions *in limine*.  As the Court explained then:

> Because the Government must prove that Defendant made his statements with the "intent to impede, intimidate, or interfere with the officials while engaged in the performance of official duties," or "to retaliate against such officials on account of the performance of official duties," the bases for his word-choices are relevant.  18 U.S.C. § 115(a)(1)(B).  Further, Defendant's alleged white-supremacist and anti-Semitic views help contextualize the purportedly white-supremacist and anti-Semitic rhetoric in his alleged threats.  *See United States v. Viefhaus*, 168 F.3d 392, 398 (10th Cir. 1999) (affirming admission of "racist and inflammatory literature and materials found in defendant's house" to contextualize his alleged bomb threat, which included racist remarks).
> . . .

---

[25] Defendant makes a similar argument about his "view on government sponsored Zionism," his "view on illegal immigration," and his possession of the manifesto of Dylann Roof.  The Court rejects these arguments for the reasons discussed below.

> Defendant argues his alleged white-supremacist and anti-Semitic views are irrelevant because "the Government does not allege that his statements were motivated by bigotry" or "directed to bigoted individuals." (Def.'s MIL, Dkt. 46, at 10.) But, as the Government contends, the testimony may "provide necessary context that establishes the meaning that Defendant ascribed to the statements" (Gov.'s MIL, Dkt. 47, at 20), and may be potentially relevant to the seriousness and genuineness of Defendant's intent. The Government is permitted to argue at trial that Defendant's views provide such context and suggest he intended to impede, intimidate, interfere with, or retaliate against the officials referenced in the alleged threats. *See* 18 U.S.C. § 115(a)(1)(B).

*Hunt*, 2021 WL 1428579, at *7 (brackets omitted).

Further, to minimize the risk of undue prejudice, the Court allowed the Government to introduce such evidence "only to the extent necessary to explain the meaning of the references in Defendant's alleged threats and Defendant's knowledge of those meanings." *Id.* at *8. The Court thus prevented the Government from asking its expert at trial to testify about whether the evidence "was consistent with someone who had anti-Semitic themes," and instead limited the Government to asking "about what Mr. Hunt could have meant or thought or why he [used certain] symbols" in his statements. (Tr. 519:18–520:8.) And, after trial, the Court instructed the jury:

> You have just heard testimony and actually observed some exhibits related to what might be considered Defendant's political views. You must treat this evidence with caution. This evidence alone cannot be used to find Defendant guilty of the offense charged in the Indictment. It may, however, be considered by you for limited purposes, such as considering the context in which statements attributed to Defendant were made, what Defendant's intent was in making the statement, and his expectation regarding the effects of his statement. You cannot find Defendant guilty because you disagree with or find distasteful his political views.

(Jury Instructions, Dkt. 92, at 10.) To the extent Defendant argues the jury should not have been permitted to consider this evidence even for the limited purpose the Court allowed, therefore, the Court has already rejected his position. Insofar as Defendant believes the jury did not weigh the evidence properly given the Court's instructions, the Court reiterates that it "must view the evidence in the light most favorable to the government, credit[] every inference that could have

been drawn in the government's favor, and defer[] to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Pauling*, 924 F.3d at 656 (quotations omitted).[26]

        Defendant also challenges the Government's introduction of the white-supremacist symbol "88." (Def. Reply, Dkt. 109, at 32.) Because Defendant's Bitchute video was 88 seconds long, the Government sought to show that it reflected a white-supremacist code. *See Hunt*, 2021 WL 1428579, at *7 (noting that "the number 88 [allegedly] signifies 'Heil Hitler'"). Defendant relies on *United States v. Pauling*, where the Second Circuit found the evidence insufficient to convict the defendant of possessing an additional 14 grams of heroin, because "no jury could [have] reasonably conclude[d] that any specific quantity of heroin was attributable to [the defendant]." 924 F.3d at 661. Defendant here points out that *Pauling* "also involved a magic number: 14," and the court there overturned the conviction.

---

    [26] Defendant also argues that his visiting white supremacist websites and his possession of materials with anti-Semitic themes should not have informed the jury's decision because those activities were lawful. (Def. Reply, Dkt. 109, at 27.) But Defendant was not convicted for those activities. To the extent the jury considered them at all, they were merely evidence that Defendant knew the meanings of the symbols he used in his Bitchute video and intended to "impede, intimidate, . . . interfere with . . . or . . . retaliate against" public officials, 18 U.S.C. § 115(a)(1), in what he described as a "Zionist Occupied Government." (*See* Tr. 221:17–21; GX 21, 21T; *see also* Tr. 555:15–24 ("Zionist . . . often . . . replaces the word 'Jew' when somebody who is anti-Semite or White Supremacist wants to talk about them.").) Contrary to Defendant's apparent position, "[t]he First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). Many actions that bear on whether a defendant has the requisite intent to commit a crime are themselves lawful. But Defendant here also made the statement that the jury found to be a threat. His words and behavior surrounding the statement, to the extent they illuminate its meaning and his intent in making it, are relevant, regardless of whether those surrounding words and behaviors were lawful.

    At oral argument, Defendant also directed the Court to *Dawson v. Delaware*, 503 U.S. 159, 166, 169 (1992), where the Supreme Court vacated a sentence because the prosecution introduced evidence at sentencing of the defendant's membership in a racist organization that "had no relevance to the sentencing proceeding." As noted, however, the evidence at issue here was relevant to Defendant's intent and the context of his statement.

But the only similarity between the "88" symbol here and the "14 grams" in *Pauling* is that both involve numbers.  The conviction in *Pauling* was for possessing the additional 14 grams.  The conviction here was for making a threat with the requisite intent.  The number 88 was, as the Court explained in its April 15, 2021 Order, relevant *evidence* of Defendant's intent, the meaning of his words, and the context of his statement.  The jury did not need to find that the video was in fact 88 seconds long—or, for that matter, that "88" had any significance whatsoever—to convict Defendant under Section 115(a)(1).  The 14 grams in *Pauling*, by contrast, was an *element* of the charged crime, and thus the very thing the evidence at trial needed to, but did not, establish beyond a reasonable doubt.

Defendant also points to his trial testimony that "[he] ha[s] five large bookshelves in [his] room . . . that contain graphic novels," one of which "was created by Siegel and Shuster, who were two Jews," and others of which reflect anti-Nazi themes and positive portrayals of Jewish people. (Def. Reply, Dkt. 109, at 30.)  Defendant argues that because he "spent his time and his money on studying and collecting art that is celebrated for its role in turning the tide against Hitler in World War II, . . . the Government's proffered inferences that [he] is a 'Nazi' or has an 'affinity for Hitler'" (*id.* at 31) are "negated by other evidence" (*id.* at 29).  Again, however, the jury was instructed that while certain evidence about Defendant's views was introduced as potential context for Defendant's allegedly threatening statements, he could not be convicted based on views the jury might find distasteful or offensive.  And, again, the Court "must view the evidence in the light most favorable to the government, credit[] every inference that could have been drawn in the government's favor, and defer[] to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Pauling*, 924 F.3d at 656 (quotations omitted).  Defendant's

argument about the weight of the competing evidence about Defendant's views on Jewish people, anti-Semitism, or Nazism falls precisely within the jury's province.

Defendant next argues that his private text messages with his father and girlfriend did not show the requisite intent under Section 115(a)(1).  (Def. Reply, Dkt. 109, at 32.)  But to the extent Defendant's point is that this evidence was inadmissible, the Court already rejected that contention. *See Hunt*, 2021 WL 1428579, at *6 ("These statements shed light on whether Defendant intended his alleged threats to retaliate against members of Congress on account of the performance of their duties, as well as whether he intended to impede, intimidate, or interfere with them while engaged in the performance of official duties." (quotations and brackets omitted)).  If Defendant is arguing that this evidence was insufficient for the jury to find intent, that argument is beside the point because these text messages were, as explained, not the only evidence of his intent.  And if Defendant's contention is that the jury failed to afford appropriate weight to the text messages, the Court reiterates that it "must . . . defer[] to the jury's . . . assessment of the weight of the evidence." *Pauling*, 924 F.3d at 656 (quotations omitted).

Finally, Defendant relies on the "equipoise" rule the Second Circuit invoked in *United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012), and *United States v. Valle*, 807 F.3d 508, 522 (2d Cir. 2015).  In *Coplan*, the court explained that "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Coplan*, 703 F.3d at 69 (quotations and brackets omitted).  But the Second Circuit has since cautioned that the equipoise rule is of "no matter to [a] sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences."  *United States v. Aquart*, 912 F.3d 1, 44–45 (2d Cir. 2018) (quoting *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir.

2005)) (citing *Cavazos v. Smith*, 565 U.S. 1, 7 (2011)).  "Thus, [the Second Circuit has] held the equipoise rule to apply only where evidence is nonexistent or so meager as to preclude the inferences necessary to a finding favorable to the government." *Id.* (quotations omitted).  In *Valle*, for example, the court affirmed that the evidence of the defendant's intent to carry out the crime in question was insufficient only because it was "indistinguishable" from evidence that the defendant merely fantasized about committing the crime.  807 F.3d at 516; *see also United States v. Lorenzo*, 534 F.3d 153, 160 (2d Cir. 2008) (noting "the absence of *any* evidence" supporting the inference that the defendant intended to further a cocaine-smuggling conspiracy (emphasis added)).

Defendant essentially argues that the jury could have drawn each inference advocated by the defense just as easily as (or more easily than) it could have drawn the Government's requested inferences.  But, again, it is not for the *Court* to decide which of the parties' competing inferences is more likely correct; rather, the Court must "credit[] every inference that *could* have been drawn in the government's favor," *Pauling*, 924 F.3d at 656 (emphasis added) (quotations omitted), and only then determine whether the evidence was sufficient for the jury to find guilt beyond a reasonable doubt.  Here, the evidence sufficiently supported the inference that Defendant intended his statement "to impede, intimidate, . . . interfere with," or "retaliate against" public officials.  18 U.S.C. § 115(a)(1).  That the jury *could* have drawn the opposite conclusion does not matter.  *See, e.g.*, *MacPherson*, 424 F.3d at 190 ("[W]here either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." (quotations omitted)).

Further, even if Defendant properly characterized the Rule 29 standard, he makes little effort to argue that the evidence as a whole was in equipoise; rather, he challenges each piece of

evidence individually.  For example, Defendant argues that the evidence of his alleged affinity for anti-Semitic themes fails to show he intended to retaliate against what he described as a "Zionist Occupied Government" because, as discussed, he also collected works by Jewish authors.  He contends that these competing pieces of evidence create at most "a tie in the battle of inferences." (Def. Reply, Dkt. 109, at 29.)  But even if Defendant were right that these pieces of evidence could not, as a matter of law, prove intent beyond a reasonable doubt, the Government did not rely solely on this evidence to prove intent.  In determining whether a rational jury could have convicted, the Court must look at *all* of the intent evidence and decide whether it "is nonexistent or so meager that no reasonable jury could find [the requisite intent] beyond a reasonable doubt."  *Martoma*, 894 F.3d at 72 (quotations omitted).  That some individual pieces of evidence, standing alone, arguably yield equally plausible competing inferences is beside the point.

### III.  Appeals to Free Speech Principles

Finally, Defendant urges the Court to "enter a judgment of acquittal here even though it means tolerating ideas that hurt, offend, and may even tempt others to violence."  (Def. Mot., Dkt. 97, at 5.)  Relying on cases such as *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992), and *Snyder v. Phelps*, 562 U.S. 443 (2011), he argues that "this tolerance is what 'makes America great,' and that [he] and all of society is better served by his learning this lesson through the natural consequences that befall those who carelessly or foolishly challenge the prevailing narrative."  (Def. Mot., Dkt. 97, at 5.)  He describes his statement not as "the planning of a slaughter," but as espousing "lofty principles of revolution." (Def. Reply, Dkt. 109, at 18.)  He concludes by comparing the "decades of mass incarceration" and "destabilization" of primarily "Black and Brown" people, caused by "the Drug War," to the potential "cost" of what he calls the "War on Speech."  (*Id.* at 43.)

54

Even leaving aside that Defendant titled his video, "Kill Your Senators" and captioned it, "Slaughter them all," his characterization of his statement as "lofty principles of revolution" rather than the "planning of a slaughter" (*Id.* at 18) is simply misplaced and misleading. In fact, the Court gave the very instruction that undergirds the First Amendment jurisprudence Defendant invokes: "the First Amendment protects vehement, scathing, and offensive criticism of public officials, including Members of Congress," as well as "political exaggeration or expressions of opinion," and even "advocacy of the use of force or violence." (Jury Instructions, Dkt. 92, at 17.) The Court further charged the jury that, to convict, it needed to find that an "ordinary, reasonable person who heard or read [Defendant's] statement, and who [was] familiar with the context of the statement, would understand it as a serious expression of an intent to inflict bodily injury," and that "Defendant acted with the intent to impede, intimidate, . . . interfere with . . . or retaliate against the officials on account of the performance of their official duties." (*Id.* at 17, 20–21 (adopting *Turner*'s language that "[t]his Circuit's test for whether conduct amounts to a true threat is an objective one—namely, whether an ordinary, reasonable recipient who is familiar with the context of the communication would interpret it as a threat of injury," 720 F.3d at 420 (quotations and brackets omitted), and the language of Section 115(a)(1)(B) requiring the intent "to impede, intimidate, . . . interfere with . . . or . . . retaliate against [public officials] on account of the performance of official duties").) Thus, as the Second Circuit explained in *Kelner*, "to convict under the charge given, the jury had to, and [the Court] must assume did, find that the statements were more than political, that they were 'an expression of an intention to inflict' injury." 534 F.2d at 1025.

Defendant's argument flouts *Kelner*'s admonition and asks the Court to assume that the jury convicted him not for violating the statute as instructed to apply it by the Court, but—contrary

to the Court's instructions—for expressing "ideas that hurt, offend[ed], [or] tempt[ed] others to violence." (Def. Mot., Dkt. 97, at 5.)  However, the Court must assume the jury convicted Defendant based on the charge given.  *See Kelner*, 534 F.2d at 1025.  The only question at this stage of the proceedings is whether the evidence supports the conviction.  The Court finds that it does.  That Defendant would characterize his statements differently than the jury is irrelevant because that determination is ultimately reserved "for the trial jury."  *Turner*, 720 F.3d at 419 (quotations omitted).

Defendant's argument also presents a circular view of the First Amendment.  While, as Defendant notes, "[t]he First Amendment generally prevents government from proscribing speech . . . because of disapproval of the ideas expressed," *R.A.V.*, 505 U.S. at 382, it does not protect otherwise criminal speech—*e.g.*, true threats—simply because the "ideas expressed" warrant disapproval.  Defendant is of course free to express sentiments that challenge what he perceives to be "the prevailing narrative" (Def. Mot., Dkt. 97, at 5), but he is not free to make certain threats against public officials in doing so, *see* 18 U.S.C. § 115(a)(1)(B).  Regardless of any political messages Defendant *also* included in his January 8, 2021 video, a jury reasonably could have convicted him because he added: "we have to show up with our guns and we need to slaughter these motherfuckers," "literally just spray these motherfuckers," "we have to kill them," "put some bullets in their fucking heads," and "I will go there myself and shoot them and kill them." (Tr. 221:17–21; GX 21, 21T.)  Although Defendant is right that a politically unpopular statement is not thereby a true threat, he is wrong in his apparent suggestion that a statement is protected speech *because* it includes language that is politically unpopular.

Finally, Defendant's comparison of the hypothetical "cost" of the "War on Speech" to the mass-incarceration and "destabilization" of people belonging to racial minorities is troubling.

56

Even taking this comparison at face value, Defendant points to no evidence that the federal government has sought—or will seek—to stifle politically unpopular speech through the mass-incarceration of historically disadvantaged minority groups—presumably the specter Defendant seeks to evoke.[27]   Nor does the Court understand Defendant's seeming appeal to the Court to intervene to protect those who threaten Democratic politicians from experiencing the treatment of "Black and Brown" people affected by "the Drug War."   In any event, Defendant does not challenge Section 115(a)(1)(B) on Equal Protection grounds.

In short, Defendant's invocation of free speech and fair justice principles does not alter, and should not obscure, the simple fact that, in this case, the jury rationally found that Defendant violated a federal law.  To the extent he asks the Court to nullify his conviction because he objects to the policy behind that law, the Court declines his request.

## CONCLUSION

For the foregoing reasons, the Court denies Defendant's motions under Federal Rules of Criminal Procedure 29(b) and (c).

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: November 18, 2021
        Brooklyn, New York

---

[27] The Court feels compelled to note that Defendant is white, as were most people seen storming the Capitol on January 6, 2021.