**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMP:DKK/ICR/FJN
F. #2021R00059

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 18, 2021

By ECF and Email

The Honorable Pamela K. Chen
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Brendan Hunt
Criminal Docket No. 21-086 (PKC)

Dear Judge Chen:

The government respectfully submits this memorandum in advance of sentencing in the above-captioned case and in response to the defendant's November 9, 2021 sentencing memorandum (Def. Mem., ECF No. 128). For the reasons below, the Court should reject the defendant's request for an exceptionally lenient sentence of time-served, which would amount to a roughly 80% variance below the low-end of the advisory United States Sentencing Guidelines range of 51-to-63 months' imprisonment calculated in the Presentence Investigation Report ("PSR").

## I. The Defendant's Lack of Remorse and Failure to Acknowledge the Seriousness of His Crime

In his sentencing memorandum, the defendant continues to deny the wrongfulness of his actions and the seriousness of his crime. His rejection of the jury's verdict and his repeated attempts to characterize his unlawful threats as merely incendiary political rhetoric only underscore the need for the sentence imposed to promote respect for the law and to achieve specific and general deterrence.

At trial, the defendant's testimony about his "Kill Your Senators" reflected no remorse for his actions or appreciation for their consequences. He said of the video that:

> it wasn't really a serious proposition that I was saying; it was kind of just like playing along with this sort of rhetoric that was going

> around at the time, and there wasn't any kind of intent on my part to sort of galvanize a militia.
>
> I'm not a political leader or a military leader of any kind. I'm sort of just a YouTube guy who makes controversial content and clickbait videos.

(Tr. 859.) The defendant also expressed regret not for threatening to murder Members of Congress, not for attempting to place them in fear for doing their jobs, but for the "inappropriate" and "careless and immature" language he used and the "irresponsible" things that he said (Tr. 823, 862), that "add[ed] a lot more fuel to an already raging political inferno in this country." (Tr. 824.) In other words, the defendant regrets that his "careless" statements inflamed an emotional response in others, but his testimony showed no remorse for his threats that were intended to place Members of Congress in fear for their lives.[1]

The defendant's sentencing memorandum continues his effort to deny his guilt by attempting to discredit the jury's verdict and to minimize the seriousness of his offense. Once again, the defendant characterizes his unlawful threats to murder Members of Congress as deliberately outlandish statements that are merely an iteration of the "incendiary rhetoric" that marks some of the dark corners of our nation's political discourse. (Def. Mem. at 4-6.) For example, the defendant quotes statements made by various public figures that suggest or imply that listeners or readers should commit violent acts against political opponents, and asserts that "[t]his incendiary rhetoric by political leaders has shifted discourse norms in our country," before rhetorically asking "how does the First Amendment bend to protect speech when the bar for appropriate public discourse has been lowered so far?" and asserting that "[t]he appetite for insulting and even threatening content that has emerged over the past few years would leave anyone confused about the bounds of decency, much less of law, in the political arena." (Def. Mem. at 6.)

This argument, that the defendant's threats were just "crude" political speech in some grey area between indecency and criminality, was presented to and swiftly rejected by the jury. In summation, the defense argued this point to the jury, characterizing the defendant's "Kill Your Senators" video as "criticism" of Members of Congress, and arguing that "Judge Chen will also instruct you that the First Amendment protects mere advocacy of the use of force or violence.

---

[1] Although the defendant's attorneys claim to appreciate the seriousness of the defendant's offense conduct, there is little, if any, indication that the defendant himself does. The defense sentencing memorandum begins by stating that "<u>We</u> have considered the seriousness of the conduct at issue, and acknowledge how very wrong it was, regardless of the ultimate constitutional issues at stake." (Def. Mem. at 1 (emphasis added).). But the defense memorandum does not say that the defendant himself joins in defense counsel's appreciation of the wrongfulness of his conduct. Surely the same defendant who looked directly into a camera and told over 500 viewers "If anybody has a gun, give me it, I will go there myself and shoot them and kill them" would be capable of a clearer expression of remorse if he were, in fact, remorseful.

It's something Brendan has a right to say. And if he has a right to say it, it cannot be a crime." (See Tr. 999-1000.)

Indeed, the jury was specifically instructed that

> the First Amendment protects vehement scathing and offensive criticism of public officials, included Members of Congress. The First Amendment therefore protects political exaggeration or expressions of the opinion. Further, the First Amendment protects mere advocacy of the use of force or violence.

(Tr. 1129.) The jury was instructed that to convict the defendant, the government was required to prove beyond a reasonable doubt that his "Kill Your Senators" video was a "true threat," that is, a statement:

> made under such circumstances that an ordinary, reasonable person who heard or read the statement, and who is familiar with the context of the statement, would understand it as a serious expression of an intent to inflict bodily injury.

(Id.)

The jury rejected the defendant's view of the evidence and found that the government had proven beyond a reasonable doubt that the defendant's statements were not merely incendiary political speech, but intentional and unlawful threats.

The defendant's sentencing memorandum also minimizes his offense conduct by claiming that the defendant's threats in the "Kill Your Senators" video were the product of a "perfect storm of factors that triggered an online rant into the void." (Def. Mem. at 2.) The argument that the defendant's threats were the isolated result of a "perfect storm" ignores the extensive evidence that the defendant's "Kill Your Senators" video was the crescendo of the defendant's months-long study of white supremacist and anti-Semitic propaganda which led him to the belief—that he espoused in the video itself—that the United States Government is controlled by a Jewish conspiracy that wanted to remove former President Trump from power. Indeed, the defendant's sentencing memorandum ignores the other threatening statements he made contemporaneously with the "Kill Your Senators" video. (See Gov't Mem. at 5-6, 10-11, ECF No. 127.) The defendant's extraordinarily explicit and vividly threatening statements against Members of Congress were the culmination of numerous similarly violent and threatening statements the defendant made during the period following the election.

Fundamentally, the defendant's sentencing arguments are a rejection of the jury's verdict, demonstrating that even after a jury trial he still does not believe that his threats to murder Members of Congress were wrong. He regrets little other than getting caught. The fact that the defendant persists in denying that his actions were criminal makes it more likely that he will engage

in similar conduct in the future and increases the need for the sentence imposed to deter the defendant and provide just punishment for the offense.

II. The Defendant Has Identified No Significant Mitigating Evidence

In seeking a far-below-Guidelines sentence, the defendant asserts without evidence that some of the Bureau of Prisons ("BOP") disciplinary violations he has incurred during his short time in custody are the product of a vindictive conspiracy perpetrated by officials at the Metropolitan Detention Center ("MDC") to abuse him (Def. Mem. at 16-18), and criticizes the government for not eliciting at trial irrelevant evidence of his passion for comic books, writing stories and other creative endeavors (Def. Mem. at 6-11). Neither of these arguments mitigates the seriousness of his offense or the sentence needed to achieve the statutory purposes of sentencing.

First, based entirely on the defendant's retained consultant's review of MDC records, the defendant asserts that the BOP disciplinary violation he incurred for assaulting another inmate and the BOP's use of force in two incidents were unjustified. (Def. Mem. at 2 (claiming that BOP conclusion he assaulted a fellow inmate is "untrue"), 16-18; Exh. A, Decl. of Maureen Baird.) But the sum total of Ms. Baird's conclusions from the cold record presented to her by defense counsel is that she has questions about what happened. (See, e.g., Exh. A, ¶¶ 54-56 (stating that she found "the official justification given in the BOP record for the two uses of force here is of questionable reliability," "My review raises concerns about whether the uses of force were motivated by something other than the official justifications given," "These should be referred for further investigation. . . . .").) Indeed, in her report Ms. Baird explicitly states that she "offer[s] no opinion regarding the lawfulness or unlawfulness of staff actions, which would require a full scale investigation." (Exh. A, ¶ 9.)

Notably, although Ms. Baird questions the BOP's official justification for the use of force against the defendant in the two incidents she reviewed, she did not interview the defendant about what occurred, even though he retained her and is an eyewitness to those events. Nor has the defendant submitted an affidavit or declaration under oath that would create a material factual dispute regarding these events. Simply put, the defendant has presented no evidence that would be sufficient to establish that he is the victim of a vindictive conspiracy by BOP employees that could be considered mitigating by the Court at sentencing.

Second, the defendant accuses the government of painting a distorted picture of him at trial by introducing evidence of the defendant's consumption of white supremacist and anti-Semitic propaganda, but not introducing other irrelevant evidence of the defendant's amateur creative endeavors. (Def. Mem. at 6-11.) The defendant had the opportunity, as all defendants do, to examine the government's witnesses and evidence, and to introduce his own. The defendant did so, introducing both documents and testimony that he presumably believed to be exculpatory. That he made the strategic choice not to introduce additional evidence is no reason to blame the government for failing to introduce it for him.

Moreover, the evidence the defendant introduced on his own case further proved what he is now trying to deny. For example, in his own effort to educate the jury about his varied interests, the defendant also admitted that he was familiar with the fact that the number "88" is a

white supremacist numerical code for "Heil Hitler." (Tr. 868 ("Q: 88 that's a code for Heil Hitler?" "A Yeah, I'm familiar with that. Yeah." "Q: You know that's a code for Heil Hitler; right?" "A Yeah.").) And when the government showed him one of the many white supremacist and anti-Semitic memes that the defendant collected on an external hard drive, the defendant immediately identified it ("That's a popular one, it's called Hipster Hitler") and readily acknowledged that it depicted Adolf Hitler, the perpetrator of a horrific genocide against the Jewish people, using a racial slur and threatening to "fix this lefty [slur omitted] shit hole in 24 hours." (Tr. 897-898, GX 211.) The defendant faults the government for showing some memes he downloaded, but not others, ignoring the more important point: he consciously chose to view, download, and familiarize himself with numerous white supremacist and anti-Semitic memes.

While the defendant's interests may be varied, the ones that mattered to the jury's assessment of the defendant's motives and intent in committing this offense were established by the government at trial. The government agrees that offensive political views are no reason to impose a significant prison sentence; but that is not what the government seeks here. To the contrary, the same motives and intent that animated the defendant's offense conduct likewise matter at sentencing in the Court's assessment of the risk the defendant presents of re-offending. The fact that the defendant espoused anti-Semitic conspiracy theories of a "ZOG government" as he threatened to murder Members of Congress only increases the risk that the same extremist beliefs will likewise motivate him to take similarly extreme and unlawful action in the future.[2]

The government respectfully submits that neither the defendant's extensive knowledge of comic books, nor his fondness for amateur creative writing and drawing projects mitigates the seriousness of his unlawful threats to murder Members of Congress, which were motivated at least in part by his white supremacist and anti-Semitic beliefs.

## III. The Other Sentences Identified by the Defendant are Not Comparable

In support of his request that the Court impose a sentence of time-served—a 10-month sentence that would reflect a roughly 80% variance below the low-end of the 51-to-63-month Guidelines range—the defendant cites recent sentences imposed in six cases in which defendants were charged with several different offenses that the defendant believes are comparable to his offense. (Def. Mem. at 21-23). They are not comparable.

In contrast to the defendant in this case, the defendants in each of the purportedly "comparable" cases identified by the defendant accepted responsibility for their crimes and pleaded guilty to the charged offenses. As a result, not only was the Guidelines range in each case reduced to account for the defendant's acceptance of responsibility, but also the sentencing judge appropriately considered the defendant's contrition in weighing the statutory sentencing factors under 18 U.S.C. § 3553(a). Beyond a court's consideration of the advisory Guidelines range, acceptance of responsibility is highly relevant to a court's assessment of the need for the sentence imposed to promote several statutory sentencing factors. A sentencing judge considering what

[2] Notably, the jury was presented with, and rejected, the defendant's argument that his reference to "ZOG" was not an invocation of a white supremacist concept but rather a protest against United States support for Israel.

sentence is necessary for a defendant who has admitted wrongdoing and demonstrated remorse may reasonably conclude that a lesser term of imprisonment is sufficient to serve the purposes of sentencing. Conversely, a sentencing judge may reasonably conclude that (1) a convicted defendant who continues to insist that he has done nothing wrong in making vivid and violent threats against elected officials does not appreciate the seriousness of his conduct and is more likely to re-offend; (2) a lower sentence would undermine respect for the law that the defendant continues to defy, and (3) general deterrence would be undermined if the public were to see such a defendant given lenient (let alone exceptionally lenient) punishment.

While the defendant cites the Guidelines sentencing ranges calculated in these allegedly comparable cases, the defendant's memorandum does not engage with the Guidelines range calculated in the PSR based on the defendant's own conduct. Based on the defendant's relevant conduct in this case, the Guidelines advise a sentencing range of 51 to 63 months' imprisonment, which reflects the application of several enhancements because the manner in which the defendant committed this offense is more severe than a generic case to which only the base offense level would apply.

In contrast to the Guidelines range indicated in this case, the cases cited by the defendant involved Guidelines sentencing ranges that were considerably lower based on the unique facts and circumstances applicable to each case. Even more important, the sentences imposed in those cases were largely within the applicable Guidelines range. In United States v. Troy Smocks, No. 21-CR-198 ECF No. 64 (D.D.C. Nov. 4, 2021) (defense motion to correct sentence), the defendant was sentenced to 14 months' imprisonment, at the top of the 8–14-month range advised by the Guidelines. (See Def. Mem. at 21.) In United States v. James Dale Reed, No. 20-CR-406 ECF No. 35, 37 (D. Md.), the defendant was sentenced to 7 months' imprisonment, again within the sentencing range of 6-12 months' imprisonment advised by the Guidelines. (See Def. Mem. at 22.) In United States v. Kao Xiong, No. 18-CR-235 (E.D. Cal.), the sentence was similarly within the Guidelines range of 10-16 months, and in United States v. Patrick Carlineo, No. 19-CR-6140 ECF Nos. 44, 70 (W.D.N.Y. Mar. 10, 2020), the defendant was sentenced to a year and a day, also within the Guidelines range of 12-18 months. (See Def. Mem. at 23.) In other words, the defendants in the cases on which this defendant relies did not enjoy the 80% downward variance that this defendant now seeks.

Moreover, Section 3553 requires a sentencing judge to sentence the defendant before the court as an individual. There are indications in the sentencing records that, in some of the cases cited by the defendant, the court took account of case-specific mitigating factors not present here. For example, nearly a quarter of the defendant's sentencing submission in United States v. Celli, No. 19-CR-127, ECF No. 172 (E.D.N.Y. July 9, 2021), in which the government agreed to a below-Guidelines sentence of time-served, is a redacted discussion of the defendant's mental health treatment. In United States v. Brogan, No. 19-CR-207, ECF No. 21 (E.D.N.Y. Sept. 13, 2019), the government acknowledged in its sentencing letter that it had erred in the plea agreement when it initially estimated the Guidelines range at 6-12 months and conceded that the Probation Department had correctly calculated the range at 18-24 months. Brogan argued for a lower Guidelines range and sought a downward departure because he provided essential caretaking and financial support to his elderly mother who had dementia and his older brother who had severe autism and an intellectual disability. (See id. ECF No. 22.) The court ultimately imposed a sentence of three years' probation. By contrast, this defendant has limited family ties and no

members of his family (or friends) have provided letters of support for the Court's consideration at sentencing.

In sum, the sentencing judgments reflected in the cases identified by the defendant in his submission are not comparable to the sentencing considerations presented to this Court by this defendant's conduct. As a result, they provide no basis for the kind of sentence the defendant seeks.[3]

## IV. Conclusion

For the foregoing reasons, the government respectfully submits that the time-served sentence requested by the defendant would fail to adequately serve the purposes of sentencing. The government submits that the Court should impose a term of imprisonment within the Guidelines range of 51 to 63 months' imprisonment to provide just punishment for this serious offense, to promote respect for the law, to deter the defendant from future criminal conduct, to protect the public from further crimes of the defendant, and to deter others from engaging in similar conduct in the future.

Respectfully submitted,

BREON PEACE
United States Attorney

By: /s/ Ian C. Richardson
David K. Kessler
Ian C. Richardson
Francisco J. Navarro
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of Court (PKC) (by ECF)
Jan A. Rostal, Esq. and Leticia Olivera, Esq. (by ECF and Email)
Gregory Giblin, United States Probation Officer (by Email)

---

[3] The defendant's other arguments about mitigation are similarly unpersuasive. He simply asserts, without explanation, that he will not be able to receive any mental health treatment while serving a prison sentence. (Def. Mem. at 18.) He also argues that he has been sufficiently punished given the loss of his job and reputation, setting aside that the vast majority of defendants face similar consequences. (Def. Mem. at 20.) And his oddly phrased suggestion that drug use "seem[s] to have played some role in the crime" is wholly unsupported by the record. (Def. Mem. at 11.)